JUDGE DANIELS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 13 CIV 1174

U. S. COMMODITY FUTURES
TRADING COMMISSION,

        Plaintiff,

        v.

WILLIAM BYRNES,
CHRISTOPHER CURTIN, and
THE NEW YORK MERCANTILE
EXCHANGE, INC.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION NO._____

COMPLAINT FOR
INJUNCTIVE AND OTHER
EQUITABLE RELIEF AND
CIVIL MONETARY
PENALTIES UNDER THE
COMMODITY EXCHANGE
ACT

JURY TRIAL DEMANDED

RECEIVED
FEB 21 2013
U.S.D.C. S.D. N.Y.
CASHIER

      As and for its Complaint, Plaintiff U.S. Commodity Futures Trading Commission

("Commission" or "Plaintiff"), alleges as follows:

## I.  SUMMARY

    1.     The New York Mercantile Exchange, Inc. ("CME NYMEX") is one of the

world's most widely used commodity futures and options exchanges, serving market

participants from around the globe.  Defendant CME NYMEX provides a platform to customers

named CME ClearPort that provides clearing services, including clearing of futures and options

transactions.  In using the platform, customers submit trades to CME NYMEX employees who

sit on the CME ClearPort Facilitation Desk.

    2.     CME ClearPort customers provide material nonpublic information to Defendant

CME NYMEX for the purpose of clearing trades through CME ClearPort and expect and trust

that information they provide in confidence to CME NYMEX will be held in confidence, and

not disclosed to third parties. The law requires as much. As alleged below, CME NYMEX and two of its employees violated that law.

3.      This case arises from dozens of unlawful disclosures of material nonpublic trading and customer information by employees of Defendant CME NYMEX to a commodity broker over a period of several years.

4.      During the relevant period, Defendant CME NYMEX employed Defendants William Byrnes and Christopher Curtin, who worked on the CME ClearPort Facilitation Desk and were responsible for facilitating customer transactions reported for clearing through the CME ClearPort system. As employees of CME NYMEX, Byrnes and Curtin had lawful access to material nonpublic information that they received from brokers and/or the principals in transactions, which they were required by law to keep confidential.

5.      As explained on the website of the CME Group, which owns and operates Defendant CME NYMEX, CME ClearPort provides clearing and settlement services for exchange-traded contracts, as well as for over-the-counter derivatives transactions.

6.      The information unlawfully disclosed by Defendants Byrnes and Curtin included, among other things, details of recently executed trades, the identities of the parties to specific trades, the buy or sell side of each party to specific trades, the identities of the brokers involved in certain trades, the number of contracts traded, the prices paid, the structure of particular transactions, and the trading strategies of market participants. This information was both nonpublic and material under the Commodity Exchange Act (the "Act") and Commission Regulations, and the disclosures were made to a commodities broker (hereinafter "broker X") who was not authorized to receive the information.

7.     CME NYMEX informed CME ClearPort customers that information submitted to
Clearport about their trades would not be made public.  In particular, the CME ClearPort User
Agreement states that "[a]ny and all non-public information in any form obtained by the
Exchange . . . including, but not limited . . . Exchange Data shall be deemed to be confidential."
The User Agreement defines "Exchange Data" as including, among other things, all price and
other trade-related data.  The User Agreement further states that the Exchange "agrees to hold
such information in strict confidence and not to disclose such information to third parties (other
than to its employees, its affiliates, their employees or its agents) or to use such information for
any purpose whatsoever other than as contemplated by this Agreement and to advise each of its
employees, affiliates and agents who may be exposed to such proprietary and confidential
information of their obligations to keep such information confidential."

8.     In making their unlawful disclosures, Defendants Byrnes and Curtin provided
broker X with nonpublic information that was not otherwise available to market participants.

9.     According to a CME NYMEX Managing Director responsible for the CME
ClearPort Facilitation Desk ("Managing Director"), maintaining the confidentiality of the type
of nonpublic information that Byrnes and Curtin disclosed is the "lifeblood" of an Exchange
such as CME NYMEX, prohibitions against disclosing such information to unauthorized
persons are "the most important thing to the business in general" of an Exchange, and disclosing
such information as Byrnes and Curtin did is "a humongous deal."

10.     In July 2009, a market participant complained to CME NYMEX that it believed
nonpublic information had been disclosed to third parties by a CME NYMEX employee named
"Billy," which was Byrnes' nickname.  That complaint was investigated by the Managing
Director.  The CME NYMEX's and the Managing Director's investigation of the complaint

comprised principally reviewing certain of Byrnes' phone calls and emails from just one day. CME NYMEX never questioned Byrnes concerning the complaint or took any additional steps designed to determine whether Byrnes had been engaged in such egregious misconduct. Thereafter, Byrnes' misconduct continued until at or about the time Byrnes was terminated in December 2010 after yet another market participant made a similar complaint to CME NYMEX. Ironically, CME NYMEX promoted Byrnes in the interim and had him train other employees on CME NYMEX's confidentiality policies.

## II.     JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which authorizes the Commission to seek injunctive relief against any registered entity or other person, or to enforce compliance with the Act, or any rule, regulation, or order thereunder, whenever it shall appear to the Commission that such registered entity or other person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

12.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), in that the defendants are found in or are inhabitants of or transact business in this District and the acts and practices in violation of the Act, or any rule, regulation or order thereunder, have occurred, are occurring, or are about to occur within this District.

### III.    THE PARTIES

13.    Plaintiff **U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged with the responsibility of administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1.1 *et seq.*, and the regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.*

14.    Defendant **William Byrnes,** known as "Billy", is an individual who, upon information and belief, resides in New York, New York.   From in or about March 2007 until on or about December 2, 2010, Byrnes was an employee of Defendant CME NYMEX. CME NYMEX terminated Byrnes' employment on or about December 2, 2010, because of his disclosure of material nonpublic information to broker X, who was not authorized to receive such information. At the time of his termination Byrnes held the position of supervisor on the ClearPort Facilitation Desk. Byrnes has never been registered with the Commission in any capacity.

15.    Defendant **Christopher Curtin** is an individual who, upon information and belief, resides in New York, New York. Curtin was an employee of Defendant CME NYMEX from in or about July 2000 to in or about April 2009. At the time he left CME NYMEX, Curtin held the position of Associate Director of the Globex Control Center. Curtin was registered from 1994 through 1999 as an associated person of two different firms, but has since not been registered with the Commission in any capacity.

16.    Defendant **CME NYMEX** is a Delaware Corporation and has been during all relevant periods a board of trade designated as a contract market and self-regulatory organization. CME NYMEX is located in New York, New York, and is owned and operated by the CME Group, which provides a wide range of benchmark futures and options products,

owning and operating the Chicago Mercantile Exchange, Chicago Board of Trade, and the COMEX markets, in addition to CME NYMEX.

## IV.    FACTS

**A.    Defendants' Access to Material Nonpublic Data on the ClearPort System**

17.    The CME ClearPort electronic platform was launched in 2002.  The platform provides clearing and settlement services for exchange-traded contracts and over-the-counter derivatives transactions.  There are more than 1,000 listed contracts available for clearing via CME ClearPort, including in energy, metals, and agricultural commodities. Over 400,000 contracts were cleared daily on CME ClearPort during the relevant period.

18.    Multiple methods are available to individuals or entities entering trades for clearing through CME ClearPort (referred to herein as "market participants").  The three primary methods are (1) in a brokered transaction a broker will enter a transaction between two market participants via ClearPort's web-based interface; (2) in a non-brokered transaction one of the market participants can confirm the trade with the other participant and process the trade; or (3) the parties to a trade can be matched by a third-party matching platform, which submits the trade over the internet directly into CME ClearPort.

19.    CME ClearPort has an associated trade blotter containing detailed information for all trades entered into the CME ClearPort system, including the identities of the parties to the trade and the broker (if any) that entered the trade into the system; the side of each party to the trade (buy or sell); and the price, volume and terms of the trade.

20.    Much of the information contained in the CME ClearPort trade blotter is confidential and not available to the public.  Access to information about trades cleared through CME ClearPort is restricted, such that certain information is available only to the parties to a

6

trade, to the broker (if any) that submitted the trade and to the clearing member clearing the trade.

21.    For example, a trading firm can access trade blotter information only about trades conducted by that firm, and brokers who submit trades can obtain information only about their client's side of the trade, *i.e.*, the buyer in a transaction cannot lawfully be given access to information about the seller's side of the trade and vice versa. A broker's access is limited to the specific trades the broker submitted for its clients. Thus, a broker does not have access to CME ClearPort trade blotter information for trades its clients submitted via other brokers or for trades submitted to CME ClearPort through other means.

22.    Only certain information about trades cleared through CME ClearPort is publicly available. Defendant CME NYMEX publishes the daily volume of trading in each contract cleared through CME ClearPort, but does not, for example, identify the names of the entities that traded a particular contract, the number of different market participants that comprised the trading volume in a product or the number of trades that constituted the day's total trading volume in a product, the size or price of individual transactions, or which individual traders executed transactions in a particular contract for a given market participant.

23.    Defendants Byrnes and Curtin, through their positions as employees of Defendant CME NYMEX, had access to material nonpublic information contained in, for example, the CME ClearPort trade blotter. This information is material information as the term is defined under Commission Regulation 1.59(a)(5), which states that material information includes, but is not limited to, "information relating to present or anticipated cash, futures, or option positions, trading strategies, the financial condition of members of self-regulatory organizations or

members of linked exchanges or their customers or option customers, or the regulatory actions

or proposed regulatory actions of a self-regulatory organization or a linked exchange."

24.    The policies governing Defendants Byrnes and Curtin's employment with CME

NYMEX, including the CME's Code of Conduct, recognize that trade data of the type that

Byrnes and Curtin disclosed is nonpublic information that must be kept confidential.

25.    For example, CME's Code of Conduct states that "any information you receive

about CME Group or about CME Group's customers or others through your employment with

CME Group is confidential and, therefore, should not be disclosed or made public. You have

an obligation to safeguard confidential information, whether generated internally or acquired

from others, and to use it only in the performance of your employment responsibilities."

26.    Similarly, Defendant CME NYMEX's Employee Handbook stated:

> Information about NYMEX, [and] its customers . . . is to be kept confidential and
> divulged only to individuals within the Exchange with both a need to receive and
> authorization to receive the information. . . . Confidential information includes,
> but is in no way limited to . . . the identity of . . . and any other account
> information on customers.

27.    Before they made their illegal disclosures Defendants Byrnes and Curtin each

signed a written acknowledgment stating that they had received, read, and understood their

obligations and responsibilities under Defendant CME NYMEX's Employee Handbook.

28.    Defendant Byrnes signed a confidentiality agreement with Defendant CME

NYMEX as part of his employment, which stated that Byrnes:

> will keep secret and retain in strictest of confidence, and shall not use for my
> benefit or the benefit of others, except in connection with the business and
> affairs of NYMEX and its affiliates, all confidential matters relating to
> NYMEX's business and the business of any of its affiliates and the business of
> NYMEX's members and their customers learned by me heretofore or hereafter
> directly or indirectly from NYMEX or any of its affiliates including, but not
> limited to, the participation, positions, margining, deliveries, brokerage
> relationships or any other trading information relating to business conducted on

8

NYMEX by or through NYMEX Members, NYMEX Member Firms or public customers (the "Confidential NYMEX Information"), and I will not disclose such Confidential NYMEX Information to anyone outside of NYMEX except with NYMEX's express written consent.

29.     Defendant Curtin also signed a Conflicts of Interest Guidelines Acknowledgment form, dated August 16, 2000, as part of his employment with Defendant CME NYMEX, which stated, in pertinent part, that Curtin:

will not reveal at any time to anyone any information of a confidential nature which is not available to the public, including but not limited to, the participation, positions, margining, deliveries, brokerage relationships or any other trading information relating to business conducted on the Exchange by or through Exchange members, member firms or public customers which information came to my knowledge either directly or indirectly as a result of my employment with the Exchange.

**B.     Defendant Byrnes' Unlawful Disclosure of Material Nonpublic Information**

30.     Defendant Byrnes' responsibilities as a CME NYMEX employee included ensuring that ClearPort registrants received timely and accurate assistance in resolving issues involving the use of the CME ClearPort platform, including the review, reconciliation and, where necessary, the correction of trades input into the ClearPort system.

31.     To perform his official duties as a CME NYMEX employee, Defendant Byrnes had access to CME NYMEX computer systems, including the CME ClearPort trade blotter, containing material nonpublic information regarding the trading activities of CME NYMEX customers. Byrnes used his access to these computer systems to obtain the material nonpublic information that he disclosed to broker X, who was not authorized or otherwise entitled to receive the information.

32.     On at least 60 occasions, from at least in or about February 2008 to at least in or about September 2010, Defendant Byrnes knowingly and willfully disclosed material nonpublic information about trades cleared through CME ClearPort and about CME ClearPort customers

and/or about other CME NYMEX trading and customers to broker X. The dates on which Byrnes made disclosures of material nonpublic information to broker X on recorded phone lines are listed in Exhibit A, attached.

33.    The material nonpublic information Defendant Byrnes disclosed included the identities of the parties to specific trades, the identity of the broker that entered the trades into the systems, the side of each party to the trades (buy or sell), the number of contracts traded, prices and the structure of particular transactions, trading strategies of certain market participants, and information relating to futures and options positions of various market participants.

34.    The information Defendant Byrnes disclosed is material information as defined in Commission Regulation 1.59(a)(5).

35.    Defendant Byrnes willfully and knowingly disclosed material nonpublic information to broker X that should not have been disclosed to that broker or to other unauthorized persons.

36.    A telephone conversation between Defendant Byrnes and broker X on or about May 15, 2009, exemplifies Byrnes' disclosures of material nonpublic information to broker X:

| Broker X: | Quick question. Cal 10 flat [i.e., options related to crude oil futures contracts] calls traded yesterday – one hundred a month - who was it?  WA Cal ten flat calls.  Tell me what price, what brokers, who bought, who sold . . . |
|---|---|
| Byrnes: | Cal ten flat calls . . . one hundred lots . . .55 (inaudible) a month. . . January 10 through Dec 10.  [States name of the buyer] buys, [states name of the seller] sells. [States name of the broker]. |
| Broker X: | Who bought? |
| Byrnes: | [States name of the buyer] |
| Broker X: | What's his name again? |

Byrnes:        [States name of the individual trader at the buyer firm].

37.     Defendant Byrnes and broker X were aware that Byrnes' CME NYMEX

telephone line was recorded by Defendant CME NYMEX.  To avoid being recorded, from time

to time Byrnes and broker X communicated via cell phones so that Byrnes could disclose

material nonpublic information about CME NYMEX trading and customers without using a

recorded line.  In fact, on multiple occasions in 2010, broker X called Byrnes on a recorded

telephone line and told Byrnes he was going to call him on his cell phone.

38.     For example, the following exchange occurred between Defendant Byrnes and

broker X in a conversation recorded on or about June 23, 2010:

Broker X:      Can you find something out for me?  Do you want me to call you
               on your cell?

Byrnes:        Cell.

Broker X:      Okay.  Will call you later.

39.     The following exchange occurred between Defendant Byrnes and broker X in a

conversation that was recorded on or about September 21, 2010:

Broker X:      You don't have your cell phone?

Byrnes:        No.

Broker X:      Bring your cell phone tomorrow.  We missed out on some massive
               trades on Friday and some stuff happened today. . . I guess you
               can't help me now then.  Bring your phone tomorrow we definitely
               want to know.

40.     Furthermore, broker X and his employer provided Byrnes with meals, drinks, and

entertainment on multiple occasions during the time Byrnes was providing material nonpublic

information to broker X.

C.    **Defendant Byrnes' Unlawful Disclosures Continued Even After Defendant CME NYMEX Received a Customer Complaint in July 2009 About Such Disclosures**

41.    In or about July 2009, Defendant CME NYMEX received a complaint from a market participant that confidential information regarding trades cleared through CME ClearPort had been disclosed to a brokerage firm by an Exchange employee named "Billy," who worked in a trade support capacity.  The complainant also provided the name of the brokerage firm that employed broker X at the time.  The complaint was investigated by the Managing Director, who, as alleged above, had responsibility for the ClearPort Facilitation Desk.

42.    In or about July 2009, the Managing Director correctly identified "Billy" – the CME NYMEX employee that was the subject of the complaint – to be Defendant Byrnes. The CME NYMEX's and the Managing Director's investigation of the complaint comprised principally reviewing certain of Byrnes' phone calls and emails from just one day.  CME NYMEX never questioned Byrnes concerning the complaint or took any additional steps designed to determine whether Byrnes had been engaged in such egregious misconduct. Thereafter, Byrnes continued to make numerous disclosures of material nonpublic information to broker X.

43.    On July 27, 2009, Defendant CME NYMEX sent an e-mail to, among others, the CME ClearPort Facilitation Desk staff including Defendant Byrnes, stating that all business calls were to be conducted on recorded desk phones and that staff were prohibited from using their cell phones while at their desk.  This e-mail made no mention of disclosures of material nonpublic information.

44.    In spite of this ban on cell phone use, after July 27, 2009, CME ClearPort Facilitation Desk employees continued to use cell phones openly at their desk.  Defendant

12

Byrnes was observed regularly using his cell phone at his desk, even more than once a day. As alleged above, at times Byrnes used his cell phone to avoid being recorded disclosing material nonpublic information.

45.    Following the July 2009 complaint concerning "Billy," Defendant CME NYMEX promoted Defendant Byrnes in July 2010 to a supervisory position on the ClearPort Facilitation Desk and included in his job responsibilities the training of other employees as to Defendant CME NYMEX's policies regarding confidential information.

46.    In November 2010, Defendant CME NYMEX received yet another complaint from a market participant about Defendant Byrnes' improper disclosures of nonpublic information. At the time, the Managing Director recognized the similarity between the November 2010 complaint and the July 2009 complaint referred to above. The market participant who complained to Defendant CME NYMEX in November 2010 did so after broker X contacted the market participant on multiple occasions, making proposals that seemed to reflect that broker X was aware of the market participant's trading activity and positions. For example, broker X offered the market participant particular trades that would have offset (flattened) the market participant's positions held at that time, even though broker X should have had no way of knowing the market participant's positions. Broker X's offers gave the market participant concern that its positions had been disclosed and that the information could be used to the market participant's financial disadvantage.

47.    In or about December 2010, Defendant CME NYMEX terminated Defendant Byrnes' employment.

**D.      Defendant Curtin's Unlawful Disclosure of Material Nonpublic Information**

48.      Defendant Curtin's responsibilities as a CME NYMEX employee included providing CME ClearPort users with timely and accurate assistance in resolving issues involving the use of the CME ClearPort platform, and training other employees on CME ClearPort operations and policies.

49.      To perform his official duties as a CME NYMEX employee, Defendant Curtin had access to Defendant CME NYMEX's computer systems, including the CME ClearPort trade blotter, containing material nonpublic information regarding the trading activities of CME NYMEX customers.  Curtin used his access to these computer systems to obtain the material nonpublic information that he disclosed to broker X, who was not authorized or otherwise entitled to receive the information.

50.      On at least 16 occasions between May 2008 and March 2009, Defendant Curtin knowingly and willfully disclosed material nonpublic information about trades cleared through CME ClearPort and about CME ClearPort customers and/or about other CME NYMEX trading and customers to broker X.  The dates on which Curtin made disclosures of material nonpublic information to broker X on recorded phone lines are listed in Exhibit B, attached.

51.      The material nonpublic information that Defendant Curtin disclosed included the identities of the parties to specific trades, the identities of the brokers that entered trades into the systems, the side of each party to the trades (buy or sell), the number of contracts traded, prices and the structure of particular transactions, trading strategies used in particular transactions, and information relating to futures and options positions of particular market participants.

52.      The information Defendant Curtin disclosed is material information as the term is defined under Commission Regulation 1.59(a)(5).

53.     Defendant Curtin willfully and knowingly disclosed material nonpublic information to broker X that should not have been disclosed to that broker or to other unauthorized persons.

54.     In a phone conversation on or about March 2, 2009, Defendant Curtin acknowledged to broker X that his disclosures were improper.  The following exchange between Curtin and broker X occurred in that recorded conversation:

> Curtin:     By the way, I am going to have to sign a confidentiality agreement soon so our little conversations are going to have to end.
>
> Broker X:   Are you serious?  What does that mean?
>
> Curtin:     It means that if they ever play the tapes and I sign that piece of paper I could get f[---]ed.

55.     Nonetheless, Defendant Curtin's disclosures to broker X continued, and Broker X and his employer provided Curtin with meals, drinks and entertainment on multiple occasions during the time Curtin was providing material nonpublic information to Broker X.

56.     In or about April 2009, Defendant Curtin voluntarily resigned from his employment with Defendant CME NYMEX for a job elsewhere in the futures industry.

## V.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT I

**(Disclosures by Defendants Byrnes and Curtin of Material Nonpublic Information in Violation of Section 9(e)(1) of the Act and Commission Regulation 1.59(d))**

57.     Paragraphs 1 through 56 are realleged and incorporated herein by reference.

58.     Section 9(e)(1) of the Act provides, in pertinent part, that it shall be a felony for any person:

who is an employee . . . of a board of trade, registered entity, or registered futures association, in violation of a regulation issued by the Commission . . .willfully and knowingly to disclose for any purpose inconsistent with the performance of such person's official duties as an employee . . . any material nonpublic information obtained through special access related to the performance of such duties.

59.     Pursuant to Section 9(e)(1) of the Act, the Commission promulgated Commission Regulation 1.59(d)(1)(ii) which provides, in pertinent part:

No employee . . . [of a self-regulatory organization ("SRO")] shall . . .disclose for any purpose inconsistent with the performance of such person's official duties as an employee . . . any material, nonpublic information obtained through special access related to the performance of such duties.

60.     Commission Regulation 1.59(a)(1) states that SRO means self-regulatory organization, as defined in Commission Regulation 1.3(ee).

61.     Commission Regulation 1.3(ee) defines an SRO as a contract market or a registered futures association under Section 17 of the Act.

62.     A contract market is defined in Commission Regulation 1.3(h) as a board of trade designated by the Commission as a contract market under the Act or in accordance with the provisions of Part 33 of the Commission's Regulations.

63.     A board of trade is defined in Commission Regulation 1.3(a) as any exchange or association, whether incorporated or unincorporated, of persons who shall be engaged in the business of buying or selling any commodity or receiving the same for sale on consignment.

64.     At all times relevant to this Complaint, Defendant CME NYMEX has been a board of trade designated by the Commission as a contract market under the Act, and an SRO.

65.     Defendant CME NYMEX, as a board of trade designated as a contract market under Section 5 of the Act, is a registered entity, pursuant to Section 1a(40) and Section 5 of the Act.

66.     The information disclosed by Defendants Byrnes and Curtin was nonpublic information pursuant to Commission Regulation 1.59(a)(6), as it was "information which ha[d] not been disseminated in a manner which [made] it generally available to the trading public."

67.     The information disclosed by Defendants Byrnes and Curtin was material information pursuant to Commission Regulation 1.59(a)(5), as it was "information which, if such information were publicly known, would be considered important by a reasonable person in deciding whether to trade a particular commodity interest on a contract market. As used in this section, 'material information' includes, but is not limited to, information relating to present or anticipated cash, futures, or option positions, trading strategies, the financial condition of members of self-regulatory organizations or members of linked exchanges or their customers or option customers, or the regulatory actions or proposed regulatory actions of a self-regulatory organization or a linked exchange."

68.     By their conduct as described in this Complaint, Defendants Byrnes and Curtin violated Section 9(e)(1) of the Act, by willfully and knowingly disclosing for purposes inconsistent with the performance of their officials duties as employees of Defendant CME NYMEX, material nonpublic information about CME NYMEX trading and CME NYMEX customers obtained through special access related to the performance of their official duties as employees of CME NYMEX.

69.     Each act of disclosure of material nonpublic information, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 9(e)(1) of the Act.

70.     By their conduct as described in this Complaint, Defendants Byrnes and Curtin violated Commission Regulation 1.59(d)(1)(ii), by disclosing for purposes inconsistent with

their performance of their official duties as employees of Defendant CME NYMEX, material nonpublic information about CME NYMEX trading and CME NYMEX customers obtained through special access related to the performance of their official duties as employees of CME NYMEX.

71.     Each act of disclosure of material nonpublic information, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Commission Regulation 1.59(d)(1)(ii).

## COUNT II

**(Defendant CME NYMEX's Liability Under Section 2(a)(1) of the Act For Byrnes and Curtin's Disclosures of Material Nonpublic Information in Violation of Section 9(e)(1) of the Act and Commission Regulation 1.59(d))**

72.     Paragraphs 1 through 71 are realleged and incorporated herein by reference.

73.     By their conduct as described in this Complaint, Defendants Byrnes and Curtin violated Section 9(e)(1) of the Act and Commission Regulation 1.59(d)(1)(ii), by willfully and knowingly disclosing for purposes inconsistent with the  performance of their officials duties as employees of Defendant CME NYMEX, material nonpublic information about CME NYMEX trading and CME NYMEX customers obtained through special access related to the performance of their official duties as employees of CME NYMEX.

74.     The disclosures of material nonpublic information by Defendants Byrnes and Curtin, as described in this Complaint, occurred within the scope of their employment with Defendant CME NYMEX.  Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), the acts, omissions and failures of Byrnes and Curtin are deemed also to be the acts, omissions and failures of Defendant CME NYMEX.

75.    Accordingly, by the conduct of Defendants Byrnes and Curtin in disclosing material nonpublic information as described in this Complaint, Defendant CME NYMEX also violated Section 9(e)(1) of the Act and Commission Regulation 1.59(d)(1)(ii).

76.    Each act of disclosure of material nonpublic information, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 9(e)(1) of the Act and Commission Regulation 1.59(d)(1)(ii), for which Defendant CME NYMEX is liable pursuant to Section 2(a)(1)(B) of the Act.

## VI.    RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its equitable powers, enter:

A. An order finding that Defendants Byrnes and Curtin violated Section 9(e)(1) of the Act and Commission Regulation 1.59(d)(1)(ii);

B. An order finding that Defendant CME NYMEX is liable for Defendants Byrnes and Curtin's violations of Section 9(e)(1) of the Act and Commission Regulation 1.59(d)(1)(ii), pursuant to Section 2(a)(1)(B) of the Act;

C. An order of permanent injunction prohibiting each of the Defendants, and any of their agents, servants, employees, assigns, attorneys, and persons in active concert or participation with them, from engaging, directly or indirectly, in conduct in violation of each Section of the Act and each Commission Regulation they are found to have violated;

D. An order permanently restraining, enjoining, and prohibiting Defendants Byrnes and Curtin from directly or indirectly:

19

1.     Entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 1.3(hh), 17 C.F.R. § 1.3(hh) (2011) ("commodity options"), security futures products, swaps (as that term is defined in § 1a(47) of the Act, as amended by the Dodd-Frank Act, and as further defined by Commission Regulation 1.3(xxx), 17 C.F.R. § 1.3(xxx) ("swaps") and/or foreign currency contracts (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act as amended by the Dodd-Frank Act, to be codified at 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts"), for their own personal accounts or for any account in which they have a direct or indirect interest;

2.     Having any commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts traded on their behalf;

3.     Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts;

4.     Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts;

5.     Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such

registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011); and

6. Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2011)), agent, or any other officer or employee of any person registered, exempted from registration or required to be registered with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011);

E. An order requiring Defendants to pay, jointly and severally, costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2);

F. An order directing Defendants each to pay a civil monetary penalty in an amount not more than the greater of $140,000 for each violation of the Act or Commission Regulations committed on or after October 23, 2008; $130,000 for each violation of the Act or Commission Regulations committed on or between October 23, 2004 and October 22, 2008; or triple the monetary gain to each Defendant for each violation of the Act or Commission Regulations committed, plus post-judgment interest; and

G. An order providing for such other and further relief as the Court may deem necessary or appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues so triable.

Dated: 2/21, 2013

U. S. COMMODITY FUTURES TRADING COMMISSION

By: _____

Stephen J. Obie
Associate Director and Regional Counsel

David W. MacGregor
Chief Trial Attorney
(*pro hac vice* admission application to be filed)

Patrick Daly
James Wheaton
Trial Attorneys

U. S. Commodity Futures Trading Commission
Division of Enforcement
140 Broadway, 19th Floor
New York, NY 10005
(646)746-9700
dmacgregor@cftc.gov
pdaly@cftc.gov
jwheaton@cftc.gov

Attorneys for Plaintiff

| Exhibit A: Byrnes Disclosures | | |
|---|---|---|
| | **Call Date** | **Disclosing Party** |
| **2008** | | |
| 1. | 2/21/08 | Byrnes |
| 2. | 2/22/08 | Byrnes |
| 3. | 2/22/08 | Byrnes |
| 4. | 5/13/2008 | Byrnes |
| 5. | 5/20/2008 | Byrnes |
| 6. | 5/22/2008 | Byrnes |
| 7. | 5/30/2008 | Byrnes |
| 8. | 6/17/2008 | Byrnes |
| 9. | 6/23/2008 | Byrnes |
| 10. | 6/23/2008 | Byrnes |
| 11. | 06/25/2008 | Byrnes |
| 12. | 6/25/2008 | Byrnes |
| 13. | 7/2/2008 | Byrnes |
| 14. | 7/3/2008 | Byrnes |
| 15. | 7/14/2008 | Byrnes |
| 16. | 7/18/2008 | Byrnes |
| 17. | 7/21/2008 | Byrnes |
| 18. | 9/10/2008 | Byrnes |
| 19. | 9/11/2008 | Byrnes |
| 20. | 9/12/2008 | Byrnes |
| 21. | 9/25/2008 | Byrnes |
| 22. | 10/2/2008 | Byrnes |
| 23. | 10/8/2008 | Byrnes |
| 24. | 10/13/2008 | Byrnes |
| 25. | 11/17/2008 | Byrnes |
| 26. | 11/18/2008 | Byres |

| | Exhibit A: Byrnes Disclosures | |
|---|---|---|
| | **Call Date** | **Disclosing Party** |
| 27. | 11/19/2008 | Byrnes |
| 28. | 11/25/2008 | Byrnes |
| 29 | 11/25/2008 | Byrnes |
| 30. | 12/04/2008 | Byrnes |
| | **2009** | |
| 31. | 1/20/2009 | Byrnes |
| 32 | 1/29/2009 | Byrnes |
| 33 | 2/4/2009 | Byrnes |
| 34. | 2/11/09 | Byrnes |
| 35. | 2/13/2009 | Byrnes |
| 36. | 2/18/2009 | Byrnes |
| 37. | 2/20/2009 | Byrnes |
| 38. | 2/24/2009 | Byrnes |
| 39. | 2/25/2009 | Byrnes |
| 40. | 2/25/2009 | Byrnes |
| 41. | 2/27/2009 | Byrnes |
| 42. | 3/9/2009 | Byrnes |
| 43. | 4/1/2009 | Byrnes |
| 44 | 4/1/2009 | Byrnes |
| 45. | 4/8/2009 | Byrnes |
| 46. | 4/13/2009 | Byrnes |
| 47. | 4/21/2009 | Byrnes |
| 48. | 4/22/2009 | Byrnes |
| 49. | 4/30/2009 | Byrnes |
| 50. | 4/30/2009 | Byrnes |
| 51. | 5/5/2009 | Byrnes |
| 52. | 5/7/2009 | Byrnes |

| Exhibit A: Byrnes Disclosures | | |
|---|---|---|
| | Call Date | Disclosing Party |
| 53. | 5/15/2009 | Byrnes |
| 54. | 5/20/2009 | Byrnes |
| 55. | 5/20/2009 | Byrnes |
| 56. | 5/21/2009 | Byrnes |
| 2010 | | |
| 57. | 5/11/2010 | Byrnes |
| 58. | 5/12/2010 | Byrnes |
| 59. | 5/18/2010 | Byrnes |
| 60. | 5/24/2010 | Byrnes |
| 61. | 5/25/2010 | Byrnes |
| 62. | 6/9/2010 | Byrnes |
| 63. | 9/17/2010 | Byrnes |

25

| | Exhibit B: Curtin Disclosures | |
|-----|------------------|------------------|
| | **Call Date** | **Disclosing Party** |
| | **2008** | |
| 1. | 5/14/2008 | Curtin |
| 2. | 5/29/2008 | Curtin |
| 3. | 6/10/2008 | Curtin |
| 4. | 6/23/2008 | Curtin |
| 5. | 6/24/2008 | Curtin |
| 6. | 10/10/2008 | Curtin |
| 7. | 10/13/2008 | Curtin |
| 8. | 11/25/2008 | Curtin |
| | **2009** | |
| 9. | 1/16/2009 | Curtin |
| 10. | 1/26/2009 | Curtin |
| 11. | 2/5/2009 | Curtin |
| 12. | 2/23/2009 | Curtin |
| 13. | 3/3/2009 | Curtin |
| 14. | 3/9/2009 | Curtin |
| 15. | 3/10/2009 | Curtin |
| 16. | 3/16/2009 | Curtin |