Patrick Fitzgerald
Albert Hogan III
Jerrold Salzman
Gretchen Wolf
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Suite 2700
Chicago, Illinois 60606
(312) 407-0700

Mark Young
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue N.W.
Washington, D.C. 20005
(202) 371-7000

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION,<br><br>_Plaintiff,_<br><br>- v -<br><br>WILLIAM BYRNES, CHRISTOPHER CURTIN, THE NEW YORK MERCANTILE EXCHANGE, INC. and RON EIBSCHUTZ,<br><br>_Defendants_. | 13-CIV-1174 (GBD)<br><br>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT NYMEX'S MOTION TO DISMISS COUNT II OF PLAINTIFF'S AMENDED COMPLAINT** |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................1

BACKGROUND .........................................................................................3

    I.      REGULATORY BACKGROUND ..................................................3

    II.     SUMMARY OF AMENDED COMPLAINT.................................5

STANDARD FOR MOTION TO DISMISS ....................................................7

ARGUMENT ..............................................................................................7

    I.      NYMEX CANNOT BE HELD VICARIOUSLY LIABLE FOR ANY
          VIOLATIONS BY ITS EMPLOYEES OF CEA SECTION 9(E)(1) AND
          REGULATION 1.59 BECAUSE THE CONDUCT ALLEGED TO HAVE
          VIOLATED THOSE PROVISIONS IS OUTSIDE THE SCOPE OF
          EMPLOYMENT....................................................................7

          A.     Byrnes And Curtin Acted Outside The Scope Of Their
                 Employment When They Misappropriated NYMEX's Confidential
                 Customer Information. ................................................8

          B.     The CFTC's Allegations Demonstrate That Byrnes And Curtin
                 Acted Outside Of The Scope Of Their Employment When They
                 Misappropriated NYMEX's Confidential Customer Information.............11

    II.     THE CEA PROHIBITS THE CFTC FROM PURSUING A STRICT
          LIABILITY CLAIM AGAINST A DCM ON THE BASIS OF ITS
          EMPLOYEES' MISAPPROPRIATION OF CONFIDENTIAL
          CUSTOMER INFORMATION....................................................15

          A.     CEA Section 2(a)(1)(B) – If Applicable – Would Impute Only
                 Acts, Not Liability, To NYMEX.  And DCMs Such As NYMEX
                 Cannot Violate The Provision Underlying The CFTC's Vicarious
                 Liability Claim. .......................................................15

          B.     NYMEX's Obligations To Safeguard Confidential Customer
                 Information Stem From A Flexible Set Of CEA Core Principles
                 That Are Incompatible With No-Fault Liability.......................17

CONCLUSION.........................................................................................21

# TABLE OF AUTHORITIES

## CASES

*In re Amaranth Natural Gas Commodities Litigation*,
   711 F. Supp. 2d 301 (S.D.N.Y 2010)..............................................................................11

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).........................................................................................................7

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007).........................................................................................................7

*In re Boesky Securities Litigation*,
   36 F.3d 255 (2d Cir. 1994).............................................................................................12

*In re Initial Public Offering Securities Litigation*,
   383 F. Supp. 2d 566 (S.D.N.Y. 2005)..............................................................................7

*Landgraf v. USI Film Products*,
   511 U.S. 244 (1994).........................................................................................................4

*Moss v. Morgan Stanley Inc.*,
   553 F. Supp. 1347(S.D.N.Y. Jan. 10, 1983) ..................................................................12

*O'Connor & Associates v. Dean Witter Reynolds, Inc.*,
   529 F. Supp. 1179 (S.D.N.Y. Dec. 30, 1981) ...........................................................11, 12

*Porrazzo v. Bumble Bee Foods, LLC*,
   822 F. Supp. 2d 406 (S.D.N.Y. 2011)..............................................................................5

*Rosenthal & Co. v. CFTC*,
   802 F.2d 963 (7th Cir. 1986) .........................................................................................11

*Stoller v. CFTC*,
   834 F.2d 262 (2d Cir. 1987)............................................................................................15

## STATUTES AND REGULATIONS

7 U.S.C. § 1a (2006), CEA § 1a.................................................................................................16

7 U.S.C. § 2 (2006), CEA § 2 ..........................................................................................*passim*

7 U.S.C. § 6 (2006), CEA § 4 .....................................................................................................4

7 U.S.C. § 6b (2006), CEA § 4b.................................................................................................16

7 U.S.C. § 7 (2006), CEA § 5 ........................................................................................4, 18, 19

7 U.S.C. § 7a-1 (2006), CEA § 5b ........................................................................5

7 U.S.C. § 7a-2 (2006), CEA § 5c ....................................................................4, 19

7 U.S.C. § 9 (2006), CEA § 6(c)..........................................................................16

7 U.S.C. § 13 (2006), CEA § 9 ........................................................................ *passim*

7 U.S.C. § 13a (2006), CEA § 9(a) ......................................................................16

7 U.S.C. § 25 (2006), CEA § 22 ..........................................................................19

49 U.S.C. § 11907 (2006) ...................................................................................16

49 U.S.C. § 14911 (2006) ...................................................................................16

17 C.F.R. § 1.3 ....................................................................................................17

17 C.F.R. § 1.59 .............................................................................................. *passim*

17 C.F.R. § 38, Appendix B..................................................................................18

## OTHER AUTHORITIES

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124
    Stat. 1376 (2010)....................................................................................3

CFTC Glossary,
    http://www.cftc.gov/ConsumerProtection/EducationCenter/CFTCGlossary/glossar
    y_c .....................................................................................................5

Futures Trading Practices Act of 1992, Pub. L. No. 102-546, § 212, 106 Stat. 3590 (1992).........6

Fed. R. Evid. 201 ...........................................................................................5, 11

Fed. R. Civ. P. 12(b)(6)........................................................................................7

Activities of Self-Regulatory Organization Employees and Governing Members Who
    Possess Material, Nonpublic Information,
    50 Fed. Reg. 24533 (Jun. 11, 1985)..................................................................9

H.R. Rep. No. 102-6 (1991)..................................................................................10

101 Cong. Rec. H5612 (Sept. 13, 1989).................................................................10

CFTC Study of the Nature, Extent and Effects of Futures Trading By Persons Possessing
    Material, Nonpublic Information (Sept. 1984) ...........................................10, 11

A New Regulatory Framework for Trading Facilities, Intermediaries and Clearing
Organizations, 66 Fed. Reg. 42256 (Aug. 10, 2001) ........................................................18

Commodity Futures Modernization Act, Pub. L. No. 106-554, § 110, 114 Stat. 2763 (2000) .....17

## PRELIMINARY STATEMENT

In December 2010, the New York Mercantile Exchange, Inc. ("NYMEX"), a commodity futures exchange, discovered that one of its employees (Byrnes) had misappropriated confidential NYMEX customer information and disclosed it to a broker friend (Eibschutz) to help him solicit new customers.  Maintaining the confidentiality of customer data is vital to NYMEX's business interests.  Accordingly, NYMEX immediately fired Byrnes and promptly reported his misconduct to its federal regulator, the Commodity Futures Trading Commission ("CFTC").  Following NYMEX's report, the CFTC initiated an investigation, enlisted NYMEX's cooperation, and reviewed a host of NYMEX-submitted communications.   During the investigation, NYMEX also learned that another former employee (Curtin) had engaged in similar misconduct.  NYMEX reported that misconduct as well.

On February 21, 2013, the CFTC filed a complaint against Byrnes and Curtin.  In addition, the CFTC included NYMEX as a defendant based solely on a theory of no-fault vicarious liability.  On May 8, 2013, the CFTC filed an amended complaint adding Eibschutz as a defendant (the "Amended Complaint").

The CFTC's case against NYMEX is based on the theory that NYMEX should be vicariously liable for conduct that was, without question, completely contrary to NYMEX's interests.  Indeed, the complaint never alleges any misconduct by NYMEX.[1]   Instead, the complaint makes clear that the conduct was harmful to NYMEX.  The CFTC's decision to

---

[1]    The CFTC suggests that NYMEX could have or should have done more to discover its employees' misconduct.  *See* Am. Compl. ¶¶ 10, 41-47.  But those allegations are simply gratuitous.  The CFTC <u>does</u> <u>not</u> and <u>could</u> <u>not</u> make out a proper claim against NYMEX under any sort of a "failure to supervise" theory.  The CFTC's case against NYMEX is purely derivative based on the acts of others.

include NYMEX as a defendant is thus at odds with common sense.  It is also at odds with the law.

The CFTC's vicarious liability theory is contrary to the statute under which the complaint is brought, for at least three reasons.  First, Byrnes and Curtin are alleged to have engaged in activities that took their conduct outside the scope of their employment with NYMEX.  The statutory scheme itself makes this clear.  Specifically, Section 9(e)(1) of the CEA and CFTC Regulation 1.59(d)(1)(ii) prohibited Byrnes and Curtin from making disclosures "inconsistent with the performance of [their] official duties" as employees of NYMEX.  But to reach NYMEX, the CFTC then seeks to impute Byrnes' and Curtin's acts to NYMEX under Section 2(a)(1)(B).  That provision, however, only operates when an employee acts "for the [employer]" and  "within the scope of his employment."  Because the CFTC alleges, as it must, that the disclosures made by Byrnes and Curtin were "inconsistent with the performance of [their] official duties," then those acts cannot at the same time be "for the [employer]" and "within the scope of their employment."

Second, even if Section 2(a)(1)(B) of the CEA did apply to make the "acts" of Byrnes and Curtin the "acts" of NYMEX, NYMEX would still not be liable under Section 9(e)(1).  Unlike many prohibitions in the CEA and at law generally, Section 9(e)(1) does not apply to all "persons."  Instead, only employees and other specifically identified individuals associated with CFTC-registered entities like NYMEX can violate Section 9(e)(1).  NYMEX cannot violate Section 9(e)(1).  Thus, even imputing Byrnes' and Curtin's wrongful disclosures to NYMEX would not make NYMEX liable under Section 9(e)(1).

Finally, as an overarching point, the CFTC's vicarious liability theory is contrary to the statutory structure and purpose of the CEA.  The CEA, during the relevant period,

2

governed NYMEX's obligations and liabilities by means of a flexible system of "Core Principles," which provided NYMEX with "reasonable discretion" to meet.  The CFTC itself recognized that taking steps to prevent the unauthorized disclosure of confidential information was a duty imposed on NYMEX under the Core Principles.   In any case where the CFTC believed that NYMEX had failed to perform in accordance with the Core Principles, the CFTC was required to give NYMEX an opportunity to cure any alleged failings before NYMEX could even be charged with a violation.  The general no-fault vicarious liability provision in the CEA (which applies to a broad range of entities) cannot operate as an end-run around the CEA's Core Principle structure that applies specifically to a contract market like NYMEX.  The CFTC's claim against NYMEX fails for this reason as well.

Given the multiple infirmities with the CFTC's theory against NYMEX, it is not surprising that there are no reported cases of the CFTC ever attempting to hold an exchange liable for its employees' improper disclosures under Section 9(e)(1), let alone attempting to do so successfully.  Because the law clearly forecloses the CFTC's claim against NYMEX, this Court should dismiss the CFTC's novel attempt to hold NYMEX liable for misconduct that was contrary to NYMEX's policies and NYMEX's interests.

## BACKGROUND

## I.    REGULATORY BACKGROUND

The CEA is a federal statute that provides for the regulation of trading in futures, options, and other derivatives.  *See* 7 U.S.C. § 1 *et seq.* (2006).[2]  The CFTC is an independent

---

[2]    Congress amended the CEA in 2010 to impose changes to the Core Principle structure (among other changes to the CEA) , effective on July 16, 2011 or later, but did not indicate that such changes would be retroactive.  *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank").  Byrnes' and Curtin's alleged conduct started in 2008 and ended in 2010.  *See* Am. Compl., Exhibits A and B.  Therefore, the Pre-Dodd Frank provisions of the CEA apply to the allegations in the

*(cont'd)*

federal regulatory agency that administers and enforces the CEA and its regulations promulgated thereunder.  Am. Compl. ¶ 14.  The CEA requires all futures contracts to be traded on or subject to the rules of a CFTC-approved self-regulatory organization called a "designated contract market" or "DCM."  *See* CEA § 4(a), 7 U.S.C. § 6(a) (2006).  NYMEX is a DCM.  Am. Compl. ¶ 18.  It operates an exchange for the trading of derivatives contracts, including futures and options on futures.  *Id*. ¶ 1.

As a DCM, NYMEX has a special role under the CEA.  During all relevant periods for purposes of this litigation, DCMs were responsible for policing their markets and market participants under a set of flexible "Core Principles" subject to CFTC oversight.  *See* CEA §§ 5(d)(1)-(18), 7 U.S.C. §§ 7(d)(1)-(18) (2006).  The Core Principles required DCMs such as NYMEX to adopt and enforce various types of rules, making DCMs the front-line regulators of the futures markets.  *See* CEA § 5(d)(2), 7 U.S.C. § 7(d)(2) (2006).  By statute, a DCM had "reasonable discretion in establishing the manner in which it complie[d] with the core principles."  CEA § 5(d)(1), 7 U.S.C. § 7(d)(1) (2006).

If the CFTC believed that a DCM had failed to conform to the requirements of the Core Principles, the CEA prescribed the path the CFTC was required to follow to cure the alleged failure.  The CFTC was required to provide the DCM with notice of the deficiency and a 30-day period to cure it before the CFTC could take legal action against the DCM.  CEA § 5c(d), 7 U.S.C. § 7a-2(d) (2006).

---

*(cont'd from previous page)*

amended complaint.  *See, e.g.*, *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994) (holding that there is a presumption against applying a statute retroactively absent Congressional intent to the contrary).

## II.       SUMMARY OF AMENDED COMPLAINT

NYMEX offers a platform to customers called ClearPort that provides clearing services for privately-negotiated, otherwise known as over-the-counter, derivatives transactions.[3] Am. Compl. ¶¶ 1, 19-21.  Defendants Byrnes and Curtin were NYMEX employees who worked on the ClearPort Facilitation Desk and were responsible for facilitating customer transactions reported for clearing through the ClearPort system.  *Id.* ¶ 4.  Because of their roles with ClearPort, Byrnes and Curtin had access to nonpublic information about trades and customers in the ClearPort system.  *Id.* ¶¶ 4, 33, 55.  NYMEX  required Byrnes and Curtin to keep that information confidential.  *Id.* ¶ 26.  As the CFTC confirms, quoting a NYMEX official, maintaining the confidentiality of customer information "is the 'lifeblood' of an Exchange," and prohibitions against disclosure are "the most important thing to the business in general" of an Exchange.  *Id.* ¶ 10.

The CFTC alleges that Byrnes and Curtin misappropriated nonpublic information from NYMEX and disclosed it to a commodity broker, Eibschutz.  *See id.* ¶¶ 3, 6, 34, 56. Eibschutz was not authorized or otherwise entitled to receive that information, and he used the information solely for his own benefit.  *See id.* ¶¶ 6, 7, 37, 38, 59, 63.  Moreover, the CFTC claims that Eibschutz aided and abetted Byrnes and Curtin by "soliciting" and "facilitating" the

---

[3]     Clearing of futures and options contracts is conducted through another type of CFTC-registered entity called a derivatives clearing organization ("DCO").  *See* CEA § 5b, 7 U.S.C. § 7a-1 (2006).  Every futures contract has a buyer and seller.  But when a futures contract is cleared, the DCO steps into the shoes of both the buyer and the seller, creating two new contracts that replace the original.  The DCO thus becomes the buyer to the seller and the seller to the buyer.  Without the involvement of a DCO, each party to a futures contract would be exposed to risk of the other party's default.  *See* CFTC Glossary, http://www.cftc.gov/ConsumerProtection/EducationCenter/CFTCGlossary/glossary_c (defining "clearing" and "clearing organization") (NYMEX Exhibit A).  NYMEX requests the Court to take judicial notice of these facts pursuant to Fed. R. Evid. 201.  *See Porrazzo v. Bumble Bee Foods, LLC*, 822 F. Supp. 2d 406, 410 (S.D.N.Y. 2011) (in considering a motion to dismiss, a court can consider "facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence") (internal citations and quotations omitted).

disclosures.  *Id*. ¶¶ 39, 41, 61, 63.  According to the CFTC, when Byrnes and Curtin disclosed

confidential information to Eibschutz, they violated CEA Section 9(e)(1)[4] and CFTC Regulation

1.59(d)(1)(ii),[5] both of which prohibit DCM employees from disclosing material nonpublic

information for any purpose inconsistent with the performance of the employees' "official

duties."  *See id*. ¶¶ 83, 85.[6]  The CFTC acknowledges that Byrnes' and Curtin's misconduct

violated their NYMEX employment policies and agreements, which contained provisions meant

to protect the confidentiality of NYMEX information.  *Id*. ¶¶ 26-31, 37, 59.

　　　　The CFTC does not allege that NYMEX itself engaged in any misconduct.

Instead, the CFTC seeks to hold NYMEX vicariously liable for its employees' misconduct that

harmed NYMEX.  Specifically, Count II charges that, even though Byrnes' and Curtin's

disclosures of information were "inconsistent with the performance of their official duties as

employees" of NYMEX, NYMEX itself is liable because Byrnes and Curtin at the same time

allegedly acted "for [NYMEX]" and "within the scope of their employment."  *Id*. ¶¶ 88, 89.

None of the allegations about Byrnes' and Curtin's misconduct could support a conclusion that

---

[4]　*See* CEA § 9(e)(1), 7 U.S.C. § 13(f)(1) (2006) (enacted in the Futures Trading Practices Act of 1992, Pub. L.
No. 102-546, § 212, 106 Stat. 3590 (1992)).  The Pre-Dodd Frank version of Section 9(e)(1) provided, "It shall
be a felony for any person – (1) who is an employee, member of the governing board, or member of any
committee of a board of trade, registered entity, or registered futures association, in violation of a regulation
issued by the Commission, willfully and knowingly to trade for such person's own account, or for or on behalf
of any other account, in contracts for future delivery or options thereon on the basis of, or willfully and
knowingly to disclose for any purpose inconsistent with the performance of such person's official duties as an
employee or member, any material nonpublic information obtained through special access related to the
performance of such duties."

[5]　*See* 17 C.F.R. § 1.59(d)(1)(ii).  At all relevant times, CFTC Rule 1.59 has provided, "No employee, governing
board member, committee member, or consultant shall . . . [d]isclose for any purpose inconsistent with the
performance of such person's official duties as an employee, governing board member, committee member, or
consultant any material, non-public information obtained through special access related to the performance of
such duties."

[6]　Even after their extensive investigation, the CFTC's allegations concerning the technical elements of the
violations are sparse on facts.  The CFTC does not allege that anyone traded based on the disclosures or made
trading decisions based on the disclosures.  Although the disclosures clearly violated NYMEX policy, NYMEX
reserves its rights with respect to the CFTC's ability to establish the elements of the alleged CEA violations.

such misconduct occurred within the scope of their employment.  Still, according to the CFTC, when Byrnes and Curtin committed their wrongful disclosures, which struck at the "lifeblood" of the exchange and breached their duties as NYMEX employees, somehow NYMEX itself violated Section 9(e)(1) and CFTC Regulation 1.59(d).   *Id.* ¶ 90.  For the reasons discussed below, as a matter of law, this claim must be dismissed.

## STANDARD FOR MOTION TO DISMISS

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual allegations "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   In evaluating a motion to dismiss, a court must "assess the legal feasibility of the complaint."  *In re Initial Pub. Offering Sec. Litig.*, 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005).   But in doing so, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   Indeed, a court should not accept as true "a legal conclusion couched as a factual allegation."  *Id*. (internal citations and quotations omitted).

## ARGUMENT

## I.  NYMEX CANNOT BE HELD VICARIOUSLY LIABLE FOR ANY VIOLATIONS BY ITS EMPLOYEES OF CEA SECTION 9(E)(1) AND REGULATION 1.59 BECAUSE THE CONDUCT ALLEGED TO HAVE VIOLATED THOSE PROVISIONS IS OUTSIDE THE SCOPE OF EMPLOYMENT

The CFTC alleges in detail that Byrnes and Curtin misappropriated NYMEX's confidential customer information for their own personal benefit and acted for purposes inconsistent with their official duties.  However, to support its vicarious liability claim against NYMEX, the CFTC alleges, without factual basis, that the misconduct by Byrnes and Curtin was for NYMEX and within the scope of their employment.  The CFTC cannot have it both ways. Any attempt to recast the employees' misconduct as for NYMEX and within the scope of their

employment undercuts the requirement that the CFTC prove the employees acted for purposes inconsistent with their official duties.  The provisions the CFTC has cobbled together in support of its novel legal theory are facially inconsistent, and the allegations of the complaint show that they are irreconcilable in this case.

### A.    Byrnes And Curtin Acted Outside The Scope Of Their Employment When They Misappropriated NYMEX's Confidential Customer Information.

The CEA's plain language and its legislative and regulatory history confirm that when Byrnes and Curtin misappropriated confidential customer information for purposes inconsistent with their official duties, they necessarily acted outside the scope of their employment with NYMEX.

The CFTC's no-fault vicarious liability case against NYMEX rests on CEA Section 2(a)(1)(B), which reads:

> The act, omission, or failure of any official, agent, or other person <u>acting for</u> any individual, association, partnership, corporation, or trust <u>within the scope of his employment</u> or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.[7] (emphasis added).

Thus, for Section 2(a)(1)(B) to apply, an employee, like Byrnes or Curtin, must be "acting for" his employer and "within the scope of his employment."  Section 2(a)(1)(B) cannot apply here.

Section 2(a)(1)(B) is incompatible with CEA Section 9(e)(1) and CFTC Regulation 1.59 – which the CFTC claims Byrnes and Curtin violated.  Specifically, Section 9(e)(1) and Regulation 1.59 prohibit an employee of a DCM, like NYMEX, from disclosing material nonpublic information "<u>for any purpose inconsistent with the performance of such person's official duties as an employee</u>."  (emphasis added).  Count II of the CFTC's amended

---

[7]    *See* 7 U.S.C. § 2(a)(1)(B) (2006).  Dodd-Frank did not alter the text of Section 2(a)(1)(B).

complaint therefore is based on the premise that a DCM employee may simultaneously disclose confidential information for a purpose inconsistent with the performance of his official duties and still be acting for the DCM and within the scope of employment.  Logic dictates otherwise. If an employee acts for a purpose inconsistent with his official duties, he cannot be said to be acting for his employer and within the scope of his employment.

The relevant history of Regulation 1.59 and Section 9(e)(1) confirms their textual incongruity with the elements of Section 2(a)(1)(B).  That history makes clear that, by disclosing material nonpublic information "for any purpose inconsistent with the performance of such person's official duties as an employee," a DCM employee is not acting to further a DCM's interests and is therefore acting outside the scope of employment.

When proposing Regulation 1.59, the CFTC explained that the prohibition against a DCM employee's disclosures of material nonpublic information targeted disclosures made outside of "the authorized course of [the employee's] duties." *See* Activities of Self-Regulatory Organization Employees and Governing Members Who Possess Material, Nonpublic Information, 50 Fed. Reg. 24533, 24535 (Jun. 11, 1985).[8]   The CFTC further explained that by prohibiting disclosures outside of an employee's authorized and official duties, it aimed to prevent, among other things, exchange employees from using confidential DCM information for "personal benefit," as such conduct "seriously undermines the concept of self-regulation and reduces public confidence in contract markets."  *Id*. at 24533.  Thus, Regulation 1.59 reaches conduct undertaken for an employee's personal benefit or other interests, not conduct that furthers the DCM's interests.  In other words, Regulation 1.59 prohibits conduct that is outside the scope of employment.

---

[8]   *See* NYMEX Exhibit B.

The CFTC's explanation of the purpose of Regulation 1.59's disclosure prohibition applies with equal force to Section 9(e)(1) because Congress enacted Section 9(e)(1) to codify CFTC Regulation 1.59.  *See* H.R. Rep. No. 102-6, at 41 (1991) (noting that the new section would codify existing CFTC regulations prohibiting the same activity).[9]  Further, when Congress debated the amendment containing Section 9(e)(1)'s language in 1989, Representative Fred Grandy, one of two sponsors of the amendment, explained that it "is aimed at people who would usurp material nonpublic information from the privileged vantage of their place of employment and convert or disclose it for their own personal gain unrelated to the legitimate commodity business of their employer."  *See* 101 Cong. Rec. H5612 (Sept. 13, 1989) (emphasis added).[10]  Congress and the CFTC thus each recognized that the disclosure of information prohibited in Section 9(e)(1) and Regulation 1.59 is the type of disclosure that furthers an employee's personal interest, not the interest of the employer.

Because a DCM employee's conduct in violation of Section 9(e)(1) and Regulation 1.59 is outside the scope of employment, Section 2(a)(1)(B) cannot apply to hold the DCM liable for that conduct.  If Section 2(a)(1)(B) were applied in the way the CFTC seeks, NYMEX would be deemed liable for its employees' misappropriation of information and improper disclosures that harmed NYMEX's business interests.

If the CFTC questions whether Byrnes and Curtin harmed NYMEX, it would need to look no further than its own guidance.  In the CFTC's 1984 study on insider trading in the futures markets, the CFTC itself recognized that "the possibility of such [exchange] staff members' exploiting their access to nonpublic material information would be particularly

---

[9]   *See* NYMEX Exhibit C.

[10]   *See* NYMEX Exhibit D.

harmful to the credibility of futures market regulation" by exchanges.  *See* CFTC Study of the Nature, Extent and Effects of Futures Trading By Persons Possessing Material, Nonpublic Information, 94 (Sept. 1984) (emphasis added).[11]

In sum, the CFTC's Section 2(a)(1)(B) claim is an unprecedented and legally untenable attempt to hold NYMEX liable for theft of its confidential information, in a case where the CFTC does not even allege that NYMEX failed in its duty to protect that information. Accordingly, the Court should dismiss Count II of the CFTC's amended complaint.

**B.**     **The CFTC's Allegations Demonstrate That Byrnes And Curtin Acted Outside Of The Scope Of Their Employment When They Misappropriated NYMEX's Confidential Customer Information.**

CEA Section 2(a)(1)(B) imputes an employee's acts to his employer only if the employee is "acting for [the employer]" and "within the scope of his employment."  Under Section 2(a)(1)(B), an employee is "acting for [his employer]" and "within the scope of his employment" when the employee's conduct furthers the employer's business or interests.  *See, e.g.*, *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir. 1986); *In re Amaranth Natural Gas Commodities Litig.*, 711 F. Supp. 2d 301, 307 (S.D.N.Y 2010). Despite the requirements of Section 2(a)(1)(B), the CFTC's factual allegations entirely foreclose the possibility that Byrnes and Curtin acted for NYMEX and within the scope of their employment when they misappropriated and misused NYMEX's confidential customer information.

In a similar context, courts have held that an employer cannot be held vicariously liable for an employee's misappropriation and disclosure (or "tipping") of inside information. For example, in *O'Connor & Associates v. Dean Witter Reynolds, Inc.*, the plaintiff sought to

---

[11]     *See* NYMEX Exhibit E.  NYMEX requests the Court to take judicial notice of this CFTC study pursuant to Fed. R. Evid. 201.

hold a corporation vicariously liable for its corporate insiders' alleged tipping of inside

information about a takeover bid, which allowed the "tippees" to purchase options with

knowledge of the proposed takeover prior to public disclosure.  529 F. Supp. 1179, 1182

(S.D.N.Y. Dec. 30, 1981).  The court dismissed the plaintiff's vicarious liability claim against

the corporation, explaining:

> [T]he common-law doctrine of respondeat superior is inapplicable in this
> context because a corporate insider necessarily exceeds the scope of his
> employment when he trades on the basis of material, nonpublic information. . . .
> [I]nsider trading and tipping cannot ordinarily said to be within the course of the
> employment.  An employee who trades on the basis of material inside information
> or who tips cannot be said to act as an employee in the transaction.  Furthermore,
> <u>his actions are ordinarily motivated by the desire for personal profit and are not in
> the interests of the corporation</u>.  In short . . . <u>an employee who trades on the basis
> of insider information or who tips such information must normally be viewed as
> on a frolic of his own.  Since such actions cannot be regarded as occurring within
> the scope of the employment</u>, the employer cannot be held liable under common-
> law principles of respondeat superior.

*Id.* at 1194 (emphasis added); *see also In re Boesky Sec. Litig.*, 36 F.3d 255, 265 (2d Cir. 1994)

(holding that an investment bank was not vicariously liable for its employee's unauthorized

disclosure of confidential information because the employee's actions "line[d] his own pockets"

and did not further the bank's interests); *Moss v. Morgan Stanley Inc.*, 553 F. Supp. 1347, 1356

(S.D.N.Y.  1983) (dismissing a vicarious liability claim against an investment bank for its

employee's tipping because "[n]o one dealing with the employee could have thought the acts

were authorized").

　　　　　Like the "tippers" in the insider trading cases described above, Byrnes and Curtin

acted outside the scope of their employment when they improperly disclosed confidential

information to Eibschutz.  Their disclosures in no way served or furthered NYMEX's interests.

Instead, their disclosures contravened their obligations to NYMEX and directly harmed the

business of NYMEX, which depends in large part on maintaining the confidentiality of customer and trading information.

NYMEX's policies and procedures, which were designed to prevent employees from misappropriating confidential customer information, are a strong indicator that Byrnes' and Curtin's violations were outside of the scope of employment.  For example, a ClearPort user agreement provided that NYMEX would safeguard its customers' confidential information.  Am. Compl. ¶ 8.  Byrnes and Curtin even signed various agreements with NYMEX, including a Code of Conduct, NYMEX's Employee Handbook, and other agreements requiring them personally to safeguard confidential customer information.  *Id*. ¶¶ 26-31.  The Code of Conduct, for instance, required employees to "safeguard confidential information [i.e., information that the employee receives …through employment ]" and "to use [such information] only in the performance of [the employee's] employment responsibilities." *Id*. ¶ 27.  Similarly, NYMEX's Employee Handbook stated, "Information about NYMEX, [and] its customers . . . is to be kept confidential and divulged only to individuals within [NYMEX] with both a need to receive and authorization to receive the information."  *Id*. ¶ 28.

The manner in which Byrnes and Curtin violated these policies and agreements also demonstrates that they acted outside of the scope of their employment.  Their official responsibilities were to assist ClearPort users in resolving issues involving the use of the ClearPort system.  *Id*. ¶¶ 32, 54.  As NYMEX employees, Byrnes and Curtin had lawful access to confidential customer information.  *Id*. ¶¶ 4, 26-31.  However, as the CFTC alleges, they wrongfully disclosed such confidential information to Eibschutz, a person "who was not authorized or otherwise entitled to receive the information."  *See id*. ¶¶ 33, 55.  Eibschutz, in turn, was under no illusion that the employees were acting properly.  Instead, according to the

CFTC, Eibschutz solicited Byrnes' and Curtin's disclosures so that he could use the confidential information to contact market participants to drum up business for himself.  *Id*. ¶ 52.   In exchange for the confidential information, Eibschutz wined and dined Byrnes and Curtin.  *Id*. ¶¶ 46, 65.  Therefore, Byrnes and Curtin clearly intended for their misconduct to benefit themselves and Eibschutz, not NYMEX.

       The CFTC makes no allegation that suggests that Byrnes' and Curtin's disclosures furthered NYMEX's interests in any way.  Had Byrnes and Curtin acted in furtherance of NYMEX's interests, they would not have feared NYMEX's detection.  Yet, Byrnes used his cell phone to evade NYMEX recording and detecting his disclosures.  *Id*. ¶ 50. And Curtin said that he would "get f[---]ed" if "they" (presumably NYMEX) played the tapes of his conversations with Eibschutz.  *Id*. ¶ 64.   Byrnes and Curtin had reason to fear NYMEX because – far from their conduct furthering NYMEX's business or interests – their conduct harmed NYMEX.  Indeed, NYMEX received complaints from market participants concerning improper disclosures of nonpublic information to Eibschutz.  *Id*. ¶¶ 47, 52.  Moreover, according to NYMEX's Managing Director responsible for the ClearPort facilitation desk, maintaining confidentiality of customer information is the "lifeblood" of the exchange, "the most important thing to the business in general." *Id*. ¶ 10.

       Therefore, in effect, the CFTC's complaint is at war with itself.  The CFTC's own allegations demonstrate that Byrnes and Curtin were never acting for NYMEX and that their actions did not otherwise further NYMEX's business.  They did not nourish the exchange's lifeblood.  They tried to poison it.

II.     **THE CEA PROHIBITS THE CFTC FROM PURSUING A STRICT LIABILITY CLAIM AGAINST A DCM ON THE BASIS OF ITS EMPLOYEES' MISAPPROPRIATION OF CONFIDENTIAL CUSTOMER INFORMATION.**

Though the CFTC administers the CEA, the CFTC does not have the power to rewrite the CEA through an enforcement action.  *See Stoller v. CFTC*, 834 F.2d 262, 267 (2d Cir. 1987) (holding that "the public may not be held accountable" under the CFTC's abrupt change in construction of the CEA without "appropriate notice").  Under the CEA, Congress did not intend for DCMs to be vicariously liable for their employees' misuse of material nonpublic information.  Instead, the CEA, its legislative history, and the CFTC's own regulations prove otherwise.

A.      **CEA Section 2(a)(1)(B) – If Applicable – Would Impute Only Acts, Not Liability, To NYMEX.  And DCMs Such As NYMEX Cannot Violate The Provision Underlying The CFTC's Vicarious Liability Claim.**

Even if the CFTC could show that Byrnes and Curtin violated Section 9(e)(1) and Regulation 1.59 by disclosing confidential information to Eibschutz while acting for NYMEX within the scope of their employment, the CFTC's complaint against NYMEX would still have to be dismissed.  The CFTC's entire legal theory against NYMEX rests on another fundamental misreading of  Section 2(a)(1)(B).  According to the CFTC, if Byrnes and Curtin violated the CEA, NYMEX is automatically liable under Section 2(a)(1)(B).   *See* Am. Compl. ¶ 89.  The actual language in Section 2(a)(1)(B), however, states otherwise.

Section 2(a)(1)(B) provides unambiguously that the "acts" of the employee (acting for the employer within the scope of employment) are "deemed" to be the acts of the employer.  Section 2(a)(1)(B)'s statutory text says nothing about liability.  All that it imputes to employers are the <u>acts</u> or conduct of the employee.  This is obvious because the statue also imputes the "omissions" and "failures" of employees.  This list would be unnecessary if the idea

was to straightaway impute "liability."  Section 2(a)(1)(B) does not do so, and, instead, makes the "acts" of the employee the "acts" of the employer.

Congress knows the difference between imputing misconduct or acts to employers and imputing liability to employers.  Where Congress wants to provide that employers are automatically <u>liable</u> for certain employee misconduct, it has done so explicitly.  *See, e.g.*, ICC Termination Act of 1995 (regarding railroads), 49 U.S.C. § 11907 (2006) (providing "An act or omission that would be a violation of this part if committed by a director, officer, receiver, trustee, lessee, agent, or employee of a rail carrier providing transportation or service subject to the jurisdiction of the Board under this part that is a corporation <u>is also a violation of this part by the corporation</u>.") (emphasis added); *see also* 49 U.S.C. § 14911 (2006) (providing same as to motor and water carriers).  In Section 2(a)(1)(B), however, Congress chose to eschew the imputation of liability, and instead imputed the employee's acts to the employer.  That difference is critical, because even if NYMEX is "deemed" to have made the alleged disclosures, NYMEX is nonetheless outside the purview of the Section 9(e)(1).  This is why:

For the major CEA enforcement provisions, there would be no difference between imputing acts and imputing liability.  For example, where Congress has prohibited "any person" from committing fraud (CEA Section 4b) or price manipulation (CEA Sections 6(c) and 9(a)(2)), an employee's misconduct that is both "for the employer" and "within the scope of employment" would, when imputed to the employer, lead to the employer's liability because Congress prohibited "any person" from committing the underlying violations.  *See* 7 U.S.C. §§ 6b, 9, 13(a)(2) (2006); *see also* 7 U.S.C. § 1a(28) (providing that "person" includes "individuals, associations, partnerships, corporations, and trusts").  For this reason, courts generally do not distinguish or need to distinguish imputed acts from imputed liability.

16

But Section 9(e)(1) is unlike other provisions in the CEA.  Only three sets of people – not just "any person" – can violate Section 9(e)(1) (and Regulation 1.59 (d)(ii)): exchange <u>employees</u>, <u>directors</u>, or <u>committee members</u>.  Section 9(e)(1) does not extend liability to DCMs and other self-regulatory organizations themselves.  Thus, even if Byrnes' and Curtin's acts were deemed to be committed by NYMEX as the CFTC claims under Section 2(a)(1)(B), NYMEX could not itself be liable under Section 9(e)(1) for those "acts."   Therefore, in Count II, the CFTC has failed to state a claim against NYMEX for which relief may be granted on this basis as well.

### B.     NYMEX's Obligations To Safeguard Confidential Customer Information Stem From A Flexible Set Of CEA Core Principles That Are Incompatible With No-Fault Liability.

Before Congress enacted the Commodity Futures Modernization Act ("CFMA") of 2000, CFTC regulations required DCMs to adopt and enforce specific rules to discharge their statutory self-regulatory mission.  Under this rules-based approach, in 1986, the CFTC adopted Regulation 1.59(b)(ii) to require "self-regulatory organizations" – a term that includes DCMs like NYMEX – to adopt and enforce rules prohibiting their employees from disclosing material non-public information to unauthorized third parties, if doing so would be inconsistent with such employees' "official duties."[12] *See* 17 C.F.R. § 1.59(b)(ii).  Thus, at that time, the CFTC could have held a DCM itself accountable if the DCM failed to enforce this specific rule designed to protect confidential information.

Through the CFMA, however, Congress overhauled DCMs' obligations under the CEA.  *See* Pub. L. No. 106-554, § 110, 114 Stat. 2763 (2000).  DCMs no longer faced rigid

---

[12]   *See* 17 C.F.R. § 1.59(b)(ii); *see also* 17 C.F.R. § 1.3(ee) (defining self-regulatory organization as a contract market).

requirements.  Rather, CFMA Section 110 added to the CEA a set of flexible "Core Principles" for DCMs.  Additionally, Congress empowered each DCM with "reasonable discretion in establishing the manner in which it complies with the core principles."  *See* 7 U.S.C. § 7(d)(1) (2006).

In response to the CFMA's new Core Principle regime, the CFTC amended its regulations so that DCMs no longer had to adopt rules pursuant to Rule 1.59(b)(ii).  *See* A New Regulatory Framework for Trading Facilities, Intermediaries and Clearing Organizations, 66 Fed. Reg. 42256, 42277 (Aug. 10, 2001) (adding 17 C.F.R. § 38.2, exempting DCMs from Rule 1.59(b)(ii) along with most other CFTC rules).[13]  This exemption acknowledges that DCMs' compliance obligations under the CEA flow from the flexible Core Principles.  Therefore, if NYMEX had any CEA duty to prevent its employees from misappropriating confidential customer information, it stemmed exclusively from Core Principle 15, which requires DCMs to "establish and enforce rules to minimize conflicts of interest in the decision making process of the contract market."  *See* 7 U.S.C. § 7(d)(15)(2006).

The CFTC outlined  "guidance" on how DCMs could satisfy Core Principle 15. In the guidance, the CFTC noted, "the Commission <u>believes</u> that the contract market <u>should</u> provide for <u>appropriate limitations</u> on the use or disclosure of material non-public information gained through the performance of official duties by board members, committee members and contract market employees or gained through an ownership interest in the contract market." (emphasis added) 17 C.F.R. § 38, Appendix B.[14]  The CFTC made clear that its guidance was "not intended to be a mandatory checklist."  *Id*.

---

[13]    *See* NYMEX Exhibit F.

[14]    The CFTC adopted this language in 2001.  *See* 66 Fed. Reg. 42256.

Congress also confirmed that it intended to prevent DCMs from facing no-fault liability by adding Section 5c(d) alongside the Core Principle provisions in the CEA.[15]  *See* 7 U.S.C. § 7a-2(d) (2006).  Section 5c(d) is a special remedy that Congress provided to the CFTC should it want to challenge a DCM's compliance with the Core Principles.[16]  Under CEA Section 5c(d), if the CFTC believed a DCM was at fault and had violated one of the many statutory Core Principles that DCMs must meet, the CFTC would have had to identify the deficiency for the DCM and provide a 30-day period to cure that deficiency.  Specifically, Section 5c(d)(1) stated:

> If the Commission determines, on the basis of substantial evidence, that a registered entity is violating any applicable core principle specified in section 5(d) [and other sections] the Commission shall:
>
> (A) notify the registered entity in writing of the determination; and
>
> (B) afford the registered entity an opportunity to make appropriate changes to bring the registered entity into compliance with the core principles.

And CEA Section 5c(d)(2) then provided:  "If, not later than 30 days after receiving a notification under paragraph (1), a registered entity fails to make changes that, in the opinion of the Commission, are necessary to comply with the core principles, the Commission may take further action in accordance with this Act."

The safeguards in Section 5c(d) further emphasize the flexible nature of the Core Principle regime and the judgment inherent in complying with those principles.  The CFTC's no-fault automatic liability legal theory against NYMEX contravenes  Section 5c(d) of the CEA by rendering it superfluous.  If the CFTC had alleged that NYMEX was itself at fault for violating a

---

[15]  Section 5c(d) was repealed by Dodd-Frank.  But the provision was effective during all times relevant to the CFTC's Amended Complaint.

[16]  Congress also provided a special remedy through a private right of action to individuals harmed as a result of a DCM failing to enforce its rules. *See* 7 U.S.C. § 25(b)(1) (2006).  However, to establish any such claim, Section 22(b)(4) requires a showing of "bad faith."  *See* 7 U.S.C. § 25(b)(4).  Requiring bad faith is a far cry from permitting liability based on no fault whatsoever.  Therefore, the provisions governing DCMs' obligations and liability under the CEA make clear that Congress did not intend for strict liability to apply to DCMs.

Core Principle – including the Core Principle that encompassed the protection of confidential information – NYMEX would have the right to notice of its deficiency and an opportunity to cure.  Yet, under the CFTC's theory, when NYMEX is innocent, and the CFTC's only claim is one of no-fault liability, somehow NYMEX is not entitled to these protections.  This is a complete circumvention of the statutory scheme.

Therefore, neither Congress nor the CFTC has ever hinted that a DCM could be vicariously liable for its employees' misconduct, especially the misappropriation of material non-public information.  Quite the opposite.  Under the Core Principle regime, NYMEX had "reasonable discretion" to prevent potential conflicts of interest, such as Byrnes' and Curtin's type of misconduct.  The CFTC itself advised simply that it "believes" that DCMs "should" provide "appropriate limitations" to their employees' disclosures of material non-public information.  Such flexibility and the only enforcement remedy (Section 5c(d)) available directly against NYMEX cannot be reconciled with no-fault strict liability.

**CONCLUSION**

For the foregoing reasons, NYMEX respectfully requests the Court to dismiss with prejudice Count II of the CFTC's amended complaint.

Dated: January 31, 2014

Respectfully submitted,

/s/ Albert Hogan III
Albert Hogan III
Patrick Fitzgerald
Jerrold Salzman
Gretchen Wolf
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
155 North Wacker Drive
Suite 2700
Chicago, Illinois 60606
Phone: (312) 407-0700
al.hogan@skadden.com
patrick.fitzgerald@skadden.com
jerrold.salzman@skadden.com
gretchen.wolf@skadden.com

Mark Young
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
1440 New York Avenue N.W.
Washington, D.C. 20005
(202) 371-7000
mark.d.young@skadden.com

***Attorneys for Defendant The New York
Mercantile Exchange, Inc.***

21