UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X
                                             :

U.S. COMMODITY FUTURES TRADING    :
COMMISSION,
                                             :
                        Plaintiff,   :

                                             :
              - against -            :
                                             :

WILLIAM BYRNES, CHRISTOPHER      :
CURTIN, THE NEW YORK MERCANTILE  :
EXCHANGE, INC., and RON EIBSCHUTZ,  :
                                             :
                  Defendants.  :
                                             :
------------------------------------------------------- X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: _____

13-CV-1174 (VSB)

**MEMORANDUM & ORDER**

Appearances:

Patryk J. Chudy
Patrick Daly
James G. Wheaton
David W. MacGregor
Division of Enforcement, U.S. Commodity Futures Trading Commission
New York, New York
*Counsel for Plaintiff*

Albert Hogan III
Patrick Fitzgerald
Jerrold Salzman
Gretchen Wolf
Skadden, Arps, Slate, Meagher & Flom LLP
Chicago, Illinois

Mark Young
Skadden, Arps, Slate, Meagher & Flom LLP
Washington D.C.
*Counsel for Defendant The New York Mercantile Exchange, Inc.*

VERNON S. BRODERICK, United States District Judge:

Defendant The New York Mercantile Exchange, Inc. ("NYMEX") moves to dismiss Count II of the Amended Complaint (the "AC") filed by Plaintiff U.S. Commodity Futures Trading Commission ("Plaintiff" or the "CFTC"). The allegations of the AC support a reasonable inference that Defendants William Byrnes and Christopher Curtin (collectively, "the Employees") acted within the scope of their employment when they allegedly disclosed material, nonpublic information for personal gain. Accordingly, the CFTC has stated a claim against NYMEX upon which relief can be granted, and, for the reasons that follow, I deny NYMEX's Motion to Dismiss.

## I.    **Background**

For the purposes of NYMEX's Motion to Dismiss, (Doc. 41), I accept as true the facts, but not the legal conclusions, set forth in the AC, (Doc. 19).

NYMEX is a commodity futures and options exchange. (AC ¶ 1.) It offers to customers an electronic platform called ClearPort that provides, among other things, clearing services for over-the-counter derivatives transactions.[1] (*Id.* ¶¶ 1, 19.) All trades entered into using ClearPort are contained in a trade blotter that details the identities of the buyer and seller; the broker, if any, that entered the trade into the system; and the price, volume, and terms of the trade. (*Id.* ¶ 21.) Most of the information contained in the trade blotter is confidential and is not available to the public. (*Id.* ¶ 22.) Access to information about trades cleared through ClearPort is restricted to the parties to the trade, the broker, and the clearing member who clears the trade. (*Id.*)

NYMEX employed Byrnes and Curtin to work on the ClearPort Facilitation Desk, where they were responsible for facilitating customer transactions reported for clearing through the

---

[1] Over-the-counter transactions occur directly between private parties rather than through an exchange.

ClearPort system. (*Id.* ¶ 4.)   As NYMEX employees, Byrnes and Curtin were bound by

NYMEX's Employee Handbook and Code of Conduct, which identifies trade data of the type to

which they had access as material, nonpublic, confidential information. (*Id.* ¶¶ 25-26; *see id.* ¶¶

27-28.)   Both Employees signed a written acknowledgment stating that they read the Employee

Handbook and understood their obligations and responsibilities as outlined therein. (*Id.* ¶ 29.)

The Employees also signed additional confidentiality agreements as part of their employment.

(*Id.* ¶¶ 30-31.)

  Through their work with ClearPort, the Employees had access to nonpublic information

about trades and customers in the ClearPort system. (*Id.* ¶¶ 4, 33, 55.)   The CFTC alleges that

the Employees misappropriated nonpublic information from NYMEX and disclosed it to

Defendant Ron Eibschutz, a commodities broker. (*Id.* ¶¶ 3, 6, 34, 56.)   In return, Eibschutz

provided the Employees with meals, drinks, and entertainment on multiple occasions. (*Id.* ¶¶ 46,

65.)   The material, nonpublic information the Employees disclosed included, among other things,

the identities of the buyer and seller in various trades, the number of contracts traded, the prices

and structure of particular transactions, and the trading strategies of certain market participants.

(*Id.* ¶¶ 35, 57.)   Eibschutz was not authorized to receive such information.[2] (*Id.* ¶¶ 37, 59.)

  In July 2009, a market participant complained to NYMEX that confidential information

regarding trades cleared through ClearPort had been disclosed to a brokerage firm by a NYMEX

employee named "Billy," who worked in a trade support capacity. (*Id.* ¶ 47.)   The managing

director responsible for the ClearPort Facilitation Desk (the "Managing Director") investigated

the complaint and identified Byrnes as "Billy." (*Id.* ¶¶ 47-48.)   NYMEX never questioned

---

[2] Besides the fact that both Byrnes and Curtin worked on the ClearPort Facilitation Desk and had contact with and
received gifts from Eibschutz, the Amended Complaint is silent concerning any other connection and/or relationship
between them, and concerning their relationship—either separately or together—with Eibschutz.

Byrnes about the complaint or took any measures to determine whether Byrnes had actually engaged in misconduct. (*Id.* ¶ 48.) Byrnes continued to disclose material, nonpublic information to Eibschutz. (*Id.*)

Shortly thereafter, NYMEX informed certain of its employees, including employees working on the ClearPort Facilitation Desk, that all business calls were to be conducted on desk phones—on which calls were recorded—and that staff were prohibited from using their mobile phones while at their desks. (*Id.* ¶ 49.) Notwithstanding the mobile phone ban, ClearPort Facilitation Desk employees continued to openly use mobile phones while at their desks. (*Id.* ¶ 50.) Indeed, Byrnes was observed regularly using his mobile phone at his desk, in some instances to avoid being recorded while disclosing nonpublic information to Eibschutz. (*See id.*)

Despite having identified Byrnes as the subject of the complaint concerning the sharing of confidential information, in July 2010, NYMEX promoted Byrnes to a supervisory position on the ClearPort Facilitation Desk. (*Id.* ¶ 51.) In this role, Byrnes's duties included training other employees on NYMEX's policies concerning confidential information. (*Id.*)

In November 2010, NYMEX received another complaint from a market participant about improper disclosures of nonpublic information. (*Id.* ¶ 52.) The Managing Director recognized the similarity between the July 2009 and November 2010 complaints, and in December 2010, NYMEX terminated Byrnes. (*Id.* ¶¶ 52-53.) Curtin had voluntarily resigned from NYMEX in April 2009. (*Id.* ¶ 66.)

The CFTC brings claims against the Employees under § 9(e)(1) of the Commodity Exchange Act (the "CEA"), 7 U.S.C. § 13(e)(1), and under § 1.59(d) of the Commission Regulations (the "Regulations"), 17 C.F.R. § 1.59(d). It alleges in Count II of the Amended

Complaint that NYMEX is vicariously liable under § 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for its Employees' improper disclosures.[3] (*Id.* ¶¶ 88-91.)

## II.     Procedural History

Plaintiff filed its initial Complaint on February 21, 2013. (Doc. 1.) The case was originally assigned to the docket of Judge George B. Daniels. On May 2, 2013, Plaintiff sought leave to amend its Complaint to add Eibschutz as a defendant. (Doc. 15.) All other parties consented to Plaintiff's filing an amended complaint. (Doc. 16 at 2.) Judge Daniels granted the motion to amend on May 8, 2013, (Doc. 18), and Plaintiff filed its AC on that same day, (Doc. 19). Defendant Byrnes filed his answer to the AC on January 29, 2014, (Doc. 38), and Defendant Curtin filed his answer to the AC on January 31, 2014, (Doc. 40). Defendant NYMEX filed its Motion to Dismiss the AC on January 31, 2014.[4] (Doc. 41.) Plaintiff filed its opposition to the Motion to Dismiss on April 25, 2014, (Doc. 48),[5] and NYMEX filed its reply on May 28, 2014, (Doc. 56).

## III.    Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility . . . depends on a host of considerations:

---

[3] The claims against the Employees are not implicated in NYMEX's Motion to Dismiss, so I do not address them.

[4] The case was reassigned to me on February 5, 2014.

[5] After seeking leave, Plaintiff filed a corrected opposition brief on April 30, 2014. (Doc. 53.)

the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Finally, although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

## IV.   Analysis

### A.    *NYMEX is amenable to suit under CEA § 2(a)(1)(B).*

NYMEX argues that, for two separate reasons, it may not be held vicariously liable for any employee violation of CEA § 9(e)(1). First, NYMEX contends that no provision of the CEA actually subjects it to such liability: CEA § 2(a)(1)(B) imputes only employee acts, not liability, to firms; and NYMEX is not one of the enumerated persons that may be directly liable under § 9(e)(1). (D's Mem. at 15-17.)[6] Second, NYMEX argues that, as a Designated Contract Market ("DCM") with its own regulatory responsibilities under the CEA, it could only be disciplined by the CFTC through a separate enforcement process for violating certain flexible "core principles" enumerated in the statute. (*Id.* at 17-20.) Neither argument is availing.

---

[6] "D's Mem." refers to the Memorandum of Law in Support of Defendant NYMEX's Motion to Dismiss Count II of Plaintiff's Amended Complaint. (Doc. 42.)

### 1.   Section 2(a)(1)(B) imputes liability to NYMEX.

The CFTC alleges, (AC ¶ 83), that the Employees violated § 9(e)(1), which prohibits any "employee, member of the governing board, or member of any committee of a board of trade, registered entity, swap data repository, or registered futures association," from "willfully and knowingly . . . disclos[ing] for any purpose inconsistent with the performance of such person's official duties as an employee or member, any material nonpublic information obtained through special access related to the performance of such duties."  7 U.S.C. § 13(e)(1).

The CFTC seeks to attribute the Employees' conduct to NYMEX pursuant to § 2(a)(1)(B), which is entitled "Liability of Principal for Act of Agent" and which provides:

> The act, omission, or failure of any official, agent or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.

7 U.S.C. § 2(a)(1)(B).  NYMEX contends that § 2(a)(1)(B) only attributes the Employees' *acts* to NYMEX and does not independently attach liability to NYMEX.  (D's Mem. at 15-16.)  Nor does § 9(e)(1) provide for NYMEX's liability, it argues, because NYMEX is not an "employee," "member of the governing board," or "member of any committee."  7 U.S.C. § 13(e)(1); (*see* D's Mem. at 17).  Thus, even if NYMEX could be held vicariously liable under § 2(a)(1)(B) for its employees' violations of other provisions of the CEA that are not limited in their scope to certain specific individuals, (*see* D's Mem. at 16), NYMEX contends that it cannot be held vicariously liable under § 2(a)(1)(B) for violations of § 9(e)(1).

"When interpreting a statute or regulation, we are required to read that statute or regulation as a whole, since the meaning of statutory language, plain or not, depends on context." *Rock of Ages Corp. v. Sec'y of Labor*, 170 F.3d 148, 155 (2d Cir. 1999) (internal citations and

quotation marks omitted).  "Congress passes legislation with specific purposes in mind. When the ordinary tools of statutory construction permit us to do so, we must attempt to discover those purposes." *In re WorldCom Inc.*, 723 F.3d 346, 360 (2d Cir. 2013) (alteration omitted) (quoting *N.Y.C. Health & Hosps. Corp. v. Perales*, 954 F.2d 854, 862 (2d Cir. 1992)).  The purpose of § 2(a)(1)(B) is entirely clear from the face of the statute:  to attach vicarious liability to a firm for its employees' misconduct within the scope of their employment.  While it is true that Congress did not use the words "shall be liable" in § 2(a)(1)(B), as it has in other statutory provisions creating various forms of supervisory liability, *cf., e.g.*, 15 U.S.C. § 78t(a) (control person liability under the Securities Exchange Act), Congress clearly communicated its intent to hold principals liable for their agents' acts through the title of the provision.  NYMEX suggests no reason why Congress would ascribe all acts within the scope of an agent's employment to the principal if it intended that the principal be held liable only for a subset of those acts.

Courts have uniformly interpreted § 2(a)(1)(B) and its predecessor provision as actually imposing liability against the principal, not merely imputing to the principal certain acts for which liability may or may not attach. *See, e.g.*, *Guttman v. CFTC*, 197 F.3d 33, 39 (2d Cir. 1999) ("Liability may be *imposed under section 2(a)(1)(A)* if the CFTC shows that (1) Magid was acting as Guttman's agent when he executed the unlawful trades, and (2) Magid's actions were within the scope of his employment or office." (emphasis added)); *Stoller & Co. v. CFTC*, 855 F.2d 1288, 1292 (7th Cir. 1988) ("Section 2(a)(1)(A) *imposes vicarious liability* upon a principal for the acts of its agent committed within the scope of his employment." (emphasis added)); *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir. 1986) ("[W]e have no doubt that section 2(a)(1) *imposes strict liability* on the principal . . . ." (emphasis added)); *In re Amaranth Natural Gas Commodities Litig.*, 711 F. Supp. 2d 301, 307 (S.D.N.Y 2010) (explaining that §

2(a)(1)(B) "creates liability"); *accord CFTC v. Int'l Fin. Servs. (N.Y.) Inc.*, 323 F. Supp. 2d 482, 499 n.12 (S.D.N.Y. 2004).

The CFTC has similarly interpreted the predecessor provision to § 2(a)(1)(B) to allow for vicarious liability for employees' violations of § 9(e)(1). *See* Application of the Cantor Financial Futures Exchange for Designation as a Contract Market, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,407 (Sept. 4, 1998) ("It is not unusual for employees of a contract market to have access to material nonpublic information, and in such cases, the contract market would be liable for employees' disclosures of that information under Section 2(a)(1)(A)(iii) of the Act."), *available at* http://www.cftc.gov/opa/press98/opacffefinal.htm.  This interpretation is not entitled to full-fledged *Chevron* deference because it was promulgated in a staff memorandum, but it is entitled to respect to the extent it has the power to persuade. *See Christiansen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) ("[I]nterpretations contained in formats such as opinion letters are entitled to respect under . . . *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), but only to the extent that those interpretations have the power to persuade . . . ." (internal quotation marks omitted)).  I find the CFTC's interpretation persuasive because, as explained above, it comports with the purpose of the statutory provision and with the overwhelming weight of judicial authority on the subject.

I therefore conclude that CEA § 2(a)(1)(B) creates vicarious liability for entities such as NYMEX for an employee's violation of other provisions of the CEA, including § 9(e)(1).

### 2.     The "core principles" do not displace all other forms of liability.

As a Designated Contract Market on which futures contracts are traded, *see* 7 U.S.C. § 6(a), NYMEX is responsible for policing its market and its market participants under a broad set of "core principles" mandated by Congress and enumerated in the CEA, *see id.* § 7(d).  A DCM

is required to comply with the core principles, *id.* § 7(d)(1)(A)(i), but has "reasonable discretion" in determining how it will do so, *id.* § 7(d)(1)(B).  One core principle requires DCMs to "establish and enforce rules . . . to minimize conflicts of interest in the decision-making process of the contract market."  *Id.* § 7(d)(16)(A).  Under a provision of the CEA that has since been repealed but was applicable during the alleged misconduct in this case, if the CFTC determined that a DCM was in violation of a core principle, it was required to notify the DCM and afford it an opportunity to correct the violation before taking further enforcement action.  *See* 7 U.S.C. § 7a-2(d)(1) (2006) (repealed 2010).  The "core principles" framework has only been in effect since 2000, *see* Commodity Futures Modernization Act of 2000, Pub. L. No. 106-554, app. A, § 110, 114 Stat. 2763A-365, 2763A-385 (2000), long after the CEA imposed vicarious liability on employers.

NYMEX argues that the imposition of *respondeat superior* liability for the Employees' wrongdoing would unfairly circumvent the far more lenient enforcement mechanism that the CFTC would have been required to use if NYMEX had violated a core principle.  (*See* D's Mem. at 19-20.)  However, NYMEX identifies no statutory language or other authority to suggest that the core principles are the exclusive means through which the CFTC may enforce the CEA against a DCM.  NYMEX contends that it should not be subject to vicarious liability because, "if NYMEX had any CEA duty to prevent its employees from misappropriating confidential customer information, it stemmed exclusively from Core Principle 15." (D's Mem. at 18.)  But the existence or breach of such a duty is irrelevant to the imposition of vicarious liability under § 2(a)(1)(B), as "negligence is not required for *respondeat superior*." *Rosenthal & Co.*, 802 F.2d at 969.  In other words, there is no contradiction between:  (1) requiring NYMEX to promulgate rules concerning conflicts of interest, by virtue of its special position as a DCM, and holding it

responsible under the core principles if it fails to do so; and (2) holding NYMEX strictly liable under other, more broadly applicable provisions of the CEA if its employees commit fraud or engage in insider trading within the scope of their employment, regardless of any rules NYMEX may or may not have promulgated.

The CFTC's regulations confirm that the establishment of the core principles did not impliedly exempt DCMs from all vicarious liability under the CEA. After Congress established the core principles, the CFTC promulgated Regulation 38.2, exempting DCMs from compliance with many existing CFTC regulations. *See* A New Regulatory Framework for Trading Facilities, Intermediaries and Clearing Organizations, 66 Fed. Reg. 42256, 42277 (Aug. 10, 2001) (codified as amended at 17 C.F.R. § 38.2). However, Regulation 38.2 continued to require DCMs to comply with Regulation 1.59(d), *see id.*, which the Employees are alleged to have violated in this case, (*see* AC ¶ 85). Regulation 1.59, in turn, prohibits certain enumerated individuals from disclosing or trading on the basis of material, nonpublic information obtained through special access in the course of their official duties. *See* 17 C.F.R. § 1.59(d)(1). As the CFTC points out, it is difficult to understand how NYMEX and other DCMs could be required to comply with Regulation 1.59(d), which regulates individual conduct, unless DCMs may be vicariously responsible for the conduct of their agents under certain circumstances. (*See* P's Mem. at 24-25.)[7]

Accordingly, I conclude that the establishment of the core principles and the availability of a separate mechanism for the CFTC to enforce them did not impliedly exempt DCMs, including NYMEX, from vicarious liability under § 2(a)(1)(B). *Cf. In re Stock Exchange*

---

[7] "P's Mem." refers to Plaintiff's [Corrected] Memorandum of Law in Opposition to Defendant New York Mercantile Exchange, Inc.'s Motion to Dismiss Count II of the Amended Complaint.  (Doc. 53.)

*Options Trading Antitrust Litig.*, 317 F.3d 134, 144-45 (2d Cir. 2003) (discussing the

presumption against concluding that a statute has been impliedly repealed).

### B. *The CFTC has adequately stated a claim against NYMEX.*

Having determined that NYMEX may be held liable under § 2(a)(1)(B) for employee

wrongdoing under § 9(e)(1), I now address whether the AC contains sufficient factual allegations

to state a claim for relief against NYMEX. I determine that it does.

CEA § 2(a)(1)(B) is "a variant of the common law principle of *respondeat superior*,"

which holds an employer "strictly liable—that is to say, regardless of the presence or absence of

fault on the employer's part—for torts committed by [its] employees in the furtherance of [its]

business." *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 515 (S.D.N.Y. 2004)

(quoting *Rosenthal & Co.*, 802 F.2d at 966). NYMEX may be held vicariously liable under §

2(a)(1)(B) if (1) the Employees were acting as NYMEX's agents when they disclosed the

nonpublic information to Eibschutz; and (2) the Employees' actions were within the scope of

their employment. *See Guttman*, 197 F.3d at 39. Thus, the CFTC need not allege that NYMEX

participated in or controlled the Employees' wrongful conduct. *See id.* The CFTC need only

allege facts supporting a reasonable inference that the Employees were "acting for" NYMEX in

disclosing the nonpublic information. *Id.* (internal quotation marks omitted); *accord Lobb v. J.T.

McKerr & Co.*, No. 85R-185, 1989 WL 242384, at *7, *11 n.22 (C.F.T.C. Dec. 14, 1989) (citing

*Rosenthal & Co.*, 802 F.2d at 966) (requiring plaintiff to establish that the agent's misconduct

was "in furtherance of the agency" to hold the principal liable under 7 U.S.C. § 2(a)(1)).

The CFTC alleges that, although the Employees' improper disclosures were "inconsistent

with the performance of their official[] duties as employees" of NYMEX, the disclosures

occurred "within the scope of their employment." (AC ¶¶ 88-89.) More specifically, the CFTC

contends that the Employees were acting for NYMEX and within the scope of their employment

when they disclosed material, nonpublic information because they:

> (i) worked on the . . . ClearPort Facilitation Desk and were responsible for
> facilitating customer transactions reported for clearing through the . . .
> ClearPort system; (ii) had lawful access to material nonpublic information
> that they received from brokers and/or the principals in transactions; (iii)
> were responsible for ensuring that ClearPort users received timely and
> accurate assistance in the use of the platform; and (iv) . . . had access to . . .
> NYMEX computer systems, including the . . . ClearPort trade blotter,
> containing material nonpublic information regarding the trading activities
> of . . . NYMEX customers.

(P's Mem. at 11 (internal citations and quotation marks omitted).)  Indeed, according to the

CFTC, the mere fact that the improper disclosures occurred while Byrnes and Curtin were

NYMEX employees supports an inference that the Employees acted in furtherance of their

employment. (*See id.* at 12.)

NYMEX contends that the CFTC cannot have it both ways.  (D's Mem. at 7.)  According

to NYMEX, the CEA's language and legislative and regulatory history make clear that, when the

Employees misappropriated confidential information for purposes inconsistent with their official

duties, they necessarily acted outside the scope of their employment.  (*Id.* at 8-11.)  Indeed,

NYMEX argues, the CFTC's allegation that the Employees misappropriated NYMEX's

confidential information for personal benefit undercuts its assertion that the Employees were

acting within the scope of their employment.  (*Id.* at 7-8.)

"An employee's act is not within the scope of employment when it occurs within an

independent course of conduct not intended by the employee to serve any purpose of the

employer."  Restatement (Third) of Agency § 7.07(2); *see also Burlington Indus., Inc. v. Ellerth*,

524 U.S. 742, 756-57 (1998) (noting that an intentional tort is generally outside the scope of an

employee's employment unless motivated by a desire to serve the employer's purposes); *In re*

13

*Ivan F. Boesky Sec. Litig.*, 36 F.3d 255, 265 (2d Cir. 1994) ("While an employer may be liable for even intentional and criminal acts committed by its employee, those acts must in some way further the interests of the employer, and not solely benefit the employee."); *Lipkin v. SEC*, 468 F. Supp. 2d 614, 623 (S.D.N.Y. 2006) (noting, under New York law, that "an employee is not acting within the scope of employment if [he] was acting solely for personal motives unrelated to the furtherance of the employer's business" (internal quotation marks omitted)).[8]

Whether an employee acted within the scope of his employment is a question of fact generally appropriate for resolution by the jury under the totality of the circumstances. *See Gallose v. Long Island R.R.*, 878 F.2d 80, 83-84 (2d Cir. 1989). NYMEX provides no authority to support the conclusion that the allegations of the AC are insufficient as a matter of law to permit any reasonable inference that Byrnes and Curtin were acting within the scope of their agency with NYMEX when they disclosed confidential information.

As an initial matter, the AC includes the express factual allegation that the Employees' unauthorized disclosures "occurred within the scope of [the Employees'] employment." (AC ¶ 89.) Furthermore, the CFTC alleges that: (1) the Employees worked on the ClearPort Facilitation Desk, (*id.* ¶ 4); (2) the Employees had access to material, nonpublic information including in the ClearPort trade blotter, as part of their official duties, (*id.* ¶¶ 33, 55); (3) phone calls made by employees on the ClearPort Facilitation Desk were recorded, (*id.* ¶ 43); (4) Byrnes knew phone calls from the desk were recorded, (*id.*); (5) Byrnes made unauthorized disclosures of material, nonpublic information on recorded phone calls during work hours on over 60 occasions, (*id.* ¶ 34; *id.* Ex. A); (6) Curtin made unauthorized disclosures of material, nonpublic

---

[8] The Employees' actions need not have had the ultimate effect of benefitting NYMEX to have been within the scope of their employment. *See Rosenthal & Co.*, 802 F.2d at 969 ("We do not rest decision on the fact that Rosenthal benefited from Pinckney's fraud . . . . [E]ven if Rosenthal had benefited from the fraud, the theory under which it was fined was respondeat superior, not unjust enrichment.").

information on recorded phone calls during work hours on at least 16 occasions, (*id.* ¶ 56; Ex. B); (7) Byrnes made further unauthorized disclosures in repeated mobile phone calls from his ClearPort desk, (*id.* ¶ 50); and (8) Byrnes was promoted to a supervisory role after the Managing Director who oversaw the ClearPort Facilitation Desk identified him as the subject of a complaint concerning the unauthorized disclosure of confidential information, (*id.* ¶¶ 48, 51).

Taken together, these facts permit a reasonable inference to be drawn that the Employees' unauthorized disclosures—and particularly Byrnes's—were intended to "serve *any* purpose" of NYMEX.  Restatement (Third) of Agency § 7.07(2) (emphasis added).  According to the allegations of the AC, Byrnes sat at his desk and, on workplace telephones that he knew were recorded, disclosed information that he had accessed in the course of his official duties.  After a cursory investigation into a complaint about his wrongdoing, he was then promoted.[9]  It is reasonable to infer from Byrnes's allegedly brazen conduct that he thought he was advancing some purpose of his employer by engaging in it.  It is also reasonable to infer from NYMEX's allegedly perfunctory investigation—where the potential perpetrator was identified, a one-day review of Byrnes's calls and emails was performed, Byrnes was not questioned, and NYMEX took no other action—and promotion of Byrnes that he was indeed advancing some purpose of his employer.  That the Employees also sought to avoid detection at times or expressed their concerns about getting caught, (*see, e.g.*, AC ¶¶ 50, 64), does not negate any possible inference that they sought to further NYMEX's purposes.  Indeed, it is unclear from the allegations of the

---

[9] I rely on the Managing Director's allegedly perfunctory investigation and Byrnes's subsequent promotion only as facts supporting a reasonable inference that Byrnes may have thought he was serving NYMEX's purposes, or may have actually been doing so, when he disclosed confidential information to Eibschutz.  My reference to these allegations is not intended to suggest that NYMEX may be held vicariously liable on the basis that it ratified Byrnes's conduct.  *See infra* note 11.

AC whether the Employees were afraid of detection by NYMEX, by the CFTC, or by other authorities.[10]

The cases on which NYMEX relies, drawn from the securities context, all involve a significantly more tenuous connection between the agent's conduct and his employment than the CFTC has alleged here. In granting summary judgment in favor of the defendant on a *respondeat superior* claim in *Moss v. Morgan Stanley Inc.*, 553 F. Supp. 1347, 1356-57 (S.D.N.Y. 1983), the court relied on the facts that the misconduct occurred outside the workplace and that the employee was acting well outside his "usual responsibilities" by purchasing stock. There, "the only link" between the employer and the employee's wrongdoing was that the employee had obtained confidential information on the job. *Id.* at 1356. Here, by contrast, the Employees are alleged to have openly and repeatedly disclosed confidential information over their NYMEX phones while sitting at the very desk where they were employed to safeguard that information. Similarly, in *In re Ivan F. Boesky Securities Litigation*, 36 F.3d at 265, summary judgment in favor of the principal on a *respondeat superior* claim was proper because the agent had acted "surreptitious[ly]" and because the plaintiff had conceded that the agent had acted outside the scope of his employment. And, in *O'Connor & Associates v. Dean Witter Reynolds, Inc.*, 529 F. Supp. 1179, 1194-95 (S.D.N.Y. 1981), the plaintiff failed even to allege that the person who traded on inside information was employed by the firm it sought to hold liable under a *respondeat superior* theory.

---

[10] NYMEX also contends that the Employees' conduct was necessarily harmful to NYMEX because protecting confidential information is the "lifeblood" of NYMEX's business. (*See* D's Mem. at 7, 14.) The CFTC does not actually allege that protecting confidentiality is NYMEX's "lifeblood." It alleges only that a NYMEX Managing Director—the same Managing Director who conducted a perfunctory investigation into the complaint about Byrnes's unauthorized disclosures—*said* that protecting confidentiality is NYMEX's lifeblood. (AC ¶ 10.) Furthermore, drawing all reasonable inferences in the CFTC's favor, the alleged fact that protecting confidentiality is important to NYMEX in general does not negate any possibility that the Employees thought they were advancing NYMEX's purposes through these particular unauthorized disclosures.

While an employee who 'tips' inside information "must normally be viewed as on a frolic of his own," *id.* at 1194, a plaintiff may properly state a *respondeat superior* claim by alleging "sufficient facts from which it may be inferred that the alleged tipper was not on a 'frolic,' but instead intended to benefit the employer as well as himself," *Energy Factors Inc. v. Nuevo Energy Co.*, No. 91-CV-4273, 1992 WL 170683, at *6 (S.D.N.Y July 7, 1992).  Here, the CFTC has done so.  Although the Employees' disclosures were inconsistent with their official duties and contrary to NYMEX policy, it is not unreasonable to infer from their alleged conduct that they thought they were advancing NYMEX's purposes.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 722 (S.D.N.Y. 2013) (denying defendants' motion to dismiss vicarious liability claims and concluding that, even though employees were suspended for allegedly contributing to LIBOR rate manipulation, it was plausible that they had done so in the scope of their employment).

Because the AC alleges facts supporting a reasonable inference that Byrnes and Curtin were acting within the scope of their employment when they disclosed confidential information, the CFTC has stated a claim for relief against NYMEX under the *respondeat superior* principles codified in § 2(a)(1)(B).[11]

---

[11] Because I conclude that the CFTC has stated a claim under § 2(a)(1)(B), I need not address the CFTC's alternative theory that NYMEX may be held vicariously liable for Byrnes's alleged wrongdoing because it ratified Byrnes's conduct by failing to take proper remedial action after being put on notice of his unlawful disclosures.  I note, however, that the CFTC brought its claim against NYMEX under § 2(a)(1)(B), and "ratification is not the theory" of that statutory provision.  *Rosenthal & Co.*, 802 F.2d at 966.  The CFTC has provided no authority for the proposition that a principal may be held liable under § 2(a)(1)(B) for subsequently ratifying an act taken by an employee that was not within the scope of his employment.

## V.   <u>Conclusion</u>

For the foregoing reasons, NYMEX's Motion to Dismiss is DENIED.  The Clerk of

Court is respectfully directed to terminate the pending motion at Doc. 41.

SO ORDERED.

Dated: September 30, 2014
     New York, New York

                               _____
                               Vernon S. Broderick
                               United States District Judge