# Exhibit 15

Page 1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    ------------------------------------------

5    U.S. COMMODITY FUTURES TRADING

6    COMMISSION,

7                         Plaintiff,

8

8              vs.        13 Civ 1174 (GBD)

9                         ECF Case

10

11   WILLIAM BYRNES, CHRISTOPHER CURTIN,

12   THE NEW YORK MERCANTILE EXCHANGE, INC.,

13   and RON EIBSCHUTZ,

14                        Defendants.

15   ------------------------------------------

16

17     VIDEOTAPED DEPOSITION OF RON EIBSCHUTZ

18

19

20          Thursday, November 19, 2015

21             New York, New York

22

23   Reported by:

24   JOAN FERRARA, RPR, RMR, CRR

25   JOB NO. 100307

1

2

3

4                        November 19, 2015

5                        11:00 a.m.

6                        New York, New York

7

8

9

10    Videotaped Deposition of Ron Eibschutz,

11  held at the offices of Skadden, Arps, Slate,

12  Meagher & Flom, Four Times Square, New

13  York, New York, Pursuant to Notice, before

14  Joan Ferrara, a Registered Merit Reporter,

15  Certified Realtime Reporter, and Notary

16  Public of the State of New York.

17

18

19

20

21

22

23

24

25

R. Eibschutz

1

2    A    Finance software, derivatives I

3  think it was.

4    Q    And you were only there for less

5  than a year?

6    A    Yep.

7    Q    Why was that?

8    A    It didn't work out.

9    Q    And according to your resume, in

10  August, you left Principia Partners in

11  August of 2006, correct?

12    A    I guess.  I don't remember.

13  According to my resume, yes.

14    Q    Okay.

15    A    Hold on.  Let me see.  I can't

16  see where it is.

17    Q    The first page.

18    A    Okay.

19    Q    Getting close to the top.

20         So after you left Principia,

21  what did you do next?

22    A    I went to Parity Energy.

23    Q    And what was your position at

24  Parity Energy?

25    A    Broker.

1                          R. Eibschutz

2      Q      Now, you had not been a broker

3   prior to your time at Parity, correct?

4      A      Correct.

5      Q      So how did you get a job at

6   Parity as a broker?

7      A      I have no idea.  I really have

8   no idea.

9      Q      You testified --

10      A      It sounds -- I don't really

11   remember, but -- I don't know.  I met them

12   for drinks and they liked me, and there you

13   go, I guess.  I don't really know.  Did I

14   say something else another time or

15   something --

16             MR. SCHECHTMAN:  You're doing

17        fine.

18      A      No.  I feel like you're alluding

19   to something.

20      Q      You did testify previously that

21   when you started at Parity, for the first

22   couple of days you did nothing, and then --

23      A      Well, brokers do a lot of

24   nothing.  They do a lot of nothing all day

25   long.

1                            R. Eibschutz

2    I went to his house and I think his wife

3    was there, I met her briefly.

4         Q     Did you ever go on any trips or

5    junkets with Byrnes or Curtin?

6         A     Like out of New York City?

7         Q     Yeah.

8         A     No.

9         Q     At some point in time, did you

10   consider Chris Curtin your friend?

11        A     I don't know.  I guess.  I mean

12   I don't know.  I don't understand the point

13   of the question, but --

14        Q     Well, forget about the point of

15   the question.  At some point in time did

16   you consider him a friend?

17        A     I don't know.  I guess.  I don't

18   know.  I mean it was a work relationship.

19   I mean I wasn't talking about my, you

20   know -- I don't know.  I guess.  I don't

21   know.  I didn't really look at it that way.

22   I don't know.

23              I know it sounds odd to you for

24   some reason.  I mean the only friend, the

25   only friend that I had really who I saw

1          R. Eibschutz

2    outside of work, like outside of work, was

3    Will.

4           MR. SCHECHTMAN:  Who was on the

5       desk with him.

6       A    He was on the desk with me.

7           MR. HERSKOVITS:  Could we get a

8       last name?

9           THE WITNESS:  Will Brittain.

10   BY MR. HOGAN:

11      Q    At some point in time, did you

12   consider William Byrnes a friend?

13      A    I guess.  Yeah, I guess so.  I

14   mean I don't -- it wasn't -- you know, I

15   think there was like a fine line with it,

16   but I guess you could say he was a friend

17   of mine.

18           We had a relationship in the

19   sense where we would joke around and kid

20   around and say a lot of stupid dumb boy's

21   locker room stupid crap, but it wasn't

22   like -- I don't know -- it wasn't like

23   someone I would talk about with like my

24   kids.

25           Does that make sense at all?

1                    R. Eibschutz

2          So when you say that there was a

3   report available, that was a report that

4   was published by NYMEX, correct?

5      A     Correct.  Sorry to interrupt, if

6   it was done on the floor, it was published

7   I think -- I don't know, but I think that

8   would be immediately -- right, it would go

9   up and everyone would see it.  Okay.

10     Q     So focusing on the information

11  that was available about transactions

12  executed through ClearPort --

13     A     Okay.

14     Q     -- there was a report that would

15  come out every day?

16     A     Yes, yeah.

17     Q     And I think you said that the

18  particular identity of parties to trading

19  activity was not disclosed in that report?

20     A     That is correct.

21     Q     With respect to any particular

22  product, were the specific trades listed or

23  was an aggregation of trading listed?

24     A     Each and every trade was listed,

25  is my recollection.

1                        R. Eibschutz

2    there.

3                    We all sit with each other.  We

4    can listen to each other's phone calls.

5    People, you know, people hear.  I mean, I

6    can't really hear out of my left ear that

7    well, but I didn't hear everything well all

8    the time, but that's a different issue.

9        Q    So why did you begin asking for

10   non-public information from people on the

11   ClearPort desk?

12       A    We were asking for cold calling

13   purposes.

14       Q    Can you explain that in a lot of

15   detail?

16                    Let me stop for a second.

17   Again, put yourself in the shoes --

18       A    I'm not being light.  I know

19   it's serious.

20       Q    Put yourself in the shoes of

21   somebody who doesn't know what a broker

22   does for a living and explain what you were

23   going to use this information for.

24       A    We make a phone call to the, to

25   the prospective company.  We tell them what

1                        R. Eibschutz

2      we do and what we broker.  We go, can I

3      have your IM and show you markets.

4           Q      Okay.

5           A      And it's basically you're

6      prospecting to try and get a customer.

7           Q      And how would getting non-public

8      information from people on the ClearPort

9      desk help you do that?

10          A      The slight advantage you might

11     have is if you don't, if you don't know who

12     is doing that, you know, who is trading,

13     for example, but it doesn't -- knowing who

14     did it doesn't really promote your book.

15     You don't know if they're going to give you

16     business.  You don't know if they're not.

17     A lot of times they're like, oh, here is my

18     IM, I'm not giving you any business.  Here

19     is my IM, you've got nothing.  You know,

20     show me what you got.  You know, it's like

21     do you want to meet for a drink.  It's all

22     like -- it's all just networking with them

23     and then just pounding the phones with them

24     and -- I don't -- okay.

25          Q      I'm going to give this a try.

```
1                    R. Eibschutz
2    trader.
3         A      Okay.
4         Q      What do you do now that you know
5    XYZ trader?
6         A      Either myself or someone else on
7    the desk would cold call that customer.
8         Q      You would call XYZ trader?
9         A      Correct.
10        Q      Why would you call XYZ trader,
11   having found out that they just executed a
12   trade through ClearPort?
13        A      Because it's really dumb.  But
14   besides that, trying to build your book.
15   But we've learned what you learn in the
16   energy business, or at least in options,
17   they all talk to each other.  So everyone
18   knows who is trading what throughout the
19   whole day, because everyone talks about it.
20   The traders are friends with each other.
21   They all go out with each other.  They let
22   them know what they're doing.
23              This is not anything that people
24   don't know at the end of every single day.
25   And I'm sure even during the day, they know
```

1                    R. Eibschutz

2    those markets, and it created some

3    animosity, and people would be like

4    shouting at each other, why don't you have

5    a relationship with your customer, you

6    know, things like that.

7         Q    Okay.  I think I understand.

8         A    I mean it became like an

9    obsession for some people to know what was

10   going on.  Like always asking, find out the

11   information, find out, find out, find out.

12        Q    Those were your co-workers at

13   Parity?

14        A    Co-workers and bosses.  It got

15   upsetting after a while and I was like, you

16   know, you've got to -- you know, but I did

17   it.

18        Q    And is that your co-workers at

19   Parity and Poten?

20        A    Correct, and bosses, too.

21        Q    Let's just stop for a second.

22             At some point you left your

23   employment at Parity, correct?

24        A    Uh-huh.

25        Q    And that was in the Spring of

1                     R. Eibschutz

2    2008?

3         A      Parity, no -- '10, '10.

4         Q      Spring of 2010?

5         A      That's the one that I got right

6    today.

7         Q      Okay.

8                Why did you leave Parity and go

9    to Poten?

10        A      To be honest?

11        Q      Yeah, that's important today.

12        A      I didn't mean it as a joke.

13   Sometimes I say things that just come out

14   that way, so I apologize.

15               Because the truth was, is

16   because Lou Pellathy is a scumbag.

17        Q      Okay.

18        A      And Will was encouraging me to

19   leave as well.

20        Q      If I understand, Poten was a new

21   brokerage venture at that time, correct?

22        A      Yes, correct.

23        Q      And who did you interview

24   with --

25               MR. SCHECHTMAN:  I should just

1                         R. Eibschutz

2    anything with this information other than

3    cold calling prospective clients?

4        A     No.  I just called prospective

5    clients, yeah, unless I accidentally said I

6    knew about something, that someone did

7    something -- but otherwise, yeah, the sole

8    purpose was cold calling, and then there

9    would be big fights on the desks on why

10   customers traded away.

11       Q     Could you explain that last part

12   for just a little bit?  What were the big

13   fights on the desk about?

14       A     Sometimes you just, because

15   people just get charged up for some reason,

16   like just -- I guess it's like the

17   testosterone kind of takes over sometimes

18   and someone can have a particularly good

19   relationship with one of the customers,

20   then it would just turn into some kind of

21   argument or something, or someone was like

22   I want to take that customer or something

23   like that.

24       Q     Okay.

25       A     I mean that's just an example.

1                    R. Eibschutz

2    I mean it just turned into a lot of

3    animosity.

4         Q    Okay.

5              You're going to have to explain

6    that just a bit.  When you say it turned

7    into animosity?

8         A    Like people just got angry and

9    then they get over it.

10        Q    Why would there be animosity

11   within say Poten about the information you

12   were learning from Mr. Byrnes?

13        A    Oh, at Poten you mean?  At

14   Parity, there was a lot of animosity.  And

15   at Poten, there was, too.

16             Because if there was a specific

17   customer who someone said they were, you

18   know, able to get business from or

19   something, then it was, they would get

20   really mad, you know.  It ended up just

21   kind of being one or two of the guys there

22   that ended up being like arguments with.

23        Q    Let me try and explain it this

24   way, see if I can --

25        A    I'm sorry.

1              R. Eibschutz

2      Q      What you're saying is that

3   occasionally you would learn that XYZ

4   trading company did a trade, right?

5      A      Right.

6      Q      And what you're saying is that

7   other people with whom you were working

8   believed they had a relationship with XYZ

9   trading company, right?

10     A      Correct.

11     Q      And either they were unhappy

12  that XYZ trading company hadn't used Poten

13  or the broker, right?

14     A      Right.

15     Q      Or they were accused of not

16  doing a very good job by other people,

17  because XYZ company hadn't used Poten as

18  the broker?

19     A      Yes.

20     Q      Got it.

21     A      Yeah, that's it.  That's exactly

22  it.

23     Q      The confidential information

24  that you were learning, did that include

25  a -- we'll start again.

1          R. Eibschutz

2          The confidential information

3    that you were learning, did that tell you

4    what a market participant's overall

5    position was?

6        A      No.  No way in hell.

7        Q      Can you explain that a bit?

8        A      I mean there is no way to know

9    unless you knew every single trade that

10   they've ever done, and they could have a

11   trade from 5 years ago, 3 years ago, 2

12   years ago -- who knows.  There's no way.

13       Q      Just for the benefit of those

14   who may not understand it, when I say

15   position, you understand that to mean

16   aggregating all of their trades?

17       A      Yeah.

18       Q      Whether they're long or short?

19       A      Yeah.

20       Q      In a particular --

21       A      I could guess and be like, yeah,

22   they're definitely so long.  But how do I

23   know?  Sometimes trader will be like I'm

24   really long this position when you meet

25   them out, they'll be like I'm so long this,

1                    R. Eibschutz

2      A      Who, me?

3      Q      Yeah.

4      A      For me to go to work as a

5  broker.  I looked at it like that.  I

6  didn't look at it in any other way.  What I

7  learned from it was when I got a new job is

8  to hire a lawyer to read a legal document.

9      Q      So --

10     A      And this is not, you know, this

11 is not something that you would ever look

12 at during at least, I don't know in the

13 legal profession, but I don't know anyone

14 who circles back to stuff that, unless

15 there's an issue with their work contract.

16     Q      Well, when you were working with

17 Parity, did you understand that it was

18 important for you to maintain information

19 about Parity's customers in confidence?

20     A      About Parity's customers?

21     Q      Uh-huh.

22     A      I guess.

23     Q      And when you went to work for

24 Poten in 2010, you talked about it a minute

25 ago, but your signature on this agreement

1               R. Eibschutz

2  with Parity became an issue, correct?

3       A     Oh, I see where you're going

4  with it.  I get it.  Can I walk through it?

5       Q     The answer is yes, right?

6       A     I'll tell you everything.

7       Q     Tell me what the issue was.

8       A     I'll just tell you everything.

9  The issue was that they didn't -- I signed

10  a document where I wasn't allowed to speak

11  to any of my customers for like 3 -- I

12  think it was like some crazy amount of

13  time.  Industry standard was they pay you

14  for 3 months and then you go back to work.

15            We went over to Poten and they

16  hired lawyers and told us to start working.

17  That's what it was, so.

18       Q     So you understood at the

19  beginning of your employment with Poten

20  that there was some issue with Parity in

21  the enforcement of this agreement?

22       A     I guess, yeah.  I mean, but

23  Poten told us to go to work, and we weren't

24  getting paid.  So if we were getting paid,

25  then -- I don't know what the legal

1               R. Eibschutz

2    Everyone else is working and living their

3    lives.

4        Q     As far as you can remember, did

5    Mr. Byrnes or Mr. Curtin -- strike that

6    question.  Strike that question.

7               Based on what you just said,

8    you're no longer working at Poten, is that

9    correct?

10       A     No.

11       Q     When did you leave Poten?

12       A     I -- they terminated, they

13   terminated the whole desk.  I have to talk

14   about myself, no one else, right?

15             MR. SCHECHTMAN:  That's right.

16       A     They terminated the whole desk

17   in March of 2013 right after the first

18   report came out from the CFTC.

19       Q     When you say they terminated the

20   whole desk, they didn't stop operations,

21   but they actually severed employment?

22       A     They stopped operations in

23   energy trading and they fired everyone, and

24   everyone got a job except -- actually,

25   yeah -- and then they all went to go to a

1                    R. Eibschutz

2    testimony, yes -- I mean from the tapes and

3    reading this, yes.

4        Q    Now, you said you may have had,

5    it was possible that you had information

6    about price at the time you made this call,

7    correct?

8            MR. JACKOWSKI:  Object to the

9        form.

10       A    I don't know.  I don't know.  I

11   don't remember.  I don't remember, I mean.

12   It was 6, 7 years ago.  I don't know.

13       Q    Is there any reason you would

14   ask about the price if your firm already

15   had that information at the time you were

16   making the request?

17       A    You know what, now that I'm

18   thinking about it now, and I'm just going

19   to think out loud, I might be wrong, but it

20   seems to me that if the information was

21   published the next day and I'm asking the

22   next day, that information was already

23   there when I asked the question.

24            So I asked a question post

25   trading day.  So I ask a question, for

1                       R. Eibschutz

2   example, today, on what happened yesterday.

3   That information is public already today,

4   right.

5              So the information that I'm

6   receiving on something that is not within

7   the day is already out there, except for

8   the counter-party and the broker.

9      Q     It's your belief that the

10  information --

11     A     It's published information.  And

12  now you know in 15 minutes, you know when a

13  trade occurs.  It's all live action.  You

14  see it.  It's got to post.

15     Q     I'm just trying to make sure I

16  can confirm your understanding of what was

17  public.

18              It was your understanding that

19  in this time period, the day after a

20  transaction, the volume of each transaction

21  was published, is that your understanding?

22              MR. JACKOWSKI:  Object to the

23       form.

24              THE WITNESS:  Am I allowed to

25       answer the question?