# Exhibit 20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

U. S. COMMODITY FUTURES
TRADING COMMISSION,

                        Plaintiff,

- against -

WILLIAM BYRNES,
CHRISTOPHER CURTIN,
THE NEW YORK MERCANTILE
EXCHANGE, INC., and
RON EIBSCHUTZ,

                     Defendants.

CIVIL ACTION NO.
13-CV-1174 (VSB)

# EXPERT REPORT OF
# ROBERT SILVAY

February 16, 2016

# TABLE OF CONTENTS

Introduction ................................................................................................................. 1

Background and Qualifications ................................................................................... 2

Overview of the Energy Derivatives Market .............................................................. 5

– Trading Venues ....................................................................................................... 5

– Instruments Traded ................................................................................................. 6

– Market Participants ................................................................................................. 8

– Mechanics of a Brokered OTC Transaction ........................................................... 10

Analysis of the Availability and Importance of the Information Shared on the Calls 13

– Availability to the Trading Public of the Information on the Calls .......................... 14

– Importance to a Reasonable Trader of the Information on the Calls ........................ 15

Conclusion .................................................................................................................. 17

Appendix A

Appendix B

Appendix C

I, Robert Silvay, traded and brokered trades in crude oil and energy derivatives for over twenty years, including the years discussed in the complaint in this case. My resume is annexed as Appendix A. Accordingly, and having reviewed materials relevant to the issues in this matter, I have personal knowledge of the facts stated herein and, if called as a witness, would testify to the facts and opinions set forth below.

## Introduction

1.      I have spent over twenty-two years as an active trader and broker of energy options, futures, and swaps for some of the largest market participants in the energy trading market. Specifically, my day-to-day responsibilities as both a trader and broker focused on the execution of transactions in the various instruments described in the amended complaint ("Complaint") in this case.

2.      I have reviewed the recordings of the sixteen calls between Christopher Curtin and Ron Eibschutz identified in Exhibit B to the Complaint (the "Calls"), as well as certain other materials identified in Appendix B to this report.

3.      I have been asked by Menaker & Herrmann LLP, counsel for Christopher Curtin, to provide an overview of the over-the-counter energy derivatives markets, and to assess whether, in my experience, (i) Curtin's statements in the Calls contained information not generally available to the trading public, and (ii) a reasonable person would find Curtin's statements in the Calls important in deciding whether to trade a particular commodity interest.

## Background and Qualifications

4.      I graduated from Georgetown University with a Bachelor of Science in Business Administration with a major in Finance in 1987, and from Columbia University with a Masters of Business Administration in Finance in 1992.

5.      My career has centered on the trading and brokering of energy futures, options, and swaps. See Appendix A to this report for my complete resume.

6.      I have personally participated in the growth and migration of the commodity trading industry from a centralized futures and options open outcry trading floor with a smaller brokered over-the-counter ("OTC") futures, swaps, and options market, to a marketplace that is equally reliant on a combination of exchange-based electronic platforms for futures and options (also still traded on the floor) and a more robust decentralized OTC market.

7.      Initially, I was a clerk for Burns Fry on the floor of the Chicago Mercantile Exchange ("CME") and later the Chicago Board of Trade ("CBOT") in futures and options. After completing my master's degree, I resumed my commodities career with O'Connor & Associates, one of the world's leading options market-making firms, as a market-maker trading and managing large and complex option portfolios in various financial option trading pits.

8.      At O'Connor & Associates, I traded energy products as both a trading pit and OTC market-maker for options, futures, and swaps in petroleum and natural gas on the New York Mercantile Exchange ("NYMEX") and the International Petroleum Exchange.

- 2 -

9.     In 1997, I started at Hess Energy Trading Company, one of the largest and most active energy trading firms in the world, as a trader and rose to be a senior dealer in energy futures and options. I personally traded on a daily basis a significant number of transactions in all trading venues, that is, floor, electronic, direct OTC and brokered OTC. As electronic trading emerged, I was one of the initial traders to participate in Intercontinental Exchange ("ICE"), CME, and NYMEX's electronic trading platforms.

10.     In the following years, I became a proprietary trader with Valhalla Capital Advisors, then a senior dealer with both Bank of America and Credit Suisse/Glencore Alliance. In these positions, I actively traded energy derivatives across all market venues.

11.     In 2009, after the bankruptcy of Lehman Brothers, I was employed by Lehman Brothers Holdings to assist with the unwinding, valuing, and settling claims of several thousand bilateral energy derivatives swaps and options for hundreds of counterparties. In conjunction with legal counsel, I negotiated directly with counterparties to apply the proper termination procedures and use the appropriate means for valuing pending claims under the guidance of the credit committee.

12.     From 2009 to 2012, I worked for Cheiron Trading as Director of OTC Energy Markets, and for Geneva Energy Markets as a market-maker and trader in petroleum futures and swaps. With both firms, I actively traded significant volumes of electronic and OTC futures and swaps. I was directly involved in the CME/NYMEX ClearPort posting process and interacted with the CME/NYMEX Facilitation Desk.

13.     In addition to my experience as an energy trader, I was a senior options and swaps broker for Power Merchants Group in the petroleum brokerage group. I brokered bilateral, principal-to-principal OTC transactions between sophisticated

- 3 -

counterparties such as oil companies, commodity trading advisors, commodity trading houses, market-makers, hedge funds, and banks. Many of the petroleum and natural gas options, swaps, and futures transactions I brokered cleared on CME/NYMEX ClearPort and ICE Clear.

14.     My experience as a market participant for over two decades provides me with extensive practical knowledge of the trading, brokering, and clearing processes of energy instruments, including options (including spread options and average price options) on crude oil futures, natural gas futures, heating oil futures, gasoline futures, and gasoil futures.

15.     I am currently a Managing Director for Wavecrest Securities, a global, independent, middle-market boutique investment bank. Wavecrest is a Financial Industry Regulatory Authority ("FINRA") and Securities Investor Protection Corporation member firm with expertise in sourcing traditional and creative financing solutions, as well as in mergers and acquisitions.

16.     I have been a member in good standing of CME, CBOT, and NYMEX. Additionally, I passed the FINRA Series 3 - National Futures Association Examination, Series 7 - General Securities Registered Representative Examination, and Series 63 - Uniform Securities State Law Examination.

17.     As a result of my many years in the energy trading markets, I have in-depth knowledge of the mechanics of trading, brokering, and clearing of energy products, and in particular of the brokering and trading of instruments cleared on CME/NYMEX ClearPort.

18.     I am paid for my time devoted to study of the materials, preparation of this report, and testimony in this proceeding at the rate of $350 per hour. My compensation is in no way conditioned on the outcome of this matter. I have not testified in any other cases or authored any publications in the past ten years.

### **Overview of the Energy Derivatives Market**

#### **– Trading Venues**

19.     Energy derivatives contracts, as opposed to contracts for the purchase of an underlying physical commodity, are traded on organized, centralized commodity markets ("exchange markets"), or on the OTC market. The OTC market is primarily a voice-brokered market, with physical and financial transactions negotiated via telephone between brokers and trading firms buying and selling at various locations.

20.     Exchange markets are tightly-regulated meeting places for buyers and sellers, with trades executed by what is known as open outcry on the exchange trading floor or on its electronic trading platform and cleared through the exchange's clearing association. In this market, buyers and sellers generally do not know with whom they are transacting. By clearing their trades through the exchange, the parties agree to the substitution of the clearing association (with all its financial resources) as the buyer to the seller and as the seller to the buyer, thereby removing the risk of their counterparty's failure to perform the terms of the contract.

21.     By contrast, OTC transactions have historically been unregulated principal-to-principal trades with counterparties using bilateral negotiated agreements—rather than the clearing services of an exchange—to govern credit risk. Almost all non-

cleared trades are governed by a standardized master agreement sponsored by the International Swaps and Derivatives Association.

22.     Exchange clearing of OTC transactions only started in 2002 with the advent of NYMEX's ClearPort, joined soon thereafter by ICE Clear. Even after exchange clearing of OTC trades was made available, many counterparties initially shied away from it because of clearing fees, tax consequences, and the requirement of daily margin calculations and payments to maintain positions. However, with the disruption in the financial and commodities markets, including the bankruptcy of Lehman Brothers, in 2008, the transition to clearing OTC transactions accelerated rapidly. Nevertheless, there was still significant trading volume in OTC transactions that were not cleared in 2008 to 2010.

**– Instruments Traded**

23.     During the 2008 to 2010 period, CME/NYMEX listed six major petroleum and natural gas contracts for trading: (a) West Texas Intermediate Crude Oil; (b) Heating Oil; (c) RBOB Gasoline; (d) Natural Gas; (e) Brent Crude Oil; and (f) Gasoil.

24.     Although the complete slate of contracts cleared on ClearPort was well into the hundreds, these six major energy contracts, including complex options and swaps derived from (and priced based on) these contracts, accounted for the vast majority of the nearly 1.5 million contracts cleared daily on the NYMEX division of the CME during this period. The major categories of derivative contracts are described below.

25.     Futures are standardized contracts that obligate a seller to deliver to a buyer a specific quantity of a standardized grade of a commodity in a specific location during a specific time period. For example, a futures contract might call for the delivery

of 1,000 barrels of West Texas Intermediate Crude Oil ratably over the listed contract month in Cushing, Oklahoma, with trading terminating on roughly the 20th day of the preceding month. Futures contracts can be offset by taking the opposite position of an open contract in the same month.

26.     Futures contracts can be traded as individual contracts, e.g., the purchase or sale of 10 December 2017 crude oil contracts (CL), which is sometime known as an "outright" purchase or sale, or they can be traded as part of a structure involving other futures contracts with different maturities (calendar spreads) or other commodities (inter-commodity spreads). Spreads, whether calendar or inter-commodity, generally involve the purchase of one contract and the sale of the other, e.g., March '17 crude oil vs. June '17 crude oil, or March '17 crude oil vs. March '17 heating oil.  These spreads can be purchased or sold as spreads, or they can be created by separately buying or selling each of the components, or legs.

27.     Swaps are exchanges of cash flows dependent on the future price of an underlying commodity or commodities. Whereas the buyer of a physical futures contract has the right to receive delivery of the underlying commodity, swaps only entitle holders to the difference between the executed price of the contract and the final settlement price for the pricing period. Like futures, swaps can be priced using the monthly settlement of a simple single commodity (e.g., June WTI Crude Oil swap) or using the relationship of the settlement between two or more commodities (e.g., June WTI Crude Oil versus June Heating Oil swap).

28.     Options are derivatives of futures or swaps contracts that give the option-holder the right, but not the obligation, to buy or sell a specific instrument at a

- 7 -

predetermined price (the "strike price") before a specified expiration date. There are two types of options: a call option (giving the right to buy) and a put option (giving the right to sell). Options are traded on futures, calendar spreads, and inter-commodity spreads, with many different maturities and strike prices trading for options based on the same underlying commodity. Options structures can consist of a single strike or a combination of strikes, usually in conjunction with a related futures hedging position. The pricing of options is highly dependent on the price of the underlying market.

### – Market Participants

29.     Participants in the energy markets are either traders or brokers. Traders fall into three categories: (a) Hedgers are risk averse physical commodity owners that need to offset the risk of adverse price fluctuation. Common categories of hedgers are oil companies, refiners, private equity funds, and end-users such as airlines, truckers, and shipping companies. (b) Speculators are traders seeking profits from, or "speculating" on, price movement, and who at the same time are willing to assume the risk of adverse price movement. Speculators include commodity trading houses, hedge funds, commodity pools, commodity trading advisors, and individuals. (c) Market-makers are sophisticated financial trading firms which employ complex models to take advantage of pricing anomalies by constantly entering trades on both sides of the market with the expectation of making a profit. Banks, large option traders, smaller "local" traders, high-frequency traders, and commodity trading houses all function as market-makers. Some firms might have different divisions or trading operations that place them into more than one of these three categories.

30.     Occasionally, in the OTC market, two trading firms will negotiate a trade directly. More often, however, trades are arranged by brokers, who match buyers and sellers by finding potentially interested traders and acting as go-betweens in negotiations. As explained below (¶ 34), a trading firm will often use multiple brokers, discussing desired trades, trading terms, and its available trading interest at various prices and locations. The brokerage receives a commission from both counterparties. Brokerages almost never interact with their competitors, and so almost always represent both the buyer and the seller in a transaction. As with direct transactions, brokered transactions can either be cleared on an exchange or not cleared, as the traders prefer.

31.     Brokerages usually specialize in a limited number of derivatives, whether for a specific category of instruments—swaps, futures, or options—or for a particular underlying commodity such as crude oil, petroleum products, or natural gas. Brokerages usually have two to ten brokers per "desk" that "cover" all trading entities that transact in the instruments of their market specialization. Some brokerages may have more than one desk, and so cover more than one market specialization.

32.     Brokerages spend years building and maintaining strong relationships with their customers. Although a few customers often account for most of their trading volume, brokerages are constantly reaching out to all of the trading entities in the market in an attempt to expand business. Primarily, this takes the form of "showing markets"— quoting prices for transactions that one of their customers is offering—to existing and potential customers through telephone calls, IM, text messages, or email conversations.

33.     Brokerages are generally aware of all the trading entities that transact in the marketplace through a combination of market knowledge, corporate websites, and

industry publications such as *Petroleum Supply Americas*, published by Opis/Stalsby Energy Directories & Databases, which lists many of the traders and brokers in the petroleum market. New relationships come from recommendations from other traders, introductions at industry functions, or cold calls to traders. As a broker, I used all of these resources regularly.

34.     Trading firms often use a number of different brokerages within each market in which they trade, choosing which brokerage to use on a transaction-by-transaction basis. A counterparty might select a particular brokerage because of the strength of its relationship with a broker, because the broker is offering an especially desirable transaction, or to spread transactions across multiple brokerages for competition's sake.  Thus, across the brokerages in the same market niches, some trading entities are very active with some brokerages and relatively dormant with others.

### – Mechanics of a Brokered OTC Transaction

35.     A brokered OTC transaction will usually start with a broker receiving a request from a trading entity for a market, that is, a bid price and an offer price for a proposed transaction in a specific instrument. For example, the customer might like a market for a twelve-month spread option on crude oil futures (WZ), +$2.00 December 2009/December 2010 call.

36.     The broker will announce within his brokerage that his customer is looking for a market in the WZ December 2009/December 2010 +$2.00 call. Then, all the brokers at that brokerage will ask the market-makers that usually have interest in WZ to get a quote for the requested market.

37.     Within a minute or two at most, the market-makers will provide their quotes, and the broker will compile the best bid and best offer. Whenever possible, the broker will include additional details—for example, that all market-makers have similar quotes, or that a particular market-maker has a strong bid or offer in comparison to the others. In our example, the communication to the client might be "WZ December 2009/December 2010 +$2.00 call is $1.10 bid/$1.20 offer." When the trader asks, "who is on that quote?", the broker replies, "one bid for 300 contracts by market-maker Alpha, two offers of 100 each by market-makers Bravo and Charlie."

38.     Once the market is established, the customer will indicate her interest in the market. For example: "Please show a $1.13 bid for 500." At this point, all the brokers at the brokerage will show the market (which now includes the customer's bid) not only to the market-makers, but also to all other potential counterparties that might have interest in this transaction. As the market narrows, brokers will constantly update their customers until hopefully bid meets offer and a transaction occurs.

39.     Traders will hear from brokers throughout the day with various markets (*See*, *e.g.*, Appendix C). As part of keeping their customers informed of the state of the quoted markets, the brokers will answer questions as to the names of potential counterparties (which might be important for parties who prefer not to clear their OTC trades), and any other details the customers consider important.

40.     Usually, a few counterparties will respond to the market announcements with requests for further information or bids. In the example above, a bank might bid $1.14 for 200 contracts, a speculator might offer 300 contracts at $1.16, and the original

market-makers might improve their bids and offers to reflect the best bid and ask of $1.14 and $1.16.

41.     At this point there would be three different bids of $1.14 and three different offers at $1.16. After being shown the updated market, the original customer might decide to bid $1.15 for 500. It is the goal of the brokerage to have as many contracts trade as possible, so the brokers would encourage the $1.16 sellers to reduce their offers by $0.01 and the $1.14 bidders to increase their bids by $0.01. Once again, all brokers at the brokerage would keep on announcing the market to all traders, hoping to attract additional customers to the transaction.

42.     If the bids and offers meet, the transaction will be consummated. The counterparties will be matched up by the broker, and, using the broker as a go-between, the traders will determine whether and where to clear the transaction.

43.     Brokerages are not only a conduit for transactions, but also repositories and dissemination centers for market information. Brokers communicate with traders throughout the day, not only about specific transactions the broker is working on, but also about the market as a whole, including clients' trades through other brokerages. Traders share information with brokers that they learn from other brokers, and vice versa. Moreover, traders share among themselves. Thus, virtually all market participants quickly end up with the same information.

44.     OTC market participants share information because it is the only way for them to learn the price of the derivatives they trade. In the world of exchange-based commodities trading, traders see the current price of a commodity on an exchange ticker or Bloomberg screen. The price for a commodity is exactly what the screen says it is, and

- 12 -

is updated in near-real time. By contrast, in the OTC markets, there is no screen, there is

no exchange reporting, and there is no source of price information for market participants

except for actual trades. However, once the market has processed trade information—

which happens almost instantaneously—the details of that trade no longer matter to

market participants. The market has moved on to the next signals about the value of the

instrument traded—news reports about the underlying commodity, press releases from

industry players, or simply the next trade. In my experience, it would be very rare for

market participants to care about trades that were more than a few minutes old.

45.     A clear example of traders and brokers sharing information of the type

discussed on the Calls can be seen in the following IM exchange between Ron Eibschutz

and Brad Hrycenko:



(Bates number 13CIV1174-CFTC-0002858). In this IM, Hrycenko, a trader, tells

Eibschutz, a broker, the names and trading patterns of other traders. Other examples of

such information sharing are collected in Appendix C.

### Analysis of the Availability and Importance of the Information Shared on the Calls

46.     The Calls contain exactly the sort of information routinely shared by

market participants. Indeed, as both a trader and a broker, I exchanged such information

with other market participants every day as a basic part of doing my job.

47.     Throughout the fragmented and often interrupted telephone conversations, Eibschutz and Curtin speak in the highly colloquial parlance of energy derivatives market participants. Typically, Eibschutz initiated the conversation with specific details (presumably learned from other market participants) of the transactions which he wanted confirm or about which he wanted additional details, and Curtin filled in some of the gaps in Eibschutz's information.

### – Availability to the Trading Public of the Information on the Calls

48.     Based on my experience with the flow of information in the energy markets, I can say confidently that the information in the Calls was available to the trading public. All of the trades discussed on the Calls were brokered. That means that the details of those trades were already known to virtually all market participants (*see above*, ¶¶ 42-43). As explained by CME Director of Marketing Thomas Holleran, "[t]he [ecosystem] for energy traders is very small and in a call around market, when a trade gets done, every broker, every trader who was involved in that particular market knows that a transaction occurred and they all have that same information" (Deposition Transcript of Thomas Holleran, 96:16-21).

49.     The availability to the trading public of this information is further illustrated by Hrycenko's disclosure to Eibschutz of identified traders' trading patterns (*see* ¶ 45). Indeed, the information in that IM is more revealing than anything discussed in the Calls.

50.     Calling Curtin may have functioned as a shortcut for Eibschutz, allowing him to bypass communication with other market participants, but the information he obtained was available to him through other channels. Indeed, the details that Eibschutz

knew before calling Curtin came to him through precisely those channels, and often times the disclosure provided by Curtin was confirmatory in nature.

51.     Moreover, much of the information that Curtin discussed with Eibschutz was merely the names and phone numbers of traders, presumably for use in cold-calling. As discussed above (*see* ¶ 32), there are resources available to the trading public that either used on their own or in combination can help identify and provide contact information for a trading entity, a trader, and an energy derivative brokerage or the associated brokers.

### – Importance to a Reasonable Trader of the Information on the Calls

52.     As a trader and a broker, I can say with a high degree of certainty that a trader would not consider the information in the Calls important in making trading decisions. The information in the Calls was too stale, too fragmented and incomplete, and related to trades with too small a volume to be significant in deciding whether to trade a particular commodity interest.

53.     Information about trades that have yet to occur might be used for front-running, that is, trading in advance of a market-moving event that is known to the trader but not the market. However, since all of the Calls were made after the trades were executed—generally, days later—there was never an opportunity for front-running here.

54.     Indeed, the Calls occurred no sooner than two hours after the trade was submitted for clearing. In view of the speed with which the market digests trade information (as discussed above in paragraph 43), this information was clearly stale and of no use.

55.     Beyond its staleness, the information on the Calls would not be important to a trader because it is so fragmented. The Calls only provided snapshots of transactions, without disclosing any of the reasons behind them. Options are usually traded in structures that combine several "legs"—for example, adding a futures hedge to an outright. No such trades, or such relationships between trades, are disclosed on the Calls. Moreover, the Calls did not contain any information to identify a trade as opening or closing a position for either trader. The Calls did not reveal either trader's overall position size in the specific instrument, either trader's present or future cash position, either trader's strategy within or across instruments, or either trading entity's financial condition. Finally, the Calls did not reveal any information about the underlying market, which is integral to pricing options.

56.     A stand-alone trade is profitable only if it predicts the direction in which the market will move. No trader gets this prediction right all of the time—otherwise, no one would trade with him. A trade reflects the views of two different traders as to where the market will go—there is no way to tell who will be right, and so no reason to mimic either the buy or sell side of a transaction. What's more, without additional information about the reasons for the transaction, the trader would not be able to determine what either of the trading entities would do next. No such information was provided on the Calls.

57.     Finally, the volume of each of the transactions discussed on the Calls was not significant enough to affect prices.

58.     Many of the instruments discussed on the Calls, such as calendar spread options, are highly illiquid third order derivatives. The price of these derivative

instruments is primarily driven by the price of the underlying calendar spread, which is extremely liquid. The price of the calendar spread, in turn, is driven by the price of the underlying commodity, which is even more liquid. Even though a spread option transaction may represent a large portion of a single day's trading volume or overall open interest in that particular instrument, information about a single trade in that instrument does not give a trader any meaningful insight into the market for the underlying commodity or calendar spread, and so cannot be used to predict prices.

### Conclusion

59.     For the foregoing reasons, and based on my over twenty-two years as a trader and broker in the energy derivatives market, it is my opinion that the information discussed on the Calls was generally available to the trading public and was not, and could not have been, important to a reasonable trader in deciding to trade an energy contract or any other commodity interest.


**ROBERT SILVAY**


2/16/16
**Date**

# APPENDIX A

# ROBERT SILVAY

1430 North Lake Shore Drive | Chicago, IL 60610
RobertSilvay@yahoo.com | (917) 327-0112

## PROFESSIONAL EXPERIENCE

**WAVECREST SECURITIES LLC,** New York, NY                    March 2013 - Present
*Managing Director, M&A Advisory, Corporate Finance, and Capital Raising*
- Source debt and equity capital;
- Provide advisory services across multiple industry verticals and geographies.

**CHEIRON ENERGY LLC,** Tuxedo Park, NY & Chicago, IL        January 2012 - July 2012
*OTC Energy Markets, Petroleum Futures & Swaps Trading Group*
- Managed high frequency futures and swap energy trading group in Crude Oil, Brent, Heating Oil, RBOB Gasoline, and Gasoil products listed on CME/NYMEX and IPE;
- Traded swaps in OTC broker market and futures on electronic platforms using sophisticated pricing models.

**GENEVA ENERGY MARKETS,** New York, NY                    April 2011 - October 2011
*Market Maker/Trader, Petroleum Futures & Swaps Trading Group*
- Actively traded and managed risk of large swaps and futures book in Crude Oil, Brent, Heating Oil, RBOB Gasoline, and Gasoil products listed on CME/NYMEX and IPE;
- Traded swaps in OTC broker market and futures on electronic platforms using sophisticated pricing models.

**POWER MERCHANTS GROUP,** New York, NY                    August 2010 - April 2011
*Senior Options & Swaps Broker, Petroleum Options & Swaps Brokerage Group*
- Brokered options, spread options, and swaps in OTC market to hedgers, speculators, and market makers in Crude Oil, Brent, Heating Oil, RBOB Gasoline, Gasoil, and Natural Gas products listed on CME/NYMEX and IPE.

**CHEIRON ENERGY LLC,** New York, NY & Chicago, IL        June 2009 - August 2010
*Director of OTC Energy Markets, Petroleum Futures & Swaps Trading Group*
- Created and managed high frequency futures and swap energy trading group in Crude Oil, Brent, Heating Oil, RBOB Gasoline, and Gasoil products listed on CME/NYMEX and IPE;
- Traded swaps in OTC broker market and futures on electronic platforms using sophisticated pricing models.

**LEHMAN BROTHERS HOLDINGS INC.,** New York, NY            January 2009 - June 2009
*Consultant, Commodity Derivatives Unwind Team*
- Facilitated bankruptcy process for commodity derivatives portfolio;
- Analyzed, negotiated, and presented for final approval swap and option terminations using ISDA guidelines in commodity derivatives to Creditor Committee.

**CREDIT-SUISSE/ GLENCORE ALLIANCE,** New York, NY      May 2008 - October 2008
*Director, Senior Crude Oil Dealer/Proprietary Trader*
- Managed global risk portfolio, quoted institutional clients, and traded speculative positions in Energy Derivatives;
- Traded via OTC broker market, exchange trading floor, and electronic platforms in energy swaps, futures, and options in Crude Oil, Brent, Heating Oil, RBOB Gasoline, and Gasoil products listed on CME/NYMEX and IPE.

**BANK OF AMERICA,** New York, NY      January 2006 - February 2008
*Director, Senior Crude Oil Dealer/Proprietary Trader*
- Managed global risk portfolio, quoted institutional clients, and traded speculative positions in Energy Derivatives;
- Traded via OTC broker market, exchange trading floor, and electronic platforms in energy swaps, futures, and options in Crude Oil, Brent, Heating Oil, RBOB Gasoline, and Gasoil products listed on CME/NYMEX and IPE.

**VALHALLA CAPITAL ADVISORS,** New York, NY      January 2005 - February 2006
*Energy Trader, Proprietary Trader*
- Created proprietary trading desk in energy futures and options;
- Analyzed and traded opportunities in outright price, spread, volatility, and cross market positions in Crude Oil, Brent, Heating Oil, RBOB Gasoline, and Gasoil products listed on CME/NYMEX and IPE.

**HESS ENERGY TRADING, LLC,** New York, NY      April 1997 - January 2005
*Energy Trader, Proprietary Trader/Senior Dealer*
- Traded speculative positions in crude oil, petroleum products, and natural gas;
- Assisted in creation of risk management systems, processes, and staffing;
- Traded via OTC broker market, exchange trading floor, and electronic market in energy swaps, futures, and options in Crude Oil, Brent, Heating Oil, RBOB Gasoline, and Gasoil products listed on CME/NYMEX and IPE.

**CONSOLIDATED NATURAL GAS CORP.,** Pittsburgh, PA      September 1996 - April 1997
*Trader, Natural Gas Options*
- Analyzed and managed risk of utilities' natural gas exposure;
- Traded natural gas futures and options via OTC brokered market and NYMEX trading floor.

**TORONTO DOMINION BANK,** Toronto, Ontario      January 1996 - September 1996
*Desk Manager/Head Trader, Energy Derivatives*
- Assembled and operated energy derivatives desk in petroleum and US/Canadian natural gas;
- Designed and created an integrated front, mid, and back office trading system to manage customer positions;
- Analyzed and traded opportunities in outright price, spread, volatility, and cross market positions in Crude Oil, Brent, Heating Oil, RBOB Gasoline, and Gasoil products listed on CME/NYMEX and IPE.

**ROCKRIMMON COMMODITIES,** New York, NY          November 1994 - December 1995
*Founder/Risk Manager/Option Trader*
- Established new business unit in commodity option trading;
- Supervised risk control of options traders and traded positions on NYMEX, CSCE, CBOT, and CBOE in commodity options;
- Traded futures and options on NYMEX and CBOT.

**O'CONNOR &ASSOCIATES/SBC,** New York, NY          June 1992 - November 1994
*Option Trader, Commodity Derivatives & Interest Rate Derivatives*
- Traded and managed large fixed income and energy derivative portfolio;
- Completed all levels of derivative training program with highest marks;
- Traded financial futures and options on the CME and CBOT trading floor.

**BURNS FRY FUTURES, INC.,** Chicago, IL          February 1988 - October 1990
*Options and Futures Trader & Broker – Financial Derivatives*
- Traded and brokered financial futures on CME and CBOT.

## EDUCATION

**COLUMBIA BUSINESS SCHOOL,** New York, NY          1992
*MBA, Finance*

**GEORGETOWN UNIVERSITY**, Washington, D.C.          1987
*BSBA, Finance*

## LICENSES

- Series 7
- Series 63
- Series 3 (Inactive)

## EXCHANGE MEMBERSHIPS

- New York Mercantile Exchange (Inactive)
- Chicago Mercantile Exchange (Inactive)
- Chicago Board of Trade (Inactive)

# APPENDIX B

In preparing this report, I have reviewed the following documents with regard to this proceeding:

    a.   The pleadings in *U.S. Commodity Futures Trading Commission v. William Byrnes, Christopher Curtin, The New York Mercantile Exchange, Inc., and Ron Eibschutz*, Case No. 13-Civ-1174.

    b.   Voice recordings and transcripts of all sixteen calls between Christopher Curtin and Ron Eibschutz identified in Exhibit B to the Complaint:

        i.   5/14/2008 (Bates number 13CIV1174-CFTC-0006562);

        ii.   5/29/2008 (Bates number 13CIV1174-CFTC-0006567);

        iii.   6/10/2008 (Bates number 13CIV1174-CFTC-0006522);

        iv.   6/23/2008 (Bates number 13CIV1174-CFTC-0006528);

        v.   6/24/2008 (Bates number 13CIV1174-CFTC-0006529);

        vi.   10/10/2008 (Bates number 13CIV1174-CFTC-0006577);

        vii.   10/13/2008 (Bates number 13CIV1174-CFTC-0006578);

        viii.   11/25/2008 (Bates number 13CIV1174-CFTC-0006594);

        ix.   1/16/2009 (Bates numbers 13CIV1174-CFTC-0018232 and 13CIV1174-CFTC-0018233);

        x.   1/26/2009 (Bates number 13CIV1174-CFTC-0018264);

        xi.   2/5/2009 (Bates number 13CIV1174-CFTC-0018169);

        xii.   2/23/2009 (Bates number 13CIV1174-CFTC-0018179);

        xiii.   3/3/2009 (Bates number 13CIV1174-CFTC-0018194);

        xiv.   3/9/2009 (Bates number 13CIV1174-CFTC-0018234);

        xv.   3/10/2009 (Bates number 13CIV1174-CFTC-0018235); and

    xvi.  3/16/2009 (Bates number 13CIV1174-CFTC-0018236).

c.  Transcripts of excerpts of voice recordings of a small selection of the over sixty purported violations by William Byrnes as identified by the CFTC in Exhibit A to the Complaint.

d.  Excerpts of voice recordings of calls between Ron Eibschutz and Brad Hrycenko:

    i.  10/7/2010 (Bates number 13CIV1174-CFTC-0002917);

    ii.  11/10/2010 (Bates number 13CIV1174-CFTC-0002921);

    iii.  4/14/2010 (Bates number 13CIV1174-CFTC-0002939); and

    iv.  4/14/2010 (Bates number 13CIV1174-CFTC-0002940).

e.  Transcripts of testimony from the following individuals:

    i.  Virginia Baldwin, dated June 16, 2011;

    ii.  Dunet Belancourt, dated October 7, 2015 and June 16, 2011;

    iii.  Nour Bheyhum, dated October 14, 2015;

    iv.  William Byrnes, dated November 23, 2015;

    v.  Christopher Curtin, dated November 24, 2015;

    vi.  Ralph Cusumano, dated October 2, 2015 and February 28, 2013;

    vii.  Ron Eibschutz, dated November 19, 2015 and July 14, 2011;

    viii.  Thomas Holleran, dated October 21 2015 and June 14, 2011;

    ix.  Howard Hopkins, dated October 20, 2015 and June 22, 2011;

    x.  Brad Hyrchenko, dated November 3, 2015;

    xi.  Sean Keating, dated October 16, 2015 and February 3, 2012;

    xii.  Valery Rouet, dated October 13, 2015; and

xiii.   Alexandra Siff, dated June 22, 2011.

f.  Notes from interviews by the CFTC, the Manhattan District Attorney's Office, and the U.S. Department of Justice of the following individuals:

   i.   Abe Glass, dated March 23, 2011 and January 14, 2011;

   ii.  William Byrnes, dated January 13, 2011; and

   iii. Ron Eibschutz, dated January 14, 2011.

g.  Various documents exchanged in this proceeding, including: emails, transcripts of instant messaging conversations ("IM"), and exchange records.

# APPENDIX C

# (Filed Under Seal)

## **CERTIFICATION**

This is to certify that a true and correct copy of the foregoing was served via

electronic mail and First Class Mail, postage prepaid, on this 16th day of February, 2016,

to:

David W. MacGregor, Esq. (dmacgregor@cftc.gov)
James G. Wheaton, Esq. (jwheaton@cftc.gov)
Patrick Daly, Esq. (pdaly@cftc.gov)
Patryk J. Chudy, Esq. (pchudy@cftc.gov)
Gabrielle Geanuleas, Esq. (ggeanuleas@cftc.gov)
U.S. Commodity Futures Trading Commission
140 Broadway, 19th Floor
New York, New York 10005
(646) 746-9700
*Attorneys for Plaintiff*

Albert Hogan III, Esq. (al.hogan@skadden.com)
Marcella Lape, Esq. (Marcella.lape@skadden.com)
Skadden, Arps, Slate, Meagher & Flom
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700
*Attorneys for Defendant New York Mercantile Exchange, Inc.*

Robert L. Herskovitz, Esq. (robert@herskovitslaw.com)
Herskovits PLLC
1065 Avenue of the Americas, 27th Fl.
New York, New York 10018
(212) 897-5410
*Attorneys for Defendant William Byrnes*

Paul Shechtman, Esq. (pshechtman@zuckerman.com)
Zuckerman Spaeder LLP
399 Park Avenue, 14th Floor
New York, New York 10022-4614
*Attorney for Defendant Ron Eibschutz*

_____
Alexander Mirkin