# Exhibit 22

Page 1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    U.S. COMMODITY FUTURES        )

5    TRADING COMMISSION,           )

6                                  )

7        Plaintiff,                )

8                                  )

9            vs.                   ) 13 Civ 1174 VSB

10                                 ) ECF Case

11   WILLIAM BYRNES,               )

12   CHRISTOPHER CURTIN, THE       )

13   NEW YORK MERCANTILE           )

14   EXCHANGE, INC.,               )

15                                 )

16       Defendants.               )

17   _____)

18

19        DEPOSITION OF HENDRICK BESSEMBINDER

20             New York, New York

21             May 10, 2016

22

23   Reported by:

24   MARY F. BOWMAN, RPR, CRR

25   JOB NO. 106200

1

2

3

4

5                         May 10, 2016

6                         9:45 a.m.

7

8

9            Deposition of HENDRICK

10    BESSEMBINDER, held at the offices of

11    Skadden, Arps, Slate, Meagher & Flom, 4 Times Square,

12    New York, New York, before Mary F. Bowman, a

13    Registered Professional Reporter, Certified

14    Realtime Reporter, and Notary Public of the

15    State of New Jersey.

16

17

18

19

20

21

22

23

24

25

Bessembinder

1   testifying in federal court in Chicago, you

2   were testifying in a matter involving

3   allegations that a market participant was

4   engaging in aberrant behavior, fair?

5       A.    Fair enough.

6       Q.    You told Judge St. Eve that you

7   were an expert in market microstructure,

8   correct?

9       A.    I believe I probably did, yes.

10      Q.    And you told her that you were

11  not a trader, correct?

12      A.    That's correct.  Still true this

13  week.

14      Q.    Still true.  I was going to cover

15  that period.

16            And you told her that you were

17  not an expert in the subjective factors

18  that drove trader behavior, correct?

19      A.    I don't recall if I used that

20  phrase.

21      Q.    But that would be correct, more

22  or less?

23      A.    Yeah, I mean, I -- I guess I'm

24  not exactly sure what you mean by

1              Bessembinder

2   I'm not offering legal opinions.

3        Q.     You don't think that a question

4   of why a trader entered an order or

5   canceled an order is a legal opinion, do

6   you?

7        A.     To circle back to last week's

8   hearing, the legal issue there was the

9   trader's intent at the time of entering

10  orders and I provided statistical evidence

11  that was relevant to assessing intent, but

12  I was not making any final legal conclusion

13  about whether the law had been violated.

14  That was not up to me.

15       Q.     I understand that.  It wouldn't

16  be.

17              Have you ever -- you have never

18  traded commodities, correct?

19       A.     That's correct.

20       Q.     Have you ever supervised people

21  who traded commodities?

22       A.     No.

23       Q.     So you have never been

24  responsible for the profit and loss

25  performance of any one trader or group of

1                    Bessembinder

2    traders, correct?

3         A.    That's correct.

4         Q.    Have you ever worked at a

5    commodities brokerage firm?

6         A.    No.

7         Q.    You never supervised commodities

8    brokers, correct?

9         A.    That's correct.

10        Q.    You have never been responsible

11   for the profit and loss performance of a

12   commodities broker, right?

13        A.    That's correct.

14        Q.    Not delving into too much

15   personal information, but in your personal

16   financial affairs, do you take positions in

17   commodities or derivatives of commodities?

18        A.    No.  I've taken positions in the

19   markets, but not commodities markets.

20        Q.    When you say you have taken

21   positions in the markets, what markets are

22   you talking about?

23        A.    Equities, ETFs, closed-end funds,

24   that sort of thing.

25        Q.    You have never had a broker

1                     Bessembinder

2     trading commodities to whom you were giving

3     instructions about what to trade?

4         A.    No.

5         Q.    Have you ever provided advice to

6     anyone on whether or why they should or

7     should not trade a commodity?

8         A.    No.  I am not in the business of

9     providing investment advice.

10        Q.    Is there any reason why, in your

11    personal financial affairs, you don't have

12    a commodity broker that you work with?

13        A.    Well, as mentioned, I've never

14    traded commodities.  So therefore, no

15    reason to bring a broker on board.

16        Q.    Is there any reason why you have

17    never decided to dabble in trading

18    commodities?

19        A.    Just broadly speaking, I'm not a

20    very active trader.  I've done some active

21    trades at what I thought were opportune

22    moments.  But for the most part, I believe

23    my comparative advantage is on the academic

24    side.  That's where I spend my time.

25        Q.    Better to leave that to the

1                    Bessembinder

2    sure.

3        Q.    Did you talk to -- in connection

4    with your work in this case, did you talk

5    with anybody who was actually a commodity

6    trader?

7        A.    In this case, no.

8        Q.    Did you think about doing that?

9        A.    No.

10       Q.    When were you first contacted are

11   about this case?

12       A.    I'm not sure if I can give you

13   the precise date.  I was contacted late

14   last year, and in that conversation, the

15   attorneys mentioned that we had discussed

16   this case once before.  But I didn't

17   actually have a memory of that so I can't

18   pinpoint when that earlier conversation

19   might have been.

20       Q.    What were you asked to do when

21   you were contacted late last year, the

22   conversation that you remember?

23       A.    So they refreshed my memory of

24   what sort of case we had here, what were

25   the issues here and I was asked if I could

1                         Bessembinder

2        Q.    I'm correct that in none of the

3    disclosures does Mr. Eibschutz indicate

4    that he believes he can disclose any of

5    this information to other market

6    participants to cause them to trade, is

7    that consistent with your recollection?

8        A.    I mean, there were many hours of

9    tapes, but as I sit here, I don't recall

10   any -- I don't recall any instances along

11   the lines of what you just said.

12       Q.    Now, Mr. Eibschutz is a broker,

13   right?

14       A.    That's my understanding.

15       Q.    He gets paid based on people

16   trading, right?

17       A.    I believe he would be compensated

18   on commissions, yes.

19       Q.    So you would agree he would have

20   an incentive to cause other market

21   participants to enter into trades, correct?

22       A.    I believe he would have an

23   incentive for people to trade through him

24   so he could get the commission.  He might

25   have other incentives, but it would seem

1                        Bessembinder

2       record.

3              (Recess)

4              THE VIDEOGRAPHER:  The time is

5       10:59 a.m.  We are back on the record.

6       Video number 2.

7       Q.     Professor Bessembinder, I want to

8       go back and talk a little bit about what

9       you were asked to do in the case and what

10      you undertook.  In the discussions with the

11      CFTC or your thinking about what you might

12      do, did you ever consider analyzing trade

13      data?

14      A.     I didn't see a viable path where

15      analyzing trade data would be useful in the

16      absence of some specificity along the lines

17      of an individual trader who might have

18      acted on the information.

19             But short of that, I didn't see

20      any viable path involving data.

21      Q.     You're familiar with the RAPID

22      and ARMADA trade data generated by the CME,

23      correct?

24      A.     I am, yes.

25      Q.     Is in other matters, for

1                     Bessembinder

2        A.    From my understanding of markets

3    in combination with various discussions.

4        Q.    Discussions with who?

5        A.    With counsel, among others, but I

6    mean, to me, it's intuitive to say that, in

7    the context of trading, information is

8    important if it would be considered in

9    trading decisions.  That seems very

10   intuitive.

11       Q.    If it would be considered in

12   trading decisions, even if it was to

13   consider the information and decide not to

14   trade, right?

15       A.    Yeah.  I mean, you know, I

16   believe there could be some shades of gray

17   in importance.  We might say that something

18   that was considered but did not generate

19   trading would be less important.  I would

20   be comfortable with that.

21       Q.    But still important?

22       A.    I mean, I wouldn't say of zero

23   importance.

24       Q.    Well, when you reached your

25   opinion here that all of the disclosures

1                    Bessembinder

2    were important, was it that it had to be

3    something greater than zero importance?

4        A.    I believe you may have gone a

5    little further than I did.  I'm not sure

6    that I said -- I'm not sure that I

7    specifically said that every disclosure was

8    important.

9        Q.    We are definitely going to get to

10   that.

11             Was it -- but sticking with

12   whatever disclosures you did think were

13   important, was your standard for importance

14   anything greater than zero importance?

15       A.    Yeah, anything greater than zero

16   I think could be categorized as important.

17   But as I said, there could be shades of

18   gray.  Some of these disclosures were

19   probably more important than other

20   disclosures.

21       Q.    We will circle back right around

22   so I don't forget it, but you looked at --

23   you looked at -- you listened to 79 calls.

24       A.    I'll take your word for it.

25       Q.    I just confirmed it.  It is 79.

Bessembinder

1

2     A.     There was a lot of calls.  That I

3  can affirm.

4     Q.     You listened to 79 calls, looked

5  at the associated transcripts.

6           Did you do an assessment of how

7  many discrete important disclosures were

8  contained in those 79 calls?

9     A.     I did not provide such account,

10  no.

11     Q.     Of the disclosures that you

12  reviewed, did you conclude that any of them

13  were not important using your definition of

14  important?

15     A.     There were none that I could rule

16  out importance.  There were none where I

17  could say zero probability this was

18  important.

19     Q.     Were there some where it was a

20  close call?

21     A.     There are shades of gray.  Some,

22  as I say, some -- it's more clear, more

23  obvious, higher probability, if you prefer,

24  that it was important.  Others, others

25  less.

1                    Bessembinder

2        Q.     In the draft exhibit that you

3    prepared or otherwise, did you attempt to

4    catalog by level of importance --

5        A.     No.

6        Q.     -- the disclosures?

7        A.     No.  I didn't.

8        Q.     How did you assess each

9    disclosure from -- in terms of determining

10   its importance?

11       A.     Well, I tried to first just

12   document the facts as best I could, what

13   was disclosed.  Then beyond that, the two

14   attributes that I -- or three maybe I

15   should say, the attributes I focused on

16   were -- there may be more than three.  Let

17   me just go through them.

18            Was it economically large, was

19   something I considered.  Did it occur in a

20   market that's relatively illiquid, slice of

21   the market, I should say.  I understand the

22   point that each of these markets is part of

23   a broader complex of energy instruments.

24   But in any event, the slice of the market,

25   the segment of the market where this

                    Bessembinder

1  trading occurred, was it a less liquid

2  segment of the market.

3          Also, did it involve traders who

4  were potentially viewed as skilled traders.

5  And then were there multiple revelations.

6  So those four dimensions were all relevant

7  to the discussion.

8      Q.    And those dimensions that you

9  just mentioned, did you come up with those

10  on your own or are these dimensions that

11  have been accepted in the academic field as

12  the proper dimensions to examine when

13  assessing importance?

14     A.    I don't think there is a

15  template.  To my knowledge, there is no

16  template in the academic literature of how

17  to determine what's an important piece of

18  information, other than things that are

19  really circular, like it is important if it

20  is value-relevant, which -- anyway, I don't

21  think there is a template out there.

22          So this assessment of importance

23  was based on my view of the literature, my

24  own specific research that was relevant,

1                 Bessembinder

2    and my interactions with traders over the

3    years.

4         Q.    Was -- again, I apologize if I

5    asked this question and I want to make sure

6    get it, in terms of the dimensions that you

7    just identified, how did you assess each

8    disclosure on those four dimensions?

9         A.    Well, you have seen my report, so

10   you know I developed measures of the

11   notional principle of the -- involved with

12   a disclosure.  I also assessed the

13   liquidity of segments of the market based

14   on average daily trading volume, provided

15   some counts of cases where there were

16   multiple disclosures for an individual

17   firm, and then just on the skilled trader

18   thing, I just pointed to one or two

19   examples where at least some participants

20   believe that some traders in these markets

21   were unusually skilled.

22        Q.    Did all of the disclosures hit on

23   at least one of your four criteria?

24        A.    In shades of gray.

25        Q.    Did you record or otherwise

1                       Bessembinder

2    that.

3        Q.    For those disclosures that aren't

4    mentioned in your report, is there any work

5    product that would help us understand your

6    methodology in determining if the

7    disclosure was important?

8        A.    I think I mentioned I had a draft

9    exhibit and it is incomplete and not

10   entirely precise, but I had a draft exhibit

11   of each time I listened to a call, I made

12   some notes about what I thought I was

13   hearing in the call.

14       Q.    You mentioned that there were no

15   disclosures that you could rule out in

16   terms of assessing their importance.

17       A.    I don't think I ruled any out.

18   As best I recall, I don't think I said,

19   this one I'm sure is not important.   I

20   don't think I ever made a statement like

21   that.

22       Q.    The methodology -- strike that.

23             The way you approached it, did

24   you believe that you needed to reach

25   certainty that something was not important

1              Bessembinder

2    before you ruled it out?

3         A.    Certainty that it was not

4    important?  I guess if I was going to

5    definitively rule it out, it would require

6    certainty.  There are shades of gray and,

7    you know, maybe you are going to ask me,

8    but I can't put specific probabilities

9    on -- I've used phrases like "substantial

10   likelihood," but can I translate that into

11   a specific probability, save you some time

12   and effort, no, I can't.

13        Q.    But you believe if we went

14   through every 79 calls -- all 79 calls,

15   your opinion, it is substantially likely

16   that it would be important?

17        A.    There are shades of gray.  I'm

18   not sure that I referenced all -- I'm not

19   sure that I referenced all 79 calls in my

20   report.  I just -- I may have.  I'm not

21   absolutely certain.  I can't remember

22   whether I referenced all 79.

23        Q.    I don't think you did.  You

24   referenced the 79, but I don't think you --

25   well, I won't put words in your mouth.  Do

1                    Bessembinder

2   in your own mind as explicit.  How did you

3   think about it?  I get the substantially

4   likely point.  That's referring to is one

5   trader substantially likely.  But is it one

6   trader is it -- it's not one, it's not all,

7   where is it?

8            MR. MacGREGOR:  I will object to

9      the form.

10      A.    I didn't have a specific number

11   in mind.  If -- if it was phrased in terms

12   of, well, what if there is only one trader

13   who would act on this, I guess my response

14   would be, well, one is enough to establish

15   it's important.

16      Q.    I have this outline and I go back

17   to it once in a while and realize I don't

18   know where I am because I asked a lot of

19   different questions.

20      A.    I'm sympathetic.  As someone who

21   sometimes lectures for four hours, I

22   understand the problem with losing one's

23   place in the discussion.  It hurts your

24   teaching evaluations, by the way, when it

25   happens.

1               Bessembinder

2     market participants who were the subject of

3     these disclosures?

4        A.    Right.  As I created this draft

5     exhibit, I was taking down names,

6     companies, individual traders, whatever was

7     revealed in individual calls.

8        Q.    Did you do any analysis or

9     testing regarding whether the market

10    participants whose trades were disclosed

11    were engaging in similar trading patterns

12    as reflected in the disclosures?

13       A.    I did not.

14       Q.    Did you do any analysis whether

15    the market participant's prior day trading

16    is predictive of their future trading

17    patterns?

18       A.    No.  I didn't really think I was

19    well-positioned to make predictions about

20    their future trading.

21       Q.    Why not?

22       A.    To extract value-relevant or

23    price-relevant information from these

24    disclosures would require certain skills

25    and I think professional traders would be

Bessembinder

1

2  much more likely to possess those skills

3  than myself as somebody who doesn't trade.

4     Q.   Just to probe that a little bit,

5  so you were looking at the disclosures --

6  strike that.

7        When you were looking at the

8  disclosures, it didn't occur to you here is

9  how I or a market participant would use

10  this information?

11     A.   I mean I -- safe to say

12  personally, I would not have known how to

13  trade off of those disclosures.  But I'm

14  not sure I'm the relevant person for this

15  test.

16     Q.   I understand.

17       MR. HOGAN:  We have been going

18    about another hour.  Why don't we go

19    off the record.

20      THE VIDEOGRAPHER:  The time is

21    12:04 p.m.  We are going off the

22    record.

23      (Luncheon recess)

24      (Continued on next page)

25

1                       Bessembinder

2        A.    I do.  I do mention those

3   packages of options if we want to use that

4   phrase.

5        Q.    To just be real direct about it,

6   do you consider those packages of options

7   to be trading strategies the way you think

8   about it and define?

9        A.    I think they can be an element of

10  a trading strategy and they can reveal

11  elements of a trading strategy.

12       Q.    Not quite my question.  Do you

13  consider those packages of options to be

14  trading strategies the way you have defined

15  it and thought about it?

16       A.    So I really don't know quite how

17  to answer that.  I don't think a single

18  trade is a strategy.  A single trade is an

19  element of a strategy, a portion of a

20  strategy.  A single trade might reveal

21  something about strategies.

22       Q.    You have -- have you studied

23  trading strategies?

24       A.    Yes.

25       Q.    Using your definition of a

1                    Bessembinder

2    more important if the trades involved are

3    larger.

4         A.    You're reading it, so I presume

5    you're reading correctly.

6         Q.    Yeah, that sounds like what you

7    would write, right?

8         A.    It sounds like what I would

9    write.

10        Q.    So what constitutes a large

11   trade?

12        A.    This is a -- this is another

13   shades of gray.  There is no black, white

14   cut-off.  Shades of gray for what's large.

15        Q.    Is there any academic literature

16   or any studies that attempt to put any

17   parameters around what constitutes a

18   "large" trade?

19        A.    There have been studies where

20   people have tried to make out large trades.

21   For example, one thing that comes to mind

22   is in years past, people used to use the

23   NYSE's definition of a block trade which,

24   if my memory is correct, was 10,000 shares.

25             So I have a recollection there

Bessembinder

1

2   were some papers that broke out 10,000

3   trade shares as large trades.  But again,

4   it's somewhat arbitrary.  It is more

5   accurately shades of gray.

6           Some trades are bigger than

7   others.  To say 10,000 is big and 9,999 is

8   small seems a little artificial.

9      Q.   What standard did you use in this

10  case to determine what was and was not a

11  large trade?

12     A.   There was shades of gray.  If

13  there was a lot of contracts, it was a

14  larger trade.  If there were fewer

15  contracts, it was a smaller trade.

16     Q.   Relative to zero contracts?

17     A.   Or even relative to each other.

18           If there was 15,000 contracts,

19  and other things equal, that's a bigger

20  trade than if there is a thousand

21  contracts.

22     Q.   We have another point of complete

23  agreement.  I agree with that point.

24     A.   That's good we can find a few of

25  those.

<sup>1</sup>                     Bessembinder

<sup>2</sup>      Q.    Can you tell us anything more

<sup>3</sup>   about the standard -- the criteria that you

<sup>4</sup>   applied to conclude that certain trades

<sup>5</sup>   were large trades?

<sup>6</sup>      A.    Again, it is shades of gray and I

<sup>7</sup>   think we could probably agree it was

<sup>8</sup>   somewhat subjective.  But if there was a

<sup>9</sup>   lot of contracts, it was a large trade.

<sup>10</sup>           Let me phrase it differently.  If

<sup>11</sup>   someone was asserting these were all small

<sup>12</sup>   trades -- and I don't know if anybody has

<sup>13</sup>   ever asserted that.  I was providing

<sup>14</sup>   counter-examples.  Trades that most people

<sup>15</sup>   would not consider to be small.

<sup>16</sup>      Q.    When you say that trades that

<sup>17</sup>   most people would not consider to be small,

<sup>18</sup>   what's your basis for assessing what most

<sup>19</sup>   people would consider to be small and large

<sup>20</sup>   trades?

<sup>21</sup>      A.    I mean, that's a figure of

<sup>22</sup>   speech.  Let me pick a number out of the

<sup>23</sup>   air.  Let's say a given trade involved 90

<sup>24</sup>   million and let's say it is a

<sup>25</sup>   delta-adjusted number just for discussion.

1                     Bessembinder

2    if you see enough of the lines, you might

3    be able to make inferences about the bigger

4    pattern.

5         Q.    You talked about the hedging

6    examples.  Even including the hedging

7    example, were you able to come to any

8    informed views about any market

9    participant's aggregate position based on

10   these disclosures?

11        A.    Well, definitely not me, but

12   again, I don't think I'm the relevant party

13   for this discussion.

14        Q.    Well, did you consult with anyone

15   to see if anybody could come to any

16   informed views about any market

17   participant's aggregate position based on

18   these disclosures?

19        A.    I did not consult with anybody.

20        Q.    In your report and today, you

21   have discussed the concept of skilled

22   traders.

23        A.    Yes.

24        Q.    What -- I don't have a reference

25   in your report, I'm sure it is in there

1                    Bessembinder

2          To go back to the -- go back to

3     the statement I made earlier about my

4     conversations with bond traders, if there

5     is a series of large bond trades reported

6     on Trace, that, in and of itself, doesn't

7     tell you who traded.

8          But I do hear statements along

9     the lines of, well, that might -- must have

10    been Morgan Stanley or something like that.

11         People who are close to these

12    markets are able to draw inferences that I,

13    as an outsider, cannot draw or,

14    respectfully, that you cannot draw.

15    Q.    No need to be polite about it.   I

16    know I can't.

17    A.    So there is another thing we

18    agree on.   You and I can't do this.

19    Q.    We can't do it.

20         So in your assessment of what's

21    important, did you assume that market

22    participants would have information and

23    make inferences that you have no ability to

24    assess yourself?

25    A.    I believe it is very plausible

                    Bessembinder

1   and likely that there could be market

2   participants that could make inferences

3   that I could not make, yes.

4        Q.    And did your understanding or

5   your belief that there were market

6   participants who could likely make

7   inferences that you could not make, did you

8   factor that into your overall assessment

9   about whether or not these disclosures

10  would be important to market participants?

11       A.    It was relevant.  I mean, to put

12  it differently, if the standard had been

13  could I make inferences that would lead to

14  desirable trading, if that was the

15  standard, this would be an easy one, the

16  answer would be no.

17       Q.    I understand.  OK.

18       A.    I didn't know, I didn't know they

19  laced your outline with jokes.

20       Q.    I'll let you in on it.  I'll let

21  you in on it.  I -- just to show you how

22  all over the top of this market I am, John

23  Arnold actually runs Centaurus, right?

24       A.    I believe he did before he

1  Bessembinder

2  strategies would require significantly more

3  disclosures than are at issue in that

4  case -- in this case, can we agree on that?

5       A.    No.  Particularly for somebody

6  who themselves is smart and skilled and

7  already has some degree of knowledge of

8  what's going on in these markets, I would

9  not dismiss the possibility that these

10 disclosures would be helpful in

11 reverse-engineering.

12      Q.    So taking them individually or

13 collectively, were you able to even begin

14 to think about what trading strategies were

15 represented of any particular market

16 participant?

17      A.    Me, no.

18      Q.    By virtue of these disclosures?

19      A.    Sorry for cutting you off.  For

20 me, no.  I think we already established

21 that more relevant is what other

22 intelligent and knowledgeable people who

23 participate in these markets regularly,

24 what they could have.  That's the relevant

25 question.

<sup>1</sup>                    Bessembinder

<sup>2</sup>        Q.     Is there any academic literature

<sup>3</sup>    assessing the ability of intelligent and

<sup>4</sup>    knowledgeable people to reverse-engineer a

<sup>5</sup>    trading strategy?

<sup>6</sup>        A.     I'm not going to say no.  I'm

<sup>7</sup>    just going to say I can't put my finger on

<sup>8</sup>    a paper that has done so.

<sup>9</sup>        Q.     You didn't rely on any such

<sup>10</sup>   academic study in the course of rendering

<sup>11</sup>   your opinions in this case?

<sup>12</sup>        A.     That's correct.

<sup>13</sup>        Q.     OK.  Coming back to staleness,

<sup>14</sup>   apart from the idea of reverse-engineering

<sup>15</sup>   a trading strategy, can you give me any

<sup>16</sup>   other sense for your view of when the

<sup>17</sup>   disclosure of a trader identity would

<sup>18</sup>   become stale?

<sup>19</sup>        A.     Again, I can't give you any

<sup>20</sup>   specific threshold by which it would be

<sup>21</sup>   stale.

<sup>22</sup>             But in addition to

<sup>23</sup>   reverse-engineering strategies, we have the

<sup>24</sup>   issue of whether disclosures potentially

<sup>25</sup>   help to forecast future trades.  So the

1                    Bessembinder

2    if we had that in front of us, we could

3    determine whether I aggregated these.

4    Going from memory -- but I think I did

5    aggregate if it was the -- if it was a

6    quantity revealed in a single call, I think

7    I aggregated those.

8         Q.    Even if it was different dates?

9         A.    I'm not absolutely sure, but I

10   believe I may.  So it would be something

11   along the lines of "X" hundred were

12   revealed in this call and how big is that

13   by comparing to daily volume.

14        Q.    And you anticipated my next

15   question.  You said you compared it to the

16   average daily volume.  You compared it to

17   the average daily volume of that contract,

18   correct?

19        A.    Yes.

20        Q.    And was there some threshold you

21   had in mind -- we covered it before, but

22   let me ask you, now that you are looking at

23   it, was there some threshold you had in

24   mind where I now believe this is a large

25   trade disclosure?

1                    Bessembinder

2      A.    No, as I said, large versus small

3  is not an on/off variable, it is shades of

4  gray.

5      Q.    How about skilled traders, did

6  any of the participants here strike you as

7  skilled traders?

8      A.    I'm not sure that individual

9  traders were identified in this call.  I

10 see firms.  I see firms, but not individual

11 traders.

12            Now on the issue of who is a

13 skilled trader, I think market participants

14 are better, better positioned to make that

15 assessment than I am.

16            Obviously, John Arnold is

17 somebody we all heard about, but who else

18 might be skilled, I think that's a --

19 market participants are better situated for

20 that than I am.

21     Q.    So when you were applying your

22 skilled trader dimension, how did you do

23 that since you don't yourself have a view

24 of who are skilled traders?

25     A.    Yeah, I mean, I -- I provided a

Bessembinder

1   A.      Spell the name.

2   Q.      Spelled V-O-E-T-M-A-N-N?

3   A.      I can't place the name, no.

4   Q.      Have you talked with anyone, in

5   your work on this case, with someone who

6   has been asked to do an event study with

7   respect to this case?

8   A.      I can't identify, no, I can't

9   think of anyone who has done an event study

10  focused on this case.  Don't know of any.

11  Q.      Here is a question I think I know

12  the answer to, but I'm going to ask anyway.

13  Did you ever take the series 3 exam?

14  A.      I did not actually.

15  Q.      And you know what the series 3

16  exam is?

17  A.      I believe it is a brokerage exam.

18  But I've not taken it.

19  Q.      You spent some time talking about

20  how you're not qualified to draw inferences

21  from some of the information that has been

22  disclosed from some of these conversations,

23  but you believe a trader would, is that

24  accurate?