# Exhibit 44

GAK5cftC

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    U.S. COMMODITY FUTURES TRADING
     COMMISSION,
4
                    Plaintiff,              New York, N.Y.
5
               v.                           13 Civ. 1174 (VSB)
6
     WILLIAM BYRNES, et al.,
7
                    Defendants.
8
     ------------------------------x
9
                                            October 20, 2016
10                                          11:45 a.m.

11   Before:

12                    HON. VERNON S. BRODERICK,

13                                          District Judge

14

15

16

17

18

19

20

21

22

23

24

25
```

GAK5cftC

1                                    APPEARANCES

2

3    COMMODITY FUTURES TRADING COMMISSION
     BY:   PATRYK J. CHUDY
4          DAVID W. MacGREGOR

5    HERSKOVITS, PLLC
           Attorneys for Defendant Byrnes
6    BY:   JOSEPH P. ALLGOR

7    MENAKER & HERRMANN, LLP
           Attorneys for Defendant Curtin
8    BY:   SAMUEL F. ABERNETHY
           WOJCIECH JACKOWSKI
9
     SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
10         Attorneys for Defendant NYMEX
     BY:   PATRICK FITZGERALD
11         ALBERT L. HOGAN, III
           MARCELLA LAPE
12
     BRACEWELL, LLP
13         Attorneys for Defendant Eibschutz
     BY:   PAUL L. SCHECHTMAN
14

15

16

17

18

19

20

21

22

23

24

25

1            (Case called)

2            THE DEPUTY CLERK:  Counsel, please state your

3     appearance for the record.

4            THE COURT:  Just a couple of housekeeping matters.

5     Number one, it occurred to me fairly far into this case -- I

6     didn't know -- so, there are a lot of people who are actually

7     familiar faces but I had actually done some work for NYMEX back

8     in 2008, it amounted to 4.8 hours over two days in April --

9     April 14th and 15th of 2008.  I had asked -- once it came to me

10    that I had done some work I asked my former firm, Weil Gotshal,

11    to run a search of the various names that appear, that are

12    relevant in this case, and none of the names popped up.  So,

13    the information predates, as least as far as I know, predates

14    anything having to do with this case so I don't think there is

15    an issue but I am raising it for the parties just so that --

16    obviously, you folks know a lot more about the case than I do

17    but my reading of the case is that any of the activity occurred

18    after the 2008 time period.

19            The second thing is, and I am not sure whether this is

20    something -- I think this is the first time we are meeting face

21    to face.  I have worked with both Mr. Fitzgerald and

22    Mr. Shechtman at the U.S. Attorney's office.  Mr. Shechtman was

23    Chief of the Criminal Division for a number of years while I

24    was in the office.  Mr. Fitzgerald and I worked as line

25    assistants together.  I don't think we ever had any cases

GAK5cftC

1    together.  Again, I don't think that is an issue.  I just

2    couldn't remember whether that is something that had come up

3    previously.  And I think, am I correct, Mr. Shechtman, that you

4    only recently appeared for Mr. Eibschutz; is that right?

5           MR. SHECHTMAN:  I think I have been active only

6    recently, your Honor.  I think that's fair to say.

7           THE COURT:  Okay.  I apologize now because I don't

8    think we went through and had everybody identify themselves for

9    the record.  First of all, does anybody have any issue with the

10   disclosure that I have made?  Obviously do your research and if

11   there is something, just bring it to my attention.

12          MR. CHUDY:  Good afternoon, your Honor.  Patryk Chudy

13   for the CFTC.  We don't foresee any issues with the disclosures

14   you have and I understand you also worked with our Director of

15   Enforcement Aitan Goelman.

16          THE COURT:  Oh, yes, I forgot about Aitan -- as did

17   some of these folks here also.  Yes, that's right.  Mr. Goelman

18   and I, just to give a little bit more color with regard to

19   Mr. Goelman, Mr. Goelman -- I was Chief of the Violent Gangs

20   Unit and Mr. Goelman was line assistant in that unit so I

21   supervised him and the cases he worked on.  Again, I don't view

22   that as an issue, but thank you for bringing that to my

23   attention.  I had forgotten about that.

24          MR. CHUDY:  Thank you, your Honor.

25          THE COURT:  Okay, and it is Mr. MacGregor?

GAK5cftC

1              MR. MacGREGOR:  Yes, your Honor.

2              THE COURT:  For the defense?  You can go whichever

3     side wants to go first.

4              MR. ABERNETHY:  Your Honor, Samuel Abernethy for

5     Mr. Curtin.  We have no objection with the disclosures you just

6     made.

7              MR. JACKOWSKI:  Wojciech Jackowski, also of Menaker &

8     Herrmann for defendant Curtin.

9              THE COURT:  Okay.

10             MR. FITZGERALD:  Good afternoon, your Honor.  Pat

11    Fitzgerald joined by Marcella Lape and Albert Hogan from

12    Skadden Arps, and no objection.  Thanks.

13             THE COURT:  All right.

14             MR. SHECHTMAN:  Paul Schechtman for Mr. Eibschutz.  No

15    objection.

16             MR. ALLGOR:  Your Honor, Joseph Allgor for Defendant

17    William Byrnes.  No objection.

18             THE COURT:  Obviously if that changes, as I mentioned,

19    that's fine.  Just let me know.  And if you want to work out a

20    procedure such that I don't, if there is some issue such that I

21    don't know what parties are raising the issue, speak to each

22    other and come out with a process.  My understanding is

23    sometimes when this happens it is done just to avoid any

24    issues.  So, feel free to do it anonymously, for lack of a

25    better term.

GAK5cftC

1          Let me review for the parties the documents I have in

2     connection with today's pre-motion conference.  I have the

3     October 10th letter from the CFTC.  I have responses from

4     Mr. Byrnes on the 13th of October, from NYMEX on the 13th of

5     October, and from Mr. Curtin on the 13th of October.  I also

6     have Defendants Byrnes and Curtin premotion letter which is on,

7     again, October 10th for both Mr. Byrnes and Curtin; and the

8     CFTC's response on October 13th; and NYMEX' pre-motion letter

9     on the 10th and CFTC's response on the 13th.

10          Am I missing any correspondence in connection with

11     today's conference?

12          MR. CHUDY:  No, your Honor.

13          MR. FITZGERALD:  No.

14          THE COURT:  All right.  I do have some questions.

15     Often one of the rationales for having a pre-motion conference

16     is to sort of vet and hopefully provide some direction to the

17     parties concerning where I think there may be certain legal

18     issues that I would like the parties to focus on.  But, as I

19     understand it, let me first address, I noted in Mr. Curtin's

20     response that there was an assertion that the information that

21     he disclosed was not public.

22          Is that an accurate assessment or statement?

23          MR. ABERNETHY:  That's accurate, your Honor.

24          Would you like me to stand?

25          THE COURT:  This goes for everyone:  You can stand or

 1    remain seated, but the only thing I ask is that if you stand or

 2    remain seated that you pull the microphone close to you so that

 3    the court reporter can take down everything.

 4          MR. ABERNETHY:  That would be difficult for me, your

 5    Honor, if I were to remain standing.

 6          THE COURT:  Yes.  So that's fine.  You can do it from

 7    a seated position.  I just ask that you pull the microphone

 8    close to you.

 9          Just explain for me, because as I was reading the

10    letter it references that it was information that was public

11    but then it references that it was the expert that had been

12    retained by you that at least provided some of that

13    information.  I just want to get a sense of what the argument

14    would be and then get the CFTC's response because, obviously,

15    if it is considered public information, that creates an issue.

16          Go ahead.

17          MR. ABERNETHY:  Our client is in the unique position

18    of the trade information that was disclosed by Mr. Curtin

19    having been about trades that were brokered, that is a voice

20    broker function as an intermediary between traders and

21    potential traders prior to a trade having been disclosed.  In

22    that process the information about the trade is well known in

23    the marketplace and because of that, we maintain, and as

24    explained by our client's expert Mr. Silvay, we think we are in

25    a position to argue that there should be summary adjudication

1    on the grounds that this information was public.

2            Perhaps I can spend a moment or so to explain how the

3    over-the-counter market operates.  Would that be useful to the

4    Court?

5            THE COURT:  In particular, in connection with your

6    phrase "well known in the marketplace," what does that actually

7    mean?

8            MR. ABERNETHY:  Well, the information either was

9    known, that is, the information about the trade, the price, the

10   quantity and the party that traded was either known or was

11   readily available in the marketplace.  Let me take a moment to

12   describe the operation of the over-the-counter market.

13           It is not a centralized marked with a bricks and

14   mortar presence.  It is one in which traders are at their

15   offices and they communicate with each other by telephone

16   either directly or through the use of brokers who are known as

17   voice brokers.  Voice brokers will call around to solicit

18   interest in a trade to multiple parties and in that process

19   they will often disclose, usually disclose either in that

20   solicitation process or at a later date, the identity of the

21   party involved.  There are various reasons why the identity

22   needs to be known.  A trading firm may have some restrictions

23   on how many trades or how large a position they can have

24   opposite a given firm.  Ultimately they may have concern about

25   whether or not the counter-party is creditworthy.

GAK5cftC

1          So, the identity of a party is circulated in the

2     marketplace through this over-the-counter brokering process.

3     And, accordingly, when a trade is consummated in this

4     relatively small, professional market of natural gas and

5     commodities traders, the information is known -- the identity,

6     the price, the structure, and so on.  And, if it isn't known by

7     a particular trader, it can be readily available which is part

8     of the definition of "available to the public."  And our expert

9     Mr. Silvay has explained that process.  This is a commercially

10    necessary component of the operation of the over-the-counter

11    market.  Our client is in the unique position of having given

12    out information that relates only to broker trades.  It is also

13    possible in the over-the-counter market that principals can

14    talk directly to each other and consummate a trade.  And in

15    those circumstances, the information may or may not get around

16    in the marketplace.

17          So, it is our contention that this information is in

18    the marketplace and therefore it is public and available to the

19    traders in the marketplace.

20          THE COURT:  Well, in connection with any -- because I

21    didn't see any and I apologize if I missed it -- case law in

22    connection with that, in other words, what does the case law

23    say in terms of -- in this type of situation because, as I

24    understand it, it is not from your description and from my

25    reading of the letters it is not, for example, would I be able

GAK5cftC

1    to go or would any individual in the public be able to go and

2    get access to the information?

3              MR. ABERNETHY:  This is a professional -- first of

4    all, to respond to your comment about case law, I'm not aware

5    of any case law that addresses this particular issue.

6              THE COURT:  Okay.

7              MR. ABERNETHY:  This is a professionals market.  The

8    relevant trading population is this group of people who are

9    industry professionals.  As a practical matter, I don't think

10   you would be recognized by other participants in the market as

11   somebody that they would want to trade against so I think in

12   the over-the-counter market as opposed to Globex Electronic

13   Market operated by the Chicago Mercantile Exchange, I think in

14   this market realistically you would not be a participant in it.

15             THE COURT:  So, I guess one of the issues that I would

16   like, obviously, is to just check to see whether either

17   necessarily in this industry but by analogy in another industry

18   where Courts have discussed what is considered non-public

19   information to determine whether or not this either fits within

20   or is outside of that information.  I understand that you are

21   currently not aware of any case law.  I am going to ask the

22   CFTC a similar question.

23             MR. ABERNETHY:  I am familiar with the Mylett case

24   which deals with rumor in the marketplace but that is just

25   that, it is rumor, it is not commercially necessary, and I

GAK5cftC

1   would distinguish that case from our situation.

2                THE COURT:  Yes.  Okay.

3                Let me hear from the CFTC on this particular issue.

4                MR. CHUDY:  Thank you, your Honor.  Patryk Chudy

5   again.

6                Your Honor, I think it is useful to point out a couple

7   of issues again which are not disputed.  There is no dispute

8   that this information that Eibschutz was obtaining from Curtin

9   was not generally disseminated or published by NYMEX or

10  anywhere else.  Eibschutz admitted that the information that he

11  was requesting for Curtin was non-public and repeatedly kept

12  asking for the information from Curtin as well as Byrnes

13  because he had no other source to obtain.

14               The mere fact that someone might be able to make a few

15  phone calls and try to see if people will tell him or advise of

16  some market rumors does not make that information generally

17  available to the trading public.  We do believe this case is

18  more akin to a situation where there is some information, some

19  leaks or some rumors out in the market which does not take it

20  out of the category of non-public.  What is more important to

21  look at, your Honor, is the fact that Curtin and Byrnes worked

22  at the Exchange and had the direct information and can

23  definitively confirm or deny whether the trades took place.

24  And the case law, your Honor, I think gives great weight to the

25  fact that insiders have that information as opposed to other

GAK5cftC

1    rumors in the market.

2              Similar to what my defense counsel was suggesting, we

3    are not aware of any case law that would support their argument

4    that in this small, professionalized market that the ability to

5    make some phone calls and maybe find out, maybe not find out,

6    rises to the level of public information.

7              THE COURT:  Although you are not aware of any

8    information that supports it, are you aware of case law that

9    suggests that simply that that would not qualify as publicly

10   available information?  In other words, by analogy.

11             MR. CHUDY:  I think the Mylett case that we cited,

12   your Honor, is what we would rely on.

13             THE COURT:  The next question I have relates to what

14   is the CFTC's position with regard to the -- on the vicarious

15   liability issue with regard to NYMEX and what evidence would

16   you point to sort of demonstrate that Messrs. Byrnes and Curtin

17   were, that they were doing this, at least in part, for NYMEX.

18             MR. CHUDY:  Your Honor, as you point out, as provided

19   there is at least a mixed motive that the disclosure served any

20   purpose of NYMEX, then vicarious liability attaches and the

21   discovery record has shown that Byrnes and Curtin were

22   repeatedly providing this information to Eibschutz while at

23   their work stations, during regular business hours, on recorded

24   lines that at some point they learned were recorded by NYMEX,

25   using NYMEX computer systems and, in addition, Byrnes, for

GAK5cftC

example, in response to a NYMEX request to admit later in the

litigation indicated the information was disclosed to Eibschutz

"for the purpose of assisting Ron Eibschutz in building his

book of bills."  They did not say, hey, I did this solely for

my only personal motives or for, unrelated to NYMEX' business.

THE COURT:  I guess my question is Eibschutz -- how do

you pronounce his name?

MR. SHECHTMAN:  I think that's fine, your Honor.

THE COURT:  So, Mr. Eibschutz is providing information

so that he could benefit?  How does that -- in other words, I

know there is reference to fees that NYMEX would have gotten

but how does the statement -- let's assume that Mr. Byrnes

provided Mr. Curtin the information to assist Mr. Eibschutz in

his business, in other words the cold calls and to get

additional work.  How is that -- and I recognize that that

might generate fees for NYMEX but how is that -- is there any

other way that you are asserting that NYMEX was benefiting?

MR. CHUDY:  Yes, your Honor; there is also a statement

which we referenced in our October 13th letter by Mr. Byrnes

where he had indicated in testimony in connection with an

unemployment hearing that he was told he could help the

customers and brokers with the questions that they had.  So, as

we cited in that letter, helping NYMEX establish and bolster

their relationship with brokerage houses serves as an objective

of NYMEX.  Also, as we cited in our letter, there is another

GAK5cftC

example in the record where another marketing employee, for

example, was asked for confidential trade information by a

market participant.  Now, this individual, by contrast,

declined to give out that information and the response that he

heard was, *come on, I'm trying to help you grow your business.*

So, by virtue of helping establish that brokerage

relationship that serves a purpose of NYMEX and we submit that

even if there was some personal motivation involved in Byrnes

and Curtin's disclosures, that doesn't take it outside the

scope of employment.

THE COURT:  What did they say?  In other words what

did Mr. Byrnes and Curtin say -- well, were they asked --

because, as I understand it, it sounds like it is conceded --

well, is it conceded that both Mr. Byrnes and Curtin

understood, putting aside whether or not that what they were

doing was a violation of the NYMEX rules?  In other words, did

they, during their depositions or otherwise, did they concede

that they were concerned or at least knew that this could

jeopardize their jobs?

MR. CHUDY:  From our reading, your Honor, yes, we

think it was, but if counsel has other views we are certainly

welcome to hear that.

THE COURT:  Let me just check.  Does any defense

counsel have any other views as to -- and obviously you don't

have the record in front of you and you are going to be

GAK5cftC

preparing your motion so I understand, I'm not going to hold
you to it, but I just want, for purposes of today, does anybody
have any information that would suggest that that wasn't the
case?

            Mr. Fitzgerald?

            MR. FITZGERALD:  As I understand it they were aware
that what they were doing was against the policy of NYMEX.

            THE COURT:  Yes.

            MR. FITZGERALD:  And to the dispositive question of
what their intent was -- I hope I quote it correctly -- my
understanding is they made an admission that this was not -- it
was done not for the purpose of conferring a benefit on NYMEX.

            THE COURT:  Okay.

            MR. FITZGERALD:  So, we think it is clear that it
wasn't done for that purpose and we think that's the
dispositive question.

            THE COURT:  I think the issue then, counsel, because
obviously you have the testimony of the individuals who are
defendants in this case so I think that's a piece of the
information, but what does the law say in terms of vicarious
liability in this situation?

            The mere fact that in other words they utilized the
phone system, in other words if any time, I guess, an employee
takes an act whether disclosing information and they're at
work, they're utilizing the systems of their employer, it seems

GAK5cftC

1    to me that would be -- it can't -- well.  I would be skeptical

2    and I would have to see case law that says that that is

3    sufficient.  And the question is what would be sufficient and

4    does the mere fact that as an incident to providing the

5    information that Mr. Eibschutz may have then done more business

6    and therefore generated fees, is that sufficient?

7         So, I really, what I need to see is case law that sort

8    of outlines exactly what would be necessary because I am

9    skeptical that the mere fact that they utilized that they were

10   at work and utilized the facilities of their employer, that

11   that would be sufficient.  It may be in combination with some

12   other things, it might be, but juxtaposed against that, as I

13   heard from Mr. Fitzgerald, it sounds as if they both concede

14   that they were concerned for their -- when they were disclosing

15   the information, they were concerned about their jobs and that

16   they may have actually -- and again, subsequently, indicated

17   that they were doing it, and I don't know what the -- I'm not

18   sure -- not for NYMEX, Mr. Fitzgerald was that?

19        MR. FITZGERALD:  Not for the benefit of NYMEX.

20        THE COURT:  Not for the benefit of NYMEX.

21        So, I need to see information that sort of counters

22   that aspect of it.  Well, are you aware of any case law

23   discussing the issue of what role -- the fact that the employee

24   utilized phone system and the like and the fact that it was

25   recorded, people often do things against their interest even

GAK5cftC

though it is being recorded or even televised and I won't say

anything further.  So, to my mind, that isn't necessarily -- it

might be some sort of indication but it certainly wouldn't

carry the day.

         So, are you aware of any sort of the case law

discussing this issue in particular when are you talking about

vicarious liability?

         MR. CHUDY:  Yes, your Honor.  If I just may respond to

a few points as well?

         THE COURT:  Yes.

         MR. CHUDY:  Our argument is not based solely on the

fact that they were doing it during regular business hours on

recorded lines.  That certainly is a component of it.  Our

argument is that based on a totality of the circumstances

including statements made by Byrnes and Curtin during the

course of their employment that they -- both -- objective

evidence shows that they were serving, indeed, some purpose of

NYMEX and I think that is established in the discovery record

by other witnesses who show that deepening this relationship

has a benefit for NYMEX.

         THE COURT:  Okay.

         MR. CHUDY:  And the fact that they received fees, I

think that is again undisputed.  It is again undisputed that

Byrnes and Curtin were aware that Parity was a top 50 customer,

again relevant to their state of mind at the time rather than

1    what they are saying three, four years later in response to a

2    request to admit served by a co-defendant.

3            There is a case I can cite to you, Judge, which talks

4    about looking at objective evidence and I will give you the

5    case cite.  It is not in our letters but if your Honor would

6    like that I am happy to provide that.

7            THE COURT:  That's fine.  Why don't -- if you have the

8    cite you might as well put it in the record.  I expect that I

9    will see it in your papers.

10           MR. CHUDY:  Gibbs v. City of New York, 714 F.Supp.2d

11   419 (E.D.N.Y. 2010), and in that case the Court had held the

12   test must be an objective, not a subjective one.  They were

13   analyzing the query of whether conduct was inside the scope of

14   employment under New York Law in that instance.

15           THE COURT:  Okay.

16           MR. SHECHTMAN:  Judge, obviously the vicarious

17   liability issue isn't mine but I might just say that from my

18   client's point of view and I think the deposition shows this,

19   the last thing in the world he thought was this is for the

20   benefit of NYMEX.  He was surprised, pleasantly surprised when

21   he got this information.  As you may know, he used it to yell

22   at people on his desk to say, *How come we didn't make that*

23   *trade? Why did they trade away from us?*  He used it

24   unsuccessfully to try to cold call.  His book was not built up

25   but I assume even if he had gotten the trade it is a zero sum

GAK5cftC

1   game and somebody else would have.

2          So, I don't quite understand the argument that this

3   was all about fees.  So, I think when you look at this

4   record -- I like these guys, I think when you look at this

5   record you are going to find very little evidence of it being

6   done on my side or on theirs for the benefit of NYMEX.

7          THE COURT:  Okay.  Let me ask this, Mr. Shechtman,

8   while you are up.

9          What was the relationship, because I saw a reference

10  that I thought that Mr. Eibschutz and Mr. Byrnes and Curtin

11  were friends.  I don't know.  What does that mean?  In other

12  words, were they in fact friends or was it basically business

13  associates?

14         MR. SHECHTMAN:  They were not close friends.  They may

15  have attended a few sporting events together.  I think the

16  record is they may have never been at each other's houses.

17  They knew of each other's families and said how are the kids.

18  And I think even before their time they engaged in locker room

19  conversation.  But, I think you will not find this in any way a

20  kind of close, personal friendship.

21         THE COURT:  Okay.

22         MR. CHUDY:  Your Honor, may I just respond very

23  briefly to one point?

24         THE COURT:  Yes.

25         MR. CHUDY:  There is points about the record that I

GAK5cftC

1  think we would disagree on, a full record, of course.

2      THE COURT:  Yes.

3      MR. CHUDY:  But I would like to point out the relevant

4  question is whether Byrnes and Curtin were serving any purpose

5  of NYMEX, not what Eibschutz thought Byrnes and Curtin were

6  doing.

7      MR. SHECHTMAN:  And I recognize that, your Honor.

8      THE COURT:  Look.  I don't know what the record is.

9  It could be, though, that some of that occurred in the

10  conversations that they had.  In other words, when they were

11  talking about what was going on there could be indicia of, one

12  way or the other, and I don't know what the record is in that

13  regard but let me ask Mr. Shechtman, do you have a, is it a dog

14  in this race?  In other words, I didn't get any letters from

15  you so I was just wondering where you stand on this.

16      MR. SHECHTMAN:  Judge, I am in this unusual position

17  and every counsel knows this -- my client's employer has

18  stopped paying him.  He has got no contractual entitlement

19  through indemnification and I have stuck with him through thick

20  and thin.  We are now very much at thin and he's judgment

21  proof, as far as I can tell, and I am just not going to walk

22  away from him.  He is going through health scares and the like.

23      THE COURT:  Sure.

24      MR. SHECHTMAN:  These guys all seem to be very good

25  lawyers.  I am likely to file --

GAK5cftC

1          THE COURT:  A me too?

2          MR. SHECHTMAN:  A me too.  If I they miss something --

3     which I doubt -- I will file, but I can tell you from my

4     client's point of view if the issue was, was this for trading

5     that certainly wasn't his purpose, and I think he has testified

6     that he finds it, as a market participant, hard to think that

7     anybody would have traded on this.

8          So, he is a strong believer in the lack of materiality

9     and if that's not made clear in these briefs we will submit

10    something short.

11         THE COURT:  I can't imagine that it wouldn't be based

12    upon the letters but let me ask this because that's a good

13    segue into the materiality issue.

14         As I understand the record, Mr. Eibschutz did not use

15    the material to trade.  Is everybody in agreement on that?  I

16    will look to the CFTC because I think the defense would agree

17    with that.

18         MR. CHUDY:  Your Honor, we have not established any

19    evidence to support that one way or the other.  We do know that

20    the record does show that Eibschutz provided the information to

21    a number of his colleagues at his work.  We don't know what

22    happened downstream but we are focused on the claims that we

23    charged against these defendants, not what somebody else did

24    with the information.

25         THE COURT:  Is it the CFTC's contention that the

1    information could still be material if the public would not

2    have viewed it as something that it would want to know in terms

3    of trading?  In other words, I understand that it wasn't

4    traded.  I don't necessarily -- and again, I haven't looked as

5    closely at the law, I don't necessarily think that that,

6    because it didn't happen, I'm not sure that carries the day

7    fully.  It certainly may be an indication and certainly it

8    sounds like Mr. Eibschutz, when he didn't in his own mind, it

9    wasn't for the purposes of trading, but is the legal argument

10   that the CFTC is making is that it doesn't have to be for

11   trading in order for it to be material?

12            MR. CHUDY:  That is correct, your Honor.

13            I do not believe that we need to establish that

14   somebody actually did trade on the information in order to

15   establish liability.  All that is required to be shown is

16   whether or not a reasonable person would have viewed the

17   information as important to a trading decision and we think the

18   Commission regulation 1.59 provides guidance on that.

19            THE COURT:  Okay.

20            Well, what would be, again, as I understand the

21   information, what is in the record that would support the idea

22   that a reasonable person in the marketplace would consider this

23   information in deciding to make a trade in the commodities

24   area?

25            MR. CHUDY:  Your Honor, as we cited in our October

1    13th letter there are -- there is deposition testimony

2    regarding witnesses who characterized the -- let me backtrack

3    for a second.

4            THE COURT:  Sure.

5            MR. CHUDY:  In a conversation between Eibschutz and

6    Byrnes, for example, there was a conversation on a recorded

7    line where Eibschutz characterized the information, hey, this

8    is a huge effing trade.  And we also have expert testimony to

9    establish the large economic value of the trades that they're

10   discussing and as well as establish reasons we think why

11   somebody would view the information as important to making a

12   trading decision irrespective of whether or not that actually

13   did or did not occur.

14           THE COURT:  Although, I guess in the context of that

15   statement, was that in connection with the trade that had

16   occurred?  Is that right?  In other words it wasn't a statement

17   that this could lead to a big trade because of the information,

18   it was the trade that was made was a big trade and that the

19   disclosure, whatever they were, the disclosure therefore was

20   that the trade was made for a certain quantities.

21           MR. CHUDY:  I think that's correct, your Honor.  A lot

22   of the trades that were captured on audio recordings pertained

23   to options so they would be exercised or expired at some point

24   in the future.  So, they do give some indication about where

25   market participants may or may not be in the future.

GAK5cftC

| | |
|---|---|
| 1 | THE COURT:  Just with regard to the options question |
| 2 | because I think -- well, let me ask this.  With regard to the |
| 3 | options question, is there evidence in the record as to when |
| 4 | the options were -- in other words, is part of the disclosure |
| 5 | something about when the exercise date was for the options? |
| 6 | MR. CHUDY:  Your Honor, the specifications of the |
| 7 | contracts, the types of contracts that were disclosed, that is |
| 8 | something that I think are standardized and available on the |
| 9 | NYMEX website.  So, if you disclose a particular type of trade |
| 10 | you can go look on the website and figure out when it would |
| 11 | expire, for example. |
| 12 | THE COURT:  Because I guess I view it in sort of |
| 13 | different buckets, right?  There are the trades that have |
| 14 | trades and as I understand, and correct me if I am not accurate |
| 15 | in terms of what the record shows, there were disclosures that |
| 16 | related to trades that were actually done.  Is that accurate? |
| 17 | MR. CHUDY:  That's correct; and mostly options trades. |
| 18 | So, if a trade was, somebody purchased an option yesterday, |
| 19 | that holder of that option has a right to either buy or sell a |
| 20 | commodity product in the future. |
| 21 | THE COURT:  Okay. |
| 22 | So, the disclosure, in essence, was X individual or |
| 23 | identity was purchasing has option to purchase however much of |
| 24 | a particular commodity; is that correct? |
| 25 | MR. CHUDY:  They vary, Judge, but yes, that's the |

GAK5cftC

1    general concept.

2            THE COURT:  Let me ask this and actually this is for

3    the defense.  Options, right?  It seems to me there is a

4    difference in kind between a sale that has occurred -- well --

5    and a sale that may occur in the future.  In other words, when

6    you are talking about -- because now I am parsing between, and

7    I understand what the CFTC is saying they don't have to show

8    that in fact there was a trade but what I am talking about now

9    is would it be public and would someone be interested in

10   knowing that an individual is poised to or could be trading in

11   the future based upon an option?

12           Yes?

13           MR. HOGAN:  Judge, Albert Hogan for NYMEX.

14           All of the trades at issue here relate to executed

15   trades.  Then, in these markets, you can trade futures

16   contracts.

17           THE COURT:  I see.  They trade the options.

18           MR. HOGAN:  You are trading the options so the futures

19   contract itself is a contract that, in the future, will

20   allow -- will require the delivery of a certain commodity.  The

21   option is just another contract that allows you to purchase a

22   futures contract in the future.

23           So, Judge, really all of it relates to fully executed

24   trades with respect to market positions that may accrue out in

25   the future but the point here is unlike an equity trade, in

GAK5cftC

some respects even more like an equity trade but even more so

in the commodities market knowing one piece of one market

participant's past executed trade, you have no idea what the

overall positions are.  They may be long.  They may be short.

This maybe to unwind a position.  This may to put a position

on.  It may be a pure hedging transaction.  It may be

speculation.  It may be a trade related to correlated markets.

          The fact is these markets are extremely complicated

and to get sort of back to the discussion here, there are

hundreds of calls, hundreds of disclosures of information and

to answer your question directly, the comment about there was a

large trade that is absolutely backward-looking, there is not

one piece of evidence in the record where any of the people

that were engaged in these disclosures said, *wow, based on this*

*someone could go out and take the following position in the*

*market.  I'm going to use this information to convince somebody*

*to go take this position in that market.*  That discussion is

completely absent.  And, Judge, I suppose in perhaps the only

respect that is the benefit of having all of these disclosures,

it shows you that these folks, when they were making the

disclosures, were not thinking about future trades in the sense

of using this information to trade, no discussion of convincing

people too trade, no discussion of receiving money based on

people using information to trade.  These were chatter about

past trades so that the broker could call those people and try

GAK5cftC

1    and take their business from one broker who was brokering with

2    NYMEX, to himself.

3         THE COURT:  As I understand it there may not be case

4    law necessarily in the commodities area.  Is there case law

5    that discusses this type of disclosure, in other words the

6    disclosure of an option trade and in terms of whether or not,

7    in terms of materiality?

8         MR. HOGAN:  Judge, we are not aware of case law

9    specifically addressing the disclosure of a prior trade as

10   whether or not that meets the materiality standard in

11   regulation 1.59.  We do believe that the general case law

12   around insider trading, first of all in the SEC context you

13   need to have actual trading.

14        THE COURT:  Yes.

15        MR. HOGAN:  So we think the record here, where there

16   is the absence of any trading and the action of any discussion

17   about how trading could occur, does play into the case law

18   about why trading is a required element under the SEC version.

19        THE COURT:  Just to be clear -- I apologize for

20   interrupting but -- just to be clear, everybody agrees, I want

21   to make sure, that there does need to be -- in other words that

22   a reasonable person, in deciding whether to make a particular

23   trade, in other words that trading, some idea of trading,

24   whether it is explicit trading or not, would be a requirement

25   of the materiality provisions here, in other words, that there

needs to be that aspect of it.

MR. CHUDY:  Yes, your Honor.  There is the commission

regulation speaks to that as well and has some nonexclusive

list of examples where the Commission has viewed that

information as material.

If I may respond to one point that Mr. Hogan had

indicated about no evidence in the record?  There is testimony

from a trader who complained that his information was disclosed

and he was asked about why he thought this information, why he

might be harmed from it and he had testified that he could get

"run over" by someone in the marketplace.

So, there is a real risk of harm and other evidence in

the record that could establish how, why this information would

be important to this hypothetical reasonable.

THE COURT:  Let me see if I have any additional

questions.  The other issue is the scienter issue.

MR. ABERNETHY:  Your Honor, may I comment on

Mr. Chudy's comments?

I think it may not be entirely responsive to the

Court's inquiry.  The central issue, obviously, is materiality

and there is a long line of case law in the commodities and

securities world that holds that the definition is as you

articulated, the information has to be important to a

reasonable trader contemplating trading a commodity interest

but the Commission, I think, is urging the Court to adopt a

GAK5cftC

different reading of CFTC Regulation 1.59 and that is that list

of items relating to, in the second sentence of 1.59 (a)(5) and

they list current and anticipated futures positions, trading

strategies and the financial condition of a firm, is material

information.  So, they're expanding that definition because

they are arguing, as I understand it, that even if this

information about a current or anticipated futures position is

not of importance to a trader in making a decision to trade a

commodity interest, that this information is material.

So, I think they're expanding or trying, proposing

that this Court expand the definition of materiality and in so

doing they are reversing decades' old interpretations by the

Commission of its own regulation which is simply that it is

material information, simply information that would be

important to a trader.

This is, in our view, an unconsidered, expedient

litigation posture and unpersuasive interpretation of

Regulation 1.59.

THE COURT:  I apologize for interrupting because that,

I mean you stated it, that's sort of the question I was getting

at.  In other words, is it the position -- because I think as

you stated, is it the CFTC's position that absent the trading

aspect of it that there still is an argument for the

information being material?  In other words, I think as

Mr. Abernethy just articulated in referring to the list of

GAK5cftC

items under 1.59, is it the CFTC's position that the fact that

it involves sort of a position of an entity and the like, even

if it wouldn't be necessarily something that a reasonable

person would be interested in in terms of trading, that that is

still material?  In other words without that trading aspect of

it?

MR. CHUDY:  Your Honor, with respect to Commission

Regulation 1.59, again, we think the plain language speaks for

itself.  It does define material information as information

that would be important to a reasonable investor making a

trading decision.  That language is there.  Counsel is asking

you to completely ignore the second sentence that illustrates

information that the Commission has traditionally viewed as

examples of that sort of information and I think the reference

to the Commission rule writing process that Mr. Abernethy is

referring to relates to a discussion on a separate aspect

called linked exchanges.

So, there was a debate about this Commission rule to

determine whether or not to add certain categories of

information to this definition or to exclude it.  So, for

example, with respect to margin, there was a discussion whether

or not the word "margin" should be added to the definition in

the second sentence and the Commission considered the fact that

they should not include it so market participants had indicated

that having that language in there would suggest that it would

GAK5cftC

always be considered material.  By contrast, with the linked

exchange sentence that Mr. Abernethy refers to, I think there

were also some discussion about whether or not that type of

information would typically be considered important to making a

trading decision and the Commission decided to keep that

language in there and had indicated with respect to that

component that you still need to establish materiality with

respect to it being reasonable to -- excuse me, with respect to

information being important to a reasonable investor in making

a trading decision.

         So, I don't think we are being inconsistent.  We are

asking the Court to look at the plain language of the

regulation.  To the extent that that doesn't persuade you, your

Honor, we have cited evidence in the record to establish,

independent of the reading of the regulation, why we believe

that materiality is established, and if it is not an issue for

summary judgment then it is -- materiality -- is typically a

question of fact.

         THE COURT:  Okay.

         MR. ABERNETHY:  Your Honor, I think the context in

which the Commission reiterates its position on the definition

of materiality used in 1.59 is irrelevant.  And indeed, yes, I

was referring to that comment but I am also referring to the

comment in the notice of proposed rulemaking in 1985 which I

shouldn't say again because that predates the 1993 statement

GAK5cftC

1    that we are talking about.  They, again, state what their

2    definition of materiality is.

3            If I may, your Honor, I would like also to make a

4    comment about the individual who said he might be run over.

5    When he made that comment he had only heard rumors that

6    information about his trading had been disclosed and his

7    comment was if they knew my position, I could be run over.

8            THE COURT:  Overall position.

9            MR. ABERNETHY:  Overall position, or maybe a position

10   in a particular structure or something like that.  And we can

11   argue about whether or not that is important to a trader.

12   Evidently to that trader his view is it is.  But, the

13   information that was disclosed here was not about positions, it

14   was about price, quantity, structure and the trader.

15           So, it is a little bit misleading to say that the

16   comment by this trader is evidence of the importance of the

17   information that was disclosed.

18           THE COURT:  All right.

19           MR. ALLGOR:  Your Honor, I might add, I am pretty sure

20   that same witness later on, when confronted with the precise

21   nature of the disclosures said, oh yeah, that's not useful for

22   running me over in later testimony.

23           THE COURT:  So, obviously I think I will need to have

24   all of this before me.  Let's talk a little bit about -- I

25   mean, as I understand the -- it seems too me that obviously

GAK5cftC

1    materiality is going to be an issue.  The issue of scienter is

2    going to be an issue.  It also seems to me that as we

3    discussed, the vicarious liability is going to be an issue for

4    the reasons that we have had a discussion on.  It sounds like

5    there is not a substantial amount of case law, at least in this

6    specific context.  Obviously I would expect the parties, to the

7    extent that if there are analogous situations, that the parties

8    can point to in the SEC context and otherwise -- and I

9    recognize the law may not be perfect analogy -- they should

10   absolutely do that.

11        Now, in terms of briefing, and in particular I would

12   like to make a comment about 56.1 statements and by my comments

13   I am not saying that any of the parties would do this, but I

14   ask you to pay careful attention to what 56.1 is about.  It is

15   about facts and disputed facts, not about arguments, not about

16   anything else.

17        So, it is to aid me in reaching a decision and in that

18   way saying what facts are in fact not disputed.  I have, at

19   times, had parties submit -- well, I will give you the most

20   egregious example, where a party in a 56.1 statement -- and

21   there could be circumstances where this happens but I think it

22   should be rare -- where every single fact was disputed even

23   within large parts of it and then, within that, there are also

24   citations to the record that didn't support the fact that they

25   were certain.  And so, what it caused us to have to do,

GAK5cftC

```
1    although I wonder whether I really even needed to, but it
2    causes actually having to go literally check every single thing
3    that was cited in order to get to the bottom of this.
4              So, the only reason why I raise it is it is an
5    unbelievably helpful aid to us in parsing through the record
6    and knowing what facts are not disputed.  Having said that, I
7    recognize that you are obviously -- this is an adversarial
8    process so I am not expecting you to agree to a fact that
9    clearly you don't believe is undisputed, but I just ask you to
10   pay careful attention to the purpose of 56.1 and to the
11   extent -- obviously, I am not limiting you to make your
12   arguments in the appropriate places but -- let me put it to you
13   this way.  If, in fact -- you shouldn't, and I don't want to
14   invite more pages, but you shouldn't use the fact that the
15   56.1, I think -- am I correct, there is nothing in our
16   individual rules that limit the size of a 56.1.
17             So, look.  If you need more pages, obviously, ask for
18   more pages.  And don't use 56.1 to make statements because you
19   couldn't fit it in your brief or something like that.  Again, I
20   am not saying that any of the parties here would but that
21   shouldn't be a reason for it.  And, again, I am in no way
22   suggesting that any counsel here would do that but it is sort
23   of preventive on my part.
24             Yes, Mr. Abernethy?
25             MR. ABERNETHY:  Your Honor, maybe this is not the
```

 1     appropriate time but you have not mentioned anything about the

 2     Daubert motions that some of us have proposed.

 3             THE COURT:  Let me ask you this.  In connection with

 4     the summary judgment motions, and I know there are references

 5     to experts in the parties' papers, is the intention of the

 6     parties to rely on their experts in connection with the summary

 7     judgment motions?

 8             MR. ABERNETHY:  Your Honor --

 9             THE COURT:  Let me hear from the CFTC first and then I

10     will hear from the defense.

11             MR. CHUDY:  Your Honor, in connection with an

12     affirmative motion I would anticipate that we would not.  I

13     think it was more of a textual argument that we made under the

14     plain language of the regulation.  To the extent we were to

15     oppose the summary judgment we would like to obviously reserve

16     the right to rely on an expert there.

17             THE COURT:  So not affirmatively but perhaps, if need

18     be, in response to arguments that the defense makes on their

19     summary judgment motions; is that accurate?

20             MR. CHUDY:  That's correct, your Honor.  And we would

21     also point out further that to the extent summary judgment is

22     based on having sufficient evidence, I think we can establish

23     materiality without relying on it and we think that expert

24     motions are premature at this point but we will take direction

25     from your Honor as to how to approach that.

GAK5cftC

1      THE COURT:  Let me hear from defendants.

2  Mr. Abernethy?

3      MR. ABERNETHY:  Your Honor, we absolutely are going to

4  depend on our expert Robert Silvay who is an individual with

5  more than 20 years of experience as a trader and a broker in

6  the natural gas and crude oil energy markets.  He has testified

7  unequivocally that the information that was disclosed would not

8  be useful to a trader, that the knowledge that came from these

9  disclosures would not enable a person to determine whether a

10  position was being put on, taken off, increased, decreased,

11  what future trading intentions might be revealed, or if any

12  intervening trades had taken place.

13      So, we absolutely depend upon Mr. Silvay's testimony

14  for establishing that the information that was disclosed is not

15  material.

16      With respect to the Commission's expert, we feel that

17  he should be disqualified because he admitted in his own

18  testimony that if he had the information he wouldn't know what

19  to do with it and he stated, also, that only a trader would

20  know whether or not this information is important in

21  considering whether or not to trade a commodity interest.

22  Consequently, we feel that any testimony that he might offer or

23  that the Commission might choose to use in a motion would be

24  inadmissible and shouldn't be considered by the Court.  If the

25  Commission would be willing to go one step further and say that

1     they would not use his testimony -- which apparently they have

2     some -- don't have a great deal of confidence in or I think

3     they would have used it more in their letters -- but if they

4     would be willing to stipulate that not only would they not use

5     it to support their own motion for summary judgment but not use

6     it in opposition to summary judgment motions made by the

7     defendants, then we would be willing to postpone our motion to

8     disqualify him.  But, if they intend to use that testimony in

9     their motion for summary judgment or in opposition, then we

10    would like to make that motion to disqualify him at this time.

11            THE COURT:  Okay.

12            From what I heard the CFTC saying was that -- and I

13    suspect the response is going to be, well, we don't know

14    exactly what the motions are going to look like so we can't say

15    exactly what we are going to say in response but at least I

16    heard them say, let me just confirm, that in connection with

17    the affirmative motion that you would make that the CFTC wasn't

18    planning on relying on its expert in connection with that.

19            MR. CHUDY:  That is correct, your Honor; and I think

20    your characterization of our position is accurate.  We

21    obviously vehemently disagree with the characterizations by

22    Mr. Abernethy.  Our expert, Dr. Hank Bessembinder, has

23    repeatedly been qualified as an expert in numerous trading

24    matters including cases that have been in the press, Oystacher

25    and Coscia, and to the extent they're taking out sound bytes to

try to make the testimony look bad at this point are taken out

of context and completely disregard his methodology that he

used to express his opinions.

          THE COURT:  Let me put it to you this way.  My

inclination is not to make a ruling on the -- and I will hear

from the parties on this -- not to make a ruling on the motion,

the Daubert motions.  This is just an observation but if you

need to, if what you are left with resorting to is experts

battling back and forth that might be an indication that

perhaps it is not an issue that necessarily is ripe for summary

judgment, putting aside whether or not that expert is going to

be able to testify in a trial.  I mean, I am speaking a little

bit in the dark here because I don't know exactly what the

actual summary judgment briefing is going to look like and what

the actual testimony that the expert is being offered to

support is or to rebut a particular summary judgment argument.

          So, that's my initial thought; that I would proceed

with the summary judgment.  If I, in reviewing the papers it

occurs to me that, boy, I need to get more information on the

experts, I will ask for that, in other words make a ruling on

that.

          Do any of the parties see any issue with the way I

intend to proceed?  I understand the desire to deal with the --

but it is not even clear to me -- well, let me ask this,

actually.  Mr. Abernethy, you did indicate that you intend to

GAK5cftC

1    rely on your expert.  In the affirmative motions by the other

2    defendants do you also intend to rely on experts that you have?

3    Perhaps this is an easier way.

4            What is the CFTC's position with regard to the expert

5    that Mr. Abernethy has put forward or any other -- in other

6    words is there Daubert challenges to Mr. Abernethy's and other

7    experts?

8            MR. CHUDY:  Yes, your Honor, I anticipate there would

9    be but it is something that could be dealt with later on.  If

10   the sole piece of evidence that Mr. Abernethy relies on is an

11   expert to try to establish confidentiality then I would imagine

12   that we may try to challenge that but there is ample evidence

13   in the record to show that there is a question of -- assuming

14   you credit his expert, there are issues of fact that won't

15   necessitate doing that until trial.

16           THE COURT:  I am not inclined to have the briefing

17   either simultaneous or to take care of the Daubert issue at

18   this stage.  I will take a look at the summary judgment papers,

19   as I said, and I am skeptical that if what is happening is a

20   battle of experts, that that would be something that would

21   necessarily be ripe.  And I haven't looked again at the case

22   law to ferret out when cases are faced with this situation on

23   summary judgment where what you have boils down to a battle of

24   experts.  Don't get me wrong, there may be situations in that

25   context where you do need to make the Daubert ruling because

GAK5cftC

 1    one side or the other is not appropriate expert testimony.  So,

 2    I am not precluding that issue but where there are experts that

 3    appear to be just at loggerheads, that might be an indication

 4    that perhaps it is not ripe for summary judgment.  But, I'm not

 5    going to schedule briefing on the Daubert motion at this stage.

 6         Have the parties discussed timing of briefing and

 7    sequencing of briefing?  I see a chart, Mr. Chudy.  Is that

 8    a --

 9         MR. CHUDY:  It is a calendar, your Honor.  The parties

10    have discussed a briefing schedule generally and I don't want

11    to speak for everyone else, but I think we had anticipated

12    proposing certain dates and, again, counsel can speak up if I

13    am not characterizing this correctly, but December 15th for

14    opening motions; February 15th for opposition to; and March

15    17th for replies.  We had not gotten into the level of detail

16    to discuss sequencing but I am happy to take direction from

17    your Honor on that as well.

18         THE COURT:  Let's first talk in terms of the dates

19    that were just indicated.  So, the 15th for opening.  Does that

20    work for all defense counsel?

21         MR. FITZGERALD:  Yes, your Honor.  I believe so.

22         If I might, just so we are clear because Mr. Abernethy

23    flagged a motion, the Daubert motion, he wanted to make sure

24    they were for NYMEX, we want to address the issue of vicarious

25    liability which we think is critical and we think it might moot

GAK5cftC

```
 1    the second motion, but the other motion we intend to address is
 2    summary judgment on the injunctive relief.  In our view where
 3    there is vicarious liability we think injunctive relief is
 4    inappropriate.  If we are going to make a no-name illusion to
 5    occurring events, like telling an NFL owner that one of his
 6    players are actually kicking it, despite being told not to,
 7    that the owner is in contempt.  In our view we don't think
 8    NYMEX should be held vicariously liable for what employees did
 9    against the rules, but to invoke an injunctive relief from a
10    Court which would imply strict liability, that if another
11    employee broke the rules that we would be in contempt of Court
12    we don't believe would be appropriate.
13            So, when we frame the motion we envision having that
14    motion as well as the vicarious liability motion.
15            THE COURT:  I think that was something that was in
16    your correspondence.
17            MR. FITZGERALD:  Yes.
18            THE COURT:  That's fine, and I think that that makes
19    sense.  So, 12/15 is okay, and then the opposition would be
20    February 15th, and then replies the 17th of March.
21            Okay.  Sequencing.  I was thinking about this earlier
22    and trying to figure out how to limit amount of paper but I am
23    not sure what the best way would be.  I mean I know that there
24    are times when some of my colleagues direct that you try and
25    file a joint brief.  I am not sure how much, necessarily
```

1    effective that would be but I am not sure -- did the defendants

2    have any thoughts in this area?  Had you discussed whether or

3    not, and particularly whether it is the individual defendants

4    and NYMEX, have you discussed whether there is a means where

5    there could be a brief?  There obviously is overlap in many of

6    the issues and so what I am trying to avoid is the need for

7    people to be repeating the same arguments.

8            Mr. Fitzgerald.

9            MR. FITZGERALD:  Speaking for NYMEX, I think we would

10   all like to avoid needless duplication for vicarious liability

11   and injunctive relief.  That is our issue.  We understand there

12   are other issues that we may not join in in a giant brief.  We

13   would like to do that, if we can.

14           THE COURT:  I think that's the way we should proceed

15   rather than forcing the parties to basically submit unified

16   briefs.  I am still learning in this job and it may be in a

17   year or two years, or maybe even six months after I get your

18   briefs that I want to have it combined, but I think that's

19   fine.

20           So, obviously, be in touch with one another so you

21   recognize what the arguments are and it is fine to do -- I know

22   Mr. Shechtman is going to do a me too but joining in others'

23   briefing is fine and I think that makes sense.  So that you can

24   each file your own papers but it may be that on certain

25   arguments you say I am joining in on the argument whether it is

GAK5cftC

1  vicarious liability or the materiality argument, Mr. Fitzgerald

2  for some of the individuals, I understand that would be fine so

3  you don't need to fully brief that out.

4          Is there anything else that we have to deal with

5  today?  From the CFTC?

6          MR. CHUDY:  No, your Honor.

7          THE COURT:  From the defense?

8          MR. ABERNETHY:  No, your Honor.

9          MR. FITZGERALD:  Your Honor, I guess there is one

10  question in terms of if we are going to be doing materiality

11  briefing on the case.  We don't have a clear understanding of

12  whether if this goes to trial whether we are looking at 90

13  violations in front of a jury or 527 or 72.

14          THE COURT:  Okay.

15          MR. FITZGERALD:  So, it would be useful to know what

16  we are shooting at.  It goes to materiality if whether we are

17  taking each data point as separate violations or a collection

18  of data points as one violation.  We don't want to shoot at the

19  wrong target in our brief.

20          THE COURT:  I saw reference in your letter to

21  different points in time so let me ask the CFTC, is it nailed

22  down to the 90?  I know that is a reference in the pre-motion

23  letter.

24          MR. CHUDY:  Your Honor, in the pre-motion letter the

25  reference to 90 was the 90 instances of audio recordings for

GAK5cftC

example and each audio recording may have had multiple

disclosures on that and I think we made that quite clear in

response to interrogatories served by NYMEX that we were

counting violations by disclosure of counter-party trade.  So,

for example, on one audio recording, if Byrnes or Curtin made a

disclosure to Eibschutz about five trades there is multiple

disclosures on that call, it is not just the one audio

recording.  So, I think we have explained that and our position

is that we are taking, counting each separate disclosure as a

violation.  We are happy to discuss with NYMEX further to try

to, as they say, pin down what they're shooting at.

            THE COURT:  I think that makes sense.

            Look, I think what needs to happen is -- and it may be

that there is an entire agreement that within the 90, it sounds

like that is the -- it is within those 90 calls; is that

accurate?

            MR. CHUDY:  That is accurate, your Honor.

            THE COURT:  Okay.  So, within that there may be

multiple times when there were disclosures so I don't know,

Mr. Fitzgerald, whether it is 90, whether that answered the

question.  In other words, as I understand counsel for the CFTC

it is those 90 recorded calls.  There may be multiple

disclosures within that.  If the 90 isn't sufficient I ask the

parties to meet and confer, well, on call one we have three

disclosures.  In other words, do you need more than that I

GAK5cftC

1    guess is the question.

2              MR. FITZGERALD:  I think what I would like to do is

3    confer with the CFTC and counsel.

4              THE COURT:  Yes.

5              MR. FITZGERALD:  I don't think we have enough for what

6    we need but I also don't want to try to figure that out on our

7    feet in your Honor's courtroom now.

8              MR. ABERNETHY:  Your Honor, we agree with that as

9    well.

10             THE COURT:  Because I think this is something that

11   sounds like the parties can work out, in other words, and

12   figure out what is in play and what is not in play.  In

13   particular -- and this is the reason I think why it can be

14   important.  It may be that there may be an argument that with

15   regard to 30 of the calls -- I mean, there may be differences

16   between, in the disclosures themselves so it is important for

17   the parties to have a sense of that and if you are actually

18   going to ask me to go disclosure by disclosure and make

19   rulings, and I don't know whether that's the case, you need to

20   be on the same page as to what the disclosures are.

21             MR. CHUDY:  Understood, your Honor.

22             THE COURT:  Okay?  All right.

23             Anything else?  CFTC?

24             MR. CHUDY:  No, your Honor.

25             THE COURT:  From the defense?

GAK5cftC

1             MR. FITZGERALD:  No, your Honor.

2             THE COURT:  All right.  Thank you very much for coming

3    in and we will stand adjourned.

4                              o0o