Samuel F. Abernethy, Esq.
Wojciech Jackowski, Esq.
Alexander Mirkin, Esq.
MENAKER & HERRMANN LLP
10 East 40th Street
New York, New York 10016
Telephone: (212) 545-1900
Facsimile: (212) 545-1656

*Counsel for Christopher Curtin*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U. S. COMMODITY FUTURES TRADING COMMISSION,<br><br>　　　　　　　　　　　　Plaintiff,<br><br>　　　　　- against -<br><br>WILLIAM BYRNES,<br>CHRISTOPHER CURTIN,<br>THE NEW YORK MERCANTILE EXCHANGE, INC., and<br>RON EIBSCHUTZ,<br><br>　　　　　　　　　　　　Defendants. | CIVIL ACTION NO.<br>13-CV-1174 (VSB) |

# MEMORANDUM OF LAW OF DEFENDANT CHRISTOPHER CURTIN
## IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

**Table of Contents**

Table of Contents ........................................................................................................................ i

Table of Authorities .................................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ........................................................................................................ 1

ARGUMENT .............................................................................................................................. 3

    I.    Relevant Legal Standard. ................................................................................................. 3

    II.    The Division Cannot Prove That The Information Disclosed By Curtin Was Material—
It Wasn't. .................................................................................................................................... 4

        A.    Information Is Material Only If It Would Be Important to a Reasonable Trader In
Deciding Whether to Trade a Particular Commodity Interest. ................................................ 4

        B.    The Division Cannot Prove That Any Information Disclosed  By Curtin Was
Material. .................................................................................................................................... 8

    III.    The CFTC Cannot Prove That Curtin Acted With Scienter. ........................................ 18

CONCLUSION ........................................................................................................................ 21

## Table of Authorities

**Cases**

*In re Amaranth Nat. Gas Commodities Litig.*,
  269 F.R.D. 366 (S.D.N.Y. 2010) ...................................................................... 12

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  568 U.S. ___, 133 S. Ct. 1184 (2013) ............................................................. 11

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .......................................................................................... 4

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .......................................................................................... 4

*CFTC v. Avco Fin. Corp.*,
  28 F. Supp. 2d 104 (S.D.N.Y. 1998) ................................................................. 5

*CFTC v. Commodity Inv. Group, Inc.*,
  2007 WL 1519002 (S.D.N.Y. February 27, 2007) ............................................ 5

*CFTC v. Int'l Fin. Servs.*,
  323 F. Supp. 2d 482 (S.D.N.Y. 2004) ............................................................... 5

*CFTC v. Standard Forex*,
  1998 WL 236923 (E.D.N.Y. Mar. 31, 1998) ..................................................... 5

*Dalberth v. Xerox Corp.*,
  766 F.3d 172 (2d Cir. 2014) ............................................................................ 16

*Folger Adam Co. v. PMI Industries*,
  1990 WL 113183 (S.D.N.Y. August 2, 1990) .................................................. 11

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000) ............................................................................ 18

*In re JP Morgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005) ............................................................... 8

*In re Kidder Peabody Sec. Litig.*,
  1995 WL 590624 (S.D.N.Y. Oct. 4, 1995) ..................................................... 14

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) .......................................................................................... 4

*Niagara Mohawk Power Corp. v. Jones Chem., Inc.*,
  315 F.3d 171 (2d Cir. 2003) ..........................................................................4

*In re Omincon Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010) ..........................................................................4

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
  573 F.3d 98 (2d Cir. 2009) ..........................................................................19

*Scott v. Harris*,
  550 U.S. 372 (2007)........................................................................................4

*SEC v. Geon Industries, Inc.*,
  531 F.2d 39 (2d Cir. 1976) .........................................................................8, 9

*SEC v. Mayhew*,
  121 F.3d 44 (2d Cir. 1997) ............................................................................9

*SEC v. Obus*,
  693 F.3d 276 (2d Cir. 2012) ........................................................................19

*SEC v. Rorech*,
  720 F. Supp. 2d 367 (S.D.N.Y. 2010) ...........................................................9

*SEC v. Texas Gulf Sulphur Co.*,
  401 F.2d 833 (2d Cir. 1968) ..........................................................................7

*TSC Industries, Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976).................................................................................5, 18

*U.S. Commodity Futures Trading Comm'n v. Moncada*,
  2014 WL 2945793 (S.D.N.Y. June 30, 2014) ........................................12, 17

*U.S. v. Litvak*,
  808 F.3d 160 (2d Cir. 2015) ........................................................................12

*Veleron Holding, B.V. v. Stanley*,
  117 F. Supp. 3d 404 (S.D.N.Y. 2015) ....................................................12, 17

*In re Vivendi, S.A. Securities Litigation*,
  838 F.3d 223 (2d Cir. 2016) ........................................................................12

**Statutes**

7 U.S.C. § 1 ..................................................................................................3

7 U.S.C. § 9(e) ........................................................................................................... 3, 18

**Rules and Regulations**

17 C.F.R. § 1.59 (2008) ...............................................................................*passim*

Activities of Self-Regulatory Organization Employees and Governing Members Who
    Possess Material, Nonpublic Information,
    50 Fed. Reg. 24533 n.9 (proposed Jun. 11, 1985) ........................................... 8

Adaptation of Regulations to Incorporate Swaps,
    77 Fed. Reg. 66288, 66330-31 (Nov. 2, 2012) ............................................... 3

Fed. R. Civ. P. 56(a) ...................................................................................................... 4

Prohibition on Insider Trading,
    58 Fed. Reg. 54966 (Oct. 25, 1993)......................................................... 7, 22

Defendant Christopher Curtin, by his attorneys Menaker & Herrmann LLP, submits this memorandum of law in support of his motion for summary judgment.

## PRELIMINARY STATEMENT

The Commodity Futures Trading Commission alleges that Christopher Curtin knowingly conveyed to defendant Ron Eibschutz certain information about past trades in the over-the-counter energy market that was material, non-public, and hence wrongfully disclosed. But the information Mr. Curtin disclosed was so uninformative, fragmented, and stale as to be of no use to traders in the OTC energy market. Not surprisingly, then, Curtin lacked the necessary scienter—he did not know, or even believe, that the information would have been important to a trader contemplating trading a commodity interest. Accordingly, Curtin asserts that the Commission will be unable to prove its case as a matter of law, and that he is entitled to summary judgment dismissing all of claims in the Amended Complaint against him.

## STATEMENT OF FACTS[1]

This case concerns certain disclosures Curtin made in the course of his employment by the New York Mercantile Exchange, Inc., as a staffer on its ClearPort Facilitation Desk. ¶¶3, 16. ClearPort is NYMEX's service for clearing over-the-counter ("OTC") trades of, *inter alia*, complex energy derivatives such as futures contracts and options on futures contracts for crude oil and natural gas. ¶¶2, 8. Unlike trades on an exchange, where all orders are directed to a central marketplace and exposed to the entire marketplace, in the OTC market, trades are bilaterally negotiated, often with the assistance of a broker. ¶9. After an OTC trade is

---

[1] A summary of the most important facts is set forth herein. The full set of undisputed material facts and record support relied on in connection with this motion are set forth in Curtin's Statement of Material Undisputed Facts Pursuant to Local Rule 56.1, submitted herewith. Any paragraph references herein (i.e., "¶") are to the Statement of Material Undisputed Facts, unless otherwise stated. Any exhibit references (i.e., "Ex. _") are to exhibits attached to the Declaration of Samuel F. Abernethy, dated December 15, 2016, submitted herewith, unless otherwise stated.

consummated, the parties—generally professionals employed by financial firms or energy producers or end users—may decide to clear the trade by submitting it to ClearPort, either online or by calling the ClearPort Facilitation Desk. ¶11. Curtin's role was to answer the phones, input trades into ClearPort for clearing, and correct trades that were incorrectly entered to ClearPort by users online. ¶12.

One of the callers to the ClearPort Facilitation Desk was Ron Eibschutz, a broker trying to establish himself in the OTC energy derivatives market. ¶5. Eibschutz came to know Curtin socially; as was common in the commodities industry, they went out after work on several occasions (at Eibschutz's invitation). ¶6. On sixteen occasions between May 2008 and March 2009, Eibschutz asked Curtin for the details of completed trades, including the price at which the trades were consummated; the quantity traded; the contract traded; the identity of the trading firms, individual traders, and brokerages involved, and the telephone numbers of traders. ¶14.

Eibschutz made clear that he wanted the trade information to develop business and keep tabs on his co-workers' failures to obtain more business from existing clients. ¶¶25, 27. For example, in one call, Eibschutz explained that he was calling in an effort to "figure out [particular trades]. We saw some sh** that traded away [i.e., was traded by an existing client of Eibschutz's through a rival brokerage]. Just trying to figure out these [trades] from yesterday, just want to double check who sold them. . . . I think [a particular firm] did some of them, and [another firm] might have sold some." Ex. 36. In response to Eibschutz's inquiries, Curtin revealed the name of an individual trader, the trading and brokerage firms involved in the trade, and the quantity of contracts traded. *Id.* Curtin also expressed some anxiety about potentially violating NYMEX policies, saying that "[o]nce I sign that piece of paper, you can't get this anymore." *Id.*

- 2 -

For his purposes, Eibschutz did not need (and so never asked for) information about (a) a trader or trading firm's past, present, or anticipated future cash, futures, or option positions; (b) a trader or trading firm's trading strategy; (c) the financial condition of a member of a self-regulatory organization; (d) the regulatory actions or proposed regulatory actions of a self-regulatory organization; or (e) pending or future orders. ¶¶17, 25. For his part, Curtin never disclosed any such information. *Id*. Not surprisingly, the record is devoid of evidence of any trading conducted as a result of Eibschutz's extracting past trade information from Curtin. ¶37.

## ARGUMENT

The Division of Enforcement (the "Division") of the Commodity Futures Trading Commission (the "CFTC" or "Commission") alleges in its Amended Complaint that Curtin's disclosures of information about trades that had been consummated in the OTC market and submitted to ClearPort for clearing were violations of Section 9(e) of the Commodity Exchange Act (the "CEAct"), 7 USC § 1 *et seq*., and CFTC Regulation 1.59(d)(1)(ii), 17 C.F.R. § 1.59 (2008) ("Reg. 1.59").[2] The Division argues that the information conveyed by Curtin to Eibschutz was material because it would have been important to a reasonable trader contemplating trading a commodity interest, and because it related to trading parties' trading strategies and present or anticipated cash, futures, or option positions. As shown below, however, the Division will be unable to sustain its burden.

## I.   RELEVANT LEGAL STANDARD.

Summary judgment "shall [be granted] if the moving party shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[2] Reg. 1.59 was amended in 2012. *See* Adaptation of Regulations to Incorporate Swaps, 77 Fed. Reg. 66288, 66330-31 (Nov. 2, 2012). The 2008 version of Reg 1.59 was operative when the events constituting the purported violation took place.

law." Fed. R. Civ. P. 56(a). *See generally, Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). Where the non-moving party bears the burden of proof on a dispositive issue, summary judgment is appropriate if there is no evidence supporting the non-moving party's case. *See Celotex Corp.*, 477 U.S. at 322-323; *In re Omincon Grp., Inc. Sec. Litig.,* 597 F.3d 501, 510 n.3 (2d Cir. 2010).

Once the moving party has made the initial showing that there is no genuine issue of material fact, the non-moving party cannot rely on the "mere existence of a scintilla of evidence," *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003), raise a "metaphysical doubt," or rest on conclusory allegations, speculation or conjecture; to defeat summary judgment, it must set forth "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986). "Where the record taken as whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## II. THE DIVISION CANNOT PROVE THAT THE INFORMATION DISCLOSED BY CURTIN WAS MATERIAL—IT WASN'T.

### A. Information Is Material Only If It Would Be Important to a Reasonable Trader In Deciding Whether to Trade a Particular Commodity Interest.

To prevail on its claims under both the CEAct and Reg. 1.59, the Division will need to prove that the information Curtin disclosed was material. Under the definitions articulated for that term in the caselaw and in the Commission's own prior rulemakings, the Division will be unable to do so.

1. Under the CEAct, information is material only if it would be important to a reasonable trader in deciding whether to trade a particular commodity interest.

Though the term "material" is not defined in the CEAct, in *Saxe v. E.F. Hutton & Co.* the Second Circuit expressly adopted a securities law materiality standard for commodities

cases. 789 F.2d 105, 111 (2d Cir. 1986) ("In the securities law context, a statement is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. . . . We see no reason to deviate from this standard in the commodities realm.") (*citing TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976)), *abrogated in part on other grounds by Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71 (2006). That standard has been applied in other cases under the CEAct. *See, e.g., CFTC v. Int'l Fin. Servs.*, 323 F. Supp. 2d 482 (S.D.N.Y. 2004) ("A misleading statement or omission 'is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision.'") (*quoting Saxe* at 111); *CFTC v. Commodity Inv. Group, Inc.*, 2007 WL 1519002 (S.D.N.Y. February 27, 2007); *CFTC v. Avco Fin. Corp.*, 28 F. Supp. 2d 104 (S.D.N.Y. 1998); *CFTC v. Standard Forex*, 1998 WL 236923 (E.D.N.Y. Mar. 31, 1998).

2.  Under Regulation 1.59, information is material only if it would be important to a reasonable trader in deciding whether to trade a particular commodity interest.

The term "material information" is defined in Reg. 1.59 as follows:

(a)  For purposes of this section:
. . .
(5) Material information means information which, if such information were publicly known, would be considered important by a reasonable person in deciding whether to trade a particular commodity interest on a contract market. As used in this section, "material information" includes, but is not limited to, information relating to present or anticipated cash, futures, or option positions, trading strategies, the financial condition of members of self-regulatory organizations or members of linked exchanges or their customers, or the regulatory actions or proposed regulatory actions of a self-regulatory organization or a linked exchange.

This definition twice states that it only applies to "this section"; it does not purport to interpret the CEAct, which is unequivocally governed by the *Saxe* standard.

The definition in Reg. 1.59 (the "Regulation Definition") tracks the *Saxe* standard in its first sentence, while the second sentence provides a non-exclusive list of examples of

potentially material information. These two sentences may conflict where unimportant information falls into one of the categories in the list in the second sentence. No caselaw exists resolving this tension, but the CFTC's own prior statements provide clear evidence that the first sentence controls.

The CFTC considered the tension between the two sentences in a rulemaking notice it issued when amending the Regulation Definition in 1993 by expanding the list of categories in the second half of the definition. The CFTC expressly stated that "[a]lthough the Commission has decided to retain the references to 'linked exchanges' in paragraph [1.59(a)(5)] in order to make clear that information related to the members or regulatory actions of such exchanges *may* be considered material, the Commission wishes to reiterate *that information of this type would be considered 'material' only if a reasonable person would consider it important in making a trading decision*." Prohibition on Insider Trading, 58 Fed. Reg. 54966, 54972 (Oct. 25, 1993) (emphasis added). The CFTC doubled down on this position by saying unequivocally that "an individual who obtained information through his or her duties at an SRO could disclose or trade on such information if it were generally available to the trading public or would not be considered important by a reasonable person in making a trading decision." *Id*. at 54969. Thus, the CFTC itself understood materiality to be defined solely according to the *Saxe* standard.[3]

This interpretation of the Regulation Definition is consistent with the initial rule proposal for Reg. 1.59, which expressly defined materiality in terms of securities law precedents. *See* Activities of Self-Regulatory Organization Employees and Governing Members Who Possess Material, Nonpublic Information, 50 Fed. Reg. 24533 n.9 (proposed Jun. 11, 1985)

---

[3] In its Answers and Objections to Curtin's Second Set of Interrogatories, the Division took precisely the opposite position. *See* Ex. 5, Responses 2 and 3. This position has never been articulated by the Division or the CFTC outside of the context of this case, and appears to be merely an expedient, unconsidered litigation posture.

("The Commission has defined 'material information' . . . as 'information which, if such information were publicly known, would be considered important by a reasonable person in deciding whether to trade a particular commodity interest on a contract market.' The Commission has used terminology consistent with that in securities case law relating to insider trading.)" (*citing TSC Industries* and *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968), *cert. denied*, 404 U.S. 1005 (1971)). Accordingly, for purposes of both the CEAct and Reg. 1.59, information can only be material if it meets the *Saxe* standard, that is, if it would be considered important by a reasonable person in deciding whether to trade a particular commodity interest.

Even if the Court were to accept the Division's argument that the second sentence of the Regulation Definition controls, the Division would still be unable to prevail on its claim under Reg. 1.59 because none of the information disclosed by Curtin falls into any of the categories in that sentence. Only two clauses could even arguably encompass information conveyed by Curtin: "present or anticipated cash, futures, or option positions" and "trading strategies." But Curtin only disclosed information dealing with past trades; he was not asked for information relating to any firm or trader's positions. Exs. 25-40. Past trade information cannot be used to reconstruct past positions, since there would be no way to determine whether a particular trade opened or closed a prior position. *See* Expert Report of Robert Silvay (hereinafter "Silvay Rep.") ¶55; Rebuttal Expert Report of Robert Silvay (hereinafter "Silvay Rebuttal Rep.") ¶6 (Exs. 20-21). More importantly, even if one could somehow use past trade information to reconstruct a firm's past positions, it would give no insight whatsoever into a firm's present or anticipated future positions. In particular, there would be no way to determine whether a particular past position was changed by intervening trades. *See* Deposition of Robert

Silvay (hereinafter "Silvay Dep.") at 255:7-21 (Ex. 23). Similarly, as admitted by the Division's expert, individual trades or trade structures are not themselves trading strategies. *See* Deposition of Hendrik Bessembinder (hereinafter "Bessembinder Dep.") at 114:12-21 (Ex. 22).. And, as explained *infra*, without more information about a trader's motivation for entering a trade, there is no way to infer trading strategies from past trades. Silvay Rep. ¶¶55-56 (Ex. 20); Silvay Rebuttal Rep. ¶6 (Ex. 21).

**B. The Division Cannot Prove That Any Information Disclosed By Curtin Was Material.**

Courts have accepted a number of forms of proof of materiality in commodities and securities cases. The Division will not be able to establish any of them.

1. <u>The Division cannot show that the disclosures were material as a matter of law.</u>

In sufficiently stark cases, courts have decided that information is (or is not) material as a matter of law, without reference to expert testimony or the particular factual context in which the information was disclosed. *Compare*, *e.g., SEC v. Geon Industries, Inc.*, 531 F.2d 39, 48 (2d Cir. 1976) (the fact that the board of directors met to act upon a proposed merger is material) *with In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 630-31 (S.D.N.Y. 2005) (the fact that the accounting treatment for 0.3% of Chase's total assets from trades or loans was changed is immaterial). The Division concedes that it cannot demonstrate materiality as a matter of law in this case under the *Saxe* standard. *See* CFTC Pre-Motion Response Letter to Byrnes and Curtin, at 2, Oct. 13, 2016 (Ex. 24) ("If it is necessary to establish . . . that a reasonable trader would find the information important in making an investment decision, then at best, it would raise a factual issue for trial").

Curtin maintains that the disclosures were not material as a matter of law. Though there are no decisions in the securities or commodities caselaw of this Circuit deciding whether

information about past trades is material, one case has considered whether information relating to past bids is material. In *SEC v. Rorech*, 720 F. Supp. 2d 367 (S.D.N.Y. 2010), the court held that the identity of a bidder for a bond offering was not material where the market already knew about the size of the overall market demand for the bond offering. Similarly, in this case, overall market trading activity in a particular derivative is known to the market both through the brokerage process and by virtue of the daily volume reports published by NYMEX. *See* Deposition of Ron Eibschutz (hereinafter "Eibschutz Dep.") at 67:2-16 (Ex. 15); Deposition of Valery Rouet (hereinafter "Rouet Dep.") at 43:6-20 (Ex. 10). The identity of a particular participant to a trade is not "sufficiently different from the general discussions in the marketplace at the time to be deemed material." *Rorech, supra,* at 411-12.

2. <u>None of the recipients of the disclosed information treated it as material.</u>

"[A] major factor in determining whether information was material is the importance attached to it by those who knew about it." *SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997). Typically, courts find information to be material where recipients of the information traded because of it. *See*, *e.g.*, *SEC v. Geon Indus.*, 531 F.2d 39, 48 (2d Cir. 1976) (recipients "demonstrated the importance they attached to the information by purchasing shares"); *Veleron v. Stanley*, 117 F.Supp.3d 404, 431-31 (S.D.N.Y 2015) ("Most telling of all is the fact that, almost as soon as its in-house account traders became aware of these potentially market-moving events . . . Morgan Stanley began taking short positions on Magna stock."). Where no trading occurs and there is no evidence that trading was contemplated, courts are more likely to find that the information was not material. *See*, *e.g.*, *Rorech, supra*, at 412.

All of the evidence in this case suggests that none of the people who had access to the information Curtin disclosed considered it important for trading. The Division concedes that there is no evidence that anyone ever traded on the basis of Curtin's disclosures. *See* Post-

Discovery Conf. Tr. at 21:18-19 (Ex. 44). Moreover, at no point in the sixteen calls between Curtin and Eibschutz (or, for that matter, in the dozens of calls between Byrnes and Eibschutz) does either one of them even hint that the information could be valuable for trading. SFA Decl. Exs. 22-37; Bessembinder Dep. at 33:2-11 (Ex. 22). Moreover, as discussed *infra*, all of the witnesses deposed in this action who were asked about it agreed that there is no way that the disclosed information could have helped a reasonable investor trade. This consensus, which includes testimony from brokers, NYMEX personnel, and even the trader who brought the initial complaint against Eibschutz, strongly weighs against a finding of materiality.

Since the disclosed information was useless for trading, why did Eibschutz work so hard to obtain it? His contemporaneous statements and deposition testimony provide two reasons, neither of which has to do with deciding whether to trade. First, he wanted the information to identify prospective clients—traders he did not yet know who dealt in the products he brokered. Eibschutz Dep. at 72:9-13, 73:5-6, 76:10-14 (Ex. 15); SFA Decl. Exs. 22-23, 37. The fact that the disclosed information could be useful to a broker for this purpose was further confirmed by Valery Rouet, a broker who had known about Eibschutz's calls to the Facilitation Desk when she worked with Eibschutz at Parity Energy (Rouet Dep. at 32:2-11, 39:17-40:12 (Ex. 10)). She testified that the information Eibschutz received was "valuable" because "for any broker to know who trades your product is a potential new client." Rouet Dep. at 41:13-21 (Ex. 10). Similarly, Thomas Holleran, a vice-president of marketing at NYMEX who had earlier worked as a trader and broker, *See* Deposition of Thomas Holleran (hereinafter "Holleran Dep.") at 17:2-18:4 (Ex.13), testified that he would have found such information useful "to expand the business [he] did as a broker" by calling the traders to solicit their business. Holleran Dep. at 32:23-33:1 (Ex. 13).

The second reason Eibschutz pried past trade information from Curtin was to use in disputes with his co-workers about existing clients trading through other brokerages. Eibschutz Dep. at 90:4-92:22 (Ex. 15). This reason, too, was corroborated by his contemporaneous statements. *See* Exs. 25, 37, 39; Ex. 37; . Moreover, Eibschutz's boss confirmed that Eibschutz was concerned about his co-workers' failure to close trades with existing clients, that he sought information from Curtin and Byrnes to track those failures, and that the information was useful for developing business. *See* Abraham Glass Meeting Notes, at 8-9, Jan. 14, 2011 (Ex. 42); Abraham Glass Meeting Notes, at 2, Mar. 23, 2011 (Ex. 43).

Importantly, neither of the two reasons why Eibschutz pressed Curtin for past trade information has anything to do with deciding to trade. "That certain information would have satisfied the curiosity of any particular investor has nothing to do with the question of materiality" unless the information is also material under an objective standard. *Folger Adam Co. v. PMI Industries*, 1990 WL 113183 at *3 (S.D.N.Y. August 2, 1990), *vacated on other grounds,* 938 F.2d 1529 (2d Cir. 1991). [4] *See also*, *e.g.*, *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. ___, 133 S. Ct. 1184, 1190 (2013) (holding that "the materiality standard is an objective one," with the reasonable investor as its benchmark.). Accordingly, the fact that Eibschutz apparently thought the information he obtained to be useful says nothing about the materiality of the information itself, and the Division will not be able to establish materiality based on the conduct of the recipients of the disclosed information

---

[4] The Division's expert, Prof. Hendrik Bessembinder, testified that "if there is only one trader who would act on [the basis of a disclosure], I guess my response would be, well, one is enough to establish it's important." Bessembinder Dep. at 103:11-15 (Ex. 22). But this approach effectively transforms the "reasonable trader" standard for materiality into a subjective standard based on a single hypothetical trader.

3.   <u>The Division has no event study showing that the information was material.</u>

Another common way that materiality is established in securities and commodities cases is an event study. "An event study is a regression analysis that examines the effect of an event on some dependent variable, such as a corporation's stock price." *Veleron Holding, B.V. v. Stanley*, 117 F. Supp. 3d 404, 432–33 (S.D.N.Y. 2015) (citation omitted). "[E]vent studies have become almost obligatory evidence in securities practice," *Id.* (citation omitted). The Second Circuit recently described event studies as "standard operating procedure in federal securities litigation." *In re Vivendi, S.A. Securities Litigation*, 838 F.3d 223, 253 (2d Cir. 2016). *See also In re Amaranth Nat. Gas Commodities Litig.*, 269 F.R.D. 366, 384 (S.D.N.Y. 2010) (certifying class action under the CEAct where plaintiffs' expert has "proposed two separate event studies to evaluate the impact of Amaranth's spread trading on natural gas futures prices and the impact of Amaranth's slam the close trades on natural gas futures prices.") (*aff'd* 730 F3d 170).  Nevertheless, the Division has proffered no event study in the case at bar. Bessembinder Dep. at 202:5-11 (Ex. 22).

4.   <u>The Division cannot controvert an experienced trader's expert opinion that the information disclosed was not important for trading.</u>

Materiality can also be proven with expert testimony from experienced market participants who can speak to the importance of the information to investors. *See U.S. v. Litvak*, 808 F.3d 160, 180, 182 n. 25 (2d Cir. 2015) (reversing district court decision to exclude expert testimony of trader on the subject on materiality where testimony was based on his experience in the market, holding that "courts regularly permit testimony similar" to that proffered, which "would have been highly probative of materiality," and collecting cases). For an expert basing his testimony on his familiarity with the market, it is the breadth of his experience, not the extent of his academic training, that gives weight to his opinion. *See*, *e.g.*, *U.S. Commodity Futures*

*Trading Comm'n v. Moncada*, 2014 WL 2945793 at *3 (S.D.N.Y. June 30, 2014) (holding that a proffered expert who "has been a commodities trader for decades . . . . probably has a better understanding about how the commodities market works than does some business school professor who has studied a great deal but never traded a futures contract under the gun.").

The Division does not rely on the testimony of any experienced market participant to establish materiality. Curtin, by contrast, has proffered the testimony of Robert Silvay, a trader and broker for over twenty years in the energy derivatives OTC marketplace. Silvay Rep. ¶1 (Ex. 20) (describing Mr. Silvay's experience in detail). Mr. Silvay has opined that none of the information disclosed by Curtin could have been important to a reasonable person in deciding whether to trade because there is no way to use the information to infer any trader's motivations for trading, future trades, or present or future positions. Silvay Rep. ¶¶52, 55-56 (Ex. 20).

The key problem with using past trade information is that there is no way to determine why each of the participants entered into the trade. Silvay Rep. ¶¶55-56 (Ex. 20). The participants in futures and options may be trading for reasons other than their simple expectations for the directional change of the market. Silvay Rebuttal Rep. ¶¶6-10 (Ex. 21). A trade might be made, among countless other reasons, to close an open position, to bet on a prediction about volatility, to lock in profits, or just based on an expectation about the future prices in the market. *Id.* Moreover, knowledge of the terms of a trade or the identity of the trader does not reveal what future trades a party to the trade might make, or whether the trader opened, closed out, increased, or decreased a position. Silvay Rep. ¶55 (Ex. 20); Silvay Rebuttal Rep. ¶6 (Ex. 21). In fact, the exact same trade might occur in the OTC derivatives market whether the buyer expects the market to rise and the seller expects it to fall or vice versa. Silvay Rebuttal Rep. ¶¶6-10 (Ex. 21). Thus, merely knowing that a party entered into a trade tells one nothing

about the party's expectations for the market, and so gives one no information on how to trade going forward.

　　　　This problem is exacerbated by the fragmentation of the information disclosed. The trades disclosed range across over roughly three dozen trading firms, *see* Exs. 25-40, some of which employ dozens of individual traders, each with her own set of aggregate positions and trading strategies. Silvay Rebuttal Rep. ¶7 (Ex. 21). Often, the particular trader is not identified—in fact, no trader is named more than two times in the disclosures. SFA Decl. Exs. 25-40. What's more, the disclosures are scattered over 10 months, with no firm's trades disclosed more than six times across all of the products traded. Under these circumstances, a reasonable investor would not be able to infer anything about any trader or trading firm's positions, strategies, or views on the market. Silvay Rep. ¶55 (Ex. 20); Silvay Dep. at 255:7-256:14 (Ex. 23).

　　　　The disclosed information was also not material because of its staleness. "Stale information is not material as a matter of law." *In re Kidder Peabody Sec. Litig.*, 1995 WL 590624, at *5 (S.D.N.Y. Oct. 4, 1995). The OTC derivatives market is made up of traders and brokers in constant communication with each other about possible (and consummated) trades. Silvay Rep. ¶¶32-43 (Ex 20). Information travels quickly; the market fully incorporates the informational content of a trade within a few minutes of the trade. Silvay Rep. ¶44 (Ex. 20). After that point, trade information is generally useless to a trader. *Id.* All of the trades disclosed were necessarily submitted for clearing after they were already consummated; many of the calls discussing them took place days later. Silvay Rep. ¶¶42, 53-54 (Ex. 20). Accordingly, all of the trade information disclosed by Curtin was too stale to be important to a reasonable investor in making trading decisions.

Silvay's view that the disclosed information would not be important to a reasonable person in deciding whether to trade is shared by a number of experienced market participants who testified on the matter. NYMEX vice-president of marketing Holleran, who had been a trader and broker for many years, testified that he did not believe that knowing recent trading activity would be useful to a trader because "they wouldn't be able to back into the trading strategy of the group. They might see a term structure, but they would never see the entire book." Holleran Dep. at 40:2-20 (Ex. 13). Eibschutz himself testified that there was no way to discern a market participant's aggregate position from the information he received because to do so would require "every single trade that they've ever done, and they could have a trade from five years ago, three years ago, two years ago—who knows." Eibschutz Dep. at 93:2-12 (SFA Decl. Ex. 15).

Even the two market participants who reported their suspicions of Byrnes' disclosures to NYMEX testified that the information disclosed was not of the sort likely to be important to a trader. Nour Beyhum, a broker who reported Byrnes' disclosures to NYMEX because of the harm that he believed such disclosures did to investors' confidence in brokers and NYMEX, *see* Deposition of Nour Beyhum (hereinafter "Beyhum Dep.") at 32:9-33:1 (Ex. 11), testified that he would not be able to infer a trader's positions or intentions from the type of information disclosed by Curtin. Beyhum Dep. at 50:18-51:9 (Ex. 11). And Brad Hrycenko, a trader, testified that his concern about the disclosures was based in concern about his competitors knowing *his positions*, *see* Deposition of Bradley Hrycenko (hereinafter "Hrycenko Dep.") at 24:13-20, 43:7-44:24 (Ex. 14), and that a market participant could not use information about any particular trade to a trader's disadvantage without knowing other information, such as what other

positions the trader had or whether the trade was opening or closing a position. Hrycenko Dep. at 68:16-69:2 (Ex. 14).

Based on the expert testimony of Robert Silvay—along with the corroborating testimony of every trader or broker to have testified on this point in this case—it is clear that the information Curtin disclosed would not be important to a reasonable trader, and so was not material. No genuine issue of material fact can exist on this point because the Division has not proffered a single witness with market experience to testify otherwise.

5. The Division's academic expert has not identified a single disclosure as material, and testified that he does not know how one would do so.

The principal evidence the Division has offered in support of its burden as to materiality is the opinion of Hendrick Bessembinder, a business school professor. "[A]n expert's report is not a talisman against summary judgment." *Dalberth v. Xerox Corp.*, 766 F.3d 172, 189 (2d Cir. 2014) (affirming grant of summary judgment for defendant on securities fraud claim where the lower court admitted plaintiff's expert and accepted his methodology, and holding that "summary judgment is not *per se* precluded because there are conflicting experts. An expert may be entitled to his opinion, but he is not entitled to a conclusion that his view of the facts necessarily precludes summary judgment.) (citation omitted).

While Prof. Bessembinder has impeccable qualifications as an expert on the theory of market microstructure, he has absolutely no experience as a trader or broker in any commodities or securities market. Bessembinder Dep. at 15:11-14, 17:17-19:15 (Ex. 22). He has not conducted a data analysis or consulted with anyone with market experience in arriving at his opinions. Bessembinder Dep. at 56:10-20, 26:3-9, 142:14-19 (Ex. 22). As such, his opinions are based solely on speculations and extrapolations from theory. Courts in this district are skeptical of academic expert testimony in securities cases unmoored in practice: "[A]cademics too often

live far from the realities of the day to day marketplace, and their lack of practical experience sometimes renders their analysis fanciful. *U.S. Commodity Futures Trading Comm'n v. Moncada*, No. 12 CIV. 8791 CM, 2014 WL 2945793, at *3 (S.D.N.Y. June 30, 2014). "'Those who can, do; those who can't, teach.' The word of an experienced trader about what traders are and are not allowed to do . . . is potentially worth far more than the opinion of any ivory tower academic." *Veleron Holding, B.V. v. Stanley*, 117 F. Supp. 3d 404, 445 (S.D.N.Y. 2015).

        In this case, no one is more skeptical of Prof. Bessembinder's ability to meaningfully opine on the materiality of the disclosed information than Prof. Bessembinder himself. Throughout his deposition testimony, Prof. Bessembinder made clear that he does not believe himself capable of using any of the disclosed information in making a trading decision (or even saying with certainty that it could be used), but that he thought it "likely" or "plausible" that a professional trader could do so. *See, e.g.*, Bessembinder Dep. 106:8-107:15, 142:5-19, 150:20-151:17, 158:12-159:12 (Ex. 22). In effect, Prof. Bessembinder testified that the person who could conclusively evaluate the importance of the disclosed information was a trader. But, as shown *supra*, all of the traders who have considered the disclosed information concluded that it was not important.

        Prof. Bessembinder's expert report identifies two ways that theory suggests past trade information might be useful in making trading decisions: (1) using past trade information to predict future trades would allow a trader to "trade ahead" of a party to the disclosed trade, Rebuttal Expert Report of Hendrik Bessembinder (hereinafter "Bessembinder Rebuttal Rep.") ¶16 (Ex. 19), and (2) using past trade information to reverse-engineer the trading strategy of a skilled trader who is a party to the disclosed trade would allow a trader to mimic the skilled trader's trading strategy. Bessembinder Rebuttal Rep. ¶¶16, 106 (Ex. 19). Prof. Bessembinder

does not know how to perform either of these techniques, but he does suggest four factors to help guess which disclosures might be useable for either of them. Bessembinder Dep. at 82:8-83:8 (Ex. 22). The problem, however, is that Prof. Bessembinder presents his factors as a "spectrum" along which "shades of gray" of importance can be observed; for all four factors, he explicitly does not provide any thresholds for importance. Bessembinder Dep. at 84:22-24, 86:23-87:22, 125:10-126:15, 127:2-9, 159:13-21, 181:20-182:4 (Ex. 22). Thus, a disclosure about trade that is larger is more likely to be important than one about a trade that is smaller, but there is no way to tell whether any particular disclosure is, in fact, likely to be important.

The "mere possibility, however unlikely" that information would be important to an investor is not sufficient to render the information material. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). *See also*, *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) ("It is not sufficient to allege that the investor might have considered the [information] important."). The Division's principal argument that the information disclosed by Curtin was material is based on the testimony of an expert who gives the trier of fact no way to determine whether a particular disclosure was likely to be important to a reasonable trader. Thus, the Division cannot meet its burden as to materiality.

### III.   THE CFTC CANNOT PROVE THAT CURTIN ACTED WITH SCIENTER.

Under both the CEAct and Reg. 1.59, Curtin can only be found liable if he acted with scienter. There is no evidence in the record, however, that Curtin knew or intended that the information he disclosed was material, or even that he recklessly disregarded the danger that it might be material.

Section 9(e)(1) of the CEAct premises liability on the defendant having acted "willfully and knowingly." Though the text of Reg. 1.59(d) does not explicitly mention scienter, in a Final Rule amending that regulation, the CFTC stated that it intended to "apply a scienter

standard" under which the defendant must have acted "intentionally or with reckless disregard for his duties under the Act." Prohibition on Insider Trading, 58 Fed. Reg. 54968-69 (Oct. 25, 1993). This standard parallels the scienter standard in securities cases for tipper liability for insider trading. *See SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012) ("In every insider trading case, at the moment of . . . trading . . . the unlawful actor must know or be reckless in not knowing that the conduct was deceptive"). The scienter requirement applies to each element of the offense, so the Division will need to establish that Curtin "[knew] that the information that is the subject of the tip is non-public and is material for [commodity] trading purposes, or act[ed] with reckless disregard of the nature of the information." *Id.* The Second Circuit has described the standard for recklessness in the securities context as follows:

> By reckless disregard for the truth, we mean conscious recklessness—i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence. In elaborating as to what may constitute recklessness in the context of a private securities fraud action, we have referred to conduct that at the least is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it . . . . An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness."

*S. Cherry St., LLC v. Hennesee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (citations and quotation marks omitted) (emphasis omitted).

The Division cannot show that Curtin acted with any sufficient level of scienter. First, there is no evidence in the record that would suggest that Curtin knew or believed (let alone intended) that the information he was disclosing was material. Curtin and Eibschutz spoke freely in the __ hours of recorded phone calls, including about the disclosures themselves. Eibschutz mentioned that he wanted information to assist in business development (e.g., Eibschutz Dep. at 72:9-13, 73:5-6, 76:10-14 (Ex. 15)) and address concerns about clients

"trading away" from his brokerage (e.g., Exs. 22, 34, 36). Curtin mentioned his concerns about disclosing information in violation of NYMEX policy (e.g., Deposition of Christopher Curtin (hereinafter "Curtin Dep.") at 273:18-274:9 (Ex.16); Exs. 25, 37, 39. Yet neither one ever said a word suggesting that he perceived a way to trade based on this information.

Nor can the Division establish that Curtin was reckless in not knowing that the information he disclosed was material. At the time of the calls, Curtin had only a limited familiarity with the OTC energy markets. He was certainly an expert in the inner workings of ClearPort and NYMEX's clearing services. At the time, however, Curtin had never traded or brokered a single energy futures or options transaction, let alone OTC versions of those transactions. Ex. 41). As such, he had no way of knowing—and thus did not *refuse* to know— whether information about past trades was useful to a trader in these complex markets.

Indeed, the futility of asserting that Curtin knew or egregiously refused to see the obvious materiality of the disclosed information becomes clear in considering the testimony of the Division's expert on materiality. Prof. Bessembinder was not able to determine definitively that any one of the disclosures on the calls was not important. Bessembinder Dep. at 81:11-18 (Ex. 22). At the same time, neither was he able to say that all of the disclosures on the calls were important. Bessembinder Dep. at 79:24-80:8 (Ex. 22). Despite considering information important if even just one trader would think it of greater than zero importance (Bessembinder Dep. at 80:11-20, 103:10-15 (Ex. 22)), Prof. Bessembinder could only say that "there could be shades of gray. Some of these disclosures were probably more important than other disclosures." Bessembinder Dep. at 80:17-20 (Ex. 22). Put plainly, determining whether a particular disclosure is material was too complex a task for Prof. Bessembinder, who studies these things for a living.

- 20 -

How, then, can the Division hope to show that the materiality of the disclosures was so obvious that Curtin must have either known it or egregiously refused to see it?

## CONCLUSION

For the foregoing reasons, the Court should grant Curtin's motion for summary judgment against all of plaintiff's claims.

Dated: December 15, 2016
      New York, New York

Respectfully submitted,

MENAKER & HERRMANN LLP

By:    _/s/ Samuel F. Abernethy_____
       Samuel F. Abernethy
       Wojciech Jakowski
       Alexander Mirkin

*Attorneys for Defendant Christopher Curtin*
10 East 40th Street
New York, New York 10016
(212) 545-1900