UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U. S. COMMODITY FUTURES TRADING COMMISSION,<br><br>       Plaintiff,<br><br>   - against -<br><br>WILLIAM BYRNES,<br>CHRISTOPHER CURTIN,<br>THE NEW YORK MERCANTILE<br>EXCHANGE, INC., and<br>RON EIBSCHUTZ,<br><br>       Defendants. | CIVIL ACTION NO.<br>13-CV-1174 (VSB) |

**DEFENDANT CHRISTOPHER CURTIN'S STATEMENT OF MATERIAL
UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1
<u>IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT</u>**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Civil Rules of Southern District of New York, Defendant Christopher Curtin, in connection with his Motion for Summary Judgment, submits the following statement of material facts as to which there can be no genuine issue for trial:[1]

### A. The Parties

1. Plaintiff Commodity Futures Trading Commission (the "Commission") is a federal regulatory agency charged with enforcing the Commodity Exchange Act, 7 USC § 1 *et seq.* Amend. Compl. ¶14 (Ex. 1).

2. Defendant New York Mercantile Exchange, Inc. ("NYMEX"), a Delaware corporation, is a commodity futures and options exchange, and since August 2008 has been owned by CME Group Inc. Amend. Compl. ¶18 (Ex. 1); Holzrichter Dep. at 26:25-27:04 (Ex. 7); CFTC Exhibit. 2 (Ex. 8).

3. Defendant Christopher D. Curtin was a NYMEX employee from mid-2000 to April 2009, when he left for a better employment opportunity. Curtin Dep. at 42:06-43:05, 56:4-8 (Ex. 16). Prior to his employment with NYMEX, Curtin had never traded or brokered a single energy futures or options transaction, let alone OTC versions of those transactions. CFTC Exhibit 81 (Ex. 41).

4. Defendant William Byrnes was a NYMEX employee from spring 2007 until his termination on December 2, 2010. Byrnes Dep. at 32:25-33:8 (Ex. 17); Keating Dep. at 51:12-14 (Ex. 12).

5. At all relevant times, defendant Ron Eibschutz was a voice broker in the OTC market for energy futures and options. Eibschutz Dep. at 33:22-34:4, 85:22-86:3 (Ex. 15).

---

[1] References are to the Exhibits (Ex. ___) annexed to the Declaration of Samuel F. Abernethy, dated December 15, 2016, submitted concurrently herewith in support of Christopher Curtin's Motion for Summary Judgment.

From 2006 until 2010, Eibschutz was an employee of Parity Energy, Inc. *Id.* In 2010, he became an employee of Poten & Partners, Inc. *Id* at 112:23-113:17. He was terminated in March 2013. *Id* at 133:7-18.

6. Eibschutz came to know Curtin and Byrnes socially; as was common in the commodities industry, they went out after work on several occasions (at Eibschutz's invitation). Curtin Dep. at 157:4-159:19 (Ex. 16); Byrnes Dep. at 53:24-54:9, 55:7-24 (Ex. 17).

7. Eibschutz worked on cultivating a relationship with both Byrnes and Curtin, eventually becoming friends with Byrnes. Eibschutz Dep. at 64:11-17 (Ex. 15). Curtin and Eibschutz had a pleasant "work relationship" but were never friends. *Id*. at 63:9-22.

### B. ClearPort and The Over-The-Counter Market

8. At all relevant times, NYMEX offered "futures and options trading in energy, metals and other contracts and clearing services for more than 400 off-exchange contracts." Ex. 8. In 2002, launched a clearing service for over-the-counter ("OTC") trades named NYMEX Clearport Clearing ("ClearPort"). Amend. Compl. ¶19 (Ex. 1).

9. Unlike trades on an exchange, where all orders are directed to a central marketplace and exposed to the entire marketplace, in the OTC market, trades are bilaterally negotiated, often with the assistance of a broker. Amend. Compl. ¶20 (Ex. 1); Silvay Rep. ¶21 (Ex. 20).

10. The OTC derivatives market is made up of traders and brokers in constant communication with each other about possible (and consummated) trades. Silvay Rep. ¶¶32, 35-43 (Ex. 20). The market fully incorporates the informational content of a trade within a few minutes of the trade. *Id*. ¶44.

11.     After an OTC trade is consummated, the parties—generally professionals employed by financial firms or energy producers or end users—may decide to clear the trade by submitting it to ClearPort, either online or by calling the ClearPort Facilitation Desk. Amend. Compl. ¶20 (Ex. 1).

12.     The Facilitation Desk staff assisted customers by entering trades into ClearPort that were submitted by phone, responding to customer inquiries, and correcting errors in trades that had been submitted electronically. Cusumano Dep. at 42:18-43:12, 47:8-11 (Ex. 9).

13.     NYMEX published a daily report showing the prior day's trading activity in the aggregate in all contracts traded and cleared on the exchange. The report listed trading volume, open interest, and settlement price. Byrnes Dep. at 44:09-47:10 (Ex. 17); Curtin Dep. at 257:14-258:09 (Ex. 16).

### C. Curtin's Disclosures of Past Trade Information to Eibschutz

14.     On sixteen occasions between May 14, 2008 and March 16, 2009, Eibschutz asked Curtin for information about past trades that had been submitted to ClearPort for clearing. Exs. 25-40.

15.     In response to Eibschutz's requests, Curtin revealed information about past trades limited to one or more of the following: the price of a trade; the volume of a trade; the contract traded; the identity of the trading firm(s) or individual trader(s); the brokerage or individual broker involved, and the telephone number of the trader involved. *Id.*

16.     When Eibschutz called the Facilitation Desk seeking trade information he generally knew many elements of the trade already. Eibschutz Dep. at 190:13-191:14 (Ex. 15). For example, Eibschutz told Curtin that a certain trade was structured as a fence. Ex. 39, 5:9-10.

17. Curtin never conveyed to Eibschutz information relating to any trader or trading firm's past, present, or anticipated future positions in any product, nor did Eibschutz seek such information. Exs. 25-40.

18. Curtin never conveyed to Eibschutz any information relating to the trading strategies of any trader or trading firm, nor did Eibschutz ever seek such information. *Id.*

19. Curtin never conveyed to Eibschutz any information relating to the financial condition of a member of a self-regulatory organization, nor did Eibschutz ever seek such information. *Id.*

20. Curtin never conveyed to Eibschutz any information relating to the regulatory actions or proposed regulatory actions of a self-regulatory organization, nor did Eibschutz ever seek such information. *Id.*

21. Curtin never conveyed to Eibschutz any information relating to pending orders or future orders, nor did Eibschutz ever seek such information. *Id.*

22. All of the trades Curtin disclosed were necessarily submitted for clearing after they were already consummated; many of the calls discussing them took place days later. *Id.*; Silvay Rep. ¶¶42, 53-54 (Ex. 20).

23. Curtin's disclosures are spread among over three dozen trading firms, some of which employ dozens of traders, each with her own independent positions and trading strategies. Exs. 25-40. Usually, the disclosures do not identify the particular traders involved in a trade, and no trader is named more than twice across all of the disclosures. *Id.*

24. Curtin's disclosures are spread over approximately 306 trading days (between May 14, 2008 and March 16, 2009), with no firm mentioned more than seven times across all products. *Id.*

### D. Eibschutz's Motives for Seeking the Disclosed Information.

25. Eibschutz sought trade information from Curtin solely for the purposes of identifying prospective clients and tracking his co-workers' brokering activities in an effort to retain existing clients. Eibschutz Dep. at 72:9; 72:24-73:24 (Ex. 15); Abraham Glass Meeting Notes, at 8-9, Jan. 14, 2011 (Ex. 42); Abraham Glass Meeting Notes, at 2, Mar. 23, 2011 (Ex. 43).

26. Eibschutz testified that there is "no way in hell" to know the market participant's overall aggregate position in the market from the information disclosed by Curtin and Byrnes because to do so would require "every single trade that they've ever done, and they could have a trade from five years ago, three years ago, two years ago—who knows." Eibschutz Dep. at 93:2-17 (Ex. 15).

27. Abraham Glass, President and Manager at Poten Energy Services and Eibschutz's boss, confirmed that Eibschutz was concerned about his co-workers' failure to close trades with existing clients, that he sought information from Curtin and Byrnes to track those failures, and that the information was also useful for developing business. Abraham Glass Meeting Notes, at 8-9, Jan. 14, 2011 (Ex. 42); Abraham Glass Meeting Notes, at 2, Mar. 23, 2011 (Ex.43).

28. In his very first call to Curtin Eibschutz explained, "[he was] trying to figure out who's doing sh** away from us [i.e., trading through a rival brokerage, despite an established relationship with Eibschutz's firm], who's not." Ex. 25 at 5:8-9.

### E. Broker and Trader Perceptions of the Disclosed Information.

29. Valery Rouet, a broker who had known about Eibschutz's calls to the Facilitation Desk when she worked with Eibschutz at Parity Energy (Rouet Dep. at 32:2-11,

39:17-40:12 (Ex. 10)). She testified that the information Eibschutz received was "valuable" because "for any broker to know who trades your product is a potential new client." *Id.* at 41:13-21 (Ex. 10).

30.  Thomas Holleran, a vice-president of marketing at NYMEX who had been a trader and broker for many years, Holleran Dep. at 17:2-18:4 (Ex. 13), testified that he would have found information such as what Curtin disclosed useful "to expand the business [he] did as a broker" by calling the traders to solicit their business. Holleran also testified that he did not believe that knowing recent trading activity would be useful to a trader because "they wouldn't be able to back into the trading strategy of the group. They might see a term structure, but they would never see the entire book." *Id.* at 40:2-20 (Ex. 13).

31.  Nour Beyhum, a broker who reported Byrnes' disclosures (which were similar to Curtin's) to NYMEX because of the harm that he believed such disclosures did to investors' confidence in brokers and NYMEX, Beyhum Dep. at 32:9-33:1 (Ex. 11), testified that he would not be able to infer a trader's positions or intentions from the type of information disclosed by Curtin. *Id.* at 50:18-51:9 (Ex. 11).

32.  Brad Hrycenko, a trader, testified that his concern about the disclosures was based in concern about his competitors knowing *his positions*, Hrycenko Dep. at 24:13-20, 43:7-44:24 (Ex. 14), and that a market participant could not use information about any particular trade to a trader's disadvantage without knowing other information, such as what other positions the trader had or whether the trade was opening or closing a position. *Id.* at 68:16-69:2 (Ex. 14).

33.     As the Commission concedes, there is no evidence that any trades were conducted as a result of Eibschutz's extracting past trade information from Curtin. Ex. 44 at 21:14-19.

Dated: December 15, 2016

                      Respectfully submitted,

                      MENAKER & HERRMANN LLP

                      By: ___/s/ Samuel F. Abernethy_____
                            Samuel F. Abernethy, Esq.
                            Wojciech Jackowski, Esq.
                            Alexander Mirkin, Esq.

*Counsel for Defendant Christopher Curtin*
10 East 40th Street
New York, New York 10016
 (212) 545-1900