**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| U. S. COMMODITY FUTURES TRADING COMMISSION, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| WILLIAM BYRNES, CHRISTOPHER CURTIN, THE NEW YORK MERCANTILE EXCHANGE, INC., and RON EIBSCHUTZ, | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

13 Civ. 1174 (VSB)

**ECF Case**

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

U.S. COMMODITY FUTURES TRADING COMMISSION

Patryk J. Chudy
David W. MacGregor (admitted *pro hac vice*)
Patrick Daly
James G. Wheaton
Alejandra de Urioste
David C. Newman

Division of Enforcement
140 Broadway, 19th Floor
New York, NY 10005
Phone: (646) 746-9700
Fax: (646) 746-9939

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS .....................................................................................................2

    A. Background and Parties ...........................................................................................2

    B. The Contracts and Disclosures At Issue ...............................................................4

    C. Complaints By Market Participants and
       Termination of Byrnes and Curtin's Employment ..............................................7

SUMMARY JUDGMENT STANDARD...................................................................................8

ARGUMENT ........................................................................................................................9

I.  THE UNDISPUTED FACTS ESTABLISH THAT BYRNES AND CURTIN
    VIOLATED SECTION 9(e)(1) OF THE ACT AND CFTC REGULATION 1.59. ................9

    A. The Trade Information Byrnes and Curtin
       Disclosed to Eibschutz Was "Non-Public Information." ....................................9

    B. The Trade Information Byrnes and Curtin
       Disclosed to Eibschutz Was "Material Information."........................................13

    C. Byrnes and Curtin Acted With Scienter............................................................17

II.  THE UNDISPUTED FACTS ESTABLISH THAT EIBSCHUTZ IS LIABLE
    FOR AIDING AND ABETTING BYRNES AND CURTIN'S VIOLATIONS.....................19

III. THE UNDISPUTED FACTS ESTABLISH THAT NYMEX IS VICARIOUSLY
    LIABLE FOR BYRNES AND CURTIN'S VIOLATIONS ...................................................20

CONCLUSION....................................................................................................................28

**TABLE OF AUTHORITIES**

**CASES**

*Amendolare v. Schenkers Int'l Forwarders, Inc.*, 747 F. Supp. 162 (E.D.N.Y. 1990).................27

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................................................................8

*CFTC v. Byrnes*, 58 F. Supp. 3d 319 (S.D.N.Y. 2014)............................................................ 21-23

*CFTC v. Complete Devs., LLC*, No. 4:10 CV 2287,
  2014 WL 794181 (N.D. Ohio Feb. 26, 2014) ........................................................................18

*CFTC v. Heffernan*, 245 F. Supp. 2d 1276 (S.D. Ga. 2003).........................................................13

*CFTC v. Int'l Fin. Servs.*, 323 F. Supp. 2d 482 (S.D.N.Y. 2004)............................................18, 21

*CFTC v. Miklovich*, No. 3:14CV594, 2015 WL 5738298 (N.D. Ohio Sept. 30, 2015) ..........18, 27

*CFTC v. Schafer*, No. Civ. A. H-96-1213, 1997 WL 33547409 (S.D. Tex. Dec. 23, 1997).........28

*CFTC v. Schor*, 478 U.S. 833 (1986)............................................................................................13

*Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006)..........................21

*Dirks v. SEC*, 463 U.S. 646 (1983) ...............................................................................................10

*Dohmen-Ramirez v. CFTC*, 837 F.2d 847 (9th Cir. 1988) ............................................................26

*Drexel Burnham Lambert, Inc. v. CFTC*, 850 F.2d 742 (D.C. Cir. 1988)............................... 17-18

*Energy Factors Inc. v. Nuevo Energy Co.*, No. 91 CIV. 4273,
  1992 WL 170683 (S.D.N.Y. July 7, 1992) ...........................................................................22

*Gibbs v. City of New York*, 714 F. Supp. 2d 419 (E.D.N.Y. 2010)................................... 21-22, 27

*Green v. Bock Laundry Mach. Co.*, 490 U.S. 504 (1989)..............................................................16

*Guttman v. CFTC*, 197 F.3d 33 (2d Cir. 1999)..............................................................................21

*In re Amaranth Natural Gas Commodities Litig.*, 711 F. Supp. 2d 301 (S.D.N.Y. 2010) ............28

*In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170 (2d Cir. 2013) .................... 19-20

*In re Ivan F. Boesky Sec. Litig.*, 36 F.3d 255, 265 (2d Cir. 1994)................................................25

*In re MF Global Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157 (S.D.N.Y. 2014) .......................19

*In re Shahrokh Nikkhah*, CFTC Docket No. 95-13,
    2000 WL 622872 (CFTC May 12, 2000) ........................................................ 19-20

*Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005) ........................................ 8-9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ....................8

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ............................................................22

*McIntyre v. United States*, 545 F.3d 27 (1st Cir. 2008) ............................................24

*Moss v. Morgan Stanley Inc.*, 553 F. Supp. 1347 (S.D.N.Y. 1983) ............................24

*Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438 (2d Cir. 1980) ..............9

*Rosenthal & Co. v. CFTC*, 802 F.2d 963 (7th Cir. 1986) ....................................26, 28

*SEC v. e-Smart Techs., Inc.*, 85 F. Supp. 3d 300 (D.D.C. 2015) ............................13

*SEC v. Lyon*, 605 F. Supp. 2d 531 (S.D.N.Y. 2009) ................................................12

*SEC v. Mayhew*, 121 F.3d 44 (2d Cir. 1997) ............................................................10

*SEC v. Suman*, 684 F. Supp. 2d 378 (S.D.N.Y. 2010) ............................................12

*SEC v. Talbot*, 430 F. Supp. 2d 1029 (C.D. Cal. 2006) ..........................................12

*Stotler v. CFTC*, 855 F.2d 1288 (7th Cir. 1988) ......................................................26

*United States v. Libera*, 989 F.2d 596 (2d Cir. 1993) ..............................................10

*United States v. Mylett*, 97 F.3d 663 (2d Cir. 1996) ................................................10

## STATUTES, RULES, AND OTHER AUTHORITIES

7 U.S.C. § 2 ......................................................................................................1, 20, 26

7 U.S.C. § 13(e) ..................................................................................................1, 9, 17

7 U.S.C. § 13c ........................................................................................................1, 19

17 C.F.R. § 1.59 ................................................................................................ *passim*

50 Fed. Reg. 24,533 (June 11, 1985) ........................................................................15

58 Fed. Reg. 54,966 (Oct. 25, 1993) ....................................................................16, 17

Fed. R. Civ. P. 56. ....................................................................................................1, 8

Restatement (Third) of Agency § 7.07(2) (2006) ................................................. 23-24

Pursuant to Fed. R. Civ. P. 56, Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, and Rule 4 of this Court's Individual Rules & Practices in Civil Cases, Plaintiff U.S. Commodity Futures Trading Commission (the "CFTC" or "Commission") respectfully submits this memorandum of law in support of its motion for partial summary judgment against all Defendants with respect to a subset of the violations alleged in the Amended Complaint, as set forth below. With respect to the illegal disclosures identified herein, *see infra* pp. 6-7, the Commission seeks an Order finding that: Defendants William Byrnes ("Byrnes") and Christopher Curtin ("Curtin") are liable for violations of Section 9(e)(1) of the Commodity Exchange Act (the "Act" or "CEA"), 7 U.S.C. § 13(e)(1), and Commission Regulation 1.59(d)(1)(ii), 17 C.F.R. § 1.59(d)(1)(ii); Defendant Ron Eibschutz ("Eibschutz") is liable under Section 13(a) of the Act, 7 U.S.C. § 13c(a), for aiding and abetting Byrnes and Curtin's violations; and Defendant New York Mercantile Exchange, Inc. ("NYMEX") is vicariously liable for Byrnes and Curtin's misconduct under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B).

## **INTRODUCTION**

Between 2008 and 2010, Byrnes and Curtin intentionally and repeatedly disclosed to a broker, Eibschutz, confidential information about derivatives trading activity that they obtained during the course of their employment at NYMEX. Byrnes and Curtin knew, at the time, that they should not disclose the trade information to Eibschutz, and Eibschutz knew that he was not entitled to receive such information. NYMEX agrees that Byrnes and Curtin were improperly disclosing confidential trade information.

The disclosures by Byrnes and Curtin to Eibschutz, many of which are captured on audio recordings whose contents are not subject to genuine dispute, pertained to trading activity in

options on commodity futures, principally in the crude oil and natural gas markets. Byrnes and Curtin disclosed, among other things, the identities of counterparties to specific options trades, whether a particular counterparty purchased or sold the option, whether it was a call or a put, the volume of contracts traded, the expiry, the strike price, and the trade price.

Because Byrnes and Curtin's disclosures contained material, non-public information they obtained through their special access as NYMEX employees, Byrnes and Curtin violated Section 9(e)(1) of the Act and Regulation 1.59(d)(ii). Eibschutz aided and abetted the underlying violations by repeatedly soliciting the trade information while knowing that he was not entitled to receive such information, and thus is liable under Section 13(a) of the Act. Because Byrnes and Curtin were acting within the scope of their employment when they made the improper disclosures, NYMEX is also vicariously liable for Byrnes and Curtin's misconduct under Section 2(a)(1)(B) of the Act.

## STATEMENT OF FACTS

### A.    Background and Parties

The Commission is an independent federal regulatory agency charged with administering and enforcing the CEA, 7 U.S.C. §§ 1 *et seq.*, and CFTC Regulations, 17 C.F.R. §§ 1.1 *et seq.* (Statement of Undisputed Facts ("Statement") ¶ 1.)

NYMEX is a commodity futures and options exchange serving market participants from around the globe. (Statement ¶ 2.) NYMEX provides a platform called ClearPort that gives customers a way to clear trades through NYMEX.[1] (*Id. ¶* 3.) At all relevant times, NYMEX

---

[1]    According to the website of CME Group (NYMEX's corporate parent) (Statement ¶ 4), clearing is "[t]he procedure through which CME Clearing House becomes the buyer to each seller of a futures contract, and the seller to each buyer, and assumes responsibility for protecting buyers and sellers from financial loss by ensuring buyer and seller performance on each contract. This is effected through the clearing process, in which transactions are matched, confirming that both the buyer's and the seller's

was a board of trade designated as a contract market and self-regulatory organization, and a registered entity under the Act.  (*Id. ¶* 5.)

From March 2007 through December 2010, Byrnes was employed by NYMEX and worked on the ClearPort Facilitation Desk.  (Statement ¶¶ 6, 17-19.)  In his capacity as a NYMEX employee, Byrnes had access to NYMEX's computer systems, including the ClearPort trade blotter.  (*Id. ¶* 65.)  Byrnes' job responsibilities included ensuring that ClearPort registrants received timely and accurate assistance in resolving issues involving the use of the ClearPort platform, including the review, reconciliation and, where necessary, correction of trades input into the ClearPort system, as well as discussing trade details over the phone. (*Id. ¶¶* 21, 158, 160.)  Byrnes' responsibilities also included the training of other employees regarding NYMEX policies relating to the handling of confidential information.  (*Id. ¶* 22.)  Byrnes received multiple promotions at NYMEX, including a promotion to a supervisory role in 2010, despite a complaint that he had disclosed confidential trade information.  (*Id. ¶¶* 19, 20, 187.)  In December 2010, Byrnes was terminated by NYMEX for disclosing confidential trade information to Eibschutz. (*Id. ¶¶* 18, 19, 195.)

From July 2000 through April 2009, Curtin was employed by NYMEX.  (Statement ¶¶ 9, 23, 24.)  Curtin was a supervisor on the ClearPort Facilitation Desk between January 2005 and April 2009.  (*Id. ¶* 24.)  In his capacity as a NYMEX employee, Curtin had access to NYMEX's computer systems, including the ClearPort trade blotter.  (*Id. ¶* 70.)  Curtin's job responsibilities included providing ClearPort users with timely and accurate assistance in resolving issues involving the use of the ClearPort platform, training other employees on ClearPort operations

---

trade information are in agreement."  www.cmegroup.com/education/glossary.html.  "ClearPort is CME Group's clearing service for Over-The-Counter markets."  *Id.*

and policies, and discussing trade details over the phone.  (*Id.* ¶¶ 25, 160.)  Curtin was

responsible for hiring Byrnes, and he trained Byrnes and other NYMEX employees.  (*Id.* ¶¶ 26,

27.)  Curtin left NYMEX in approximately April 2009 and went to work for another exchange.

(*Id.* ¶¶ 24, 28.)

At all relevant times, Eibschutz was employed in New York City as a broker of energy

futures and options.  (Statement ¶¶ 12, 13.)  Eibschutz brokered trades in the crude oil and

natural gas markets, including trades cleared through ClearPort.  (*Id.* ¶¶ 14, 15.)  One of the

brokerage firms that Eibschutz worked for was identified by NYMEX as a "Top 50" broker on

ClearPort.  (*Id.* ¶ 16.)  NYMEX earned fees as a result of trades brokered by Eibschutz and his

employers that were cleared through ClearPort.  (*Id.* ¶¶ 178-182.)

## B.      The Contracts and Disclosures At Issue

Disclosures to Eibschutz of confidential trade information were captured in audio

recordings of Eibschutz's telephone calls with Byrnes and Curtin.  (Statement ¶¶ 108-131.)

Byrnes and Curtin, using information they accessed as NYMEX employees, disclosed

information that Eibschutz was not authorized to receive about, for example, crude oil options

contracts trading on NYMEX, such as the WA contract, which is a contract for WTI (West Texas

Intermediate) calendar spread (put or call) options on Light Sweet Crude Oil Futures (i.e.,

options to assume opposite positions in the first and second expiring Light Sweet Crude Oil

Futures in the spread); upon expiry, the WA contract may be exercised into the underlying light

sweet crude oil futures contract (CL).[2]  (*Id.* ¶¶ 45-73.)

---

[2]      An option on a futures contract is the right, but not the obligation, to buy or sell a futures contract
on or before a certain expiration date.  (Statement ¶ 32.)  A call option gives the holder (buyer) the right,
but not the obligation, to buy (go long) a futures contract at a specific price on or before an expiration
date.  (*Id.* ¶ 33.)  A put option gives the holder (buyer) the right, but not the obligation, to sell (go short) a
futures contract at a specific price on or before an expiration date.  (*Id.* ¶ 34; *see generally id.* ¶¶ 29-44.)

Byrnes and Curtin disclosed details of trading activity including, in some instances, the identities of the parties to specific trades, which party bought and which sold, the number of contracts traded, the price of the trade, and the identities of the brokers involved in the trade. (Statement ¶¶ 108-131.)

As an example of a disclosure by Byrnes, on February 25, 2009, Eibschutz called Byrnes and asked for information about activity in the LO contract (option on crude oil futures), from earlier in the day. (Statement ¶ 115.) On the call, Eibschutz stated, ███████████████ ████████████████████████████████████ (*Id.* ¶¶ 115(b), 115(e).) Byrnes informed Eibschutz that it was ████████████████████████████████ ██████████ (*Id.* ¶ 115(c).) Because one LO contract pertains to 1,000 barrels of oil, the trading activity disclosed by Byrnes related to ██████ barrels of oil. (*Id.* ¶ 49.) Upon hearing the information, Eibschutz said, "that's a fucking huge fucking trade." (*Id.* ¶ 115(d).)

As an example of a disclosure by Curtin, on January 26, 2009, Eibschutz called Curtin and asked for counterparty information about █████████████████████████████ █████████████████████████████████████████████████ ██████████████████████████████████████. (Statement ¶ 127(c).) Curtin informed Eibschutz that █████████████████████████████████ ██████. (*Id.* ¶ 127(a), (b).) Because each AO contract provides an option on one CS contract (financially settled futures contract), the latter of which relates to 1,000 barrels of oil, the trading information disclosed by Curtin pertained to ██████ barrels of crude oil. (*Id.* ¶ 53.) On the call, Eibschutz stated, "Jesus, that's a huge trade." (*Id.* ¶ 127(d).)

The table below identifies 22 audio recordings containing at least 68 unambiguous disclosures of trade information that violate Section 9(e)(1) of the Act and Regulation 1.59

(counting as a distinct violation each time Byrnes or Curtin disclosed the trading activity of an identified counterparty), and thus are amenable to disposition on summary judgment:[3]

|  | Selected Disclosures - Byrnes to Eibschutz |
| SUF ¶ | Date | Bates # | Counter-party ID | Product | Put / Call | Buy / Sell | Vol. | Expiry | Strike Price | Trade Price | # Viol. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 109 | 7/14/08 | 13CIV1174-CFTC-0006503 | ✓ | WA | ✓ | ✓ | ✓ | ✓ | ✓ | | 2 |
| 110 | 9/10/08 | 13CIV1174-CFTC-0006511 | ✓ | LN | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 2 |
| 111 | 11/18/08 | 13CIV1174-CFTC-0006588 | ✓ | WA | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 3 |
| 112 | 2/20/09 | 13CIV1174-CFTC-0018177 | ✓ | WA | ✓ | ✓ | ✓ | ✓ | ✓ | | 1 |
| 113 | 2/24/09 | 13CIV1174-CFTC-0018184 | ✓ | WA | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 2 |
| 114 | 2/25/09 | 13CIV1174-CFTC-0018185 | ✓ | LO | ✓ | ✓ | ✓ | ✓ | ✓ | | 14 |
| 115 | 2/25/09 | 13CIV1174-CFTC-0018188 | ✓ | LO | ✓ | ✓ | ✓ | ✓ | ✓ | | 1 |
| 116 | 2/27/09 | 13CIV1174-CFTC-0018189 | ✓ | WA | ✓ | ✓ | ✓ | ✓ | ✓ | | 2 |
| 117 | 3/13/09 | CME-CFTC-SUP-174101 | ✓ | WA | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 2 |
| 118 | 4/1/09 | 13CIV1174-CFTC-0018227 | ✓ | WA | ✓ | ✓ | ✓ | ✓ | ✓ | | 2 |
| 119 | 4/3/09 | CME-CFTC-SUP-174178 | ✓ | WA | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 2 |
| 120 | 5/7/09 | 13CIV1174-CFTC-18200 | ✓ | WA | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 2 |
| 121 | 5/15/09 | 13CIV1174-CFTC-18249 | ✓ | WA | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 2 |
| 122 | 5/21/09 | 13CIV1174-CFTC-18252 | ✓ | WA | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 9 |
| 123 | 6/1/09 | CME-CFTC-SUP-174187 | ✓ | WA | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 2 |
| 124 | 5/18/10 | 13CIV1174-CFTC-0005673 | ✓ | WA | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 3 |
| colspan="11" | Number of Violations – Disclosures by Byrnes of Confidential Trade Information By Counterparty | 51 |

---

[3]     The "SUF ¶" column refers to the paragraph of the Statement of Undisputed Facts describing the disclosure; the "Date" column refers to the date of the recording, which may differ from the date of the trade; a checkmark under the heading "Counterparty ID" indicates whether the identities of counterparties to trades were disclosed; "Product" refers to the NYMEX product code and specifications; a checkmark under the headings "Put/Call," "Buy/Sell," "Vol[ume]," "Expiry," "Strike Price," and "Trade Date" signifies whether such specific information was disclosed in the calls; and "# Viol." refers to the number of violations of the Act and the Regulation, calculated by the number of counterparties whose specific trade information was disclosed.  For example, the two violations identified in the first row of the table reflect the fact that on July 14, 2008, Byrnes disclosed confidential trade information for two counterparties.  (Statement ¶ kkkk.)

| Selected Disclosures - Curtin to Eibschutz | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SUF ¶ | Date | Bates | Counter-party ID | Product | Put / Call | Buy / Sell | Vol. | Expiry | Strike Price | Trade Price | # Viol. |
| 126 | 11/25/08 | 13CIV1174-CFTC-0006594 | ✓ | WA | ✓ | ✓ | ✓ | ✓ | ✓ | | 2 |
| 127 | 1/26/09 | 13CIV1174-CFTC-0018264 | ✓ | AO | ✓ | ✓ | ✓ | ✓ | ✓ | | 2 |
| 128 | 3/3/09 | 13CIV1174-CFTC-0018194 | ✓ | WA | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 2 |
| 129 | 3/10/09 | 13CIV1174-CFTC-0018235 | ✓ | WA | ✓ | ✓ | ✓ | ✓ | ✓ | | 6 |
| 130 | 3/16/09 | 13CIV1174-CFTC-0018236 | ✓ | WA | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 3 |
| 131 | 3/19/09 | CME-CFTC-SUP-174103 | ✓ | WA | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 2 |
| Number of Violations – Disclosures by Curtin of Confidential Trade Information By Counterparty | | | | | | | | | | | 17 |

(Statement ¶¶ 108-131.)

## C. Complaints By Market Participants and Termination of Byrnes and Curtin's Employment

In approximately April 2009, Curtin left his position at NYMEX. (Statement ¶ 24.) In July 2009, a broker lodged a complaint with NYMEX regarding disclosures by a NYMEX employee associated with ClearPort, identified as "Billy."[4] (*Id.* ¶ 187.) Although a senior NYMEX official followed up on this complaint, the "investigation" was limited to reviewing a single day of Byrnes' emails and phone line recording. (*Id.* ¶¶ 188, 189.) The NYMEX official leading this investigation never confronted Byrnes about the allegations in the July 2009 complaint. (*Id.* ¶ 190.) As noted above, Byrnes received a promotion to a supervisory role on the ClearPort desk in mid-2010. (*Id.* ¶¶ 19, 20.)

In November 2010, a trader became concerned that Eibschutz seemed to have information about the trader's positions and complained to NYMEX. (Statement ¶ 135.) This complaint was also investigated by the same senior NYMEX official. (*Id.* ¶ 193.) NYMEX reviewed several months of Byrnes' communications, determined that Byrnes had improperly

---

[4] Byrnes was known as "Billy." (Statement ¶ 6.)

disclosed trade details to Eibschutz, and terminated Byrnes in December 2010.  (*Id.* ¶¶ 194, 195.)

The investigating NYMEX official later acknowledged that Curtin and one other ClearPort

employee had also improperly disclosed confidential information to Eibschutz, and that he would

have also recommended their termination had he known of the disclosures.  (*Id.* ¶¶ 196, 197.)

After a contested hearing on Byrnes' application for unemployment benefits, an

Administrative Law Judge for the New York State Unemployment Insurance Appeal Board

concluded that Byrnes gave a broker information about confidential customer trading activity.

(Statement ¶ 198.)

## SUMMARY JUDGMENT STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "[T]here is no issue for trial unless there is sufficient evidence favoring the

nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable,

or is not significantly probative, summary judgment may be granted."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (internal citations omitted).  "[T]he mere existence of

*some* alleged factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment; the requirement is that there be no *genuine* issue of *material*

fact."  *Id.* at 247-48.  "Where the record taken as a whole could not lead a rational trier of fact to

find for the non-moving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).  To defeat a

motion for summary judgment, the nonmoving party "must do more than simply show that there

is some metaphysical doubt as to the material facts, and they may not rely on conclusory

allegations or unsubstantiated speculation."  *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d

Cir. 2005) (internal citations and quotation marks omitted); *see also Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980) (party opposing summary judgment "must bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful").

**ARGUMENT**

I.  **THE UNDISPUTED FACTS ESTABLISH THAT BYRNES AND CURTIN VIOLATED SECTION 9(e)(1) OF THE ACT AND CFTC REGULATION 1.59.**

Undisputed facts demonstrate that Byrnes and Curtin are liable for violating Section 9(e)(1) and Regulation 1.59, which are aimed at proscribing the conduct of a narrow class of market participants. The plain language of Section 9(e)(1) and Regulation 1.59 make it unlawful for a self-regulatory organization employee to "disclose for ***any purpose inconsistent with the performance of such person's official duties*** . . . any material non-public information" obtained through special access related to the performance of the employee's duties. 7 U.S.C. § 13(e)(1) (emphasis added); 17 C.F.R. § 1.59(d)(1)(ii) (emphasis added).[5] Trading on the basis of material non-public information is not a necessary element of the offense. As set forth in further detail below, this Court should give effect to the plain language of the statute and regulation.

A.  **The Trade Information Byrnes and Curtin Disclosed to Eibschutz Was "Non-Public Information."**

The undisputed facts establish that the counterparty trade information disclosed by Byrnes and Curtin to Eibschutz was "non-public information." As defined in Rule 1.59, "[n]on-public information" is "information which has not been disseminated in a manner which makes it generally available to the trading public." 17 C.F.R. § 1.59(a)(6). Although there is no analogue

---

[5]     Each quotation of Section 9(e)(1) or Regulation 1.59 in this memorandum of law provides the language of the applicable provision that was in effect during the relevant time period.

to Rule 1.59's broad, prophylactic anti-disclosure rule under the securities laws, securities case law defining "non-public" in the anti-fraud context is instructive, but not controlling. Under the securities laws, information remains "non-public" until either (1) the information is "disclosed 'to achieve a broad dissemination to the investing public generally and without favoring any special person or group,'" or (2) "when, although known only by a few persons, their trading on it 'has caused the information to be fully impounded into the price of the particular stock.'" *SEC v. Mayhew*, 121 F.3d 44, 50 (2d Cir. 1997) (quoting *Dirks v. SEC*, 463 U.S. 646, 653 n.12 (1983), and *United States v. Libera*, 989 F.2d 596, 601 (2d Cir. 1993)). Further, for information to be non-public, it "must be specific and more private than a general rumor." *Id.* (quoting *United States v. Mylett*, 97 F.3d 663, 666 (2d Cir. 1996)). Thus, information conveyed from an insider that goes beyond what has been already publicly disseminated may be considered non-public. *See, e.g*, *Mylett*, 97 F.3d at 666-67 (tip from insider that is more reliable or specific than public rumors is non-public despite existence of such rumors); *Mayhew*, 121 F.3d at 51 (information from insider that was more specific and certain than what had been reported in the press was not public).

Here, undisputed facts establish that the trade information disclosed by Byrnes and Curtin was non-public. When asked about particular disclosures made in audio recordings, Byrnes admitted that the identities of parties to the trades and the size of individual trades were not publicly available information (Statement ¶¶ 93, 94); all of the Byrnes calls identified in the table above involved Byrnes disclosing the identity of counterparties and the size of particular trades, *see supra* p. 6. In addition to agreeing with Byrnes that counterparty identities and trade sizes were not publicly available, Curtin and several former and current NYMEX employees likewise acknowledged that other types of trade information disclosed by Byrnes and Curtin – such as

price, contract month, and expiration date of individual trades – were also not publicly available. (Statement ¶¶ 93-96.) Eibschutz expressly confirmed that the information he requested and received from both Byrnes and Curtin was not available to the public. (*Id.* ¶¶ 97, 98.)

Indeed, as Curtin admitted, only certain information about trades cleared through ClearPort is publicly available; much of the information contained in the ClearPort trade blotter is "confidential" and not available to the public. (Statement ¶¶ 99, 100.) Both Curtin and NYMEX admitted that NYMEX does not publish the names of the entities that traded a particular contract, the number of different market participants that comprised the trading volume in a product, the number of trades that constituted the day's total trading in a product, the size or price of individual transactions, or which individual traders executed transactions in a particular contract for a given market participant. (*Id.* ¶ 101.) NYMEX broadly admitted that Byrnes and Curtin disclosed "confidential" trade information. (*Id.* ¶¶ 57, 58.)

It is also undisputed that NYMEX restricted access to the ClearPort system such that certain information is made available only to the parties to a trade, the broker (if any) that submitted the trade, and the clearing member clearing the trade. (Statement ¶¶ 105, 106.) Specifically, as Curtin admitted, a broker can only access from ClearPort the specific trades the broker submitted for its clients and lacks access to trade blotter information for trades its clients submitted via other brokers or for trades submitted to ClearPort through other means. (*Id.* ¶ 107.)

The undisputed evidence of NYMEX and Eibschutz's understanding further confirms that the information disclosed by Byrnes and Curtin was non-public. NYMEX has acknowledged that in making disclosures, Byrnes and Curtin disclosed "confidential trade information." (Statement ¶ 102.) A senior NYMEX official likewise testified: "No positions,

whether large or small, [are] public information.  And, as well as trading activity of those customers, is not public information."  (*Id.* ¶ 103.)  Lastly, Eibschutz testified that "counterparty information, the names of buyers and sellers and the breakdown of volume by buyers and sellers" were not publicly available anywhere.  (*Id.* ¶ 104.)

Here, the uncontested facts show that the trade information disclosed by Byrnes and Curtin in the specific calls was confidential and non-public.  There is no competent evidence showing that the specific trade information disclosed to Eibschutz in the particular calls at issue, *see supra* p. 7, was generally available to the trading public.  Defendants cannot point to any website, news article, press release, regulatory filing, or other piece of evidence indicating that the specific trade information Byrnes and Curtin disclosed in the telephone calls referenced in the table above was disseminated to the trading public generally, or that the information was somehow fully incorporated into market prices.  The Court should thus find that there is no genuine issue of material fact that the trade information disclosed by Byrnes and Curtin was non-public.  *See, e.g., SEC v. Suman*, 684 F. Supp. 2d 378, 388 (S.D.N.Y. 2010) (granting summary judgment after finding information non-public); *SEC v. Lyon*, 605 F. Supp. 2d 531, 541-42 (S.D.N.Y. 2009) (finding information non-public based upon evidence information was not generally known and had not been disseminated to the investing public generally); *SEC v. Talbot*, 430 F. Supp. 2d 1029, 1044 (C.D. Cal. 2006), *aff'd in part rev'd in part on other grounds*, 530 F.3d 1085 (9th Cir. 2008) (granting summary judgment where defendant failed to provide any evidence information was made public).

**B.  The Trade Information Byrnes and Curtin
        Disclosed to Eibschutz Was "Material Information."**

The trade information disclosed by Byrnes and Curtin was material within the meaning of

Section 9(e)(1) and Regulation 1.59.  Throughout the relevant time period, Regulation 1.59

defined "material information" as follows:

> Material information means information which, if such information were publicly
> known, would be considered important by a reasonable person in deciding
> whether to trade a particular commodity interest on a contract market.  *As used in
> this section, "material information" includes, but is not limited to, information
> relating to present or anticipated cash, futures, or option positions*, trading
> strategies, the financial condition of members of self-regulatory organizations or
> members of linked exchanges or their customers or option customers, or the
> regulatory actions or proposed regulatory actions of a self-regulatory organization
> or a linked exchange.

Regulation 1.59(a)(5) (emphasis added).

Although the application of the definition of materiality for purposes of Section 9(e)(1)

and Rule 1.59(d) is a question of first impression in the federal courts, in general the issue of

materiality may be resolved as a matter of law in the context of a civil enforcement action.  *See,

e.g.*, *SEC v. e-Smart Techs., Inc.*, 85 F. Supp. 3d 300 (D.D.C. 2015) (summary judgment for

SEC); *see also CFTC v. Heffernan*, 245 F. Supp. 2d 1276 (S.D. Ga. 2003) (summary judgment

for CFTC).  The Commission's decision in Rule 1.59 to define "materiality" for these purposes

is entitled to significant deference.  *See, e.g.*, *CFTC v. Schor*, 478 U.S. 833, 844 (1986).

Here, it is undisputed that Byrnes and Curtin disclosed to Eibschutz details about options

trading activity on NYMEX.  (Statement ¶¶ 108-131.)  The information disclosed by Byrnes and

Curtin pertained to options on crude oil and natural gas futures (*id.*), which would be exercised,

offset, or expire subsequent to the date of disclosure.  By definition, a market participant's

purchase or sale of a call or put option would either increase or decrease that market participant's

position in a particular product, and thus such trading activity "relates to" a market participant's then-"present" or "anticipated" futures or options positions.

The plain language of Regulation 1.59 reflects the Commission's reasoned determination that information about a customer's trading activity is material because it "relates to" their positions and thus should be kept confidential for purposes of the regulation and Section 9(e)(1) of the Act. Such a rule makes sense because knowing what options or futures trades a party executed on an exchange would allow another market participant to make inferences regarding that party's position. In sworn testimony in 2011, a senior NYMEX official implicitly admitted that market participants expect their trading activity to be held in strict confidence because others may make inferences regarding their positions from such trading information:

> Our customers, when they bring a trade to the Exchange, people don't want to know or people – customers don't want others to know or suspect what their positions in the marketplace might be. And, as such, when they bring trades to the Exchange, they expect it to be held in the strictest of confidence.

(Statement ¶ 132.)

A senior crude oil financial trader who was responsible for his firm's trading on NYMEX testified that in late 2010, he became concerned about his communications with Eibschutz, and in particular that Eibschutz seemed to know about trading activity that matched the positions the trader had open for his firm:

> Basically I would receive a communication about Ron saying, Hey, would you be interested in this type of trade? I, you know, think I can get some bids or offers, depending what my position was. And there was a few of those types of conversations, and it was just odd that it happened to be the positions that I had the largest open interest on in my – for the firm.

(Statement ¶¶ 133, 137.) This concerned the senior crude oil financial trader because, as he stated, "you really don't want the brokers to know what side or what your positions are because . . . someone could run over you." (*Id.* ¶ 137.) The trader brought his concerns to NYMEX,

fearing that if brokers had such information then other traders could use it to their advantage and his disadvantage. (*Id.* ¶¶ 134-137.)[6] Another market participant, a broker of oil options who complained to NYMEX that someone named "Billy" had been leaking information, testified that he was "paranoid" that if he was doing a big deal with a client who did not want his name out because the client did not want others to know his "position," "Billy" might leak the information about the client's identity. (*Id.* ¶¶ 138, 187.)

Because the statute and the regulation are clear on their face, there is no need to resort to legislative or rulemaking history. The rulemaking history, in any event, supports the CFTC's position. In promulgating Regulation 1.59, the Commission expressed its intention to provide bright-line guidance to self-regulatory organizations and their employees. The Commission explained that "[e]mployees so engaged [by a self-regulatory organization] can be expected to have access to information which relates to cash, futures or option positions, trading strategies, and the financial condition of members or their customers, among other things." 50 Fed. Reg. 24,533, 24,535 (proposed June 11, 1985). The Commission explained, with respect to "information which relates to cash, futures or option positions . . . of members or their customers," that "this type of information, which is not usually available to the public, *would* be considered important by a reasonable person in deciding whether to trade a particular commodity interest and, thus, *would* be considered material, nonpublic information for purposes of this regulation." *Id.* (emphases added). In 1993, in connection with amendments, the Commission likewise described the sentence in Regulation 1.59 enumerating what is "include[d]" in the definition of "material information" as a "non-exclusive list of information that *would* be

---

[6]    This complaint ultimately led to NYMEX terminating Byrnes. (Statement ¶¶ 194, 195.)

considered 'material' in making a trading decision." 58 Fed. Reg. 54,966, 54,972 (Oct. 25, 1993) (emphasis added).

The general definition of "material information" that precedes the non-exclusive list of information that would be considered "material" cannot reasonably be interpreted to require a case-specific inquiry into the importance of every piece of information, as general language is not meant to implicitly limit specific language. *See generally Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 524 (1989) (noting that a "general statutory rule usually does not govern unless there is no more specific rule"). If the Commission were required to separately establish that information would be important to a reasonable investor, the language providing a "non-exclusive list" of information that is material in the context of the regulation would be rendered meaningless. *Cf.* 58 Fed. Reg. at 54,972 (noting that, although it decided to omit "property deposited as margin" from the non-exclusive list, the Commission stated that "*under particular circumstances* such information could be considered important in making a trading decision" and thus "would still be considered 'material' . . . *if* the information" were important to a reasonable investor) (emphases added).[7]

Where, as here, there is no genuine issue of fact that the information that was disclosed falls within the list of specifically enumerated items of what constitutes material information, the Court should apply the plain language of the regulation and deem the disclosures of options

---

[7]     With regard to one category of information that was included in the "non-exclusive" list – information related to "linked exchanges" – the Commission observed in its 1993 revisions to Rule 1.59 that information "of this type" would be considered "material" only if a reasonable person would consider it important in making a trading decision. 58 Fed. Reg. at 54,972. However, the reference to linked – i.e., foreign or securities – exchanges was controversially added to the Rule for the first time in 1993, and broadly expanded the reach of the rule beyond information pertaining to registered commodity futures exchanges, their members, and the products traded on such exchanges. Linked exchanges are not at issue in this case, and the Commission's suggestion that information regarding linked exchanges might not be conclusively "material" should not create any doubt that information about trading activity in commodity interests that "relates to" present or anticipated futures or options positions would be deemed material.

trading information in the audio recordings "material" as a matter of law, without the need for a case-by-case showing that the disclosures in each call would be important to a reasonable person in making an investment decision.

      **C.**      **Byrnes and Curtin Acted With Scienter.**

Undisputed facts show that both Byrnes and Curtin acted with scienter when they disclosed confidential trade information to Eibschutz. CEA Section 9(e)(1) prohibits any employee of a registered entity, such as NYMEX, from "willfully and knowingly" disclosing material non-public information "for any purpose inconsistent with the performance of their official duties." 7 U.S.C. § 13(e)(1). Regulation 1.59(d)(1)(ii), in turn, prohibits employees of self-regulatory organizations, such as NYMEX, from "[d]isclos[ing] for any purpose inconsistent with the performance of such person's official duties as an employee . . . any material, non-public information obtained through special access related to the performance of such duties."[8]

Unlike Section 9(e)(1), the language of Regulation 1.59(d) does not have an express scienter requirement. The Commission intentionally omitted an express scienter requirement when amending the regulation to effectuate Section 9(e)(1), noting "that the phrase 'willfully and knowingly' is intended to address the degree of culpability necessary to prove a felony and is not necessary for non-criminal liability." 58 Fed. Reg. at 54,970. In adopting the amendments to Regulation 1.59, the Commission indicated that it would not seek to enforce the rule in cases of negligent or inadvertent conduct but instead only "where an individual commits a wrongful act intentionally or with reckless disregard for his duties under the Act." *Id.* at 54,968-69. Recklessness has been defined as conduct "that departs so far from the standards of ordinary care

---

[8]      It is uncontested that Byrnes and Curtin's disclosures to Eibschutz were "inconsistent" with performance of their duties as NYMEX employees, and that they used their "special access" as NYMEX employees to obtain the information they disclosed. (Statement ¶¶ xx-ooo.)

that it is very difficult to believe the [actor] was not aware of what he was doing." *Drexel Burnham Lambert, Inc. v. CFTC*, 850 F.2d 742, 748 (D.C. Cir. 1988).

The issue of scienter may be resolved on a motion for summary judgment in a civil enforcement action. *See, e.g.*, *CFTC v. Miklovich*, No. 3:14CV594, 2015 WL 5738298, at *3-4 (N.D. Ohio Sept. 30, 2015) (holding that "circumstantial evidence of [defendant's] knowledge and intent" was sufficient to find that defendant acted willfully for purposes of the scienter element of a CEA antifraud provision); *CFTC v. Complete Devs., LLC*, No. 4:10 CV 2287, 2014 WL 794181, at *18-20 (N.D. Ohio Feb. 26, 2014) (holding that, as a matter of law, defendant's failure to investigate and perform due diligence was at least reckless); *CFTC v. Int'l Fin. Servs.*, 323 F. Supp. 2d 482, 502-03 (S.D.N.Y. 2004) (holding that defendant acted "at best recklessly, if not deliberately," in the context of a fraud claim under Section 4(b) of the Act, thus "[u]nquestionably" establishing scienter).

Undisputed facts in this case establish that Byrnes and Curtin intentionally and repeatedly disclosed confidential trade information about options on commodity futures to Eibschutz, knowing that Eibschutz was not entitled to receive such information.

Byrnes admitted in testimony that he understood that Eibschutz was asking for information about trades that he was not a party to, and that Byrnes knew he was not supposed to give the information to Eibschutz. (Statement ¶¶ 75, 76, 79.) At the time, Byrnes had been in the industry for more than 20 years, was promoted to a supervisory role at NYMEX in 2010, and had trained other employees on confidentiality. (*Id.* ¶¶ 19, 20, 22, 77.) Byrnes also signed multiple acknowledgements that he received NYMEX's confidentiality policies.[9] (*Id.* ¶ 78.) As

---

[9]      For example, on March 29, 2007, Byrnes signed an acknowledgment form which stated: "I will keep secret and retain in strictest of confidence . . . all confidential matters relating to . . . the business of

Byrnes testified, "At the time I made the disclosures I knew I could be fired for it, so I was somewhat aware of the policy, of NYMEX's policy not to disclose the information."  (*Id.* ¶ 74.)

Curtin likewise acknowledged in testimony that he was deliberately providing information about customer trading activity to Eibschutz, and that he knew at the time that his behavior was wrong and that his disclosures violated NYMEX policy.  (Statement ¶ 80-83.)  At the time, Curtin had been in the industry for more than 20 years, including a prior stint as a currency trader.  (*Id.* ¶¶ 84, 85.)  Curtin was a supervisor at NYMEX, and was responsible for hiring and training Byrnes and others.  (*Id.* ¶¶ 24, 26, 27, 86-88.)  Curtin admitted that he signed multiple acknowledgments indicating that he read and understood NYMEX's policies, and agreed that information relating to trades cleared on ClearPort would be covered by the policies. (*Id.* ¶¶ 82, 91, 92.)

## II.   THE UNDISPUTED FACTS ESTABLISH THAT EIBSCHUTZ IS LIABLE FOR AIDING AND ABETTING BYRNES AND CURTIN'S VIOLATIONS.

Undisputed facts establish that, pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a), Eibschutz is liable for aiding and abetting Byrnes and Curtin's underlying violations of Section 9(e)(1) and Regulation 1.59.  In order to establish aiding and abetting liability under Section 13(a), the Commission must prove that Eibschutz "in some sort associated himself with the venture, that he participated in it as in something that he wishes to bring about, that he [sought] by his action to make it succeed."  *In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170, 183 (2d Cir. 2013) (quotation omitted); *see also In re MF Global Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157, 177-78 (S.D.N.Y. 2014); *In re Shahrokh Nikkhah*, CFTC Docket No. 95-13, 2000 WL 622872, at *11 n.28 (CFTC May 12, 2000) (aiding and abetting liability requires a

---

NYMEX's members and their customers . . . including but not limited to . . . trading information relating to business conducted on NYMEX . . . ."  (Statement ¶  SSS2.)

showing that (1) the Act, or rules promulgated thereunder, was violated, (2) the defendant had knowledge of the wrongdoing underlying the violation, and (3) the defendant intentionally assisted the primary wrongdoer).

Here, the undisputed facts regarding Eibschutz's knowledge, intent, and actions establish that Eibschutz associated himself with Byrnes and Curtin's misconduct, participated in it as something that he wished to bring about, and sought by his actions to make it succeed. (Statement ¶¶ 139-154.) *See Amaranth*, 730 F.3d at 183. At the time Eibschutz was receiving confidential trade information from Byrnes and Curtin, Eibschutz knew he was not entitled to receive such information, he knew that they were not permitted to give him such information, and he knew it was wrong for him to receive such information. (Statement ¶ 153.)

Moreover, Eibschutz admitted that he provided Byrnes and Curtin with specific information so that they could identify and locate the specific trades Eibschutz was inquiring about, and that Byrnes and Curtin provided Eibschutz confidential trade information as a result of Eibschutz's repeated requests for the information. (Statement ¶¶ 146, 152.) It is evident from the calls that Eibschutz sought confidential trade information from Byrnes and Curtin by specifically making inquiries to them about non-public trade details. Eibschutz understood it was wrong for Byrnes and Curtin to respond to his questions about non-public trade details, and he acknowledged that "what I did was wrong." (*Id.* ¶ 154.)

Accordingly, the court should grant the CFTC summary judgment on its aiding and abetting claim against Eibschutz.

## III. THE UNDISPUTED FACTS ESTABLISH THAT NYMEX IS VICARIOUSLY LIABLE FOR BYRNES AND CURTIN'S VIOLATIONS.

Under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), NYMEX may be held vicariously liable for Byrnes and Curtin's unlawful disclosures if (1) Byrnes and Curtin were

acting as NYMEX's agents when they disclosed the non-public information to Eibschutz and (2) Byrnes and Curtin's actions were within the scope of their employment with NYMEX. *CFTC v. Byrnes*, 58 F. Supp. 3d 319, 326 (S.D.N.Y. 2014) (citing *Guttman v. CFTC*, 197 F.3d 33, 39 (2d Cir. 1999)). Here, NYMEX admitted that Byrnes and Curtin were employees of NYMEX at the time of the unauthorized disclosures and that they acted as agents for NYMEX while they were employees of NYMEX, to the extent they were acting within the scope of their employment. (Statement ¶¶ 7, 8, 10, 11.) Accordingly, NYMEX's vicarious liability depends upon whether Byrnes and Curtin acted within the scope of their employment when they made the unlawful disclosures.

As this Court has held, whether an employee acted within the scope of his or her employment is resolved by analyzing the facts under the totality of the circumstances. *Byrnes*, 58 F. Supp. 3d at 327; *see also Int'l Fin Servs.*, 323 F. Supp. 2d at 499 n.12 (granting summary judgment after determining, based on the "totality of the circumstances," that agents worked for principal). Further, the facts are analyzed based upon an objective review of the evidence. *See Gibbs v. City of New York*, 714 F. Supp. 2d 419, 425 (E.D.N.Y. 2010) (under New York law, "the only meaningful test for determining whether the servant was engaged in his master's business at the relevant time is an objective one"); *see also Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 663 (D.C. Cir. 2006) (in the Federal Tort Statute context, "the test for scope of employment is an objective one, based on all the facts and circumstances"). Although "the question of whether a particular act was within the scope of employment is dependent on factual considerations and so is ordinarily one for the jury, the Court . . . may make that determination as a matter of law where the essential facts are not disputed." *Gibbs*, 714 F. Supp.

2d at 422 (granting summary judgment for plaintiff where "no reasonable jury would fail to find that [employee] was acting within the scope of his employment").

In its decision denying NYMEX's motion to dismiss, this Court held that facts alleged in the Amended Complaint permitted a reasonable inference that Byrnes and Curtin were acting within the scope of their employment with NYMEX when they disclosed confidential information, notwithstanding that Byrnes and Curtin's conduct was contrary to NYMEX policy. *See Byrnes*, 58 F. Supp. 3d at 327-29; *see also McCullen v. Coakley*, 134 S. Ct. 2518, 2547 (2014) ("The phrase 'scope of employment' is a well-known common-law concept that includes '[t]he range of reasonable and foreseeable activities that an employee engages in while carrying out the employer's business.' The employer need not specifically direct or sanction each aspect of an employee's conduct for it to qualify. Indeed, employee conduct can qualify even if the employer specifically forbids it." (internal citations omitted)). Relying upon *Energy Factors Inc. v. Nuevo Energy Co.*, No. 91 CIV. 4273, 1992 WL 170683, at *6 (S.D.N.Y. July 7, 1992), this Court held that the facts alleged in the Amended Complaint permitted the inference that Byrnes and Curtin were not on a "frolic," but instead intended to benefit their employer as well as themselves. *Byrnes*, 58 F. Supp. 3d at 329. Thus, the objective evidence that Byrnes and Curtin were acting within the scope of their employment establishes NYMEX's liability under Section 2(a)(1)(B). *See id.*; *Energy Factors*, 1992 WL 170683, at *6 (intent to benefit employer adequately alleged where "the tip is alleged to have benefited Nuevo by serving as a payback to Southcoast for its past assistance [and] the tip is alleged to have been passed using Nuevo facilities during the conduct of company business, not in a casual, non work-related setting").

Under the totality of the circumstances, the undisputed facts here establish that Byrnes and Curtin acted within the scope of their employment, and no reasonable jury could find

otherwise. *See* Restatement (Third) of Agency § 7.07(2) (2006) ("An employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control. An employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer."). This Court has already found alleged facts that, taken together, "permit a reasonable inference to be drawn" that Byrnes and Curtin's disclosures "were intended to 'serve *any* purpose' of NYMEX," *Byrnes*, 58 F. Supp. 3d at 327-28, and nearly all of those allegations[10] have not only been substantiated in the discovery record but have been established as undisputed facts. (Statement ¶¶ 17, 19, 24 (Byrnes and Curtin worked on ClearPort desk); *id.* ¶¶ 65, 70 (Byrnes and Curtin had access to trade blotter); *id.* ¶¶ 171, 172 (as Byrnes knew, phone calls were recorded); *id.* ¶¶ 108-124 (Byrnes made disclosures during work hours); *id.* ¶¶ 125-131 (Curtin made disclosures during work hours); *id.* ¶¶ 19, 20, 187, 188 (Byrnes was promoted following complaint).)

*First*, Byrnes and Curtin made the improper disclosures openly and regularly, during the course of performing the types of duties they were employed by NYMEX to do:

- The disclosures to Eibschutz occurred using NYMEX facilities and computer systems during normal business hours in the conduct of company business, not in a casual, non-work setting. (Statement ¶¶ 108-131.)

- The disclosures were captured on NYMEX recorded lines that Byrnes and Curtin knew were recorded. (*Id.* ¶¶ 171-172.)

- Byrnes and Curtin's jobs at NYMEX included responding to customer inquiries, providing information to customers, and problem solving in connection with the

---

[10]    As indicated above, *see supra* pp. 6-7, the Commission is moving for summary judgment only as to 68 disclosures contained in 22 recorded calls, and not as to all of the disclosures identified in the Amended Complaint, *see Byrnes*, 58 F. Supp. 3d at 328 (citing number of alleged disclosures). In addition, though it is undisputed that Byrnes made improper disclosures from his ClearPort desk, and the evidence strongly suggests that he used a mobile phone for some of those disclosures, the discovery record does not conclusively establish any undisputed disclosures by mobile phone. *See id.* (citing allegation about disclosures using Byrnes' mobile phone).

ClearPort system, while in possession of confidential trade information. (*Id.* ¶¶ 21, 25, 156, 159, 160.)

- Byrnes had routine contact with NYMEX customers, including brokers. According to his supervisor, Byrnes was the "go to guy when brokers needed assistance with trading strategies." (*Id.* ¶ 162.)

- Byrnes's 2010 performance review stated that he should seek out information from "internal and external customers and use it to prioritize and focus our effort" and "[t]ake proactive steps to cultivate . . . relationships with customers." (*Id.* ¶ 161.)

- When Byrnes and Curtin's supervisor was asked whether, in general, he ever heard them "discussing trade details over the phone" he testified "that was their job to, you know, do that." (*Id.* ¶ 160.)

Thus, undisputed evidence shows that Byrnes and Curtin were entrusted with handling confidential information and were allowed to discuss such information with market participants involved in the trades, as part of their day-to-day responsibilities. This is not a case where the only link between the employer and the employee's wrongdoing was that the employee had obtained confidential information on the job. *Cf. Moss v. Morgan Stanley Inc.*, 553 F. Supp. 1347, 1356-58 (S.D.N.Y. 1983) (tipper acted outside the scope of his employment where the illegal trading did not take place on or use the facilities of employer and tipper's usual responsibilities involved mergers and acquisition analysis, not the purchase and sale of securities). Rather, Byrnes and Curtin's misconduct was within their customary range of responsibilities. *See McIntyre v. United States*, 545 F.3d 27, 44 (1st Cir. 2008) (praise from superiors for handling of informants and high performance reviews for work with informants relevant to finding that employee's leaking of information to informants was within the kind of conduct employee was hired to perform).

*Second*, undisputed facts show Byrnes and Curtin were engaging in a course of conduct subject to their employer's control, and not on an independent course of conduct. *See* Restatement (Third) of Agency § 7.07(2). For example:

- NYMEX had policies addressing the handling of confidential information and gave Byrnes and Curtin access to non-public ClearPort trade information, while it restricted other employees' access to the same information. (Statement ¶¶ 65, 70, 191.)

- In addition to Byrnes and Curtin, a third former ClearPort employee improperly disclosed confidential trade information to Eibschutz, as captured in an audio recording. (*Id.* ¶¶ 90, 163.)

- In the spring of 2009, Curtin informed his supervisor, Ralph Cusumano, that Curtin had made unauthorized disclosures to Eibschutz. Curtin was told "not to worry, we have your back." (*Id.* ¶ 165.)

- Curtin and Cusumano decided that Curtin would no longer deal with Eibschutz, and that Byrnes would handle calls from Eibschutz. (*Id.* ¶ 166.)

- Curtin knew that Eibschutz continued calling for Byrnes. In a call on April 1, 2009, Eibschutz called Curtin and said: "[T]here's a big trade that happened today, but if you want I can bother Billy." (*Id.* ¶ 167.)

- Curtin continued to transfer calls from Eibschutz to Byrnes. In a call on April 3, 2009, Curtin said, "Hey, let me get you Bill," even though Eibschutz had not asked to be transferred to "Bill." (*Id.* ¶ 168.)

- In July 2009, NYMEX received a complaint that "Billy," a ClearPort employee, was making unauthorized disclosures of trade data, but NYMEX failed to adequately investigate the complaint. (*Id.* ¶¶ 187-190.) NYMEX failed to confront Byrnes about the complaint. (*Id.* ¶ 190.)

Thus, the evidence here establishes that Byrnes and Curtin's conduct was well within NYMEX's control. Indeed, *multiple* employees at NYMEX were involved in disclosing information to Eibschutz, or were aware of the disclosures but were indifferent or did nothing about it. (Statement ¶¶ 164, 197.) For instance, a third ClearPort desk employee, supervised by Curtin, was captured on at least one audio recording making similar disclosures of trade information to Eibschutz. (*Id.* ¶¶ 89, 90, 197.) This is not a case where a single agent surreptitiously steals confidential information solely for his or her own personal benefit, *cf. In re Ivan F. Boesky Sec. Litig.*, 36 F.3d 255, 265 (2d Cir. 1994) (tipper acted outside scope of employment where he gained access to confidential information through casual conversation with co-workers and by secretly visiting the office of a co-worker to search for information) – though even if NYMEX were unaware of Byrnes and Curtin's misconduct, it would still be liable

under Section 2(a)(1)(B), *see, e.g., Rosenthal & Co. v. CFTC*, 802 F.2d 963, 967 (7th Cir. 1986) (principal subject to liability regardless of whether principal knew about or was involved in the conduct); *Stolter v. CFTC*, 855 F.2d 1288, 1292 (7th Cir. 1988) ("[U]nder § 2(a)(1)(A) it does not matter if the principal participated in or even knew about the agent's acts; he is strictly liable for them.").

*Third*, the evidence shows that in making the unlawful disclosures, Byrnes and Curtin were motivated, at least in part, to serve a purpose or confer a benefit on NYMEX – though there is no requirement under Section 2(a)(1)(B) to show that NYMEX ultimately benefitted from the misconduct, *see, e.g.*, *Rosenthal & Co.*, 802 F.2d at 969 (affirming imposition of liability even where the misconduct could not be presumed to have benefitted, or even had an effect on the principal); *Dohmen-Ramirez v. CFTC*, 837 F.2d 847, 858-59 (9th Cir. 1988) ("That a principal may not have benefitted from the agent's fraud does not preclude a finding that the agent was acting within the scope of his agency.").  Undisputed facts show that:

- In Curtin's 2007 NYMEX self-evaluation, he wrote that a goal of his was to "continue to grow facilitation desk knowledge base and increase the business." (Statement ¶¶ 170, 183-185; *see also id.* ¶ 169 (goal of Byrnes' communications was to generate more trading volume for the desk).)
- Byrnes and Curtin knew that Eibschutz worked for a broker making NYMEX's list of "Top 50" Brokers for ClearPort. (*Id.* ¶ 16.)
- NYMEX earned fees as a result of trades brokered by Eibschutz and the brokerage firms for which he worked.  (*Id.* ¶¶ 176-182.)
- Byrnes "admits" that when he disclosed confidential trade information to Eibschutz, it was to assist Eibschutz in building his book of business.  (*Id.* ¶ 186.)  At his unemployment hearing, he testified:  "I was not aware that I couldn't give out all that private information.  I was told I can . . . I was supposed to help the customers and the brokers with questions that they had."  (*Id.* ¶ 157.)
- Curtin testified that "to this day, [he] still do[es]n't know why" he provided confidential trade information to Eibschutz (*id.* ¶ 173), and that Eibschutz told him that "he could price his customers a little better" (*id.* ¶ 175).  Curtin did not recall Eibschutz ever saying that he was using the information for cold calling purposes. (*Id.* ¶ 174.)

These facts, viewed objectively under the totality of the circumstances, establish that Byrnes and Curtin were, at least in part, serving some purpose of NYMEX in making the disclosures. *See Amendolare v. Schenkers Int'l Forwarders, Inc.*, 747 F. Supp. 162, 169 (E.D.N.Y. 1990) ("[T]he acts of an agent motivated partly by self-interest – even where self-interest is the predominant motive – lie within the scope of employment so long as the agent is actuated by the principal's business purposes 'to any appreciable extent.'").

Even if the Court were to consider Byrnes and Curtin's subjective intent, the Commission is entitled to summary judgment. As noted above, at his unemployment hearing in 2011, Byrnes testified that in making the disclosures to Eibschutz, it was his understanding that he "was supposed to help the customers and the brokers with questions that they had." (Statement ¶ 157.) Thus, Byrnes' own testimony establishes that he subjectively believed, at least in part, that he was serving some purpose of NYMEX in making the disclosures. By contrast, Curtin has not declared any particular motive, but rather, as he testified during his deposition, he "do[es]n't know why" he disclosed confidential trade information to Eibschutz. (*Id.* ¶ 173.) *Cf. Gibbs*, 714 F. Supp. 2d at 422 (in holding that the test must be objective and not subjective, the court noted that "[a]n inquiry into the undeclared motives prompting the conduct of a policeman to determine whether he was acting within the scope of his employment . . . is not constructive"). In the absence of direct evidence regarding what was in Curtin's mind at the time of the disclosures, his subjective motive or intent may be established through circumstantial evidence. *See, e.g.*, *Miklovich*, 2015 WL 5738298, at *3-4. In view of the undisputed circumstantial

evidence cited above, no reasonable factfinder could fail to find that Curtin thought he was, at least in part, serving some interest of NYMEX in making the disclosures.[11]

Holding NYMEX liable here comports with the policy underlying Section 2(a)(1)(B) and *respondeat superior* liability generally, which is "to encourage employers and other principals to monitor the conduct of those acting on their behalf." *Rosenthal and Co.*, 802 F.2d at 969. "Liability under the Act is strict on the belief that 'employers and sometimes other principals can in the general run of cases prevent torts committed by their employees or agents in furtherance of the employment or agency.'" *CFTC v. Schafer*, No. Civ. A. H-96-1213, 1997 WL 33547409, at *7 n.13 (S.D. Tex. Dec. 23, 1997) (quoting *Rosenthal and Co.*, 802 F.2d at 969); *see also In re Amaranth Natural Gas Commodities Litig.*, 711 F. Supp. 2d 301, 307 (S.D.N.Y. 2010) (under the CEA, "the ascription of agency is a purposive, policy-oriented act rather than an exercise in semantics") (quotation omitted). Here, the nature of NYMEX's business as an exchange and self-regulatory organization requires it to safeguard the confidential information of market participants. Enforcing existing NYMEX policies, supervising and monitoring Byrnes and Curtin's activities, and properly investigating and addressing complaints about Byrnes' conduct could have avoided or limited the unauthorized disclosures. Accordingly, Section 2(a)(1)(B) liability is appropriate.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court grant Plaintiff's motion for partial summary judgment with respect to the 68 violative disclosures

---

[11]     Any purported "admissions" by Byrnes and Curtin (made in response to NYMEX's carefully crafted Requests for Admissions served in 2016 after both had given extensive sworn testimony) fail to raise a genuine issue of fact. Even if none of the disclosures to Eibschutz were made "for the purpose of conferring a benefit on NYMEX," such purported admissions fail to negate that Byrnes and Curtin were engaged in a course of conduct intended, at least in part, to serve some purpose of NYMEX.

discussed herein, and allow post-liability briefing to determine the scope of relief to be imposed,

including but not limited to entry of a permanent injunction, imposition of civil monetary

penalties, and such other and further relief as the Court deems appropriate.

Dated: New York, New York
      December 15, 2016

Respectfully submitted,
U.S. COMMODITY FUTURES TRADING
COMMISSION

By:    s/  Patryk J. Chudy

Patryk J. Chudy
David W. MacGregor (admitted *pro hac vice*)
Patrick Daly
James G. Wheaton
Alejandra de Urioste
David C. Newman

Division of Enforcement
140 Broadway, 19th Floor
New York, New York 10005
Phone: (646) 746-9700
Fax: (646) 746-9939