UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————

|  |  |  |
|---|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | ) ) ) | |
| | ) | |
| Plaintiff, | ) ) | No. 13 Civ. 1174 (VSB) |
| v. | ) ) | ECF Case |
| WILLIAM BYRNES, CHRISTOPHER CURTIN, THE NEW YORK MERCANTILE EXCHANGE, INC. and RON EIBSCHUTZ, | ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

——————————————————————

## STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PLAINTIFF U.S. COMMODITY FUTURES TRADING COMMISSION'S MOTION FOR SUMMARY JUDGMENT

Plaintiff U.S. Commodity Futures Trading Commission (the "Commission" or "CFTC") submits the following statement of undisputed facts in support of its Motion for Partial Summary Judgment against all defendants.  The information supporting this statement is described herein and can be found in the pleadings filed to date or in the declaration dated December 15, 2016, of Senior Futures Trading Investigator Trevor Kokal or in the documents, data files, audio files, or transcripts of sworn testimony, attached to his declaration as exhibits.

### I.    Parties

1.     Plaintiff U.S. Commodity Futures Trading Commission is an independent federal regulatory agency charged with administering and enforcing the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 1 et seq., and the CFTC Regulations, 17 C.F.R. §§ 1.1 et seq.  See Ex. 1 to the Kokal Decl.[1] (Amended Cmplt.) ¶ 14; Ex. 11 (NYMEX Ans.) ¶ 14.

---

[1] Throughout this Statement, all Exhibits to the Kokal Declaration are cited as "Ex."

2.     Defendant The New York Mercantile Exchange, Inc. ("NYMEX"), a Delaware corporation, is a commodity futures and options exchange serving market participants around the globe.  See Ex. 1 (Amended Cmplt.) ¶ 1; Ex. 11 (NYMEX Ans.) ¶ 1; Ex. 2 (Byrnes Ans.) ¶ 1; Ex. 9 (Eibschutz Ans.) ¶ 1.

3.     NYMEX provides a platform named ClearPort that provides customers a way to clear previously-executed trades through NYMEX.  See Ex. 1 (Amended Cmplt.) ¶ 1; Ex. 11 (NYMEX Ans.) ¶ 1.

4.     NYMEX is owned and operated by the CME Group, which also operates other exchanges in addition to NYMEX.  See Ex. 1 (Amended Cmplt.) ¶ 18; Ex. 11 (NYMEX Ans.) ¶ 18.

5.     NYMEX has been during all relevant periods a board of trade designated as a contract market and self-regulatory organization, and is a "registered entity" under the Act.  See Ex. 1 (Amended Cmplt.) ¶¶ 18, 79-80; Ex. 11 (NYMEX Ans.) ¶¶ 18, 79-80.

6.     Defendant William Byrnes, known as Billy, is an individual who resides in New York, NY.  See Ex. 1 (Amended Cmplt.) ¶ 15; Ex. 2 (Byrnes Ans.) ¶ 15.

7.     At the time of all disclosures at issue, Byrnes was an employee of NYMEX.  See Ex. 3 (Byrnes Resp. to CFTC 1st RFA) No. 12; Ex. 4 (Byrnes Resp. to CFTC 2nd RFA) No. 12; Ex. 12 (NYMEX Resp. to CFTC 1st RFA) No. 1; Ex. 1 (Amended Cmplt.) ¶¶ 4, 15; Ex. 11 (NYMEX Ans.) ¶ 4; Ex. 2 (Byrnes Ans.) ¶¶ 4, 15; Ex. 9 (Eibschutz Ans.) ¶¶ 4, 15.

8.     While employed by NYMEX, Byrnes was an agent of NYMEX as to matters that fell within the scope of his employment.  See Ex. 12 (NYMEX Resp. to CFTC 1st RFA) No. 3.

9.     Defendant Christopher Curtin is an individual who resides in New York, NY.  See Ex. 1 (Amended Cmplt.) ¶ 16; Ex. 6 (Curtin Ans.) ¶ 16.

10.     At the time of all disclosures at issue made by Curtin, Curtin was an employee of NYMEX.  See See Ex. 1 (Amended Cmplt.) ¶ 16; Ex. 6 (Curtin Ans.) ¶ 16; Ex. 9 (Eibschutz Ans.) ¶ 16; Ex. 12 (NYMEX Resp. to CFTC 1st RFA) No. 2; Ex. 8 (Curtin Resp. to CFTC 2d RFA) No. 12.

11.     While employed by NYMEX, Curtin was an agent of NYMEX as to matters that fell within the scope of his employment.  See Ex. 7 (Curtin Resp. to CFTC 1st RFA) No. 17; See Ex. 12 (NYMEX Resp. to CFTC 1st RFA) No. 4.

12.     Defendant Ron Eibschutz is an individual who resides in Westfield, NJ.  See Ex. 1 (Amended Cmplt.) ¶ 17; Ex. 9 (Eibschutz Ans.) ¶ 17.

13.     At all relevant times, Eibschutz was employed in New York, NY as a broker of energy futures and options.  See Ex. 1 (Amended Cmplt.) ¶ 17; Ex. 9 (Eibschutz Ans.) ¶ 17.

14.     Eibschutz brokered trades in the crude oil and natural gas markets.  See Ex.  25 (Eibschutz Test. 7/14/11) 20:15-21; 33:14-37:19; Ex. 17 (Eibschutz Dep. 11/19/15) 33:20-34:8.

15.     Eibschutz used NYMEX ClearPort to clear trades he brokered.  See Ex. 17 (Eibschutz Dep. 11/19/15) 50:20-53:10.

16.     One of the brokerage firms that Eibschutz worked for was identified by NYMEX as a top 50 broker on ClearPort; Byrnes and Curtin were aware of this at the time.  See Ex. 37 (2/24/09 Curtin Email); Ex. 15 (Curtin Dep. 11/24/15) 245:21-250:16; Ex. 14 (Byrnes Dep. 11/23/15) 165:17-167:11; Ex. 62 (audio recording disc) 13CIV1174-CFTC-0018185; Ex. 68 (transcript of recording with Bates number 13CIV1174-CFTC-0018185).

## II.    Byrnes' and Curtin's Employment at NYMEX

17.     Byrnes was hired by NYMEX in March 2007 as a ClearPort analyst.  See Ex. 39 (3/29/07 NYMEX Ltr. to Byrnes); Ex. 14 (Byrnes Dep. 11/23/15) 33:3-8.

18.    Byrnes was terminated by NYMEX in December 2010.  Ex. 1 (Amended Cmplt.) ¶ 15; Ex. 11 (NYMEX Ans.) ¶ 15; Ex. 2 (Byrnes Ans.) ¶ 15.

19.    Byrnes received multiple promotions at NYMEX, including promotions to Lead ClearPort Analyst, effective September 2009, and Supervisory ClearPort Analyst, effective July 2010.  Byrnes held the position of Supervisory ClearPort Analyst at the time of his termination in December 2010.  See Ex. 31 (NYMEX/CME HR Records); Ex. 18 (Cusumano Dep. 10/2/15) 75:10-90:11.

20.    While employed by NYMEX, Byrnes received a promotion to a supervisory position on the ClearPort Facilitation Desk.  See Ex. 1 (Amended Cmplt.) ¶ 51 ; Ex. 11 (NYMEX Ans.) ¶ 51; Ex. 2 (Byrnes Ans.) ¶ 51.

21.    Byrnes' job responsibilities as a NYMEX employee on the ClearPort Facilitation Desk included ensuring that ClearPort registrants received timely and accurate assistance in resolving issues involving the use of the ClearPort platform, including the review, reconciliation and, where necessary, the correction of trades input into the ClearPort system.  See Ex. 1 (Amended Cmplt.) ¶ 32; Ex. 11 (NYMEX Ans.) ¶ 32; Ex. 2 (Byrnes Ans.) ¶ 32.

22.    Byrnes' responsibilities as a NYMEX employee on the ClearPort Facilitation Desk also included the training of other employees regarding NYMEX policies relating to the handling of confidential information.  See Ex. 1 (Amended Cmplt.) ¶ 51; Ex. 11 (NYMEX Ans.) ¶ 51; Ex. 27 (Lopez Test. 6/14/11) 35:8-15; Ex. 28 (Barkhordar Test. 6/16/11) 35:15-36:21.

23.    Curtin was hired by NYMEX in July 2000.  See Ex. 40 (7/5/00 NYMEX Ltr. to Curtin).

24.     While employed by NYMEX, Curtin held a supervisory position on ClearPort from January 2005 until he left NYMEX in April 2009.  See Ex. 41 (Curtin Job Descriptions); Ex. 15 (Curtin Dep. 11/24/15) 42:2-18; Ex. 1 (Amended Cmplt.) ¶ 16; Ex. 6 (Curtin Ans.) ¶ 16.

25.     Curtin's job responsibilities as a NYMEX employee on the ClearPort Facilitation Desk included providing ClearPort users with timely and accurate assistance in resolving issues involving the use of the ClearPort platform, and training other employees on ClearPort operations and policies.  See Ex. 1 (Amended Cmplt.) ¶ 54; Ex. 11 (NYMEX Ans.) ¶ 54; Ex. 6 (Curtin Ans.) ¶ 54.

26.     Curtin approached Byrnes about Byrnes coming to work at NYMEX, and participated in Byrnes' employment interview.  See Ex. 15 (Curtin Dep. 11/24/15) 153:3-154:21.

27.     Curtin trained Byrnes at NYMEX.  See Ex. 15 (Curtin Dep. 11/24/15) 81:22-25.

28.     Curtin left NYMEX in 2009 to work for ELX Futures Exchange, a commodity exchange which at the time was involved in interest rate futures.  See Ex. 15 (Curtin Dep. 11/24/15) 42:2-18.

**III.    Futures and Options**

29.     A "futures contract" is a legally binding agreement to buy or sell a commodity or financial instrument at a later date pursuant to the Rules of the Exchange.  See Ex. 52 (CME Group Glossary).

30.     A futures contract specifies a "contract month/year," which, for physically delivered contracts, is the month and year in which a given contract is delivered in accordance with the Rules and which, for cash settled contracts, is the month and year in which a given contract is finally settled in accordance with the Rules.  See Ex. 52 (CME Group Glossary).

31.     The futures contract specifications specify the "contract size," that is, the actual amount of a commodity represented in a futures or options contract.  See Ex. 52 (CME Group Glossary).

32.     An "option" on a futures contract is the right, but not the obligation, to buy or sell a particular futures contract at a specific price on or before a certain expiration date.  See Ex. 53 (CME Group Options on Futures) p. 5.

33.     A "call option" on a futures contract gives the holder (buyer) the right to buy (go long) a futures contract at a specific price on or before an expiration date.  See Ex. 53 (CME Group Options on Futures) p. 5.

34.     A holder of a "put option" on a futures contract has the right to sell (go short) a futures contract at a specific price on or before the expiration date.  See Ex. 53 (CME Group Options on Futures) p. 5.

35.     The "premium" is the price that the buyer of an option pays and the seller of an option receives for the rights conveyed by an option.  See Ex. 53 (CME Group Options on Futures) p. 6.

36.     The "option buyer" of an option on a futures contract can choose to exercise their right and take a position in the underlying futures. A call buyer can exercise the right to buy the underlying futures and a put buyer can exercise the right to sell the underlying futures contract. See Ex. 53 (CME Group Options on Futures) p. 5.

37.     An "option seller" (i.e., someone who sells an option that they didn't previously own) is also called an option writer or grantor. The seller of an option on a futures contract is contractually obligated to take the opposite futures position if the option buyer exercises their right to the futures position specified in the option. In return for the premium, the option seller

assumes the risk of taking a possibly adverse futures position.  See Ex. 53 (CME Group Options on Futures) p. 5.

38.     The strike price, or "exercise price," is the price at which the option buyer may buy or sell the underlying futures contracts.  Exercising the option results in a futures position at the designated strike price.  See Ex. 53 (CME Group Options on Futures) p. 6.

39.     An "American-style option" is a type of option contract that can be exercised at the buyer's discretion on any trading day up to and including the expiration date.  See Ex. 52 (CME Group Glossary).

40.     A "European style option" is a type of option contract which can only be exercised on the expiration date.  See Ex. 52 (CME Group Glossary).

41.     A "calendar spread option" is an option to enter into two separate futures positions: one long and one short.  See Ex. 54 (Trading Calendar Spread Options on Energy Futures) p. 2.

42.     A calendar spread call option can be exercised into a long futures position that is closest to expiration and a short futures position in a more distant month. See Ex. 54 (Trading Calendar Spread Options on Energy Futures) p. 2.

43.     A calendar spread put option can be exercised into a short futures position that is closest to expiration and a long futures position in a more distant month.  See Ex. 54 (Trading Calendar Spread Options on Energy Futures) p. 2.

44.     The strike price of a calendar spread option is the price differential between the long and short futures positions. See Ex. 54 (Trading Calendar Spread Options on Energy Futures) p. 2.

## IV.    The Contracts at Issue

45.    The "CL" contract is a futures contract calling for physical delivery of 1,000 barrels of crude oil at Cushing, Oklahoma.  See Ex. 55 (CL Contract Specifications).

46.    The "CS" contract is a futures contract that pertains to 1,000 barrels of crude oil, and is financially settled based on the average daily settlement price of the first nearby CL contract during the contract month.  See Ex. 56 (CS Contract Specifications).

47.    The "NG" contract is a futures contract calling for the delivery of 10,000 million British thermal units ("MMBtu") of natural gas.  See Ex. 57 (NG Contract Specifications).

48.    The "LO" contract is an American option on the CL futures contract.  See Ex. 58 (LO Contract Specifications).

49.    One LO contract involves one CL contract.  A trade pertaining to one LO contract therefore pertains to 1,000 barrels of crude oil.  See Ex. 55 (CL Contract Specifications); Ex. 58 (LO Contract Specifications).

50.    The "WA" contract is a one-month calendar spread option on the CL crude oil futures contract.  See Ex. 59 (WA Contract Specifications).

51.    One WA contract involves two CL futures contracts.  A trade pertaining to one WA contract therefore pertains to 2,000 barrels of crude oil.  See Ex. 55 (CL Contract Specifications); Ex. 59 (WA Contract Specifications).

52.    The "AO" contract is an average price European option on the CS crude oil futures contract.  See Ex. 60 (AO Contract Specifications).

53.    One AO contract involves one CS contract.  A trade pertaining to one AO contract therefore pertains to 1,000 barrels of crude oil.  See Ex. 56 (CS Contract Specifications); Ex. 60 (AO Contract Specifications).

54.    The "LN" contract is a European option on the NG futures contract.  See Ex. 61 (LN Contract Specifications).

55.    One LN contract involves one NG contract.  A trade pertaining to one LN contract therefore pertains to 10,000 MMBtu of natural gas.  See Ex. 57 (NG Contract Specifications); Ex. 61 (LN Contract Specifications).

**V.    Byrnes' and Curtin's Disclosures Were Inconsistent with Their Official Duties**

56.    NYMEX policies prohibited the disclosure of trade information and defined trade information as confidential.  See Ex. 38 (Excerpts from NYMEX Handbook); Ex. 30 (CME Code of Conduct); Ex. 32 (4/7/09 Confidentiality Obligations Memo).

57.    Byrnes disclosed trade information that NYMEX defined as confidential.  See Ex. 19 (Keating Dep. 10/16/15) 132:10-18; Ex. 12 (NYMEX Resp. to CFTC 1st RFA) No. 7; ¶¶ 108 to 124, infra.

58.    Curtin disclosed trade information that NYMEX defined as confidential.  Ex. 15 (Curtin Dep. 11/24/15) 270:23-272:6; 273:13-274:9; Ex. 12 (NYMEX Resp. to CFTC 1st RFA) No. 8; Ex. 19 (Keating Dep. 10/16/15) 68:16-69:15; ¶¶ 125 to 131, infra.

59.    NYMEX admits that Byrnes' and Curtin's disclosures of confidential trade information to Eibschutz in Exhibits A and B to the Amended Complaint and in other calls were inconsistent with the performance of their official duties as employees of NYMEX.  See Ex. 12 (NYMEX Resp. to CFTC 1st RFA) Nos. 7-8; Ex. 13 (NYMEX Resp. to CFTC 2nd RFA) Nos. 7-8.

60.    Curtin admits that disclosure of information deemed confidential by NYMEX was inconsistent with the performance of his official duties as an employee of NYMEX.  Ex. 7 (Curtin Resp. to CFTC 1st RFA) No. 14; Ex. 15 (Curtin Dep. 11/24/15) 251:21-252:18.

61.    Byrnes does not think that his disclosures of confidential information to Eibschutz were authorized by NYMEX.  Ex. 14 (Byrnes Dep. 11/23/15) 75:7-16.

**VI.    Byrnes' and Curtin's Use of Their Access to NYMEX's Systems for Disclosures**

62.    ClearPort has an associated trade blotter containing detailed information for all trades entered into the ClearPort system, including the identities of the parties to the trade and the broker (if any) that entered the trade into the system, the side of each party to the trade (buy or sell) and the price, volume and terms of the trade.  See Ex. 1 (Amended Cmplt.) ¶ 21; Ex. 11 (NYMEX Ans.) ¶21; Ex. 6 (Curtin Ans.) ¶ 21.

63.    The ClearPort trade blotter and a system called Crystal Reports were NYMEX systems that ClearPort staff used in connection with their job responsibilities.  See Ex. 19 (Keating Dep. 10/16/15) 27:16-28:23; Ex. 22 (Cox Deposition 2016/7/20) 128:15-129:25.

64.    Byrnes obtained the information he disclosed to Eibschutz as a result of his employment at NYMEX.  Ex. 1 (Amended Cmplt.) ¶ 33; Ex. 11 (NYMEX Ans.) ¶ 33; Ex. 2 (Byrnes Ans.) ¶ 33; Ex. 12 (NYMEX Resp. to CFTC 1st RFA) No. 9.

65.    As a NYMEX employee, Byrnes had access to NYMEX's computer systems, including the ClearPort trade blotter.  See Ex. 1 (Amended Cmplt.) ¶¶ 25, 33; Ex. 2 (Byrnes Ans.) ¶¶ 25, 33; Ex. 11 (NYMEX Ans.) ¶¶ 25, 33.

66.    Byrnes acknowledged that he told Eibschutz, in a recorded phone call on July 21, 2008, produced under Bates number 13CIV1174-CFTC-0006505, that he could look up the information he was disclosing in the trade blotter.  See Ex. 14 (Byrnes Dep. 11/23/15) 131:11-132:23; Ex. 62 (audio recording disc) 13CIV1174-CFTC-0006505; Ex. 89 (transcript of recording with Bates number 13CIV1174-CFTC-0006505).

67.     Byrnes made statements captured in the recorded disclosures that indicated he was using NYMEX systems to look up the information he disclosed to Eibschutz.  For example, after Eibschutz asked Byrnes for information about a trade, Byrnes said "Let me check . . . . Bring up a different screen," and on another occasion when Eibschutz asked about trade information, Byrnes said "just let me power up my system here . . . slowest damn computer in the world."  See Ex. 62 (audio recording disc) 13CIV1174-CFTC-0006580, 13CIV1174-CFTC-0018120; Ex. 90 (transcript of recording with Bates number 13CIV1174-CFTC-0006580/CME-CFTC-SUP-11887); Ex. 88 (transcript of recording with Bates number 13CIV1174-CFTC-0018120/CME-CFTC-SUP-11771).

68.     When Eibschutz asked Byrnes for information about ClearPort transactions, he understood that Byrnes was looking up the answers on some kind of NYMEX computer system. See Ex. 17 (Eibschutz Dep. 11/19/15) 199:17-24, 200:11-22.

69.     Curtin obtained the information he disclosed to Eibschutz as a result of his employment at NYMEX.  See Ex. 7 (Curtin Resp. to CFTC 1st RFA) No. 15; Ex. 1 (Amended Cmplt.) ¶¶ 25, 55; Ex. 11 (NYMEX Ans.) ¶¶ 25, 55; Ex. 12 (NYMEX Resp. to CFTC 1st RFA) No. 10.

70.     As a NYMEX employee, Curtin had access to NYMEX's computer systems, including the ClearPort trade blotter.  See Ex. 1 (Amended Cmplt.) ¶  55; Ex. 6 (Curtin Ans.) ¶ 55.

71.     Curtin made statements captured in the recorded disclosures that indicated he was using NYMEX systems to look up the information he disclosed to Eibschutz.  See Ex. 62 (audio recording disc) CME-CFTC-SUP-174103, CME-CFTC-SUP-174104; Ex. 84 (transcript of

recording with Bates number CME-CFTC-SUP-174103) 6:1-5; Ex. 92 (transcript of recording with Bates number CME-CFTC-SUP-174104) 4:20-24.

72.     Curtin acknowledged during his testimony regarding recorded disclosures produced under Bates numbers CME-CFTC-SUP-174103 and CME-CFTC-SUP-174104 that he used NYMEX systems, particularly the trade blotter and Crystal Reports, to look up the information he disclosed to Eibschutz.  See Ex. 16 (Curtin Dep. 8/23/16) 309:23-311:25, 313:4-18, 319:18-324:12, 326:3-327:6.

**VII.     Byrnes and Curtin Acted with Scienter**

73.     NYMEX policies prohibited disclosures that Byrnes and Curtin made to Eibschutz.  Ex. 1 (Amended Cmplt.) ¶¶ 26-28; Ex. 11 (NYMEX Ans.) ¶¶ 26-28.

74.     Byrnes testified that: "At the time I made the disclosures I knew I could be fired for it, so I was somewhat aware of the policy, of NYMEX's policy not to disclose the information."  See Ex. 14 (Byrnes Dep. 11/23/15) 77:22-78:3.

75.     When Byrnes was asked whether he understood "Ron Eisbschutz was asking you for information about trades that he was not a party to," Byrnes responded "Yes."  See Ex. 14 (Byrnes Dep. 11/23/15) 72:24-73:6.

76.     Byrnes admitted that he knew he was not supposed to give Eibschutz the information he disclosed.  See Ex. 14 (Byrnes Dep. 11/23/15) 72:24-73:10.

77.     At the time of his disclosures to Eibschutz, Byrnes had been in the commodity futures industry for more than 20 years.  See Ex. 42 (Byrnes Resume); Ex. 14 (Byrnes Dep. 11/23/15) 24:8-33:2.

78.     Byrnes signed multiple forms acknowledging that he received materials setting forth NYMEX's confidentiality policies, including a form acknowledging that he had received,

read, and agreed to abide by the NYMEX Code of Business Conduct, and a form stating "I will keep secret and retain in strictest of confidence … all confidential matters relating to … the business of NYMEX's members and their customers … including but not limited to … trading information relating to business conducted on NYMEX."  See Ex. 43 (Byrnes Signature Pages).

79.    Byrnes testified that "I was unaware of the policies. I knew there was a confidentiality policy. I was unaware of the -- like I said, the wording in it. I have never read these documents, but I had a feeling for, not to disclose confidential information, which I did with Mr. Eibschutz."  See Ex. 14 (Byrnes Dep. 11/23/15) 116:14-117:14.

80.    Curtin stated that his general understanding of how trade information was to be handled when he was at NYMEX was that it could "[b]asically just, you know, go directly to the customer that was involved and that's it."  See Ex. 15 (Curtin Dep. 11/24/15) 57:16-58:11.

81.    When asked whether it was "fair to say that every time you disclosed trade information to Mr. Eibschutz, you knew you were violating the Exchange's rule," Curtin responded "Yeah."  See Ex. 15 (Curtin Dep. 11/24/15) 197:16-199:12.

82.    Curtin testified that he had signed a form stating that he had received and read NYMEX's conflict of interest policy, which among other things prohibits employees from revealing confidential information, including trade information, and Curtin admitted that "information relating to trades executed on ClearPort" is covered by the policy.  See Ex. 15 (Curtin Dep. 11/24/15) 206:21-208:16.

83.    Curtin testified that, at the time of the disclosure in a call recorded on March 18, 2009, produced under Bates number CME-CFTC-SUP-174104, he understood he was violating NYMEX policy when he disclosed the identities of parties associated with the trade discussed in that recording.  See Ex. 16 (Curtin Dep. 8/23/16) 304:24-305:19; 315:25-316:8.

84.     At the time of his disclosures at issue, Curtin had been in the commodity futures industry for more than 20 years.  See Ex. 44 (Curtin Resume); Ex. 15 (Curtin Dep. 11/24/15) 20:14-41:25.

85.     Curtin had been employed as a currency trader during his career.  See Ex. 44 (Curtin Resume); Ex. 15 (Curtin Dep. 11/24/15) 31:17-23.

86.     Dunet Belancourt, a NYMEX employee who worked on ClearPort, testified that Curtin was a supervisor on the desk, and responded "yes" when asked whether Curtin "stated the importance of protecting confidential customer information."  See Ex. 21 (Belancourt Dep. 10/7/15) 16:6-23; 49:4-25.

87.     Joshua Barkhordar, a NYMEX employee who worked on ClearPort, stated in investigative testimony that Byrnes had trained him on multiple topics, including on the Exchange's confidentiality policy, and that Byrnes and he had discussed client requests for data they were not entitled to, about which Byrnes "[j]ust said they are not allowed to have it, and that was pretty much understood."  See Ex. 28 (Barkhordar Test. 6/16/11) 9:20-10:6; 35:15-36:21.

88.     Agustin Lopez, a NYMEX employee who worked on ClearPort, stated that during his training in 2009 Byrnes and Curtin both told him that he could not divulge trade details.  See Ex. 27 (Lopez Test. 6/14/11) 10:9-17; 35:8-15.

89.     Curtin supervised an individual named Manny Garcia during his time as a supervisor on the ClearPort Facilitation Desk.  See Ex. 15 (Curtin Dep. 11/24/15) 68:11-69:25.

90.     Manny Garcia was captured in a recorded call, produced under Bates number 13CIV1174-CFTC-0006476, disclosing confidential trade data to Eibschutz.  See Ex. 62 (audio recording disc) 13CIV1174-CFTC-0006476; Ex. 87 (unofficial transcript of recording with Bates

number 13CIV1174-CFTC-0006476 [Deposition Exhibit 45]); Ex. 19 (Keating Dep. 10/16/15)
78:2-82:20.

91.    Curtin signed multiple acknowledgments indicating that he read and understood
NYMEX's policies on confidentiality.  See Ex. 15 (Curtin Dep. 11/24/15) 206:21-208:16; Ex. 45
(Curtin Signature Pages).

92.    Curtin admitted that information relating to trades cleared on ClearPort would be
covered by the NYMEX Conflict of Interest  and CME Code of Conduct policies governing
confidentiality.  See Ex. 15 (Curtin Dep. 11/24/15) 206:21-211:20.

**VIII.   The Information Disclosed Was Non-Public**

93.    The identities of the parties to a trade cleared through ClearPort is not publicly
available information.  See Ex. 1 (Amended Cmplt.) ¶ 24; Ex. 6 (Curtin Ans.) ¶ 24; Ex. 10
(Eibschutz Resp. to CFTC RFA) Nos. 17-18, 48-49; Ex. 14 (Byrnes Dep. 11/23/15) 146:16-
149:18; 150:1-13; Ex. 17 (Eibschutz Dep. 11/19/15), 15:13-16:3; Ex. 19 (Keating Dep. 10/16/15)
27:16-29:4; Ex. 21 (Belancourt Dep. 10/7/15) 27:19-28:13.

94.    The size of individual trades cleared through ClearPort is not publicly available
information.  See Ex. 1 (Amended Cmplt.) ¶ 24; Ex. 6 (Curtin Ans.) ¶ 24; Ex. 14 (Byrnes Dep.
11/23/15) 151:3-16; 134:11-135:14; Ex. 21 (Belancourt Dep. 10/7/15) 27:19-28:13.

95.    The price of individual trades cleared through ClearPort is not publicly available
information.  See Ex. 1 (Amended Cmplt.) ¶ 24; Ex. 6 (Curtin Ans.) ¶ 24; Ex. 19 (Keating Dep.
10/16/15) 27:16-29:4.

96.    The contract month or expiration date of individual trades cleared through
ClearPort is not publicly available information.  Ex. 19 (Keating Dep. 10/16/15) 27:16-29:4.

97.    The information Eibschutz requested and received from Byrnes was not available to the public.  Ex. 10 (Eibschutz Resp. to CFTC RFA) Nos. 17-18; Ex. 17 (Eibschutz Dep. 11/19/15) 15:13-16:3.

98.    The information Eibschutz requested and received from Curtin was not available to the public.  Ex. 10 (Eibschutz Resp. to CFTC RFA) Nos. 48-49; Ex. 17 (Eibschutz Dep. 11/19/15) 15:13-16:3.

99.    Much of the information contained in the ClearPort trade blotter is "confidential and not available to the public."  See Ex. 1 (Amended Cmplt.) ¶ 22; Ex. 6 (Curtin Ans.) ¶ 22.

100.    Only certain information about trades cleared through ClearPort is publicly available.  See Ex. 1 (Amended Cmplt.) ¶ 24; Ex. 6 (Curtin Ans.) ¶ 24.

101.    NYMEX publishes the aggregate daily volume of trading in each contract cleared through ClearPort; it does not publish the names of the entities that traded a particular contract, the number of different market participants that comprised the trading volume in a product or the number of trades that constituted the day's total trading in a product, the size or price of individual transactions, or which individual traders executed transactions in a particular contract for a given market participant.  See Ex. 1 (Amended Cmplt.) ¶ 24; Ex. 6 (Curtin Ans.) ¶ 24; Ex. 11 (NYMEX Ans.) ¶ 24.

102.    NYMEX has acknowledged that in making disclosures to Eibschutz, Byrnes and Curtin disclosed "confidential trade information."  See Ex. 13 (NYMEX Resp. to CFTC 2nd RFA) Nos. 5-6.

103.    A senior NYMEX official testified in 2011 that "No positions, whether large or small, [are] public information.  And, as well as trading activity of those customers, is not public information."  See Ex. 34 (Byrnes Unemployment Hearing Tr. 5/17/11) 39:2-5.

104. Eibschutz testified that "counterparty information, the names of buyers and sellers and the breakdown of volume by buyers and sellers" was not publicly available anywhere. See Ex. 25 (Eibschutz Test. 7/14/11) 118:20-119:2.

105. NYMEX restricted access to the ClearPort system such that certain information was made available only to the parties to a trade, the broker (if any) that submitted the trade, and the clearing member clearing the trade. See Ex. 1 (Amended Cmplt.) ¶ 22; Ex. 6 (Curtin Ans.) ¶ 22; Ex. 11 (NYMEX Ans.) ¶ 22.

106. A "clearing member" is a firm meeting the requirements of, and approved for, clearing membership at the Exchange. See Ex. 52 (CME Group Glossary).

107. A broker has limited access to information through ClearPort. A broker can only access from ClearPort the specific trades the broker submitted for its clients and does not have access to trade blotter information for trades its clients submitted via other brokers or for trades submitted to ClearPort through other means. See Ex. 1 (Amended Cmplt.) ¶ 23; Ex. 6 (Curtin Ans.) ¶ 23; Ex. 11 (NYMEX Ans.) ¶ 23.

## IX. Disclosures by Byrnes

108. Byrnes disclosed to Eibschutz details of previously-executed trades, including, in some instances, the identities of the parties to specific trades, which party bought and which sold, the number of contracts traded, the price of the trade, and the identities of the brokers involved in the trade. See Ex. 1 (Amended Complt.) ¶¶ 6, 35, 57; Ex. 11 (NYMEX Ans.) ¶¶ 6, 35, 57. Details of these disclosures at set forth in paragraphs 109 to 124 below.

109. ███████████████████████████████████

████████████████████████████████████



110.

111.



112.

113.

114.





115.

116.



117.

118.





122.



123.

124.



## X.     Disclosures by Curtin

125.     Curtin disclosed to Eibschutz details of previously-executed trades, including, in some instances, the identities of the parties to specific trades, which party bought and which sold, the number of contracts traded, the price of the trade, and the identities of the brokers involved in the trade.  See Ex. 1 (Amended Cmplt.) ¶¶ 6, 35, 57; Ex. 11 (NYMEX Ans.) ¶¶ 6, 35, 57; Ex. 6 (Curtin Ans.) ¶ 57.  Details of these disclosures at set forth in paragraphs 126 to 131 below.







130.

131.



**XI.    Information About a Market Participant's Trades Relates to the Market Participant's Futures or Options Position**

132.    Sean Keating, Managing Director, NYMEX Operations, testified that "Our customers, when they bring a trade to the Exchange, people don't want to know or people – customers don't want others to know or suspect what their positions in the marketplace might be. And, as such, when they bring trades to the Exchange, they expect it to be held in the strictest of confidence." See Ex. 34 (Byrnes Unemployment Hearing Tr. 5/7/11) 38:7-15.

133.    A senior crude oil financial trader, who was responsible for managing his firm's exposures and hedging, and trading financial products on NYMEX, Brad Hrycenko, testified that if one trader is repeatedly getting matched up with the same counterparty the trader would be able to guess his counterparty's position based on his knowledge of the counterparty's trades. See Ex. 24 (Hrycenko Dep. 11/3/2015) 9:3-17; 23:23-24:12.

134.    Hrycenko testified that if other traders in the market know someone's position they could use that information to trade against the person.  See Ex. 24 (Hrycenko Dep. 11/3/2015) 24:13-26:22.

135.    In November 2010, Hrycenko became concerned that Eibschutz had knowledge of his positions based on Eibschutz's inquiries about the types of trades Hrycenko might be

interested in, and reported the issue to NYMEX.  See Ex. 29 (11/30/10 Email Chain); Ex. 33

(Hrycenko Email Chain); Ex. 24 (Hrycenko Dep. 11/3/2015) 29:15-33:18; 39:4-19; 43:6-45:10.

136.    Hrycenko was concerned that if information about his positions was known it

could be used against him.  See Ex. 24 (Hrycenko Dep. 11/3/2015) 32:23-33:7.

137.    Hrycenko testified:

Q:  Can you explain what happened?
A:  Sure.  Basically I would receive a communication about Ron saying, Hey, would you
        be interested in this type of trade?  I, you know, think I can get some bids or
offers,  depending what my position was.  And there was a few of those types of
conversations, and it was just odd that it happened to be the positions that I had the
largest open interest    on in my -- for the firm.
…
Q:  So, now, the trade Mr. Eibschutz was suggesting to you.
A:  M-hm.
Q:  You said they were -- they basically were matching in terms of the spread, the strike
        price, the product, whether there was a put or a call, they were matching your
positions?
A: That is correct.  They just seemed very similar. Sort of like, Wow.  Either it's a very
        big coincidence or something.
…
Q:  And why did that concern you?
A:  You never want -- again, similar to the ClearPort Clearing agreement, you really don't
        want the brokers to know what side or what your positions are because, again, that
could   lead to, I guess -- I don't want to -- someone could run over you, I guess, is the
concern.
Q:  Would it be fair to say someone could use that information to their advantage and
        your disadvantage?
A:        That is correct.

See Ex. 24 (Hrycenko Dep. 11/3/15) 29:15-33:7.

138.    Nour Beyhum, a broker of oil options, testified that when he thought Byrnes was

still at NYMEX, Beyhum was "paranoid" when doing a big trade for a client who did not want

his name out because Byrnes may "pass[] that name out," which the client would not want

because, according to Beyhum, "[t]hey do not want [others] to know his position."  See Ex. 23

(Beyhum Dep. 10/14/15) 39:5-23.

## XII.    Aiding and Abetting

139.    Eibschutz obtained information from Byrnes that was not available to the public as a result of his request for the information.  See Ex. 10 (Eibschutz Resp. to CFTC RFA) No. 19.

140.    When Eibschutz's boss asked him to find out what counterparties were doing trades, Eibschutz would call and ask Byrnes, because Byrnes "provided the information to me." See Ex. 17 (Eibschutz Dep. 11/19/15) 160:18-161:16.

141.    Eibschutz was aware that Byrnes was providing him information that was not available to the public pertaining to transactions neither he nor his employer brokered.  See Ex. 10 (Eibschutz Resp. to CFTC RFA) Nos. 21-22.

142.    Eibschutz was aware the Byrnes should not have provided the information to Eibschutz.  See Ex. 10 (Eibschutz Resp. to CFTC RFA) No. 23.

143.    Eibschutz knew Byrnes was not permitted to give him confidential trade information.  See Ex. 17 (Eibschutz Dep. 11/19/15) 199:11-16.

144.    Eibschutz was aware that Byrnes was an employee of NYMEX.  See Ex. 10 (Eibschutz Resp. to CFTC RFA) No. 25.

145.    Eibschutz was aware that Byrnes was using NYMEX computer systems or other NYMEX data sources to obtain the information he disclosed to Eibschutz.  See Ex. 10 (Eibschutz Resp. to CFTC RFA) No. 26; Ex. 17 (Eibschutz Dep. 11/19/15) 199:17-24.

146.    Eibschutz provided Byrnes specific information so that Byrnes could identify and locate the specific trades Eibschutz was inquiring about.  See Ex. 10 (Eibschutz Resp. to CFTC RFA) No. 27.

147.    Eibschutz obtained information from Curtin that was not available to the public as a result of his request for the information.  See Ex. 10 (Eibschutz Resp. to CFTC RFA) No. 49.

148.    Eibschutz was aware that Curtin was providing him information that was not available to the public pertaining to transactions neither he nor his employer brokered.  See Ex. 10 (Eibschutz Resp. to CFTC RFA) Nos. 52-53.

149.    Eibschutz "understood [Curtin] was doing something wrong" in responding to Eibschutz's questions about trade counterparties, brokers, volumes, and prices.  See Ex. 17 (Eibschutz Dep. 11/19/15) 194:18-195:21.

150.    Eibschutz was aware that Curtin was an employee of NYMEX.  See Ex. 10 (Eibschutz Resp. to CFTC RFA) No. 55.

151.    Eibschutz was aware that Curtin was using NYMEX computer systems or other NYMEX data sources to obtain the information he disclosed to Eibschutz.  See Ex. 10 (Eibschutz Resp. to CFTC RFA) No. 56.

152.    Eibschutz provided Curtin specific information so that Curtin could identify and locate the specific trades Eibschutz was inquiring about.  See Ex. 10 (Eibschutz Resp. to CFTC RFA) No. 57.

153.    Eibschutz knew at the time that he was not entitled to receive confidential trade information from Byrnes and Curtin and that it was wrong to be getting such information from Byrnes and Curtin.  See Ex. 17 (Eibschutz Dep. 11/19/15) 120:4-13, 101:5-18; Ex. 25 (Eibschutz Test. 7/14/11) 102:2-103:10.

154.    Eibschutz testified, with regard to receiving confidential trade information, that "what I did was wrong and I shouldn't have done what I did."  See Ex. 17 (Eibschutz Dep. 11/19/15) 77:24-25.

### XIII.   Scope of Employment

155.    A manager of the ClearPort Facilitation Desk described it as a "customer service desk" and stated that providing high level customer service was an important goal of the desk. See Ex. 20 (Fein Dep. 10/22/15) 57:5-58:15.

156.    A senior NYMEX official also characterized the ClearPort Facilitation Desk as providing customer service.  See Ex. 26  (Keating Test. 2/13/12) 69:11-70:12.

157.    In May 2011, Byrnes testified about his disclosures:  "I was not aware that I couldn't give out all that private information.  I was told I can, you know, I was supposed to help the customers and the brokers with questions that they had."  See Ex. 34 (Byrnes Unemployment Hearing Tr. 5/17/11) 48:7-15.

158.    Byrnes further testified in May 2011:  "From the day I started [at NYMEX] . . . they said, here, answer the phones, answer their questions, put their trades in when they give you trades, do the corrections when they have corrections … to be done."  See Ex. 34 (Byrnes Unemployment Hearing Tr. 5/17/11) 48:19-49:8.

159.    The duties of NYMEX ClearPort Facilitation Desk employees include answering questions of customers, including brokers and traders.  See Ex. 26 (Keating Test. 2/13/12) 69:11-70:2.

160.    Ralph Cusumano, Byrnes' and Curtin's immediate supervisor at NYMEX during the relevant period, when asked about Byrnes and Curtin discussing trade details over the phone, testified "[t]hat was their job, to, you know, do that."  See Ex. 18 (Cusumano Dep. 10/2/15) 238:25-239:10.

161.    Byrnes' 2010 performance review stated that he should seek "information from internal and external customers and use it to prioritize and focus our effort" and "[t]ake proactive

steps to cultivate effective, respect-based relationships with customers."  See Ex. 46 (Byrnes 2010 Evaluation), p. NX-CFTC-WB-0167.

162.    According to Ralph Cusumano, Byrnes was "the go-to guy when brokers need assistance with trading strategies."  See Ex. 18 (Cusumano Dep. 10/2/15) 124:2-125:3.

163.    In addition to Byrnes and Curtin, at least one other employee on the ClearPort Facilitation Desk improperly disclosed confidential trade information to Eibschutz.  See Ex. 19 (Keating Dep. 10/16/15) 79:18-82:20.

164.    In addition to Byrnes and Curtin, at least one other NYMEX employee disclosed confidential ClearPort data to a person outside of NYMEX other than Eibschutz.  See Ex. 19 (Keating Dep. 10/16/15) 70:20-72:7.

165.    Curtin testified that in the spring of 2009, he told his boss Ralph Cusumano that he, Curtin, had disclosed trade information to Eibschutz.  Cusumano's response, according to Curtin, was "not to worry, we have your back."  See Ex. 15 (Curtin Dep. 11/24/15) 171:16-18; 172:14-174:18.

166.    Curtin and his supervisor, Cusumano, decided that Curtin would no longer deal with Eibschutz, and that Byrnes would handle calls from Eibschutz.  See Ex. 15 (Curtin Dep. 11/24/15) 177:4-178:21.

167.    Curtin was aware that Eibschutz was calling the ClearPort desk seeking information about trades in April 2009.  In a call on April 1, 2009, Eibschutz called Curtin and said—in response to Curtin's question "what's happening?"—"I want -- there's a big trade that happened today, but if you want I can bother Billy."  See Ex. 62 (audio recording disc) CME-CFTC-SUP-174071; Ex. 85 (transcript of recording with Bates number CME-CFTC-SUP-174071).

168.    Curtin continued to transfer calls from Eibschutz to Byrnes in April 2009.  In a call on April 3, 2009, Curtin said, "Hey, let me get you Bill," even though Eibschutz had not asked to be transferred to "Bill."  See Ex. 16 (Curtin Dep. 8/23/16) 347:7-348:13; Ex. 62 (audio recording disc) CME-CFTC-SUP-174073; Ex. 86 (transcript of recording with Bates number CME-CFTC-SUP -174073).

169.    As a NYMEX employee, Byrnes communicated with ClearPort customers about potential new products they were interested in trading.  A goal of such communications was to generate more trading volume for the ClearPort Facilitation Desk.  See Ex. 18 (Cusumano Dep. 10/2/15) 117:4-119:12.

170.    In a form entitled Employee Self Review 2007, Curtin responded to the question "Is there anything your supervisor can do differently to help you succeed?" by writing "No – just let me do my thing and I will make us all a lot of money."  See Ex. 36 (2007 Curtin Self Review) p. 3.

171.    Byrnes understood that NYMEX recorded the phone lines for the ClearPort Facilitation Desk.  See Ex. 14 (Byrnes Dep. 11/23/15) 69:16-24; 71:8-11.

172.    Curtin understood that NYMEX recorded the phone lines for the ClearPort Facilitation desk.  Ex. 62 (audio recording disc) 13CIV1174-CFTC-0018193; Ex. 91 (transcript of recording with Bates number 13CIV1174-CFTC-0018193) 4:1-10.

173.    Curtin testified "to this day, [he] still do[es]n't know why" he disclosed confidential trade information to Eibschutz, and attributed it generally to laziness and hubris.  See Ex. 15 (Curtin Dep. 11/24/15) 197:16-199:16.

174.     Curtin does not recall Eibschutz ever saying that Eibschutz was using the information Curtin disclosed for cold calling purposes.  See Ex. 15 (Curtin Dep. 11/24/15) 201:6-201:9.

175.     Eibschutz told Curtin he used the information so that "he could price his customers a little better."  See Ex. 15 (Curtin Dep. 11/24/15) 199:19-200:17.

176.     During 2008, 2009, and 2010, Byrnes was aware that NYMEX received fees as a result of trades cleared through ClearPort.  See Ex. 3 (Byrnes Resp. to CFTC 1st RFA) No. 34.

177.     During 2008 and 2009, Curtin was aware that NYMEX was entitled to receive fees as a result of trades cleared through ClearPort.  See Ex. 7 (Curtin Resp. to CFTC 1st RFA) No. 22.

178.     In 2008, 2009, and 2010, NYMEX received fees as a result of trades brokered by Parity Energy that were cleared through ClearPort.  Ex. 12 (NYMEX Resp. to CFTC 1st RFA) Nos. 23-25.

179.     Eibschutz worked at Parity Energy from October 1, 2006 to March 1, 2010.  See Ex. 47 (5/28/10 Flaster Ltr.).

180.     In 2010, NYMEX received fees as a result of trades brokered by Poten Energy Services that were cleared through ClearPort.  Ex. 12 (NYMEX Resp. to CFTC 1st RFA) No. 26.

181.     Eibschutz worked at Poten from April 1, 2010 to March 2013.  See Ex. 48 (Poten New Employee Checklist); Ex. 17 (Eibschutz Dep. 11/19/15) 133:11-18.

182.     In 2008, 2009, and 2010, NYMEX received fees as a result of trades brokered by Eibschutz that were cleared through ClearPort.  Ex. 12 (NYMEX Resp. to CFTC 1st RFA) Nos. 27-29.

183.    Curtin was part of the process for the creation of a fee schedule charging for services associated with having the ClearPort Facilitation Desk enter transactions for customers.  See Ex. 15 (Curtin Dep. 11/24/15) 117:4-118:13.

184.    The fee schedule changed the ClearPort Facilitation Desk from a free service to a profit center for the Exchange, which Curtin estimated brought in roughly $200,000 a month in fees at the time Curtin left the Exchange.  See Ex. 15 (Curtin Dep. 11/24/15) 120:5-122:4.

185.    In Curtin's 2007 NYMEX self-evaluation, he wrote that a goal of his was: "Continue to grow facilitation desk knowledge base and increase the business."  See Ex. 36 (2007 Curtin Self Review) p. 3.

186.    Byrnes admits that when he disclosed confidential trade information to Eibschutz, it was for the purpose of assisting Eibschutz in building his book of business.  See Ex. 5 (Byrnes Resp. to NYMEX RFA) No. 2.

187.    In July 2009, a broker lodged a complaint with NYMEX regarding disclosures by a NYMEX employee associated with ClearPort named "Billy." See Ex. 49 (7/14/09 Keating Email); Ex. 19 (Keating Dep. 10/16/15) 82:21-84:21; Ex. 23 (Beyhum Dep. 10/14/15) 29:3-30:25, 35:5-36:23, 37:12-21.

188.    The Managing Director of NYMEX Operations and head of the New York Office conducted a follow up investigation into the disclosure allegation reported to NYMEX in July 2009.  See Ex. 19 (Keating Dep. 10/16/15) 12:20-25, 82:21-84:21.

189.    The review conducted by NYMEX following the July 2009 complaint was limited to reviewing a single day of Byrnes' emails and phone line recordings.  See Ex. 50 (7/16/09 Keating Email); Ex. 19 (Keating Dep. 10/16/15) 86:13-87:17, 90:23-91:10.

190.    The official leading the investigation of the July 2009 complaint never confronted Byrnes about the July 2009 complaint or disclosure allegations. See Ex. 19 (Keating Dep. 10/16/15) 88:5-7.

191.    In 2009, in relation to an incident with another NYMEX employee, access to the ClearPort trade blotter was taken away from the staff of the NYMEX Products and Services group.  See Ex. 19 (Keating Dep. 10/16/15) 233:17-236:4.

192.    In November 2010, a trader reported concerns about Eibschutz's knowledge of his positons to NYMEX.  See supra ¶ 135.

193.    The November 2010 complaint was investigated by the same senior NYMEX official who investigated the July 2009 complaint.  See Ex. 19 (Keating Dep. 10/16/15) 112:7-25, 118:17-119:20, 122:24-123:3.

194.    The scope of the November 2010 investigation included a review of Byrnes' communications going back to September 1, 2010, and resulted in the identification of an improper disclosure of trade details by Byrnes to Eibschutz.  See Ex. 19 (Keating Dep. 10/16/15) 123:12-125:24; Ex. 51 (12/1/10 Durkin Email).

195.    Byrnes' employment with NYMEX was terminated as a result of the identification of a disclosure of "confidential trade information to Mr. Eibschutz."  See Ex. 19 (Keating Dep. 10/16/15) 132:10-18.

196.    The senior NYMEX official who conducted the investigations into the 2009 and 2010 complaints acknowledged, following the review of an audio recording of a disclosure by Curtin, that Curtin "was improperly disclosing confidential information" and that he would have recommended Curtin's termination had he been aware of the recording.  See Ex. 19 (Keating Dep. 10/16/15) 69:10-70:5.

38

197.    The senior NYMEX official who conducted the investigations into the 2009 and 2010 complaints acknowledged, following the review of an audio recording of a disclosure of trade detail information by a third ClearPort employee, Manny Garcia, that Garcia was also improperly disclosing confidential information to Eibschutz, and that he would have recommended Garcia's termination had he been aware of the recording.  See Ex. 19 (Keating Dep. 10/16/15) 81:10-82:20.

198.    After a contested hearing on Byrnes' application for unemployment benefits, an Administrative Law Judge for the New York State Unemployment Insurance Appeal Board made findings of fact that Byrnes gave a broker information about confidential customer trading activity.  See Ex. 34 (Byrnes Unemployment Hearing Tr.) pp. 1-6; Ex. 35 (Byrnes Unemployment Decision) p. 3, 5.


Dated: December 15, 2016

                            U.S. COMMODITY FUTURES
                            TRADING COMMISSION


                            By:_____/s/ Patryk J. Chudy_____
                                Patryk J. Chudy, Esq.  (pchudy@cftc.gov)
                                Patrick Daly, Esq.  (pdaly@cftc.gov)
                                David MacGregor, Esq.  (dmacgregor@cftc.gov)
                                James Wheaton, Esq.  (jwheaton@cftc.gov)


                                Division of Enforcement
                                140 Broadway, 19th Floor
                                New York, New York 10005

                                Phone: (646) 746-9700