**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | )<br>)<br>) |
| Plaintiff, | ) |
| v. | )<br>) |
| WILLIAM BYRNES,<br>CHRISTOPHER CURTIN,<br>THE NEW YORK MERCANTILE<br>EXCHANGE, INC., and<br>RON EIBSCHUTZ, | )<br>)<br>)<br>)<br>) |
| Defendants. | ) |

13 Civ. 1174 (VSB)

**ECF Case**

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO INDIVIDUAL DEFENDANTS'
## <u>MOTIONS FOR SUMMARY JUDGMENT</u>

U.S. COMMODITY FUTURES TRADING
COMMISSION

Patryk J. Chudy
David W. MacGregor (admitted *pro hac vice*)
Patrick Daly
James G. Wheaton
Alejandra de Urioste
David C. Newman

Division of Enforcement
140 Broadway, 19th Floor
New York, NY 10005
Phone: (646) 746-9700
Fax: (646) 746-9939

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

SUMMARY JUDGMENT STANDARD ................................................................................2

ARGUMENT .......................................................................................................................3

I.  SECTION 9(e)(1) OF THE ACT AND CFTC REGULATION 1.59 PROSCRIBE
    TRADING *OR* DISCLOSURE BY NYMEX EMPLOYEES...................................3

II. BYRNES AND CURTIN ARE NOT ENTITLED TO SUMMARY JUDGMENT ON
    THE ISSUE OF WHETHER THEY DISCLOSED "MATERIAL INFORMATION" ...........6

    A.  Under Regulation 1.59, What Byrnes and Curtin Disclosed to Eibschutz Was
        "Material Information" as a Matter of Law. ..........................................................6

        1.  Information "Relating To" Customer Positions Is *Per Se* "Material
            Information"...................................................................................................6

        2.  Information "Relating To" Customer's Positions Is Not Limited to
            Information Fully Revealing Those Positions. .......................................8

    B.  Even If the Law Required a Jury To Determine That the Information Disclosed
        Would Be Important To a Reasonable Trader, There Is Ample Evidence To
        Permit Such a Finding........................................................................................10

        1.  Fact Witness Testimony and Documentary Evidence Support the
            Conclusion That the Information Disclosed Would Be Useful to a Trader..........11

        2.  The CFTC's Expert Opined That the Information Disclosed Would Be
            Important to a Trader. ...............................................................................14

    C.  Byrnes and Curtin's Arguments That Their Disclosures Were Immaterial as a
        Matter of Law Are Without Merit .....................................................................15

        1.  There Is No Reason Jurors Would Be Required To Credit the Conclusory
            Opinions of Curtin's Purported Expert Witness. ....................................15

        2.  The Absence of Record Evidence of Insider Trading Does Not Prove That
            a Reasonable Trader Could Not Have Used the Information. ..............18

        3.  The Information Was Not "Stale"...............................................................20

        4.  An Event Study Is Not Required To Show Materiality. ........................21

III. BYRNES AND CURTIN ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF WHETHER THEY ACTED WITH SCIENTER. ........................................21

    A.  Byrnes and Curtin Acted With Scienter as a Matter of Law. ...........................................21

    B.  Even If the Law Required a Jury To Determine That Defendants Knew or Disregarded That Information Disclosed Would be Important to a Reasonable Trader, There Is Ample Evidence To Permit Such a Finding...........................................22

IV. THE RECORD EVIDENCE SUPPORTS A FINDING THAT EIBSCHUTZ IS LIABLE FOR AIDING AND ABETTING BYRNES AND CURTIN'S VIOLATIONS ......................................................................................................................25

CONCLUSION...................................................................................................................26

<u>**TABLE OF AUTHORITIES**</u>

**CASES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................3

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .........................................................3

*CFTC v. Maggio*, No. C05-5766, 2007 WL 2900180 (W.D. Wash. Oct. 1, 2007) .......................10

*CFTC v. Moncada*, No. 12 Civ. 8791, 2014 WL 2945793 (S.D.N.Y. June 30, 2014) ...........16, 17

*CFTC v. Moncada*, 31 F. Supp. 3d 614 (S.D.N.Y. 2014) .............................................16

*CFTC v. Oystacher*, No. 15-CV-9196 (N.D. Ill. filed Oct. 19, 2015) ...........................15

*CFTC v. Schor*, 478 U.S. 833 (1986) .......................................................................8

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ......................................16

*Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73 (2d Cir. 2002) ...................18

*Hicks Nurseries, Inc. v. Comm'r of Internal Revenue*, 517 F.2d 437 (2d Cir. 1975) .....................7

*In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170 (2d Cir. 2013) .................................11

*In re Blech Sec. Litig.*, No. 94 Civ 7696, 2002 WL 31356498 (S.D.N.Y. Oct. 17, 2002) ...........18

*In re Kidder Peabody Sec. Litig.*, No. 94 CIV. 3954,
1995 WL 590624 (S.D.N.Y. Oct. 4, 1995) ..............................................................20

*Luitpold Pharm., Inc. v. ED. Geistlich Sohne A.G. Fur Chemische Industrie*,
No. 11-cv-681, 2015 WL 5459662 (S.D.N.Y. Sept. 16, 2015) ............................17

*McWatt v. Port Authority Trans-Hudson Corp.*, No. 13-CV-4421,
2015 WL 12559894 (S.D.N.Y. Mar. 20, 2015) ......................................................3

*Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998) ..................................................4

*R&W Tech. Servs., Ltd. v. CFTC*, 205 F.3d 165 (5th Cir. 2000) ..................................10

*Saxe v. E.F. Hutton & Co.*, 789 F.2d 105 (2d Cir. 1986) ...........................................7

*SEC v. Nadel*, 97 F. Supp. 3d 117 (E.D.N.Y. 2015) ...............................................10

*SEC v. Thrasher*, 152 F. Supp. 2d 291 (S.D.N.Y. 2001) ...........................................8

*United States v. Coscia*, 177 F. Supp. 3d 1087 (N.D. Ill. 2016) ...............................15

*United States v. Contorinis*, 692 F.3d 136 (2d Cir. 2012) ................................................9

*United States v. Ferguson*, 676 F.3d 260 (2d Cir. 2011) ..............................................11

*United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015) ...........................................10, 16

*Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404 (S.D.N.Y. 2015) ....................21

## STATUTES, RULES, AND OTHER AUTHORITIES

7 U.S.C. § 13(e) ................................................................... *passim*

17 C.F.R. § 1.59 .................................................................. *passim*

50 Fed. Reg. 24,533 (June 11, 1985) ......................................................5, 24

58 Fed. Reg. 54,966 (Oct. 25, 1993).....................................................22, 24

Fed. R. Civ. P. 56..........................................................................1, 3, 25

Fed. R. Evid. 702 .........................................................................16

Larry Harris, *Trading and Exchanges* (2003).............................................15

Joel Hasbrouck, *Empirical Market Microstructure* (2007) ...............................15

Phillip McBride Johnson et al., *Derivatives Regulation* (2016) ............................5

Letter from Craig S. Donahue (Jan. 3, 2011), *available at*
    https://comments.cftc.gov/PublicComments/ViewComment.aspx?id=27269 ........................8

Pursuant to Fed. R. Civ. P. 56, Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, and Rule 4 of this Court's Individual Rules & Practices in Civil Cases, Plaintiff U.S. Commodity Futures Trading Commission (the "CFTC" or "Commission") respectfully submits this memorandum of law in opposition to the motions for summary judgment that were filed by Defendants William Byrnes ("Byrnes") (ECF No. 134) and Christopher Curtin ("Curtin") (ECF No. 141) and joined by Defendant Ron Eibschutz ("Eibschutz") (ECF No. 151) (together, the "Individual Defendants").

## INTRODUCTION

The Individual Defendants do not genuinely dispute that Eibschutz, a broker, knowingly solicited confidential trade information from NYMEX employees Byrnes and Curtin, who intentionally disclosed the information to Eibschutz for purposes inconsistent with the performance of their official duties at NYMEX. As explained in the memorandum of law in support of the Commission's motion for partial summary judgment (ECF No. 148) ("CFTC Mem."), Byrnes and Curtin therefore, as a matter of law, violated Section 9(e)(1) of the Commodity Exchange Act (the "Act") and Commission Regulation ("Regulation") 1.59(d)(1)(ii) with respect to 68 unambiguous disclosures of trade information, and Eibschutz aided and abetted those violations. Nevertheless, the Individual Defendants not only deny their liability but argue that the Commission is not even entitled to present its case at trial and that they are entitled to judgment as a matter of law. The Individual Defendants are mistaken.

First, Byrnes, relying on inapposite securities case law, asserts that liability does not attach in the absence of evidence of trading on the basis of the improper disclosures. However, Section 9(e)(1) of the Act and Regulation 1.59 expressly proscribe disclosure of material non-public information for "any purpose" inconsistent with the performance of official duties, and

1

not merely for the purpose of trading.  The Court should reject Byrnes' efforts to rewrite the law to include a requirement that Congress and the Commission intentionally omitted.

Second, Byrnes and Curtin, ignoring the plain language definition of "material information" in Regulation 1.59, argue that, as a matter of law, their disclosures to Eibschutz were not "material."  Their arguments rely on mischaracterizations of the discovery record and, in Curtin's case, on purported expert testimony that is directly controverted by the Commission's expert.  Even if Byrnes and Curtin were correct (which, as explained in the Commission's motion for partial summary judgment, they are not) in asserting that materiality must be demonstrated through assessment of the importance of each individual piece of information to a reasonable trader, there is ample record evidence to create a triable issue of fact as to the materiality of all of the disclosures identified in the Commission's amended complaint.

Third, Byrnes and Curtin seek summary judgment on the grounds that they lacked scienter as a matter of law, but the record is replete with evidence of their intent.  Byrnes and Curtin knew they were providing Eibschutz with nonpublic trading information related to the positions of NYMEX customers and knew they were forbidden to do so.  Even if liability required scienter as to whether a particular piece of nonpublic information would be important to a trader (and, as discussed in the Commission's motion, no such scienter is required), a jury could easily infer that Byrnes and Curtin were at least reckless as to that importance.

Fourth, to the extent Eibschutz's purported "motion by letter" is construed to present arguments on his behalf independent from those advanced by Byrnes and Curtin, they do not provide any valid reasons entitling Eibschutz to summary judgment.

## SUMMARY JUDGMENT STANDARD

A court may grant summary judgment only where (1) the movant shows that there is no

genuine dispute as to any material fact and (2) the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The party moving for summary judgment bears the initial burden of identifying "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (internal quotation marks omitted). A "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *McWatt v. Port Auth. Trans-Hudson Corp.*, No. 13-CV-4421, 2015 WL 12559894, at *2 (S.D.N.Y. Mar. 20, 2015) (Broderick, J.) (internal quotation marks omitted). Summary judgment must be denied if "there is any evidence in the record that could reasonably support a jury's verdict for the non moving party." *Id.* (internal quotation marks omitted).

## ARGUMENT

### I.  SECTION 9(e)(1) OF THE ACT AND CFTC REGULATION 1.59 PROSCRIBE TRADING *OR* DISCLOSURE BY NYMEX EMPLOYEES

As a threshold matter, the Court should reject Byrnes' suggestion that the Commission's complaint itself is defective because it lacks "any allegation . . . that insider trading occurred or was even intended" (Mem. of Law Supp. Byrnes' Mot. for Summ. J. ("Byrnes Mem.") at 15 (ECF No. 150)). Both the plain language and the history of Section 9(e)(1) and Regulation 1.59 confirm that liability does not require *trading* on the basis of material non-public information.

Byrnes' argument otherwise, which was neither joined by the other Defendants on summary judgment nor advanced by anyone at the motion-to-dismiss stage, borders on frivolous.

Section 9(e)(1) makes it unlawful for a board of trade employee to disclose material non-public information "for ***any purpose inconsistent*** with the performance of such person's official duties." 7 U.S.C. § 13(e)(1) (emphasis added).[1] Likewise, Regulation 1.59(d)(1)(ii) (as distinct from Regulation 1.59(d)(1)(i), which deals with *trading*) forbids improper *disclosures* by self-regulatory organization ("SRO") employees. *See* 17 C.F.R. § 1.59(d)(1). Byrnes suggests that this Court ought to ignore Section 9(e)'s plain meaning and instead read the statute as limited by its title ("Insider Trading Prohibited"), arguing that a statute's title may be consulted where the actual statutory language is ambiguous. (Byrnes Mem. at 16 & n.8.) But Byrnes does not identify any ambiguity in the text of Section 9(e)(1), because there is none.[2] *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (disregarding statute's title after finding statute unambiguous, noting that "[t]he title of a statute . . . cannot limit the plain meaning of the text" (second alteration in original)).

Byrnes states that, in Section 9(e)(2), Congress made it unlawful for a recipient of confidential information obtained in violation of Section 9(e)(1) to trade on such information, but did not criminalize "the mere receipt" of such information from an SRO employee. (Byrnes Mem. at 17.) Oddly, Byrnes concludes that Congress must have intended Section 9(e)(1) only to cover disclosures made for trading purposes (notwithstanding the proscription against disclosure "for ***any purpose*** inconsistent" with the employee's duties), because otherwise "an SRO

---

[1] Each quotation of Section 9(e)(1) or Regulation 1.59 in this memorandum of law provides the language of the applicable provision that was in effect during the relevant time period.

[2] Nor does Byrnes explain how his preferred interpretation can be squared with Regulation 1.59, which is broadly entitled "Activities of self-regulatory organization employees, governing board members, committee members and consultants," and does not mention "insider trading."

employee could be liable for disclosing information pursuant to 9(e)(1) for an innocent purpose, but the recipient of that information would not be liable under 9(e)(2)." (*Id.* at 18.) Putting aside Byrnes' characterization of an SRO employee's unauthorized transmittal of confidential information as disclosure "for an innocent purpose" (as if knowing misuse of confidential information could be deemed "innocent"), there is no "disconnect" (*id.* at 18 n.10) whatsoever in Congress's common-sense determination that one who knowingly breaches professional duties to maintain confidences should be held to a higher standard than a private citizen passively receiving unsolicited confidential information.

Indeed, Section 9(e)(1) and Regulation 1.59 reflect Congress and the Commission's recognition of the special role played by SROs and acute concerns about the possibility of abuse and the appearance of impropriety stemming from employees and governing members of SROs having access to material nonpublic information. *See* 50 Fed. Reg. 24,533, 24,533 (June 11, 1985) (expressing concerns that even the "potential" for abuse could "seriously undermine[] the concept of self-regulation and reduce[] public confidence in contract markets and their clearing organizations as regulators of their respective marketplaces"). Accordingly, Section 9(e)(1) and Regulation 1.59 are narrowly targeted to apply only to certain covered individuals, but the proscriptions are broad and prophylactic, making it unlawful to disclose confidential information "for any purpose" inconsistent with performance of the official duties of those individuals. *See* Phillip McBride Johnson et al., *Derivatives Regulation* § 2.09[5] (2016) ("[I]t must be remembered that [Regulation 1.59] is not a general prohibition against insider trading by all market participants but, rather, like [Section 9(e)(1)], is limited to employees and governing board members and consultants of self-regulatory organizations.").

In sum, the plain language of Section 9(e)(1) and Regulation 1.59 is properly focused on disclosures *or* trading by SRO employees, and is not aimed at all market participants nor limited to instances where insider trading is established.

## II. BYRNES AND CURTIN ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF WHETHER THEY DISCLOSED "MATERIAL INFORMATION"

As explained in the Commission's motion for partial summary judgment, Byrnes and Curtin disclosed "material information" as a matter of law, because the disclosures to Eibschutz (or at least 68 of them) were unambiguously "related to" customer positions. Byrnes and Curtin propose alternative tests for what is "material," but their arguments, as discussed below, contradict the plain meaning of Section 9(e)(1) and Regulation 1.59. Even if Byrnes and Curtin's suggested interpretations of the statute and regulation were adopted, however, there would be more than enough evidence for a jury to find that the disclosures at issue were material.

### A. Under Regulation 1.59, What Byrnes and Curtin Disclosed to Eibschutz Was "Material Information" as a Matter of Law

Applying the plain language of Section 9(e)(1) and Regulation 1.59, the trade information disclosed by Byrnes and Curtin was material as a matter of law. (*See* CFTC Mem. at 13-17.) Because Byrnes and Curtin disclosed "information relating to present or anticipated cash, futures, or option positions," 17 C.F.R. § 1.59(a)(5), they disclosed "material information." Byrnes and Curtin's arguments to the contrary are unavailing.

#### 1. Information "Relating To" Customer Positions Is *Per Se* "Material Information"

The Individual Defendants contend that "information relating to present or anticipated cash, futures, or option positions" is not necessarily material, arguing that the seemingly clear instruction that "'material information' includes" such information "must be read in conjunction with the first sentence of portion [sic] of CFTC Regulation 1.59(a)(5) which requires that the

information disclosed must prove **important** as to a trading decision."  (Byrnes Mem. at 7-8; *see also* Mem. of Law of Curtin Supp. Mot. Summ. J. ("Curtin Mem.") at 5-6 (ECF No. 143).) While one enumerated category – information related to "linked" (i.e., foreign or securities) exchanges – may not be *per se* material, as the Commission suggested in 1993 revisions to Regulation 1.59 (*see* CFTC Mem. at 16 n.7), the Individual Defendants' interpretation is undermined by the structure of the Regulation and all of the remaining rulemaking history.

There would be no purpose to enumerating specific categories of "material information" if the Commission intended to require the same individualized proof as to the importance of a piece of disclosed information regardless of whether it fell within or without that "non-exclusive list" (Curtin Mem. at 5).  Defendants' interpretation would render the second sentence of Regulation 1.59(a)(5) wholly superfluous, *see, e.g.*, *Hicks Nurseries, Inc. v. Comm'r of Internal Revenue*, 517 F.2d 437, 440 (2d Cir. 1975) (rejecting interpretation of regulation that would render sentence "mere surplusage"), and would contradict the Commission's desire to provide market participants with clarity as to the confidentiality obligations of SRO employees.  (*See* CFTC Mem. at 15-16.)

Curtin argues that *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105 (2d Cir. 1986) – a *fraud* case under Section 4b of the Act – imposes a traditional securities law standard for determining what is "material information," and that Regulation 1.59 should not apply because it does not even "purport to interpret the [Act]." (Curtin Mem. at 4-6.)  In making this argument, Curtin ignores the plain language of Section 9(e)(1), which expressly applies to conduct "in violation of a regulation issued by the Commission."  Moreover, Curtin's argument ignores the Commission's clear intent in the text of Regulation 1.59 to provide a special definition of "material information" for purposes of regulating *non-fraudulent* conduct of SRO employees, *see*

Regulation 1.59(a)(5) ("As used in this section, 'material information' includes . . . ."), as well as the Commission's determination that certain types of information disclosed by SRO employees are *per se* material, a judgment that is entitled to significant deference, *see, e.g.*, *CFTC v. Schor*, 478 U.S. 833, 844 (1986).[3]

2.     <u>Information "Relating To" Customer Positions Is Not Limited to Information Fully Revealing Those Positions</u>

Byrnes and Curtin also erroneously deny that the information they disclosed was "information relating to present or anticipated cash, futures, or option positions" of NYMEX customers, arguing that only information that actually identifies a party's "aggregate position" qualifies as "relating to . . . positions" under the law. (Byrnes Mem. at 12; *see* Curtin Mem. at 7 (asserting that only information that can be used to "reconstruct" past positions would relate to such positions); *id.* at 15 (suggesting that only information allowing a trader to "discern a market participant's aggregate position" can be material).)

This argument has no textual support in Regulation 1.59(a)(5), which, again, refers to information "relating to . . . positions," not information from which one may conclusively "determine" a market participant's "aggregate" or "overall" position (Byrnes Mem. at 11-13, 15; Curtin Mem. at 10). *Cf. SEC v. Thrasher*, 152 F. Supp. 2d 291, 298 (S.D.N.Y. 2001) ("A tip does not have to be certain before it is material, as long as disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." (internal quotation marks omitted)). The information here was coming from reliable sources with accurate information about market participants' trading

---

[3] As CME Group opined in connection with CFTC rulemaking for Regulation 180.1, commodity markets, "which react to world-wide supply and demand factors, have different 'material information' considerations than markets that focus on the fortunes of a single company." Letter from Craig S. Donahue at 3 (Jan. 3, 2011), *available at* https://comments.cftc.gov/PublicComments/ViewComment.aspx?id=27269.

activity, and plainly related to the positions of NYMEX customers even if it did not show what those positions were in aggregate. (*See, e.g.*, Statement of Undisputed Facts Supp. CFTC Mot. for Summ. J. ("CFTC Statement") ¶¶ 108-131 (ECF No. 149).) *Cf. United States v. Contorinis*, 692 F.3d 136, 144 (2d Cir. 2012) ("information obtained from a particular insider" may be found "sufficiently more reliable [than other sources], and, therefore . . . material").

Furthermore, Byrnes and Curtin's proposed limitation on the commonsense meaning of "relating to" would, if adopted, elevate the materiality threshold to an impossible standard and eviscerate Section 9(e)(1) and Regulation 1.59. According to Byrnes and Curtin, it is undisputed that they, as NYMEX employees, only had access to the trades executed on the exchange, and could not access a trader's overall or aggregate position. (*See* Byrnes Mem. at 12 ("it would be impossible for [Byrnes] to discern a market participant's strategy or positions based on the information in the ClearPort blotter"); Curtin Mem. 13-16; *see also* Pl.'s Resp. to Byrnes' Rule 56.1 Statement & Pl.'s Statement of Additional Material Facts ("CFTC Byrnes SAF") ¶ 2 (Curtin's purported expert testified: "People just don't only have instruments on one exchange. They have instruments on multiple exchanges, physical positions.").)[4] Following their logic, no NYMEX employee could ever violate the "relating to . . . positions" prong of Regulation 1.59, no matter how many confidential trade details they disclosed, because NYMEX personnel did not have access to, and thus would not be able to disclose, a trader's overall or aggregate position.[5]

---

[4] All citations to "CFTC Byrnes SAF" are to the paragraphs of Plaintiff's Statement of Additional Material Facts Pursuant to Rule 56.1(b) at the end of the document. The cited paragraphs are also contained, in identical form, at the end of Plaintiff's response to Curtin's Rule 56.1 statement.

[5] In addition to "relating to" customer positions as a matter of law, there is also record evidence from which a factfinder could conclude that the information disclosed by Byrnes and Curtin was "material information" for the separate reason that it related to "trading strategies" of NYMEX customers. For instance, the CFTC's expert, Dr. Hendrik Bessembinder opined that while the disclosures did not reveal complete trading strategies, they did "reveal

**B.    Even If the Law Required a Jury To Determine That the Information Disclosed Would Be Important To a Reasonable Trader, There Is Ample Evidence To Permit Such a Finding.**

Assuming arguendo that the plain language of Regulation 1.59 is not controlling as to the meaning of "material information" and that it must be independently established that the information Byrnes and Curtin disclosed would be important to a reasonable trader in making a commodities trading decision, there is ample evidence in the record to permit a jury to make such a finding, precluding summary judgment for Individual Defendants.

As a threshold matter, this second type of materiality (i.e., whether a representation would be considered important in a decision to invest) is a mixed question of law and fact, *see, e.g.*, *R&W Tech. Servs., Ltd. v. CFTC*, 205 F.3d 165, 169 (5th Cir. 2000); *CFTC v. Maggio*, No. C05-5766, 2007 WL 2900180, at *4 (W.D. Wash. Oct. 1, 2007) (holding that issues of fact precluded summary judgment for defendant on materiality), which "the Supreme Court has identified as especially well suited for jury determination," *United States v. Litvak*, 808 F.3d 160, 175-76 (2d Cir. 2015) (internal quotation marks omitted) (holding, in securities fraud case, that question of materiality of misrepresentations was properly left to jury's determination).  As Individual Defendants concede, materiality requires an ***objective*** inquiry, determined by reference to a reasonable trader.  (Curtin Mem. at 11; Byrnes Mem. at 9.)  Moreover, to be material, a statement must alter the mix of information available to a reasonable trader, but it need not be outcome determinative in his decision-making process.  *See, e.g.*, *SEC v. Nadel*, 97 F. Supp. 3d 117, 122-23 (E.D.N.Y. 2015).

---

elements of strategies."  Dr. Bessembinder further explained that the disclosures could be relevant to inferring strategies.  (CFTC Byrnes SAF ¶¶ 3-4.)

1. <u>Fact Witness Testimony and Documentary Evidence Support the Conclusion That the Information Disclosed Would Be Useful to a Trader</u>

A reasonable jury could conclude that the nonpublic trade information that Byrnes and Curtin disclosed to Eibschutz would be important to a reasonable investor based on the testimony from several fact witnesses. *See, e.g.*, *United States v. Ferguson*, 676 F.3d 260, 274 n.10 (2d Cir. 2011) (noting, in securities fraud criminal case, that testimony by stock analysts and investor-relations manager about the information's importance to investors was "substantial" evidence of materiality). The Commission recited some of this testimony in its motion for summary judgment in explaining the rationale for Regulation 1.59 forbidding SRO employees' to disclose confidential trade details that relate to customers' positions – i.e., a trader with information about the positions of another market participant might use that information in his own trading – and the testimony of market participants corroborating that rationale demonstrates materiality of the trade information even under Individual Defendants' proposed test.

First, a trader in the crude oil markets testified that he had concluded from his own communications with Eibschutz that Eibschutz had obtained confidential information about his trading activity, that he believed Eibschutz had made inferences about his positions from that information, and that this concerned him due to the possibility that a trader could use the information Eibschutz had obtained to the trader's disadvantage: "you really don't want the brokers to know what side or what your positions are because . . . *someone could run over you*." (CFTC Mem. at 14; CFTC Statement ¶¶ 133-137 (emphasis added).)[6]

---

[6] The trader also testified that he considered an open interest of 750 or 1,000 contracts, for his firm, to be "a pretty significant position." (CFTC Byrnes SAF ¶ 5.) *See also In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 176 (2d Cir. 2013) (noting, in the context of natural gas futures trading, allegations that "most traders consider control of only a few hundred contracts to be a substantial position").

Second, Eibschutz acknowledged that counterparty information could also be useful to market participants by, for example, allowing them to *avoid* getting "run over" by a large participant that is active in the market. Eibschutz testified: "I know that in nat[ural] gas, for example, if people know that if [one of the world's largest publicly owned oil and gas companies (hereinafter 'Big Oil Company') is] out there they don't want to be on the other side of the trade, for example, things like that, because they don't want to get stuck on anything because they know that's, you know, *they got to get out of the way*, if you know what I mean." (CFTC Byrnes SAF ¶ 6 (emphasis added).) Significantly, both Byrnes and Curtin provided Eibschutz with confidential information about Big Oil Company as a counterparty to specific trades.[7]

Third, the testimony of a NYMEX managing director, Sean Keating, confirmed that the rationale behind Regulation 1.59 (and NYMEX's corresponding policy forbidding employees from disclosing confidential trade information) reflects legitimate fears about the consequences to market participants that could arise from disclosure. He testified: "Our customers, when they bring a trade to the Exchange, people don't want to know or people – *customers don't want others to know or suspect what their positions in the marketplace might be*." (CFTC Statement ¶ 132 (emphasis added).)

Fourth, a NYMEX executive and former trader, Thomas Holleran, testified that, in his experience, market participants do indeed benefit from knowing the trading activity of their competitors; a trader's knowledge of recent activity such as what products and in what direction other participants are trading may help the trader understand the market, providing insight into potential liquidity and other anticipated market conditions. (CFTC Byrnes SAF ¶ 10.) For instance: "If you know [an oil] refiner's coming in and buying gasoline, you know that there's

---

[7] *See* CFTC Statement ¶¶ 124, 129; CFTC Byrnes SAF ¶¶ 7-9.

something wrong with the refinery output, and you could jump ahead of that. You also know that crack spreads[ ] are going to explode because he is buying gasoline, not crude to run through his refinery." (*Id.* ¶ 11.)

Fifth, a broker of oil options testified that he was "paranoid" when executing a big trade on NYMEX for a client because of his concern that Byrnes may "pass[] that name out." (CFTC Statement ¶ 138.) The broker testified that his client would have a problem with this because he did "not want [others] to know his position." (*Id.*) That broker ultimately lodged a complaint with NYMEX about Byrnes' conduct. (*Id.* ¶ 187.)[8]

Lastly, NYMEX documents also support the inference by a factfinder that the information disclosed by Byrnes and Curtin could have assisted traders in their decisions. For example, CME Group's Data Classification Policy classifies as "Highly Sensitive" certain categories of information, including "Trade data that shows proprietary information of market participants that would allow an individual to reconstruct trading records," and then specifies the following information: "trade date; . . . buy/sell indicator; instrument (contract type and month); number of contracts (order quantity); and price)." (CFTC Byrnes SAF ¶ 13.) This is precisely the type of information that Byrnes and Curtin disclosed to Eibschutz.[9] (*See, e.g.*, CFTC Statement ¶¶ 108-131.)

---

[8] Curtin misstates the record when he argues that this broker, Nour Beyhum, and the trader who was concerned about getting "run over," Brad Hrycenko, actually "testified that the information disclosed was not of the sort likely to be important to a trader." (Curtin Mem. at 15.)

Curtin cites Beyhum's testimony that, hypothetically, information "that entity A was involved in a trade of 100 lots of crude oil on a date certain" (without reference to the type of instrument, the price, whether A bought or sold, how recently the trade occurred, or the date of expiry) would not be sufficient to inform Beyhum – a broker, not a trader – of the entity's "overall trading strategy" or its "overall position in the market." (CFTC Byrnes SAF ¶ 12.) This is hardly a repudiation of Beyhum's concern that the information disclosed to Eibschutz could enable others to trade on the basis of his clients' confidential information.

[9] Likewise, the CME Group Confidentiality and Data Protection Policy states: "Detailed transaction data – Trade data including order and messaging data at the specific account or customer level, identifying the primary economic

2.    The CFTC's Expert Opined That the Information Disclosed Would Be Important to a Trader

A reasonable jury could also conclude from expert testimony – namely, the expert opinion of Dr. Hendrik Bessembinder – that the information at issue would be important to a reasonable investor in making an investment decision. Dr. Bessembinder identified particular disclosures in the recordings and opined that, for several categories of disclosures (all of which included information about counterparty identity), it was substantially likely that the information that Byrnes or Curtin disclosed to Eibschutz about particular trades would be important to an economically rational trader in making an investment decision: (i) disclosures about economically large options trades, (ii) disclosures about options trades in thinly traded contracts, (iii) disclosures about options trades that are both economically large and thinly traded, (iv) disclosures of trading strategies and financial information, (v) disclosures over multiple trading days, and (vi) disclosures of trades involving market participants viewed as particularly skilled. (CFTC Byrnes SAF ¶ 15.) In reaching his opinions, Dr. Bessembinder listened to the 63 audio recordings of disclosures by Byrnes and 16 audio recordings of disclosures by Curtin identified in the Amended Complaint,[10] reviewed related transcripts, relied on relevant academic literature on topics such as market transparency, and analyzed market data relating to the specific contracts at issue. (*Id.* ¶ 16.)

A factfinder could reasonably credit Dr. Bessembinder's conclusions, particularly given what Curtin concedes are his "impeccable qualifications" (Curtin Mem. at 16). Indeed, Dr. Bessembinder is a distinguished academic who has been qualified to testify in numerous matters

---

terms of a trade, including but not limited to, buy/sell or price information, *from which market positions and/or profit and loss might be derived*." (CFTC Byrnes SAF ¶ 14 (emphasis added).)

[10] Dr. Bessembinder also reviewed the additional audio recordings that NYMEX produced after the close of discovery, and they did not change his opinions. It was agreed by the parties that the respective expert reports would cover the new calls, without the need to formally supplement the expert reports.

in federal and state courts, including in relation to trading in the commodity markets; most recently he has offered expert opinions in *CFTC v. Oystacher*, No. 15-CV-9196 (N.D. Ill. filed Oct. 19, 2015), and in *United States v. Coscia*, 177 F. Supp. 3d 1087 (N.D. Ill. 2016), the first criminal prosecution under the Dodd-Frank Act's anti-spoofing provision.  Curtin unwittingly acknowledges the relevance of Dr. Bessembinder's opinions when he objects that Dr. Bessembinder is merely an "expert on the theory of market microstructure" (Curtin Mem. at 16), which is "the branch of financial economics that investigates trading and the organization of markets," Larry Harris, *Trading and Exchanges* 3 (2003) (CFTC Byrnes SAF ¶ 30), including transparency, i.e., "a market attribute that refers to how much information market participants (and potential market participants) possess about the trading process," Joel Hasbrouck, *Empirical Market Microstructure* 6 (2007) (CFTC Byrnes SAF ¶ 31).  In sum, Dr. Bessembinder's opinions provide an ample basis for a reasonable jury to conclude that an economically rational trader would view the information that was disclosed to Eibschutz as important in making an investment decision.  Such expert evidence precludes a finding that the information at issue was immaterial as a matter of law.

### C. Byrnes and Curtin's Arguments That Their Disclosures Were Immaterial as a Matter of Law Are Without Merit

Ignoring the substantial record evidence that would support a factfinder's determination that the information disclosed would be important to a reasonable trader, Byrnes and Curtin advance a series of arguments that they are nonetheless entitled to summary judgment on the issue of materiality.  None of these arguments can be sustained.

#### 1. There Is No Reason Jurors Would Be Required To Credit the Conclusory Opinions of Curtin's Purported Expert Witness

The principal argument for summary judgment on the issue of materiality advanced by Curtin (but not Byrnes) is that jurors could not determine that the information was material

because they would be required to credit the purported expert opinion of Robert Silvay that none of the information disclosed by Curtin could have been important to a reasonable trader. (Curtin Mem. at 12-16.)[11] Curtin's contention is unsupported by any authority and wholly without merit.

Curtin baselessly suggests that because it is possible for an experienced trader to render *admissible* expert testimony, it follows that Silvay's testimony in this case not only would survive scrutiny under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), but indeed would ultimately have to be believed by the factfinder. The cases Curtin cites obviously do not support this proposition. In *CFTC v. Moncada*, the court *permitted the testimony of the CFTC's expert, Dr. Bessembinder, see* 31 F. Supp. 3d 614, 616 (S.D.N.Y. 2014), and actually struck in its entirety the testimony of the "seasoned" trader offered by the defense, No. 12 Civ. 8791, 2014 WL 2945793, at *5-6 (S.D.N.Y. June 30, 2014), holding that the defense expert's testimony grounded merely in his "personal experience" was inadmissible ipse dixit, *see id.* at *5 ("[Defense expert's] statements about what other traders would do or how they would react have no basis other than his own personal experience as a trader – they represent nothing more than his assertion about how *he* would act or react."); *id.* ("[N]othing in [defense expert's] Report affords this Court any confidence that [his] *ipse dixit* is worth the paper on which it is written – notwithstanding his long tenure and multiple roles in the commodities market."). In *Litvak*, the other case cited by Curtin, the Second Circuit held that the securities fraud defendant was entitled to present at trial the expert testimony of an experienced trader, but did not indicate in any way that the jury would be required to credit that testimony as against

_____

[11] Byrnes did not offer his own purported expert's testimony in support of his summary judgment motion, and he does not (and could not) rely on the testimony of Silvay, who offered opinions only as to the calls between Curtin and Eibschutz.

what the court ruled was otherwise sufficient evidence of materiality.  *See* 808 F.3d at 175-78, 181-85.

Assuming that Silvay's testimony reached the factfinder in this case, it would be quite reasonable for a jury to discount Silvay's opinions, given that they suffer from the same defects as the testimony that was stricken in *Moncada*.  Indeed, Silvay repeatedly testified that the basis for his opinions was, simply, his "professional experience."  (CFTC Byrnes SAF ¶ 17.)  When asked to elaborate on what he did to form his opinion on whether the disclosed information would be important to a reasonable person, Silvay reiterated that "he applied [his] professional personal experience to the question at hand."  (*Id.* ¶ 18.)  In terms of his methodology, Silvay testified that "[i]f my professional experience is methodology, that's what I did."  (*Id.* ¶ 19.)  *See Moncada*, 2014 WL 2945793, at *3 (striking opinion of commodities trader "because he fails to use any recognized methodology – or, for that matter, any methodology at all").  When asked if he did anything to test the validity of his opinion, Silvay said, "[o]nce again, I just used my personal experience.  I'm not sure if that's a test."  (CFTC Byrnes SAF ¶ 17.)  Silvay's inability to even articulate the basis for his opinion beyond a conclusory reference to "professional experience" renders his testimony a mere ipse dixit – which is neither admissible nor helpful and should be disregarded.  *See Luitpold Pharm., Inc. v. ED. Geistlich Sohne A.G. Fur Chemische Industrie*, No. 11-cv-681, 2015 WL 5459662, at *8 (S.D.N.Y. Sept. 16, 2015) (excluding expert testimony "based on [the expert's] own experience," because it "appears to be merely ipse dixit, not drawn from any verifiable data").

In addition, Silvay's qualifications as an expert are questionable.  Prior to his engagement in this matter, he had never been an expert in any other matter.  (CFTC Byrnes SAF ¶ 20.)  Silvay has not been subject to any relevant peer review, because has never written any articles

regarding commodities trading or the Act or Regulations.  (*Id.* ¶ 22.)  For that matter, he has not published on the topic of materiality in connection with securities trading.  (*Id.* ¶ 21.)  Silvay's current employer does not conduct any trading on behalf of clients, and in 2015 he derived "probably half" of his income from his work as a real estate broker.  (*Id.* ¶¶ 23-24.)  Plaintiff reserves the right to challenge the admissibility of his testimony.

Most fundamentally, a jury would certainly not be required to adopt Silvay's conclusions *as a matter of law* for the simple reason that the CFTC's expert, Dr. Bessembinder, reaches the opposite conclusion in his expert report and specifically criticizes Silvay's reasoning and conclusions in his rebuttal report – a classic battle of the experts.  "A motion for summary judgment should not be granted where the parties have produced competing expert testimony." *In re Blech Sec. Litig.*, No. 94 Civ. 7696, 2002 WL 31356498, at *1 (S.D.N.Y. Oct. 17, 2002); *see generally Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 79 (2d Cir. 2002).  Dr. Bessembinder explains that Silvay's conclusions about materiality are defective because, for instance, they fail to take account of large trade size, or the ability of traders to form views on the market from details about multiple trades, or the significance of information producing only a slight change in a trade's expected profitability.  (CFTC Byrnes SAF ¶ 25.)

2. The Absence of Record Evidence of Insider Trading Does Not Prove That A Reasonable Trader Could Not Have Used the Information

Curtin notes that, in the context of insider trading of securities, the fact that recipients of insider information traded on the information may be evidence that the information was material. From that premise, he concludes that a *lack* of evidence of trading following the disclosure of confidential information demonstrates that the information must have been *immaterial*.  (*See* Curtin Mem. at 9-10.)  This argument, for which Curtin cites no supporting authority, is legally

erroneous because it would effectively import an insider trading requirement into Section 9(e)(1) and Rule 1.59(d)(1)(ii), which include no such requirement (*see supra* Point I).

Curtin's argument also makes little sense given the discovery record. Although Curtin argues that evidence "suggests" that "none of the people who had access to the information Curtin disclosed considered it important for trading" (Curtin Mem. at 9), the only such recipient cited by Curtin is Eibschutz himself.[12] A jury could easily disbelieve Eibschutz's self-serving testimony that he did not recognize the information as potentially useful for trading and wanted it only to cold call potential customers, particularly given Curtin's testimony that Eibschutz had actually told him he wanted the information to "price his customers a little better" and Curtin's lack of recollection of any mention of cold-calling (CFTC Statement ¶¶ 174-175), not to mention Eibschutz's own testimony demonstrating his understanding that counterparty information of the type he disclosed could be useful to traders (*see supra* Point II.B.1). Even if a jury believed Eibschutz did not subjectively view the information as valuable to a reasonable trader, there is no reason to conclude that Eibschutz – who in fact used the information to *broker* trades (*see* note 12 below) – was correct in his view.

Moreover, the supposed "consensus" of "all of the witnesses" that "there is no way" a trader could have used the disclosed information (Curtin Mem. at 10) is belied by the discovery record. As discussed above (*see supra* Point II.B), the testimony of Brad Hrycenko, Nour Beyhum, Sean Keating, Thomas Holleran, and Hendrik Bessembinder certainly does not reflect a

---

[12] Byrnes argues, similarly, that "[t]here is no evidence that anyone . . . believed the Information could be used to trade commodity interests" (Byrnes Mem. at 15), but identifies only two recipients: Eibschutz, and Eibschutz's former Parity colleague, Valery Rouet, who called the information "priceless" and "too good to be true" (CFTC Byrnes SAF ¶ 26) and never denied that it could be used by a trader. However, Rouet explained that she saw Eibschutz "getting new client[] after new client[] just because his friend works at NYMEX." (*Id.* ¶ 27.) Rouet also testified that she recalled a specific client that Eibschutz obtained as a result of his communications with Byrnes. (*Id.* ¶ 28.)

consensus around that view.  Even viewing the witness testimony in the light most favorable to Individual Defendants (which is the opposite of what is required), Curtin concedes that the testimony, at most, "*weighs against* a finding of materiality" (Curtin Mem. at 10 (emphasis added)); it does not demonstrate that the information was immaterial as a matter of law.

### 3. The Information Was Not "Stale"

Curtin also argues, incorrectly, that the information disclosed is immaterial as a matter of law because it was "stale."  (Curtin Mem. at 14.)  Notably, in the sole case Curtin cites for that proposition, *In re Kidder Peabody Securities Litigation*, No. 94 CIV. 3954, 1995 WL 590624 (S.D.N.Y. Oct. 4, 1995), the court rejected that very argument, holding that an alleged misstatement that occurred nearly three months before the class period started was not immaterial as a matter of law, *see id.* at *5.  In any event, there is no authority (besides the ipse dixit of Curtin's purported expert) that the particular information disclosed to Eibschutz was stale.  To the contrary, many of the disclosures related to options that would expire in the future. There is evidence, for example, showing that Eibschutz had access to the open interest, which pertains to the total number of futures contracts "that has been entered into and not yet offset or fulfilled by delivery."  (CFTC Byrnes SAF ¶ 32; *see also id.* ¶ 33 (Eibschutz asking Byrnes about trade information: "And who was that?  It's in the open interest as $4."); Curtin 56.1 Statement ¶ 13 (ECF No. 146); NYMEX 56.1 Statement ¶ 15 (ECF No. 133).)  Curtin does not explain how information can be stale if it relates to trades creating future delivery rights or obligations, or requires future offset or delivery.  Moreover, as Dr. Bessembinder explains, the identity of counterparties to specific trades was not known to the public, and so that information at least was not stale when it was revealed.  (CFTC Byrnes SAF ¶ 29.)

Curtin also asserts that summary judgment for defendants is warranted because the Commission has not offered to prove materiality through an "event study." (Curtin Mem. at 12.) Oddly, Curtin cites *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404 (S.D.N.Y. 2015), in support of this assertion, despite that the *Veleron* court rejected this exact argument by the defendant in that case. Noting that event studies are "not *actually* obligatory," the court denied Morgan Stanley's motion for summary judgment, despite the fact that Morgan Stanley "submitted an event study suggesting that the disclosure of the non-public information had no impact on the price" of the stock, while plaintiff Veleron did *not* submit an event study. *Id.* at 433-34. Curtin's argument here, of course, is even weaker than Morgan Stanley's was in *Veleron*, because unlike Morgan Stanley, Curtin has not proffered his own event study to establish the lack of price impact, nor has he tried to establish that trading correlated to his disclosures to Eibschutz did *not* occur.

## III.  BYRNES AND CURTIN ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF WHETHER THEY ACTED WITH SCIENTER

As explained in the CFTC's summary judgment motion, it is undisputed that Byrnes and Curtin intentionally disclosed confidential information relating to customer positions, knowing they were violating NYMEX rules by doing so. (*See* CFTC Mem. at 17-19.) Their disclosures were therefore made "willfully and knowingly," which is all the scienter that Section 9(e)(1) requires. The Individual Defendants' arguments should be rejected for the reasons below.

### A.    Byrnes and Curtin Acted With Scienter as a Matter of Law

The Individual Defendants argue that Section 9(e)(1) requires knowledge or recklessness regarding the materiality of the information disclosed. (Byrnes Mem. at 6-7; Curtin Mem. at 18-20.) Byrnes and Curtin assert that they lacked scienter as a matter of law because there is no

evidence that they believed – or recklessly disregarded the risk – that the information they

disclosed "could be used for commodities trading purposes" (*e.g.*, Byrnes Mem. at 6).[13] But that

position wrongly ignores the fact that "material information" for the purposes of Section 9(e)(1)

and Regulation 1.59 "includes" information relating to customers' positions, and that Byrnes and

Curtin plainly knew that the trade data related to customers' positions.  (*See supra* Point II.A.)

Byrnes correctly does not seek summary judgment on the Commission's Regulation 1.59

claim on the issue of scienter, as Regulation 1.59(d)(1) itself contains no scienter requirement.

Curtin, by contrast, asks the Court to impose a scienter requirement for Regulation 1.59.  (Curtin

Mem. at 18 ("Under . . . Reg. 1.59, Curtin can only be found liable if he acted with scienter.").)

Curtin's attempt to rewrite Regulation 1.59 is misguided.  The Commission purposefully omitted

a scienter requirement from the Regulation, stating:  "The Commission is unaware of instances

of SRO disciplinary or other actions against SRO insiders based on inadvertent conduct.  Nor has

the Commission brought any such action.  The language of the regulation itself provides ample

protection against the possibility of enforcement action based solely on inadvertent conduct."  58

Fed. Reg. 54,966, 54,968-69 (Oct. 25, 1993).  Where, as here, all disclosures at issue were

intentional (*see* CFTC Statement ¶¶ 73-92), Regulation 1.59 plainly applies.

**B.      Even If the Law Required a Jury To Determine That Defendants Knew or
         Recklessly Disregarded That Information Disclosed Would Be Important to
         a Reasonable Trader, There Is Ample Evidence To Permit Such a Finding**

Even assuming, as Curtin asserts, that the CFTC needs to demonstrate that defendants

knew or recklessly disregarded that the confidential information they were disclosing would have

been important for commodities trading purposes (as opposed to knowing or recklessly

---

[13]  Byrnes goes further, appearing to argue that 9(e)(1) liability requires knowledge or recklessness regarding
whether the information disclosed "*would* be used for purposes of commodities trading" (Byrnes Mem. at 6
(emphasis supplied)), which is incorrect given that actual trading is not a required element of a Section 9(e)(1)
violation (*see supra* Point I).

disregarding that the information was related to customer positions or trading strategies), there is ample evidence from which a jury could reach that conclusion.

Byrnes and Curtin's extensive experience in the commodities industry itself provides a strong basis to discredit their insistence that they thought their disclosures were useless for trading. While Curtin claims that he "had only a limited familiarity with the OTC energy markets" (Curtin Mem. at 20), he spent more than 20 years in the industry, including working as a currency trader (*see* CFTC Statement ¶¶ 84-85), and in the past has sung a much different tune, for instance writing in a 2007 NYMEX employee self review: "I have sort of become a celebrity throughout the Energy markets and have become the face of NYMEX customer service. My ability to teach staff and customers has helped increase the efficiency of the desk." (CFTC Byrnes SAF ¶ 34.) Byrnes also spent over 20 years in the industry (*see* CFTC Statement ¶ 77), and his 2010 review, his supervisor noted that Byrnes "knows most contract specs from memory" and even "suggested new contracts to the new products team." (CFTC Byrnes SAF ¶ 35.) A factfinder could infer that Byrnes and Curtin appreciated that the information they were *repeatedly* disclosing (audio recordings of over 1,000 phone calls were produced in discovery (*see* Byrnes Mem. at 3)) at the request of a broker, was useful (as testified to by witnesses in different industry roles) to the broker's clients and potential clients (i.e., traders).

The record evidence indicates that Byrnes and Curtin were well aware of the NYMEX policies that required the confidentiality of customer trade information to be maintained (*see* CFTC Statement ¶¶ 73-92), and a factfinder could likewise conclude that they must have understood that those requirements reflected the reality that such information could be used for trading. The evidence is that they each signed multiple acknowledgments of receiving NYMEX's policies restricting the disclosure of trade information, and in fact were responsible

for training other employees on those policies.  (*See id.* ¶¶ 22, 25, 78, 82, 91.)  Byrnes and Curtin occupied a unique and privileged position as NYMEX employees with access to valuable confidential trading information.  Indeed, as Byrnes acknowledged to Eibschutz on one of their telephone conversations, stating, after providing Eibschutz with details about a number of trades: "It's fun being the gatekeeper, huh?"  Eibschutz replied, "Maybe I should become one."  (CFTC Byrnes SAF ¶ 36.)

The text and history of Regulation 1.59 itself also demonstrate why a jury could reasonably conclude that the Individual Defendants acted with scienter.  The Commission explained that information relating to positions of NYMEX members and customers "*would* be considered important by a reasonable person in deciding whether to trade a particular commodity interest and, thus, *would* be considered material" under the Regulation.  50 Fed. Reg. 24,533, 24,535 (June 11, 1985) (emphases added); *see also* 58 Fed. Reg. 54,966, 54,972 (Oct. 25, 1993) (describing "non-exclusive list of information that *would* be considered 'material' in making a trading decision" (emphasis added)).  (*See* CFTC Mem. at 15-16.)

In light of all the evidence demonstrating that Byrnes and Curtin were experienced market participants who knew or should have known that confidential trade details generally could be used for trading – and the *absence* of any record evidence showing that Byrnes or Curtin took any steps whatsoever to ascertain whether particular information they were disclosing could have been used for trading – a reasonable jury could infer that Byrnes and Curtin were at least reckless as to the likelihood that the information they were providing to Eibschutz could have been viewed as important to a reasonable trader.

## IV.  THE RECORD EVIDENCE SUPPORTS A FINDING THAT EIBSCHUTZ IS LIABLE FOR AIDING AND ABETTING BYRNES AND CURTIN'S VIOLATIONS

In an abundance of caution, the Commission briefly notes that the letter application submitted by Eibschutz to "join the motions" of Byrnes and Curtin (Letter from Paul Shechtman to the Court ("Shechtman Letter") at 1 (ECF No. 151)), does not provide any basis for summary judgment in favor of Eibschutz separate from those grounds advanced by Byrnes and Curtin.

To the extent that Eibschutz's submission seeks to raise his own summary judgment arguments, it is defective for failure to comply with Local Rule 56.1(a). Regardless, Eibschutz's two assertions accompanied by record citations do not entitle Eibschutz to judgment as a matter of law. First, even assuming the truth of Eibschutz's testimony that the reason he asked Byrnes and Curtin to disclose confidential information was "cold calling" (Shechtman Letter at 1), it does not change the fact that Eibschutz was actively and intentionally soliciting trade information that he was not entitled to receive, and also knew that Byrnes and Curtin were not permitted to disclose such information. Second, Eibschutz's testimony that there was "[n]o way in hell" that *he* (not a trader) could determine a market participant's overall position based on the confidential information he received (*id.* at 1 n.1) is beside the point. There is no requirement that the disclosures reveal an "overall" or "aggregate" position. (*See supra* Point II.A.2.) Moreover, based on Eibschutz's testimony alone, a jury could conclude that knowing which counterparties entered into a trade would be important to a reasonable trader. (*See supra* Point II.B.1 (discussing the need to "get out of the way" of large participant).)

The record evidence is that Eibschutz associated himself with Byrnes and Curtin's misconduct, participated in it as something that he wished to bring about, and sought by his actions to make it succeed. He is therefore liable as a matter of law for aiding and abetting Byrnes and Curtin's violations. (*See* CFTC Mem. at 19-20.)

25

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court deny

Individual Defendants' motions for summary judgment in their entirety.

Dated: New York, New York
       February 15, 2017

Respectfully submitted,
U.S. COMMODITY FUTURES TRADING
COMMISSION

By:____s/  Patryk J. Chudy_____

Patryk J. Chudy
David W. MacGregor (admitted *pro hac vice*)
Patrick Daly
James G. Wheaton
Alejandra de Urioste
David C. Newman

Division of Enforcement
140 Broadway, 19th Floor
New York, New York 10005
Phone: (646) 746-9700
Fax: (646) 746-9939