**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **U. S. COMMODITY FUTURES TRADING COMMISSION,** | ) ) ) |
| **Plaintiff,** | ) ) |
| **v.** | ) ) ) |
| **WILLIAM BYRNES, CHRISTOPHER CURTIN, THE NEW YORK MERCANTILE EXCHANGE, INC., and RON EIBSCHUTZ,** | ) ) ) ) ) ) |
| **Defendants**. | ) ) |

13 Civ. 1174 (VSB)

**ECF Case**

## PLAINTIFF'S REPLY MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

U.S. COMMODITY FUTURES TRADING
COMMISSION

Patryk J. Chudy
David W. MacGregor (admitted *pro hac vice*)
Patrick Daly
Alejandra de Urioste
David C. Newman

Division of Enforcement
140 Broadway, 19th Floor
New York, NY 10005
Phone: (646) 746-9700
Fax: (646) 746-9939

## <u>TABLE OF CONTENTS</u>

I.  THE UNDISPUTED FACTS ESTABLISH THAT BYRNES AND CURTIN
    VIOLATED SECTION 9(e)(1) OF THE ACT AND CFTC REGULATION 1.59. .................2

    A.  The Trade Information Byrnes and Curtin
        Disclosed to Eibschutz Was "Non-Public Information."......................................3

    B.  The Trade Information Byrnes and Curtin
        Disclosed to Eibschutz Was "Material Information.".........................................6

    C.  Byrnes and Curtin Acted With Scienter..............................................................9

II.  THE UNDISPUTED FACTS ESTABLISH THAT EIBSCHUTZ IS LIABLE
     FOR AIDING AND ABETTING BYRNES AND CURTIN'S VIOLATIONS...................13

III. THE UNDISPUTED FACTS ESTABLISH THAT NYMEX IS VICARIOUSLY
     LIABLE FOR BYRNES AND CURTIN'S VIOLATIONS ...................................13

    A.  Byrnes and Curtin Acted Within Their Customary Range of Responsibilities. ...............15

    B.  Byrnes and Curtin Acted Subject to NYMEX's Control...................................16

    C.  Byrnes and Curtin Acted, At Least in Part, To Serve a Purpose of NYMEX... ................17

    CONCLUSION...................................................................................20

i

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...............................................................5

*CFTC v. Byrnes*, 58 F. Supp. 3d 319 (S.D.N.Y. 2014)....................................... *passim*

*CFTC v. Fleury*, No. 03-61199 CIV, 2010 WL 5146283 (S.D. Fla. June 18, 2010).....................3

*In re Perez*, CFTC No. 08-11, 2008 WL 4051019 (Aug. 26, 2008).................................7

*Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005).............................................5

*Lipkin v. SEC*, 468 F. Supp. 2d 614 (S.D.N.Y. 2006) ...................................................15

*Moss v. Morgan Stanley Inc.*, 553 F. Supp. 1347 (S.D.N.Y. 1983)...............................16

*R&W Technical Servs., Ltd. v. CFTC*, 205 F.3d 165 (5th Cir. 2000) .............................3

*Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1 (2004) ......................8

*Redd v. Wright*, 597 F.3d 532 (2d Cir. 2010) ........................................................... 5-6

*SEC v. Mayhew*, 121 F.3d 44 (2d Cir. 1997). ..............................................................5

*SEC v. Obus*, 693 F.3d 276 (2d Cir. 2012) ......................................................... 10-11

*United States v. Valencia*, 394 F.3d 352 (5th Cir. 2004)............................................11

### STATUTES, RULES, AND OTHER AUTHORITIES

7 U.S.C. § 6c.............................................................................................................12

7 U.S.C. § 13(e) ......................................................................................................2, 9

17 C.F.R. § 1.59.................................................................................................. *passim*

29 C.F.R. § 2510.3-3..................................................................................................8

58 Fed. Reg. 54,966 (Oct. 25, 1993)........................................................................7, 8

Fed. R. Civ. P. 8................................................................................................... 5-6

Letter from Craig S. Donohue (Jan. 3, 2011), *available at*
    https://comments.cftc.gov/PublicComments/ViewComment.aspx?id=27269 .......................7

Local Civil R. 56.1....................................................................................................13

Restatement (Third) of Agency § 7.07(2) (2006) .......................................................17

In Defendants' briefs opposing the Commission's motion for partial summary judgment as to 68 violations of Section 9(e)(1) of the Act and Commission Regulation 1.59(d)(1)(ii), it is noteworthy what arguments Byrnes, Curtin, and NYMEX[1] do not make.  Defendants largely refrain from advancing a view of the discovery record that would create genuine issues of material fact for trial.  No Defendant disputes the substance of any of the 68 disclosures at issue in the Commission's motion – effectively conceding that the disclosed information was material unless the Court adopts Defendants' proposed legal standards for the meaning of "material information" and "relating to . . . positions."  No Defendant disputes that Byrnes and Curtin's disclosures of confidential trade information to Eibschutz were done intentionally, knowing that such disclosures were wrongful, understanding of the nature of the information and recognizing that their actions were inconsistent with their duties as NYMEX employees (thus admitting scienter under the Commission's interpretation of the applicable provisions).  Aside from Curtin, no Defendant disputes that the disclosures were non-public as a matter of law.

Instead, Defendants attempt to distract the Court from the issues at hand, denigrating this action as an insider trading case without evidence of trading,[2] which it is not.  The Commission has not alleged that Defendants or anyone else traded on the basis of Byrnes and Curtin's

---

[1] The terms "Commission," the "Act," "Byrnes," "Curtin," "NYMEX," and all other terms defined in the Commission's opening brief ("CFTC Mem." (ECF No. 148)) have the same meaning in this reply memorandum.

[2] *See, e.g.*, Mem. of Law of Def. Christopher Curtin in Opp. to Pl.'s Mot. for Summ. J. ("Curtin Opp. Mem.") at 2 (ECF No. 163).  At times, Defendants go so far as to affirmatively claim that *no trading occurred* as a result of the disclosures.  (*See* NYMEX's Opp. to Pl.'s Mot. for Summ. J. ("NYMEX Opp. Mem.") at 1 ("no trading ever occurred") (ECF No. 175); Byrnes' Mem. of Law in Opp. to Pl.'s Mot. for Partial Summ. J. ("Byrnes Opp. Mem.") at 13 ("no trading occurred as a result of these disclosures") (ECF No. 160).)  NYMEX offers no record support for this assertion, and Byrnes cites only deposition testimony unrelated to the issue:  (a) his own testimony (1) that his motivation for the disclosures was to help Eibschutz and (2) that he personally could not ascertain traders' aggregate positions from the information on ClearPort (Byrnes 56.1 Statement ¶¶ 15-16 (ECF No. 138)), and (b) Eibschutz's testimony that he personally could not use the information disclosed to discern a trader's strategy or aggregate position (*id.* ¶ 17).  Meanwhile, Byrnes has separately represented to the Court that an expert he retained concluded that it would *not be possible* to prove that no trading occurred as a result of the disclosures.  (*See* July 5, 2016 Letter at 1 (ECF No. 100).)

1

improper disclosures, and need prove no such thing.  Whether a factfinder ought to credit Byrnes and Curtin's inconsistent and self-serving testimony about what they believed would be done with the disclosed information, or about their purported disbelief that it would be used for trading, is wholly irrelevant to whether they violated Section 9(e)(1) and Regulation 1.59(d)(1)(ii), which each prohibit a narrow class of market participants from disclosing material non-public information to individuals who are not entitled to receive it – regardless of whether anyone trades on the information.

As to vicarious liability under Section 2(a)(1)(B) of the Act, NYMEX fails to raise any genuine dispute of material fact.  NYMEX focuses on snippets of Byrnes and Curtin's testimony and admissions that fail to contradict the facts identified by the Commission in its motion demonstrating that Byrnes and Curtin acted to serve "any purpose" of NYMEX.  NYMEX also makes unconvincing arguments about whether Byrnes and Curtin acted within the customary range of their job responsibilities or subject to NYMEX's control.  The totality of undisputed facts here, however, compel the conclusion that Byrnes and Curtin acted within the scope of their employment, and NYMEX should therefore be held liable for Byrnes and Curtin's violations.

## I.  THE UNDISPUTED FACTS ESTABLISH THAT BYRNES AND CURTIN VIOLATED SECTION 9(e)(1) OF THE ACT AND CFTC REGULATION 1.59.

Rather than identify factual disputes relevant to the question whether Byrnes and Curtin unlawfully "disclose[d] for ***any purpose inconsistent with the performance of [their] official duties*** . . . material non-public information" obtained through special access related to the performance of their duties as NYMEX employees, 7 U.S.C. § 13(e)(1) (emphasis added); 17 C.F.R. § 1.59(d)(1)(ii) (emphasis added),[3] Defendants principally advance the same legal

---

[3] Each quotation of Section 9(e)(1) or Regulation 1.59 in this memorandum of law provides the language of the applicable provision that was in effect during the relevant time period.

arguments on which their own cross-motions for summary judgment are based.  These arguments – which were addressed in opposition to Defendants' cross-motions (*see* ECF Nos. 168, 170) – raise legal issues of first impression in the federal courts and, if decided in the CFTC's favor, warrant the entry of judgment as to the 68 violations on which the Commission has moved.

Consideration of these legal issues must take into account the canon of statutory construction that remedial legislation such as the CEA should be liberally construed to effectuate the law's remedial purpose.  *See, e.g.*, *R&W Technical Servs., Ltd. v. CFTC*, 205 F.3d 165, 173 (5th Cir. 2000); *CFTC v. Fleury*, No. 03-61199 CIV, 2010 WL 5146283, at *10 (S.D. Fla. June 18, 2010), *aff'd*, 479 F. App'x 940 (11th Cir. 2012).  Defendants here seek to turn that canon on its head.  They propose cramped readings of Section 9(e)(1) and Regulation 1.59(d)(1)(ii) that would immunize the very sort of wrongdoing Congress and the Commission sought to prevent, borrowing inapposite concepts from cases interpreting Section 10(b) of the Securities Exchange Act ("Section 10(b)") and SEC Rule 10b-5 in an attempt to distract from the plain meaning of the provisions at issue.

### A.     The Trade Information Byrnes and Curtin Disclosed to Eibschutz Was "Non-Public Information."

Curtin is the only Defendant who contests the Commission's entitlement to judgment as a matter of law on the issue of whether the trade information disclosed by Byrnes and Curtin to Eibschutz was "non-public information."  (*See* Curtin Opp. Mem. at 17-21.)  According to Curtin, there is record evidence raising the "possibility" that Curtin's 17 disclosures identified in the Commission's motion[4] contained information that was "never non-public to begin with" or

---

[4] No Defendant disputes that the 51 disclosures by Byrnes that are the subject of the Commission's motion contained information that was "nonpublic" for purposes of Section 9(e)(1) and Regulation 1.59, and summary judgment should therefore be entered for the Commission on that issue as to those disclosures.

else was "already assimilated by the market before it was disclosed."  (*Id.* at 18.)  Neither of these arguments finds support in law or fact.

First, Curtin offers no authority for his suggestion that the supposed availability of the information at issue "to any market participant inclined to ask for it" means that it was "never non-public to begin with" (Curtin Opp. Mem. at 18, 20).  "Non-public information" is "information which has not been disseminated in a manner which makes it generally available to the trading public," 17 C.F.R. § 1.59(a)(6), and thus undisseminated information is by definition non-public.  In any event, there is no basis for Curtin's contention that the information at issue was generally available to the trading public.  Assuming arguendo that the opinions offered by Curtin's purported expert, Robert Silvay, are competent evidence (which the Commission disputes[5]), Silvay's testimony observes that bids and offers in brokered transactions are commonly communicated to market participants who happen to be watching the broker market at the time, but does not even attempt to show that the details of any specific consummated trade that Curtin looked up on ClearPort and provided to Eibschutz were actually disseminated to the trading public.

Second, Curtin's assertion that "information related to brokered trades . . . likely . . . was . . . fully assimilated in the relevant price" (Curtin Opp. Mem. at 19) is completely unsupported.  As noted above, there is no evidence that details of completed trades (the information that Byrnes and Curtin provided to Eibschutz) were disseminated to the market.  Even if the available information about bids and offers communicated by brokers were somehow sufficient to render information about completed trades "already disclosed in the course of the brokering process"

---

[5] As the Commission has argued, Silvay's purported expert opinions may be properly excluded from the Court's consideration without need for separate briefing.  (*See* Pl.'s Mem. of Law Opp. Individual Defs.' Mots. for Summ. J. ("CFTC Opp. Mem.") at 17 (ECF No. 170).)

(*id.*), Curtin has presented no evidence from which a factfinder could conclude that the specific information that Curtin disclosed to Eibschutz was "fully impounded into the price of the particular stock," *SEC v. Mayhew*, 121 F.3d 44, 50 (2d Cir. 1997).  According to Curtin's own argument, such a showing would require an event study (presumably concluding that market participants traded on the information after the dissemination proposed by Curtin, and not after the same information was conveyed to Eibschutz), but Curtin has offered no such study.

Recognizing the absence of record evidence to support his position, Curtin objects that the Commission "impermissibly tries to shift the burdens of production and persuasion" on the issue of whether the information disclosed was non-public (Curtin Opp. Mem. at 20) – evidently misunderstanding the fundamentals of Rule 56.  As Curtin "readily admits" (*id.* at 18), the Commission has identified admissible evidence that the information Curtin disclosed was *not* disseminated in a manner making it generally available, *i.e.*, that it was nonpublic, which results precisely in the burden shifting to Curtin to present evidence from which a factfinder could conclude to the contrary.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Because Curtin presents no more than "unsubstantiated speculation" that the information may have been disseminated, raising merely the "metaphysical doubt" that necessarily accompanies the Commission's position as movant seeking to prove a negative, *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), summary judgment should be granted.[6]

---

[6] Curtin also argues in a footnote that summary judgment must be denied as to two disclosures on March 19, 2009 because the call between Curtin and Eibschutz during which the disclosures occurred was not listed in Exhibit B to the Amended Complaint.  (Curtin Opp. Mem. at 4 n.3.)  This argument is frivolous.  Curtin does not, because he cannot, suggest that he was prejudiced by the omission from the Commission's pleading, let alone provide an affidavit or declaration under Rule 56(d) demonstrating a lack of access to facts essential to justify his opposition to summary judgment as to the March 19, 2009 violations.  (To the contrary, Curtin was deposed on the subject of the March 19, 2009 violations, and he does not dispute his role in, or the contents of, those recorded disclosures (*see* Curtin's Resp. to Pl.'s Rule 56.1 Statement ¶ 131 (ECF No. 166)).)  The Amended Complaint did not allege that Exhibit B was a comprehensive list of dates on which Curtin violated the Act and Regulation 1.59; instead, it alleged that Curtin disclosed information to Eibschutz on "at least" 16 occasions, and that Exhibit B contained a list of dates

### B.     The Trade Information Byrnes and Curtin
######         Disclosed to Eibschutz Was "Material Information."

The Commission's argument for summary judgment on the issue of whether 68

disclosures by Byrnes and Curtin contained "material information" is straightforward.  "Material

information" for purposes of Section 9(e)(1) and Regulation 1.59 "includes" information

"relating to present or anticipated cash, futures, or option positions" of NYMEX customers, and

the disclosures at issue necessarily contained information relating to such positions, because they

were options trades with exercise, offset, or expiration to occur post-disclosure.  Defendants

assemble a host of arguments against these simple premises, but none of them is persuasive.

First, Defendants deny that information "relating to present or anticipated cash, futures,

or option positions" is actually defined by Regulation 1.59 as "material information."  Curtin

contends that the Court should defer to what he characterizes as the Commission's pre-litigation

interpretation of the regulatory definition of "material information" (Curtin Opp. Mem. at 8-12),

but he misreads the Commission's prior pronouncements, as do Byrnes and NYMEX (Byrnes

Opp. Mem. at 7-9; NYMEX Opp. Mem. at 9-11).  The Commission's informal commentary

justifying the addition of "linked exchanges" in the second sentence of Regulation 1.59(a)(5)

should not be read to contradict that sentence's plain meaning in the full context of the provision,

particularly given the Commission's simultaneous categorical statement that the second sentence

lists "information that *would* be 'material.'"  In addition, the plain-meaning interpretation of the

---

of disclosures on recorded telephone calls known to the Commission at the time.  NYMEX belatedly produced the March 19, 2009 audio recordings on June 2, 2016, long after the Amended Complaint was filed.  (*See* ECF Nos. 90, 111.)  In the sole authority Curtin cites in support of his argument, *Redd v. Wright*, 597 F.3d 532 (2d Cir. 2010), the plaintiff's complaint challenged a prison policy under the Eighth Amendment, and then in opposition to defendants' motion for summary judgment raised new allegations of retaliatory mistreatment that plaintiff claimed occurred *in contravention of the prison policy*; the Second Circuit affirmed that these claims, which were totally distinct from the complaint's allegations, were not properly before the district court.  *See* Mem. & Order at 4, 9-10, *Redd v. Wright*, No. 04-cv-401 (N.D.N.Y. Aug. 9, 2006), ECF No. 31, *aff'd*, 597 F.3d at 539.  Nothing in *Redd* suggests that the "short and plain statement" required by Federal Rule of Civil Procedure 8(a)(2) must comprehensively list every instance of violative conduct that may later be uncovered during discovery.

statute is wholly consistent with the Commission's sole prior enforcement action under Section 9(f)(1) of the Act (now Section 9(e)(1)) and Regulation 1.59(d)(1)(ii), in which the Commission sanctioned a former NYMEX employee for disclosing to brokers material information relating to "proposed regulatory actions," per Regulation 1.59(a)(5), without any determination that the information at issue could have been used for trading purposes (or that the employee knew it could have been so used), *see In re Perez*, CFTC No. 08-11, 2008 WL 4051019 (Aug. 26, 2008). None of the Defendants explain why it is appropriate to displace the plain meaning of the regulation, nor do they argue that the Commission has misstated what that plain language says.[7]

Second, NYMEX argues that if Regulation 1.59 had defined information "relating to . . . positions" as "material information," that regulation would be arbitrary and capricious. But NYMEX provides no precedent in which a court rejected the plain language of an agency's regulation in order to avoid invalidating the regulation as arbitrary. In any event, the Commission plainly did not fail to "engage in reasoned decision-making" (NYMEX Opp. Mem. at 12). Rather, it engaged in a thoughtful process in which NYMEX and other market participants were heavily involved, *see, e.g.*, 58 Fed. Reg. 54,966, 54,967, 54,972 (Oct. 25, 1993) (noting that the Commission received nine written comments on its proposed 1993 amendment to Regulation 1.59, including a letter from NYMEX regarding the definition of "material information"), and the resulting regulation was adopted by NYMEX in its own confidentiality policies restricting disclosure of the type of information at issue here (*see, e.g.*, Statement ¶ 56; CFTC Opp. Mem. at 13).

---

[7] Defendants' repeated plea to displace the Regulation 1.59 definition of "material information" with securities-fraud materiality concepts is ironic given arguments by CME Group's CEO in the context of the Commission's proposed Regulation 180.1 that "the precedent developed in the securities fraud context is *largely* inapplicable to CFTC-regulated markets due to key differences in . . . market structures . . . [,] *i.e.*, types of market participants, applicable duties, [and] ***material information considerations***." Letter from Craig S. Donohue at 7 (Jan. 3, 2011), *available at* https://comments.cftc.gov/PublicComments/ViewComment.aspx?id=27269 (second emphasis added).

Third, Curtin argues (Curtin Opp. Mem. at 6-7) that the Regulation 1.59 definition of "material information" does not apply to Section 9(e)(1), relying on a misreading of *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1 (2004).  In *Yates*, a Department of Labor regulation, 29 C.F.R. § 2510.3-3, specified that a narrow definition of "employee" would be used for the purpose of determining whether a plan qualifies as an "employee benefit plan" under Title I of ERISA.  The *Yates* Court held that Regulation 2510.3-3's definition of "employee" for that limited purpose does not supersede the broad statutory definition of "employee" for the separate purpose of determining who is a "participant" of an employee benefit plan.  *See Yates*, 541 U.S. at 18-22.  Here, unlike in *Yates*, there is no statutory definition of "material information" that could override Regulation 1.59; the regulation and Section 9(e)(1) are entirely harmonious, and there is no reason to read the same "material information" differently in the two provisions[8] – a point acknowledged by Byrnes.[9]

Fourth, Defendants all argue that the information disclosed to Eibschutz was not "related to" customer positions.  (NYMEX Opp. Mem. at 13-15; Byrnes Opp. Mem. at 10; Curtin Opp. Mem. at 12-16.)  Defendants cite no legal authority for their cramped view of "relating to . . . positions," which is contrary to common sense, to the principle that remedial legislation is meant to be broadly construed, and to the regulatory history demonstrating the Commission's intent to aggressively police intentional wrongful disclosures of confidential information by SRO

---

[8] Indeed, in amending Regulation 1.59 to effectuate Section 214 of the Futures Trading Practices Act of 1992 ("FTPA") (codified as Section 9(e) of the Act), the Commission observed that "[a]lthough Congress was fully aware of the existence of Regulation 1.59 and of its scope when it adopted section 214 of the FTPA, the legislative record is devoid of any indication that Congress intended that the Commission delete the regulation or amend its definitions."  58 Fed. Reg. 54966, 54969 (Oct. 25, 1993).

[9] Byrnes has explained:  "CFTC Regulation 1.59(d) was promulgated pursuant to CEA Section 9(e).  For the purposes of this motion, the language of the two provisions is substantially identical.  Byrnes' arguments apply equally to the statute and the regulation."  (Mem. of Law. in Supp. of Def. William Byrnes' Mot. for Summ. J. at 4 n.5 (ECF No. 150).)

employees (*see* CFTC Mem. at 15-16; CFTC Opp. Mem. at 4-5).  As Curtin's purported expert

conceded, Curtin's disclosures described transactions that affected positions of the specifically

disclosed counterparties.  (*See* Pl.'s Resp. to Curtin's Rule 56.1 Statement, CFTC Resp. to Curtin

¶ 17 (ECF No. 172).)  It strains credulity to assert such information did not "relate to" positions.

Fifth, Byrnes and Curtin argue that witness testimony cited by the Commission does not

prove as a matter of law that a hypothetical reasonable trader would have actually been able to

make use of the information that Byrnes and Curtin disclosed to Eibschutz (*see* Byrnes Opp.

Mem. at 11-12; Curtin Opp. Mem. at 14-16), but this is beside the point.  There would indeed be

a genuine issue of fact as to materiality if, as Defendants argue, the Court were required to ignore

the second sentence of Rule 1.59(a)(5) and instead assess whether specific pieces of confidential

trade data would useful be to a reasonable commodities trader.  But, as the Commission has

demonstrated (CFTC Mem. at 13-17), that is not the inquiry that Section 9(e)(1) and Regulation

1.59 require.

### C.    Byrnes and Curtin Acted With Scienter.

Defendants do not dispute that CEA Section 9(e)(1) prohibited Byrnes and Curtin from

"willfully and knowingly" disclosing material non-public information "for any purpose

inconsistent with the performance of [their] official duties," 7 U.S.C. § 13(e)(1), nor do they

deny that Byrnes and Curtin knew that their conduct violated their duties as NYMEX employees.

They argue instead that Byrnes and Curtin lacked the required scienter to violate Section 9(e)(1)

and Regulation 1.59(d)(1)(ii) because they did not know the information they disclosed was

"material information" (NYMEX Opp. Mem. at 15-22; Byrnes Opp. Mem. at 4-6; Curtin Opp.

Mem. at 16-17).  Defendants are mistaken.

As a threshold matter, no scienter whatsoever – let alone knowledge of whether

information improperly disclosed was "material information" – is required for a violation of

Regulation 1.59(d)(1)(ii).[10]  NYMEX nevertheless contends that scienter as to materiality is somehow required by language contained in the Commission's 1986 version of Regulation 1.59 (pre-dating CEA Section 9(e)(1)) *that was deleted* by the Commission in its subsequent amendments to Regulation 1.59.  (NYMEX Opp. Mem. at 18-20.)  Even assuming that the Commission's informal subsequent statements that the revised regulation would be "similar in scope" to its prior version somehow maintained in effect the prior language, that would not support the inference that the statute requires scienter as to materiality.  The 1986 regulation prohibited disclosures by an SRO employee "where such employee *has or should have a reasonable expectation* that the information disclosed *may* assist" in trading commodities, 17 C.F.R. 1.59(b)(1) (1986) (emphases added) – a rule sounding in negligence, not scienter.  *Cf. SEC v. Obus*, 693 F.3d 276, 287-88 (2d Cir. 2012) (in Section 10(b) context, distinguishing scienter requirement that tippee "must know" that tipped information is material, from requirement that tippee merely "knows or should know" that the tipper breached a duty, noting that the latter resembles a negligence standard).[11]

Defendants' erroneous attempt to blindly import to Section 9(e)(1) the requirement from Section 10(b) case law, *e.g.*, *Obus*,[12] that a tipper possess scienter as to materiality (NYMEX

---

[10] NYMEX and Curtin mischaracterize the Commission's position as "conced[ing]" or "acknowledg[ing]" that knowing or reckless conduct is required for a violation of Regulation 1.59(d)(1)(ii).  (NYMEX Opp. Mem. at 15-16; Curtin Opp. Mem. at 16.)  In fact, the Commission merely noted the agency's stated intention to use its discretion not to "seek to enforce the rule in cases of negligent or inadvertent conduct."  (CFTC Mem. at 17.)  Since there is no doubt here that Byrnes and Curtin's disclosures were intentional rather than accidental, enforcement of the regulation against Defendants is entirely consistent with the cited agency guidance.

[11] Nor does NYMEX's observation that the "has or should have a reasonable expectation" language remains in the portion of Regulation 1.59 concerning minimum standards for SRO rules (NYMEX Opp. Mem. at 20-21) support its argument.  The very fact that the Commission maintains such a standard in a separate provision of the same rule indicates, if anything, that it acted deliberately in omitting such language from Regulation 1.59(d)(1)(ii).

[12] Moreover, even applying securities law would not enable Defendants to avoid summary judgment on the issue of scienter, because as a matter of law Byrnes and Curtin acted with reckless disregard to the material nature of the information they were disclosing.  *See Obus*, 693 F.3d at 286 ("First, the tipper must tip deliberately or recklessly, not through negligence.  Second, the tipper must know that the information that is the subject of the tip is non-public

Opp. Mem. at 17-18; Curtin Opp. Mem. at 16-17; Byrnes Opp. Mem. at 4-6) is particularly

inappropriate given CME Group's own recognition that considerations of materiality in the

securities and commodities markets are distinct (*see supra* p. 7 n.7; CFTC Opp. Mem. at 8 n.3).

Whatever the scienter requirement might be for a hypothetical criminal prosecution under

Section 9(e)(1), there is no indication that Congress intended, in the civil enforcement context, to

require the Commission to prove that a board of trade employee who intentionally transmitted

confidential trade data to another person in knowing violation of his duties as an employee,

knowing that the information was confidential to his employer's customers and useful to the

unauthorized recipient, *additionally* knew that the reason for the misappropriated information's

utility was that it met the legal criteria to qualify as "material information."[13]  Such a

requirement would be at odds with Section 9(e)(1)'s applicability to *all* board of trade

employees, including those without specialized commodities industry experience (unlike Byrnes

and Curtin) who might not be in a position to grasp the nature of the stolen information they are

disclosing.  Elsewhere in the CEA, when Congress sought to proscribe disclosures of material

nonpublic information only where the disclosing person had scienter as to why the information

---

and is material for securities trading purposes *or act with reckless disregard of the nature of the information*.  Third, the tipper must know (or be reckless in not knowing) that to disseminate the information would violate a fiduciary duty.  While the tipper need not have specific knowledge of the legal nature of a breach of fiduciary duty, he must understand that tipping the information would be violating a confidence.") (emphasis supplied)  Byrnes and Curtin were sophisticated industry veterans with years of experience who understood the substance of the information they were deliberately and repeatedly disclosing to Eibschutz, and admitted that they understood that they were violating NYMEX policy by doing so.  (*See* CFTC Mem. at 18-19.)

[13] In *United States v. Valencia*, 394 F.3d 352 (5th Cir. 2004), on which NYMEX relies (NYMEX Opp. Mem. at 17), the court rejected a criminal defendant's facial overbreadth challenge to CEA Section 9(a)(2), construing the provision making it a felony "knowingly to deliver or cause to be delivered . . . false or misleading . . . reports" to require scienter as to the false or misleading nature of the reports, so as to "avoid[] criminalizing innocent conduct," 394 F.3d at 355-56; *see id.* at 356 ("The presumption in favor of scienter requires a court to read into a statute only that *mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct.") (internal quotation marks omitted).  Here, by contrast, the requirement that a defendant willfully and knowingly act inconsistently with his official duties ensures that "innocent conduct" could not be the basis for a violation of Section 9(e)(1), and Byrnes and Curtin do not in any way suggest that their disclosures were an "innocent" mistake.

might be useful to another for purposes of trading derivatives, it expressly forbid conduct only if accompanied by specific intent. *See* 7 U.S.C. § 6c(a)(4)(A) (prohibiting federal employees "to impart [nonpublic] information . . . *with intent to assist another person*, directly or indirectly, to use the information to enter into, or offer to enter into" commodity futures, options or swap transactions (emphasis added)). Here, Section 9(e)(1) simply makes it unlawful for NYMEX employees to knowingly and willfully disclose "for any purpose" inconsistent with the performance of their official duties, and does not connect scienter with materiality.

Even assuming that Section 9(e)(1) requires scienter as to whether information disclosed was "material information," there would only be a genuine factual dispute about whether Byrnes and Curtin had that scienter if Defendants were correct about what "material information" means. As discussed above (*see supra* Point I.B), the information disclosed by Byrnes and Curtin was "material information" as a matter of law because it related to positions of NYMEX customers. Defendants do not deny that Byrnes and Curtin understood the nature of the information they were disclosing: they knew that it was trade data relating to customer positions. Indeed, their argument rests on the flawed assumption that information about a market participant's trading activity can only "relate to" positions or assist a reasonable trader if it discloses a market participant's entire, net, or aggregate position. (*See* CFTC Opp. Mem. at 8-9.)

Lastly, Curtin alone appears to argue also that there is an issue of fact about his state of mind as to the *nonpublic* nature of the information he disclosed, asserting in conclusory fashion that "the Division has failed to offer any evidence whatsoever" on the issue of "whether Curtin knew or was reckless in not knowing that the disclosed information was . . . nonpublic." (Curtin Opp. Mem. at 17.) However, Curtin admitted that he knew that information about the identity of counterparties was not publicly available on ClearPort. (*See* CFTC Mem. at 11 (citing Statement

¶¶ 99-101).)  For the reasons explained above (*see supra* Point I.A), Curtin is wrong on the

underlying question of whether the information he disclosed was actually nonpublic (as a matter

of law, it was – as the other Defendants do not dispute), and based on the record evidence cited

in the Commission's opening brief (CFTC Mem. at 19 (citing Statement ¶¶ 24, 26, 80-88,

91-92)), no reasonable juror could find that Curtin lacked knowledge of the information's

nonpublic nature.

## II.     THE UNDISPUTED FACTS ESTABLISH THAT EIBSCHUTZ IS LIABLE FOR AIDING AND ABETTING BYRNES AND CURTIN'S VIOLATIONS.

In its motion for partial summary judgment, the Commission demonstrated that as a

matter of law, given the record evidence cited in its statement of material facts, Eibschutz

associated himself with Byrnes and Curtin's misconduct, participated in it as something that he

wished to bring about, and sought by his actions to make it succeed.  (CFTC Mem. at 19-20

(citing Statement ¶¶ 139-154).)  As Eibschutz has not submitted a Rule 56.1(b) statement

controverting the facts set forth in the Commission's Statement (or any other papers opposing the

Commission's motion), all of the facts set forth in the Statement should be deemed to be

admitted for purposes of the motion against Eibschutz, *see* Local Civil R. 56.1(c), and partial

summary judgment should be entered against him.

## III.    THE UNDISPUTED FACTS ESTABLISH THAT NYMEX IS VICARIOUSLY LIABLE FOR BYRNES AND CURTIN'S VIOLATIONS.

In its opening brief, the Commission set forth undisputed material facts demonstrating

that Byrnes and Curtin acted within the scope of their employment by illegally disclosing

material nonpublic information (1) openly and regularly while performing the types of duties

they were employed by NYMEX to do, (2) while engaging in a course of conduct subject to

NYMEX's control, and (3) while motivated, at least in part, to serve a purpose of or confer a

benefit on NYMEX.  (*See* CFTC Mem. at 23-28.)  In addition to its unpersuasive arguments on

13

the first two of these issues, NYMEX suggests that this Court should focus narrowly on a few snippets of testimony and admissions made by Byrnes and Curtin that supposedly encapsulate all of their subjective views and motives, to the exclusion of the direct and circumstantial evidence identified by the Commission.  That is not the correct lens through which to assess the Commission's motion, and NYMEX's arguments are insufficient to defeat summary judgment.

Although NYMEX concedes that, to resolve the scope of employment issue, the Court must analyze the facts under the totality of the circumstances (NYMEX Opp. Mem. at 24), NYMEX suggests that this analysis requires consideration only of testimony and admissions made by Byrnes and Curtin as to their subjective intent.  A "totality of the circumstances" analysis, however, requires one to consider all of the facts and circumstances and then draw a conclusion based on the whole picture.  Moreover, although NYMEX maintains that the inquiry should only consider Byrnes and Curtin's own views of their subjective motivation (rather than looking at all of the evidence objectively), it cites no cases standing for such a proposition.

This Court has already held that NYMEX may be found liable where Byrnes and Curtin acted to serve *any* purpose of NYMEX.  *See CFTC v. Byrnes*, 58 F. Supp. 3d 319, 327-28 (S.D.N.Y. 2014).  The Commission therefore submits that if the facts demonstrate that Byrnes and Curtin had multiple or mixed motives, NYMEX should be found liable if Byrnes or Curtin acted, at least in part, to serve some purpose of NYMEX.  The Commission has shown just that, including by establishing as undisputed most of the facts that this Court already concluded (in denying NYMEX's motion to dismiss) could provide a sufficient basis from which to infer that Byrnes and Curtin acted within the scope of their employment.  (CFTC Mem. at 23.)  As discussed below, NYMEX's arguments to the contrary are unavailing.

14

### A.   Byrnes and Curtin Acted Within Their Customary Range of Responsibilities.

NYMEX does not dispute the facts identified by the Commission that establish that

Byrnes and Curtin made the improper disclosures openly and regularly, during the course of

performing the types of duties they were employed to do.  (*See* CFTC Mem. at 23-24.)  Instead,

NYMEX suggests that Byrnes and Curtin acted outside of the "customary range" of their job

responsibilities because providing customers with details of other customers' trades was not

specifically considered one of their job responsibilities, was prohibited by NYMEX policy, and

was inconsistent with their official duties.  (NYMEX Opp. Mem. at 28-29.)  NYMEX's

argument fails because it approaches the issue of job duties at the wrong level of generality.

When considering an employee's customary range of employment activity, the relevant inquiry

is into the relationship between the misconduct and the *kind* of acts an employee was employed

to do.  There is no requirement that the specific acts of misconduct be authorized by the

employer, and the misconduct may even be prohibited by the employer.  *See Lipkin v. SEC*, 468

F. Supp. 2d 614, 623 (S.D.N.Y. 2006) ("An employee's act is within the scope of employment if

the act was done while the servant was doing his master's work, no matter how irregularly, or

with what disregard of instruction.") (internal quotation marks omitted).

Here, NYMEX does not dispute that Byrnes and Curtin's work at NYMEX included

answering questions from NYMEX customers about trades via NYMEX telephone lines while in

possession of confidential trade information.  (*See* NYMEX's Resp. to Pl.'s Rule 56.1 Statement

("NYMEX 56.1 Resp.") ¶¶ 21, 25, 108-131, 156, 159-162 (ECF No. 173).)  And Byrnes and

Curtin's misconduct involved precisely this:  answering questions from Eibschutz, a NYMEX

customer, about trades via NYMEX telephone lines by providing confidential trade information

to which NYMEX entrusted Byrnes and Curtin with access.  Thus, Byrnes and Curtin were

undoubtedly engaging in the *kind* of conduct they were employed to do when making the illegal

disclosures.   (*See* CFTC Mem. at 24.)  NYMEX relies on *Moss v. Morgan Stanley Inc.*, 553 F.

Supp. 1347 (S.D.N.Y.), *aff'd*, 719 F.2d 5 (2d Cir. 1983), but in *Moss* the "usual responsibilities"

of a mergers and acquisitions employee, which involved "the analysis of potential targets and the

structuring of deals," were not of "the same general nature or at all similar" to the conduct in the

alleged insider trading scheme involving the purchase and sale of securities, 553 F. Supp. at

1356-57.  This is not the case here, where NYMEX concedes that Byrnes and Curtin's duties

involved answering customer inquiries about their NYMEX ClearPort trades (NYMEX Opp.

Mem. at 29), and the misconduct involved disclosing confidential trade information.  *See Byrnes*,

58 F. Supp. 3d at 328-29 (distinguishing *Moss* on very similar grounds).

Moreover, there is no genuine dispute that the illegal disclosures occurred openly and

regularly, during regular business hours, on NYMEX recorded lines, by multiple NYMEX

employees, for a prolonged period of time.  (*See* NYMEX 56.1 Resp. ¶¶ 90, 163 (undisputed that

NYMEX employee Manny Garcia disclosed confidential trade information to Eibschutz); *id.*

¶¶ 108-131; *id.* ¶ 164 (undisputed that an additional NYMEX employee disclosed confidential

trade information to a person other than Eibschutz); *id.* ¶¶ 171-172.)  NYMEX's claim that one

only need review "a single transcript of a call" between Byrnes or Curtin and Eibschutz to

determine that it was not the type of discussion Byrnes and Curtin were employed to have

(NYMEX Opp. Mem. at 29) therefore rings hollow.  The corporate policies and official duties

that NYMEX points to simply do not negate the reality that Byrnes and Curtin were doing the

very types of things they were employed to do when they made the illegal disclosures.

## B.   Byrnes and Curtin Acted Subject to NYMEX's Control.

NYMEX also argues that Byrnes and Curtin did not act subject to NYMEX's control.

This is baseless.  Aside from the absurd implication that NYMEX did not have actual control

over its own employees' use of NYMEX telephone lines during regular business hours to speak

to NYMEX customers about trade information, the issue is whether Byrnes and Curtin engaged in a course of conduct *subject to* NYMEX's control.  *See* Restatement (Third) of Agency § 7.07(2) (2006).  Issuing and enforcing policies, providing instruction to and supervising employees, and investigating and disciplining employees for misconduct are all indicia of an employer's control.  And NYMEX does not dispute key facts identified by the Commission that demonstrate NYMEX's control over the specific acts of misconduct in which Byrnes and Curtin were engaged.  (*See* CFTC Mem. at 24-26.)

NYMEX does not dispute:  (1) that it had a policy addressing the handling of confidential information (NYMEX 56.1 Resp. ¶ 73); and (2) that it regulated access to ClearPort trade information, specifically giving Byrnes and Curtin access while restricting the access of other employees (*id.* ¶¶ 64-65, 70, 191).  Moreover, NYMEX does not dispute other facts indicating that it had the ability to exert control over this misconduct, but failed to do so:  (1) that Byrnes and Curtin were not the only employees who disclosed confidential trade information (*id.* ¶¶ 90, 163-164); (2) that NYMEX's cursory investigation of the 2009 complaint about "Billy" consisted of reviewing a single day's worth of Byrnes' communications and speaking to the complainant (*id.* ¶¶ 187-189); and (3) that NYMEX never even confronted Byrnes about the 2009 complaint (*id.* ¶ 190).  These undisputed facts demonstrate NYMEX's ability to control Byrnes and Curtin's entirely foreseeable specific acts of misconduct.

### C.    Byrnes and Curtin Acted, At Least in Part, To Serve a Purpose of NYMEX.

In addition to the undisputed evidence that Byrnes and Curtin made the illegal disclosures openly and regularly while performing the types of duties they were employed by NYMEX to do, and while engaging in a course of conduct subject to NYMEX's control, the Commission has also identified undisputed evidence that Byrnes and Curtin were motivated, at least in part, to serve a purpose of or confer a benefit on NYMEX.  Under the totality of the circumstances, these

17

facts establish that, as a matter of law, Byrnes and Curtin acted within the scope of their employment when they made the illegal disclosures.

As to Byrnes, none of the facts raised by NYMEX that supposedly demonstrate Byrnes' subjective intent negate another NYMEX-related purpose behind Byrnes' disclosures.  For example, Byrnes' statements that he disclosed trade information to Eibschutz to help out a friend or to help Eibschutz (a NYMEX customer) build his book of business (*see* NYMEX Opp. Mem. at 25) must be read in conjunction with Byrnes' pre-litigation statement that he thought he "was supposed to help the customers and the brokers with questions that they had" as part of his job (CFTC Mem. at 26).  Nor does Byrnes' "admission" (procured by NYMEX in this litigation after Byrnes had given extensive sworn testimony) regarding whether Byrnes sought to "benefit" NYMEX (*see* NYMEX Opp. Mem. at 25 n.4) contradict Byrnes' prior statement about helping customers and brokers, or raise a genuine dispute as to whether Byrnes was engaged in a course of conduct intended in part to serve a purpose of NYMEX.[14]  *See Byrnes*, 58 F. Supp. 3d at 327 n.8 ("The Employees' actions need not have had the ultimate effect of benefitting NYMEX to have been within the scope of their employment.").

NYMEX also points to evidence that Byrnes knew his conduct went against NYMEX policy and that Byrnes knew that he could be fired for making the illegal disclosures.  (*See* NYMEX Opp. Mem. at 25.)  But this Court has already held that it may still be inferred based on Byrnes' conduct that he thought he was advancing a NYMEX purpose.  *See Byrnes*, 58 F. Supp.

---

[14] This Court should reject NYMEX's invitation to permit an employer to escape respondeat superior liability simply by procuring a former employee's response to a contrived request for admission.  NYMEX's suggestion that an employee's rote denial of any desire to benefit his employer should conclusively immunize the employer would fly in the face of the policy behind respondeat superior liability, which is to encourage employers to prevent torts by their employees.  (*See* CFTC Mem. at 28.)  If representations such as Byrnes and Curtin's admissions requested by NYMEX could absolve an employer from liability, as NYMEX suggests, employers might seek to avoid vicarious liability by seeking such representations from departing employees as a matter of course.

3d at 329.  Moreover, there is room for doubt over how concerned Byrnes could have been about breaking NYMEX policy or getting fired for making the illegal disclosures given that he was able to engage in these conversations with Eibschutz so often and for so long without any sanction by NYMEX.  This is particularly so given that he was considered a "star employee" at the time (NYMEX Opp. Mem. at 31) and was in fact promoted for his good work (CFTC Mem. at 23) – facts that NYMEX does not dispute.  Finally, NYMEX points to Byrnes' purported silence during his termination by NYMEX as evidence that Byrnes did not think he was helping NYMEX by making the disclosures (NYMEX Opp. Mem. at 25), but this silence does not contradict that Byrnes acted at least in part to serve a purpose of NYMEX.

As to Curtin, NYMEX raises only:  (1) Curtin's "admission"; (2) Curtin's testimony providing speculative and noncommittal explanations for his conduct; and (3) testimony that Curtin knew his disclosures violated NYMEX policy and that he was putting NYMEX and his co-workers "in a bad position."  (NYMEX Opp. Mem. at 25-27.)  None of these facts rule out a NYMEX purpose behind Curtin's disclosures.  In the absence of direct evidence regarding what was in Curtin's mind at the time of the disclosures – indeed, he has testified that he does not know why he made the disclosures – his subjective motive or intent may be established through circumstantial evidence.  Here, undisputed evidence compels the conclusion that Curtin thought he was, at least in part, serving some interest of NYMEX.  (*See, e.g.*, NYMEX 56.1 Resp. ¶ 160 (undisputed that Curtin's job included responding to customer inquiries, providing information to customers, and problem solving in connection with the ClearPort system, while in possession of confidential trade information); *id.* ¶ 172 (undisputed that the disclosures were made on NYMEX recorded lines that Curtin knew were recorded); *id.* ¶¶ 170, 183-85 (undisputed that Curtin's 2007 NYMEX self-evaluation goal was to "continue to grow facilitation desk knowledge base

and increase the business," even if he had no responsibility for doing so, and that Curtin was involved in part of the process for the creation of a fee schedule that Curtin estimated brought in roughly $200,000 a month in fees for NYMEX).)

In sum, none of the facts cited by NYMEX create a genuine dispute of material fact over whether Byrnes and Curtin acted within the scope of their employment.  Given the evidence cited by the Commission that remains uncontroverted, the Court should find that NYMEX is vicariously liable for Byrnes and Curtin's violations under Section 2(a)(1)(B).

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court grant Plaintiff's motion for partial summary judgment with respect to the 68 violative disclosures discussed herein, and allow post-liability briefing to determine the scope of relief to be imposed, including but not limited to entry of a permanent injunction, imposition of civil monetary penalties, and such other and further relief as the Court deems appropriate.

Dated: New York, New York
      April 20, 2017

Respectfully submitted,
U.S. COMMODITY FUTURES TRADING
COMMISSION

By:___ s/ Patryk J. Chudy_____

Patryk J. Chudy
David W. MacGregor (admitted *pro hac vice*)
Patrick Daly
Alejandra de Urioste
David C. Newman

Division of Enforcement
140 Broadway, 19th Floor
New York, New York 10005
Phone: (646) 746-9700
Fax: (646) 746-9939
